Douglas W. Dal Cielo (CA Bar No. 157109)
ddalcielo@bwslaw.com
Brian M. Affrunti (CA Bar No. 227072)
baffrunti@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
60 South Market Street, Suite 1000
San Jose, CA  95113
Telephone: (408) 606-6300
Fax: (408) 606-6333

Patricia L. Peden (CA Bar No. 206440)
ppeden@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Telephone: (510) 273-8780
Fax: (510) 839-9104

Alexander D. Pencu (*pro hac vice*)
adp@msf-law.com
Christopher J. Major (*pro hac vice*)
cjm@msf-law.com
Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com
**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYNWOOD INVESTMENTS CY LIMITED,<br><br>Plaintiff,<br><br>vs.<br><br>MAXIM KONOVALOV, IGOR SYSOEV, ANDREY ALEXEEV, MAXIM DOUNIN, GLEB SMIRNOFF, ANGUS ROBERTSON, NGINX, INC. (BVI), NGINX SOFTWARE, INC., NGINX, INC. (DE), BV NGINX, LLC, RUNA CAPITAL, INC., EVENTURE CAPITAL PARTNERS II LLC and F5 NETWORKS, INC.,<br><br>Defendants. | Case No. 20-CV-03778-LHK<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1

**AMENDED COMPLAINT**

2

Plaintiff Lynwood Investments CY Limited ("Lynwood" or "Plaintiff"), as the assignee of

3

Rambler Internet Holding LLC and its affiliates, brings this action against Defendants, and, as and

4

for its Amended Complaint, hereby alleges as follows:

5

**INTRODUCTION**

6

1.      Defendants Igor Sysoev and Maxim Konovalov, along with their co-conspirators,

7

brazenly stole an entire popular web server enterprise from their employer Rambler Internet Holding

8

LLC ("Rambler") in Russia, where the computer software, known as NGINX (pronounced "Engine-

9

X"), was conceived, developed as a work for hire, and first publicly deployed.

10

2.      The conspirators achieved the object of their conspiracy when they ultimately sold

11

the purloined NGINX-based enterprise in 2019 for $670 million to Defendant F5 Networks, Inc.

12

("F5"), a publicly traded United States company with annual revenue of approximately $2.35 billion.

13

3.      The conspirators, former high-level officers and employees of Rambler, the company

14

that developed and deployed the web server technology in Russia, planned to seek, and specifically

15

sought out, Silicon Valley to monetize their theft because they rightly assumed a large and profitable

16

United States technology company would bid a high price.

17

4.      The conspirators fraudulently concealed their conduct from their former employer

18

Rambler in a highly-coordinated manner, including by hiding the true utility and value of the NGINX

19

software and associated business opportunities that they had developed while employed at Rambler.

20

5.      The conspirators covered up their scheme by, among other things, concealing NGINX

21

proprietary code Sysoev and the co-conspirators were developing at Rambler, being purposefully

22

opaque about their plans following their exit from Rambler, and deleting electronic communications

23

and stealing and destroying Rambler servers containing evidence of their unlawful conduct.

24

6.      The defendants in this action, including the co-conspirators, Runa Capital, Inc.

25

("Runa Capital"), EVenture Capital Partners II LLC, formerly known as BV Capital ("E. Ventures"),

26

and F5, which aided and abetted the conspiracy, all acted unlawfully and with knowledge of the

27

conspiracy detailed herein.

28

7.      Rambler and its assignee, Plaintiff Lynwood, which along with its affiliated companies formerly owned 50% of Rambler, having been alerted to the scheme detailed below by a whistleblower in April 2019, conducted an extensive investigation into the defendants' conduct.

8.      After learning of the scope and effect of the conspirators' unlawful scheme, Lynwood moved with all deliberate speed to investigate the conspirators' conduct and misdeeds.   The investigation was hampered by the conspirators' extensive concealment of their wrongful actions, including the deletion of emails and other materials from the Rambler computer network, and their unauthorized removal of computer servers from Rambler's premises that contained evidence of the conspirators' disloyal and illicit actions.

9.      The extensive investigation, which required forensic recovery of numerous smoking guns that the conspirators had gone to great lengths to attempt to hide and destroy, revealed that the conspirators engaged in a sophisticated conspiracy and cover-up to hijack an immensely valuable business enterprise based on their commercial exploitation of proprietary NGINX web server software developed while they were employees of Rambler, the demand for which is driven by NGINX software released to the public as "open source" code, which today is used by more than 450 million websites worldwide ("Open Source NGINX").

10.     The conspirators were well-placed in key positions at Rambler that enabled them to operate undetected at the company and to remove all traces of their activities when they departed from Rambler.   For example, the software programmer conspirators (including Defendant Igor Sysoev) worked together in a tight-knit department devoted to product development within Rambler known as the Network Operation Center ("NOC") that was ring-fenced from the rest of the company. The NOC department utilized its own servers, including for email communications, and those servers were not integrated with the rest of the company.   The gatekeepers responsible for providing oversight over the NOC department were Rambler's Chief Technology Officer Defendant Maxim Konovalov, Deputy Chief Technology Officer Viktor Popov and the Head of the NOC Department Defendant Gleb Smirnoff.

11.     The conspirators removed and destroyed key servers from the NOC department that exclusively housed NGINX proprietary commercial software code that Sysoev was developing unbeknownst to Rambler's board of directors and senior management (with the exception of Konovalov).  The conspirators also removed and wiped the NOC email server that they had used to communicate in furtherance of their common plan to clandestinely develop a business around Open Source NGINX, misappropriate it from Rambler and then sell it to a third-party U.S. technology company.

12.     Rambler's internal inventory records memorializing the location and purpose behind the company's servers and equipment were fabricated by Deputy Chief Technology Officer Popov and Smirnoff to conceal the conspirators' actions in removing and destroying key servers that contained the proprietary NGINX software code that was clandestinely developed by Sysoev.  The fabricated inventory documents also concealed the existence of the conspirators' NOC server hosting the conspirators' walled off emails.  As a result, no evidence of suspicious activity was found when Rambler performed a review of its records at the end of 2012 following the departures of Defendants Konovalov, Sysoev and Smirnoff from Rambler.

13.     It was only after one of the co-conspirators, Alexander Korotkov, came forward in 2019 and blew the whistle to Rambler and Lynwood concerning the conspirators' scheme, including how it was carried out and where to search in Rambler's facilities and warehouses that Rambler and Lynwood discovered the conspirators' actions.  Korotkov's disclosures prompted Rambler and Lynwood to perform an internal investigation, including an exhaustive and manual review of its approximately ten thousand (10,000) servers.  Ultimately, Rambler and Lynwood located an aging, non-descript server located in an offsite Rambler server farm that had been disconnected and had its data deleted.  This "off the grid" server was also in queue for dismantlement (the "Yam Server").

14.     After hiring a leading third-party forensic investigations firm to examine the Yam Server, Rambler and Lynwood discovered that it was a NOC server that the conspirators had commandeered for communicating between themselves and which had never been integrated with

Rambler's company-wide email systems.  Rambler was previously unaware of the existence of the Yam Server.

15.     In examining the Yam Server, the outside forensic investigations firm discovered that it contained a massive number of emails and other materials that the conspirators sought to hide and had previously deleted.  After the forensics firm restored those emails, code snippets and other electronic meta data found on the Yam Server, Rambler and Lynwood discovered that the conspirators, while they were employed by Rambler, had secretly developed proprietary, commercial versions of NGINX software code never previously disclosed to others at Rambler (let alone Rambler's board of directors or chief executive officer) and which were never released to the public as Open Source NGINX.  The conspirators referred to this secret proprietary NGINX software code as "NGINX+" or "NGINX Plus".

16.     Rambler was not aware of the existence of NGINX Plus, which  the conspirators were secretly developing inside of Rambler's NOC department, using Rambler resources.  To the contrary, Konovalov had repeatedly misrepresented to Rambler's senior management and board of directors that Open Source NGINX had no intrinsic value and that its only use for Rambler was to solve Rambler's internal technical issues surrounding the company's management and hosting of Russia's web traffic and to burnish Rambler's reputation as a worldwide leader in technology innovation.

17.     Konovalov repeatedly misrepresented to Rambler's senior management that Open Source NGINX had no independent commercial value or prospects for monetization.  Accordingly, Rambler only utilized Open Source NGINX that the company had directed Sysoev to develop; Rambler thought that Sysoev's NGINX development work was limited to successive iterations of Open Source NGINX that was being deployed internally at Rambler.

18.     In reality, however, the conspirators had decided, years before they left Rambler and unbeknownst to Rambler management, to pursue an "open core" business model, outside the confines of Rambler, with Open Source NGINX as its foundation.  That model would entail developing and monetizing proprietary, non-open source NGINX software products on top of the Open Source NGINX layer that could be licensed to the huge installed user base of Open Source

NGINX users around the world, in exchange for lucrative license and subscription fees and service-related fees.  NGINX Plus, the first of such fee-generating products, was clandestinely developed by Sysoev and his fellow conspirators while they were still employed by Rambler.

19.     The restored emails from the Yam Server also revealed that Defendants Sysoev and Maxim Konovalov had conspired with outside venture capital firms to misappropriate the "open core" NGINX business opportunity by raising capital, soliciting future customers and forming entities outside of Russia while they were still employees of Rambler.  The stated purpose of these newly formed entities, in covert presentations made to the venture firms by Konovalov, Sysoev and co-conspirator Defendant Andrey Alexeev in early 2011, while Konovalov and Sysoev were still employed by Rambler, was to lift out of Rambler and gain control of the misappropriated NGINX enterprise, grow it with the aid of private equity investments, and ultimately sell it to a large American technology company for hundreds of millions of dollars. In a slide deck for those presentations, a copy of which is attached as Exhibit A hereto, under the heading "Exit", Defendant F5 was specifically named as one of the companies the conspirators were targeting as a potential purchaser of the purloined NGINX-related business opportunities and enterprise, proprietary NGINX software (including NGINX Plus), Open Source NGINX, and related intellectual property and goodwill (collectively, the "NGINX Enterprise").  A copy of the slide identifying F5 as an "exit" target is below:

AMENDED COMPLAINT, Case No. 20-CV-03778-LHK

20.     The restored emails from the Yam Server also revealed that by early April, 2011, when Konovalov and Sysoev were still employed by Rambler, the conspirators had negotiated and finalized a term sheet for $3 million in Series A Preferred Stock Financing for their covertly formed company with United States-based venture capital firms.  Defendants BV Capital (now Defendant E. Ventures) and Defendant Runa Capital participated in that initial round of venture funding.

21.     The restored emails from the Yam Server also revealed extensive acts of concealment by co-conspirator Smirnoff and select Rambler employees throughout 2012 immediately after Sysoev and Konovalov left Rambler with the misappropriated NGINX Enterprise.  Smirnoff and other Rambler employee conspirators deleted all electronic information concerning the conspirators' actions, removed and destroyed at least seven servers containing NGINX-related software and related development documentation, and fabricated Rambler chain of custody and inventory forms that concealed the existence and removal of this equipment from Rambler to avoid future discovery by Rambler of their actions.

22.     Accordingly, Plaintiff files this action to vindicate its rights to the highly innovative and valuable NGINX Enterprise, including NGINX Plus and its progeny, and the business opportunities associated with it, and to recover the extensive and ongoing damages caused by the Defendants' unlawful conduct.

23.     The life of the popular web server software that has become known worldwide as Open Source NGINX began on October 23, 2001 when Sysoev wrote his first line of NGINX-related software code.  On this date, Sysoev had already been employed at Rambler for approximately one year and had signed his employment agreement with Rambler as a Systems Administrator three months earlier wherein he was tasked by the company with developing programs to solve Rambler-specific issues related to handling large volumes of web server traffic.

24.     Sysoev was a programming talent at Rambler and was compensated accordingly with frequent pay raises and outsized bonuses tied to his work on developing Open Source NGINX to solve Rambler's internal technical problems associated with hosting the high volume of Russia's web traffic.  Moreover, Sysoev was insulated from Rambler senior management and board oversight

by his co-conspirators Konovalov and Smirnoff who were his direct supervisors at Rambler.  As Rambler's Chief Technology Officer ("CTO"), Konovalov enabled Sysoev and the other conspirators to operate clandestinely within Rambler to develop the NGINX Enterprise on Rambler's dime, using Rambler equipment, infrastructure, resources and talent, while simultaneously closely guarding the software's technical and commercial development and value from discovery by Rambler's senior management.

25.     For the next 10 years, until the conspirators orchestrated their resignations from Rambler and stole the NGINX Enterprise that they had hidden and nurtured for themselves, Sysoev, who claims to have written ninety-seven (97) percent of Open Source NGINX himself during those years, did so during regular Rambler business hours at the Rambler office in Moscow, with extensive assistance from other Rambler employees, using Rambler equipment and software, and utilizing Rambler's large-scale Internet traffic and infrastructure as a convenient, no-cost software test bed.

26.     As Konovalov repeatedly confirmed in internal Rambler documents, Sysoev's official job at Rambler was to develop Open Source NGINX.  Indeed, in a Rambler organizational chart emailed by Konovalov on April 9, 2008, Sysoev was identified as a "Web-Servers Programmer" and "Development of nginx" was identified as of one of his duties.  Later, in an attachment to a Konovalov email dated April 22, 2009, Konovalov under the heading "Typical Tasks" for Sysoev identified "Nginx Development"; under the heading "Knowledge, experience and role in the team", Konovalov wrote "Lead developer"; in the same document, Konovalov identified Sysoev's "Responsibility" as "Product improvement".

27.     In carrying out their sophisticated conspiracy to steal the NGINX Enterprise, including NGINX Plus, the conspirators violated multiple duties to Rambler that are enumerated in their employment agreements, internal Rambler policies and codes of ethics, as well as applicable Russian law.

28.     Like Konovalov and the other former Rambler employees with whom Sysoev conspired, when arriving at Rambler, Sysoev signed employment agreements with Rambler that

explicitly provided that what he developed while employed at Rambler constituted works for hire that Rambler automatically owned, in all respects.

29.     Rambler was also fastidious in promulgating and maintaining internal employment policies, handbooks and a code of ethics when the conspirators were employed there which expressly provided that employee work product such as computer software and other technology would be owned by Rambler and which clearly stated that Rambler employees were obligated to maintain the strict confidentiality thereof.

30.     Rambler also maintained extensive conflict-of-interest policies during the tenures of Sysoev, Konovalov, Smirnoff and the other co-conspirators that explicitly restricted them from engaging in activities that could result in conflicts of interest with their employer Rambler.

31.     Additionally, Russian law in effect at the time that the conspirators were employed by Rambler conferred on Rambler ownership of work product generated by its employees and imposed duties of loyalty on all Rambler employees, including the conspirators.

32.     Sysoev, Konovalov, Smirnoff and their co-conspirators violated their obligations imposed by their Rambler employment and separation agreements, Rambler's written code of ethics, employment policies and handbooks, conflict-of-interest policies that they received, reviewed and acknowledged in writing, and applicable Russian law that protected Rambler's intellectual property rights and imposed duties of loyalty on the co-conspirators.

33.     Instead of complying with their legal obligations to Rambler, Sysoev, Konovalov, Smirnoff and the other conspirators saw a huge financial opportunity in the NGINX Enterprise and related business opportunities, and rather than inform Rambler of it, they executed a covert scheme to misappropriate it for themselves.

34.     After Sysoev first publicly released what became Open Source NGINX in 2004, without authorization from Rambler, it quickly surged in popularity among operators of large Web sites in Russia and soon, around the world.

35.     While Sysoev had released Open Source NGINX under a simple "BSD-style" open source license for the world to use, the conspirators, with Konovalov at the helm after his arrival at

Rambler in 2008 as CTO, soon identified the potentially lucrative NGINX Enterprise, which they decided to exploit for themselves, rather than for the benefit of Rambler.

36.     Cognizant of their multi-layered legal obligations to Rambler and Rambler's ownership rights to the NGINX Enterprise, secrecy was paramount; and Sysoev, Konovalov, Smirnoff and the other co-conspirators at Rambler were in a perfect position to achieve it.  Together, with Konovalov as CTO, they were able to freely operate below the radar and without drawing scrutiny from Rambler management.  Indeed, the conspirators were able to carry out their scheme without Rambler's knowledge by virtue of Konovalov's high-level position as CTO, which he used to conceal from Rambler the true extent of Sysoev's software development at Rambler and the related business opportunities that resulted therefrom.

37.     The conspirators' vision of the NGNIX Enterprise was simple and elegant: They would draw on the growing momentum and popularity of Open Source NGINX among operators of large commercial Web sites around the world by developing, licensing and servicing proprietary, fee-based software, in executable form only, to provide paying customers, with enhanced functionality that did not exist in Open Source NGINX.

38.     It was the perfect plan.  No one in the world knew more about Open Source NGINX than Sysoev, its principal architect and coder.  He had become the NGINX guru and a worldwide technology celebrity, all at Rambler's expense.  He and his conspirators had free reign to determine what would be in the next public release of Open Source NGINX, and, more importantly, what new improvements and features, such as those contained in NGINX Plus, could be held back and released only as executable code to paying customers.  Once released, no one but Sysoev and his conspirators would have the source code for those proprietary extensions and be able to effectively charge service fees, on top of license and/or subscription fees, to implement, debug and maintain them.

39.     In short, Open Source NGINX was the razor, and proprietary NGINX extensions and add-ons such as NGINX Plus and derivatives thereof were the razor blades.  The conspirators fully recognized that the value was in the blades and orchestrated a scheme to monetize the business of selling blades for themselves.

40.     By 2008, Konovalov had arrived at Rambler and as CTO oversaw the company's entire technological product development.   Konovalov recognized the potential for the NGINX Enterprise, and convinced Sysoev that they could enrich themselves by stealing it from Rambler and selling it to a large American technology company.

41.     As the popularity of Open Source NGINX surged, the conspirators were able to surreptitiously attract venture capital investors to help them launch the NGINX Enterprise away from Rambler for their own enrichment.

42.     With Sysoev's focus on the software, and Konovalov taking point with potential investors (while simultaneously misrepresenting to Rambler senior management that the company's NGINX-related assets were worthless), the scheme could not fail.

43.     By early 2010, nearly two years before Sysoev exited Rambler, execution of the conspirators' covert scheme was well underway, under the protective cover of Konovalov and his tightknit circle of senior team leaders within Rambler's NOC – the department where Sysoev and most of the conspirators were employed.

44.     By February 2010, the conspirators started to move on a key part of the plan that they referred to as "NGINX Plus," sometimes referred to in the early days as "NGINX+."  NGINX Plus (or "NGINX+") is proprietary commercial software functioning as feature-rich extensions of Open Source NGINX that Sysoev had already begun quietly developing at Rambler, while employed by Rambler and using Rambler resources, without the company's knowledge.

45.     That is when Sysoev and Konovalov enlisted the help of the whistleblower in this case, Alexander Germanovich Korotkov ("Korotkov"), who had served as Rambler Director of Management Information Systems (the "CIO") from August 23, 2007 until June 29, 2009, and Dmitry Galperin ("Galperin"), Rambler's Director of Strategic Development from April 16, 2009 to August 17, 2010, to help lay the groundwork for misappropriating the NGINX Enterprise that was conceived and developed at Rambler for the conspirators' personal enrichment.

46.     Sysoev and Konovalov needed conspirators outside of Rambler to lay the groundwork for stealing the NGINX Enterprise.  They found their men in former Rambler employees Korotkov

and Galperin who served as intermediaries between the conspirators (all of whom were still employed at Rambler) and the venture capital community willing to finance a new company that would be anchored by the stolen NGINX Enterprise.  The object of the conspiracy was monetizing the misappropriated NGINX Enterprise by selling it to a large American technology company.

47.     In an effort to avoid leaving their fingerprints behind, Sysoev and Konovalov solicited Korotkov to join the conspiracy and directed him to start executing on their scheme by first registering the Internet domain name "NGINXPLUS.COM".

48.     While he had exited Rambler seven months earlier, Korotkov, who initially was part of the conspiracy until Sysoev and Konovalov snubbed him, tried to position himself as the lead deal maker of the group.  Korotkov had moved to Silicon Valley to work in the tech industry. There, he continued to assist Sysoev and Konovalov in their efforts to shop the NGINX Enterprise to Silicon Valley investors, both to finance the fledgling business and increase the financial exit reward down the road.  Of course, Rambler could have incubated the NGINX Enterprise if only the conspirators had informed Rambler of its existence.  But the conspirators wanted to steal the NGINX Enterprise and sell it themselves to a large American technology company.

49.     Korotkov assisted the conspirators in promoting the NGINX Plus-based model to select venture capital investors.  He also developed and populated a Web site, NGINXPLUS.COM, which promoted "NGINX+" (the "Korotkov Site").  A snapshot of the Korotkov Site which he submitted to the United States Patent and Trademark Office ("USPTO") in support of a trademark application for the NGINX trademark filed on March 16, 2011 – shortly before Konovalov left Rambler and nine months before Sysoev exited the company – reveals that the conspirators were already carrying out their plan to monetize NGINX Plus.  A copy of the Korotkov Site submitted to the USPTO in support of his trademark application is below:



50.     The Korotkov Site shows that it was located at Internet URL nginxplus.com.   In addition, it prominently displayed the term "nginx+".  Further, the page from the Korotkov Site shows that the group had already included a category called "Pricing" on the site.

51.     The Korotkov Site also revealed, in bold letters, that there were already 12,547 "ACTIVE APPLICATIONS" of "nginx+" "DEPLOYED," which were "[r]unning on the Nginx Hosted Platform."

52.     In his trademark application, Korotkov included a statement that the NGINX trademark had been *first used on February 1, 2010*, and *first used in commerce March 1, 2011*, even though Sysoev and Konovalov were still Rambler employees at those times and that Open Source NGINX was being deployed within Rambler.

53.     Additionally, Korotkov included in his identification of goods and services for the NGINX trademark the following identification of services in International Class 42: "Computer services, namely, providing virtual and non virtual application servers, web servers, file servers, co-location servers, load balancing servers, redundancy servers, media servers and database servers of variable capacity to third party computing and data storage facilities; Platform as a service (PAAS) featuring computer software platforms for web applications, web server applications, web server

frameworks, cloud computing; Software as a service (SAAS) services featuring software in the field of web applications, web server applications, web server frameworks, cloud computing."

54.     In other words, according to Korotkov's own sworn statements to the USPTO, as early as February 1, 2010, and by no later than March 1, 2011, the conspirators had already kicked off their new NGINX Plus business based on a fee-based license or subscription model that had already deployed at least 12,547 active applications without informing Rambler, the true owner of the NGINX Enterprise.

55.     Korotkov's identification of goods and services and the information contained in the Korotkov Site go well beyond the purported model that Sysoev was using for Open Source NGINX that consisted merely of posting on the Internet and maintaining a library of Open Source NGINX for download by third parties pursuant to a two-paragraph open source BSD-type license.

56.     In reality, the conspirators' seemingly innocuous handling of Open Source NGINX while they were still employed by Rambler was merely a smokescreen to camouflage the fledgling business they had already quietly built around their "open core" strategy and NGINX Plus, as confirmed in a videotaped interview given by Konovalov in November 2019 during a GoTech 19 conference in Moscow, six months after the F5 merger.  As Rambler and Lynwood would discover only in late 2019 and early 2020, and as confirmed in the 2019 Konovalov interview, Sysoev and the conspirators were hard at work conceiving and developing NGINX Plus product offerings well before they departed Rambler in 2011.

57.     In the interview, available at https://www.youtube.com/watch?v=X6SXe1SPu-8, a transcript of which is attached as Exhibit B hereto ("Konovolav Tr."), Konovalov stated: "In parallel, we – in 2011, we started to build commercial product, NGINX Plus, and started to sell it to enterprises and corporations." Konovalov Tr. at 8.

58.     Konovalov in his GoTech interview went on to acknowledge that he and his co-conspirators had discussed how to monetize Open Source NGINX since in or around 2009, adding, "So we spent a lot of time on talking and discussing and yeah." Konovalov Tr. at 17. Konovalov stated further:

As I said previously, NGINX customer base -- it's not really customers but user base because it was an open-source and freeware project.  So we can talk about users, not customers.  So but anyway, by 2011, like six or eight percent all internet use NGINX, and it was -- it became crystal clear that there were some business opportunities.  And three of us came together, Igor, myself and one -- we had a sort of co-founder -- and started to talk about that.  And at some point we decided, okay, let's try.  Let's try and explore these opportunities.  And so that is how we decided to build a company and there are many -- there was a bunch of ideas of how to extract money from open-source and freeware product.  But we decided to take like an easy one probably.  We decided to explore the open core model.  Open core model is when you take an open-source software and build something paid like commercial software on top.  And this is what we have been doing since 2011.  No changes surprisingly in our strategy.  So we continue to develop NGINX open-source these days and continue to build a great open-source freeware software.    In parallel, we -- in 2011, we started to build commercial product, NGINX Plus, and started to sell it to enterprises and corporates.  So this is what we are doing today, yeah.

Konovalov Tr. at 7-8.

59.    Indeed, in the course of their respective investigations, Rambler and Lynwood discovered that the conspirators and Korotkov spent 2010 and 2011 not only registering domain names and filing a trademark application in an effort to position NGINX Plus product offerings as their own, but they also, as part of their clandestine "open core" strategy, formed their own business

entities and secured outside investors to launch the NGINX Enterprise for themselves by misappropriating it from Rambler where they had developed both Open Source NGINX and NGINX Plus as works made for hire using Rambler's resources.

60.     In August 2010, Galperin left Rambler's employment in furtherance of the conspiracy to approach targeted venture capital firms, including Defendant Runa Capital. Galperin solicited Runa Capital on behalf of Konovalov and Sysoev and disclosed their intentions and the object of the conspiracy (i.e., the misappropriation from Rambler and subsequent sale of the NGINX Enterprise to an American technology company).

61.     Runa Capital joined the conspiracy and, in furtherance of securing an opportunity to invest in the NGINX Enterprise and score a big exit pay day, hired Galperin directly in February 2011 explicitly for the purpose of encouraging and assisting Sysoev and Konovalov and coordinating with them to carry out the conspirators' common plan (i.e., the misappropriation and subsequent sale of the NGINX Enterprise).

62.     Runa Capital and Defendant E.Ventures, Silicon Valley venture capital firms, knew of Sysoev's and Konovalov's duties owed to Rambler and that Rambler maintained the ownership rights to Open Source NGINX, NGINX Plus and the NGINX Enterprise. Nevertheless, Runa Capital and E. Ventures assisted and encouraged Sysoev and Konovalov, while they were still employees at Rambler, to breach their duties to Rambler and to misappropriate the NGINX Enterprise for the benefit of the fledgling business that Sysoev and Konovalov were forming and that Runa Capital and E. Ventures intended on funding and ultimately did fund. All of the foregoing acts were undertaken by Sysoev, Konovalov, Runa Capital and E. Ventures in furtherance of the conspirators' common plan to ultimately achieve a large payday by selling the purloined NGINX Enterprise to a large American technology company, expressly including F5.

63.     The pre-separation work that Sysoev and the conspirators devoted to NGINX Plus specifically, and to the NGINX Enterprise more generally, while still employed at Rambler, enabled the conspirators to quickly roll out and license to paying customers commercial NGINX Plus products through their newly formed company, defendant NGINX, Inc. ("NGINX BVI"), officially

in August of 2013, only 21 months after Sysoev departed from Rambler.  In fact, Konovalov stated in his 2019 GoTech interview that the conspirators actually began quietly commercializing an earlier version of NGNIX Plus as early as 2011, the same year that Konovalov and Sysoev both exited Rambler.

64.     Unbeknownst to Rambler and Lynwood, from 2013 to 2019, when NGINX BVI merged with Defendant F5, NGINX Plus was the primary driver of revenue for the company and the reason that the company raised approximately $100 million in venture funding.  In short, NGINX Plus was the crown jewel of the NGINX Enterprise.  But for the conspirators' breaches of their contractual and fiduciary duties as officers and employees of Rambler and their subsequent concealment of same, NGINX Plus and the NGINX Enterprise would have remained at Rambler as works made for hire and Rambler would have enjoyed the fruits of its investments.

65.     NGINX Plus was also one the primary drivers of the F5 merger.  In its 10K filing for 2019 following the merger, F5 touted the NGINX acquisition, stating: "Under the NGINX brand we offer: NGINX Plus, an all-in-one load balancer, web server, content cache, and API gateway for modern applications. NGINX Controller, which provides centralized monitoring and management for NGINX Plus."

66.     F5 has continued to aggressively market and sell NGINX Plus, including under a paid subscription model, in the two years since the merger.  F5's message to the software world is stated very simply on its website: "If You Like NGINX, You'll Love NGINX Plus."

67.     F5's website also states: "NGINX Plus is a software load balancer, web server, and content cache built on top of open source NGINX. NGINX Plus has exclusive enterprise-grade features beyond what's available in the open source offering, including session persistence, configuration via API, and active health checks.  Use NGINX Plus instead of your hardware load balancer and get the freedom to innovate without being constrained by infrastructure."

68.     F5 conducted extensive due diligence in early 2019 in connection with the NGINX, Inc. merger, as confirmed by Konovalov in his GoTech interview in which he confirmed having spoken with "dozens" of employees of F5 during the due diligence process.  Konovalov Tr. at 16.

This due diligence included a review and analysis of NGINX Plus and Open Source NGINX, along with Sysoev's employment agreements with Rambler, which revealed that Open Source NGINX and NGINX Plus were written during the term of Sysoev's employment at Rambler.

69.     F5 gained actual knowledge prior to the consummation of the merger that the conspirators had stolen the NGINX Enterprise from Rambler, including such assets as NGINX Plus and Open Source NGINX.  For example, in its own filings with the United States Patent and Trademark Office following the merger, F5 recognized and confirmed that use by the conspirators of the NGINX trademark in commerce, including in connection with the software-as-a-service-type model that Korotkov had revealed in his previous trademark application, had predated the conspirators' departure from Rambler.

70.     F5 took over a trademark application from NGINX BVI for the NGINX trademark originally filed on June 14, 2017 by having F5's legal counsel file a Statement of Use which claims that the first use of the NGINX trademark was in connection with not only server software, but also in connection with various commercial software-as-a-service offerings.

71.     In the Statement of Use, the F5 attorney swore that the first use of the NGINX trademark in connection with such goods and services took place on December 14, 2009, and that the first use in commerce took place on April 12, 2011.  These dates, which were generated out of whole cloth by the F5 attorney based on F5's own extensive diligence, not only closely align with the date of first use (February 1, 2010) and the date of first use in commerce (March 1, 2011) cited by Korotkov on his own trademark application on behalf of the conspirators, but also clearly demonstrate that F5 knew that NGINX Plus was developed by the conspirators while employed at Rambler and in furtherance of the scope of their employment responsibilities.

72.     F5 proceeded with the merger despite such knowledge, in total disregard of how the conspirators had repeatedly violated Rambler's rights, resulting in vast damages to Rambler, and in turn, to Rambler's assignee Lynwood.

**THE PARTIES**

73.     Plaintiff Lynwood is a Cyprus limited company with a principal place of business located at Saifi, 1, Porto Bello, Floor 3, Flat 302 3042, Limassol, Cyprus.  Until January 2015, Lynwood was known as A&NN Holdings Limited.

74.     Lynwood is prosecuting this action in its capacity as assignee of all rights and interests of Rambler and its affiliates, which are located in Moscow, Russia.

75.     Defendant Maxim Olegovich Konovalov ("Konovalov") is a citizen of the Russian Federation who resides in Moscow, Russia.

76.     Defendant Igor Vladimirovich Sysoev ("Sysoev") is a citizen of the Russian Federation who resides in Moscow, Russia.

77.     Defendant Andrey Victorovich Alexeev ("Alexeev") is a citizen of the Russian Federation who resides in Moscow, Russia.

78.     Defendant Maxim Sergeevich Dounin ("Dounin") is a citizen of the Russian Federation who resides in Moscow, Russia.

79.     Defendant Gleb Alexandrovich Smirnoff ("Smirnoff") is a citizen of the Russian Federation who resides in Los Gatos, California.

80.     Defendant NGINX BVI is a British Virgin Islands corporation incorporated by Konovalov, Alexeev, and Sysoev on July 6, 2011.  NGINX BVI is now a wholly-owned subsidiary of Defendant F5 Networks, Inc.  NGINX BVI maintains its principal place of business at 795 Folsom Street, 6th Floor, San Francisco, California 94107.   F5 refers to this office as "NGINX San Francisco."   NGINX BVI previously maintained an office at 85 Federal Street, San Francisco, California 94107.

81.     Defendant NGINX Software, Inc. ("NGINX Software, Inc.") is a Delaware corporation with a principal place of business located at 795 Folsom Street, Suite 600, San Francisco, California. NGINX Software, Inc. was incorporated in Delaware on May 4, 2011. NGINX Software, Inc. opened an office in San Francisco, California around that time.  As part of registering to do business in California, on May 23, 2011 NGINX Software, Inc. filed a Statement and Designation

by Foreign Corporation.  The Statement and Designation by Foreign Corporation appointed an agent for service of process in California and it was executed on behalf of NGINX Software, Inc. by Konovalov as its Chief Executive Officer ("CEO").  NGINX Software, Inc. has appointed CT Corporation System as its agent for service in the State of California.

82.     Defendant NGINX, Inc. is a Delaware corporation ("NGINX DE") with a principal place of business located at 795 Folsom Street, Suite 600, San Francisco, California.  NGINX DE was incorporated on August 8, 2011.  Upon information and belief, NGINX DE did not register to do business in California.

83.     Defendant BV NGINX, LLC ("BV NGINX") is a Delaware limited liability company with a principal place of business located at 795 Folsom Street, Suite 600, San Francisco, California.

84.     Defendant Angus "Gus" James Bruce Robertson ("Robertson") is a citizen of the State of Florida, and resides at 300 South Point Drive, Apartment 2706, Miami Beach, Florida 33139. Robertson joined NGINX as CEO in 2012.  Robertson joined F5 as a result of the merger between F5 and NGINX BVI, and like Konovalov and Sysoev, received restricted F5 stock as part of the transaction.  Robertson is Senior Vice President and General Manager of NGINX at F5.

85.     Defendant Runa Capital is a Delaware corporation engaged in the business of providing venture capital, headquartered at 459 Hamilton Avenue, Suite 306, Palo Alto, California 94301.

86.     Defendant E. Ventures is a Delaware limited liability company engaged in the business of providing venture capital, headquartered at 600 Montgomery Street, 43rd Floor, San Francisco, California 94111.

87.     Defendant F5 is a Washington corporation headquartered at 801 5th Avenue, Seattle, Washington 98104.  F5 is publicly traded on the NASDAQ exchange under the symbol FFIV.  F5 is registered to do business in the State of California, does business in the State of California, and has appointed CT Corporation System as its agent for service of process in California.

1

**JURISDICTION AND VENUE**

2       88.     This action arises under the Copyright Laws of the United States, 17 U.S.C. §§ 1, *et*

3   *seq.*, and the Lanham Act, 15 U.S.C. §§ 1051, *et seq.* as well as under the Berne Convention for the

4   Protection of Literary and Artistic Works (the "Berne Convention"). This Court therefore has subject

5   matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

6       89.     This Court also has supplemental jurisdiction over the remaining claims pursuant to

7   28 U.S.C. § 1367, as the remaining claims form part of the same case or controversy.

8       90.     This Court has personal jurisdiction over Defendants under Cal. Code Civ. Proc.

9   § 410.10 and the United States Constitution because Defendants regularly and systematically

10  conduct business in California, including by maintaining headquarters, offices, and conducting

11  commerce within California.   Moreover, Defendants committed a substantial portion of the

12  misconduct described in this Complaint in California.

13      91.     In addition, NGINX Software, Inc. and F5 are registered to do business in California

14  and have appointed agents for service of process in California.

15      92.     Runa Capital and E. Ventures both have their headquarters in California and regularly

16  do business in California.

17      93.     Smirnoff resides in California.

18      94.     NGINX BVI, NGINX DE, and BV NGINX have maintained their headquarters in

19  California and regularly conducted business in California and therefore should have registered to do

20  business in California and appoint an agent for service of process in California.  By default, NGINX

21  BVI, NGINX DE, and BV NGINX have appointed the California Secretary of State as their agent

22  for service of process in California.

23      95.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because

24  multiple defendants reside in this District and, additionally, pursuant to 28 U.S.C. § 1391(b)(2)

25  because a substantial part of the events giving rise to the claims set forth herein occurred in this

26  District.

27

28

**FACTS COMMON TO ALL COUNTS**

96.     Rambler is a limited liability company organized and existing under the laws of the Russian Federation and headquartered in Moscow, Russia.

97.     Rambler is one of the largest media companies and web portals in Russia.  Rambler was also the largest technology company and search engine in Russia during Sysoev's employment with the company.

98.     Lynwood with its affiliated companies owned 50% of Rambler up until December 2014.

99.     Defendants Konovalov, Sysoev and Smirnoff (the "Disloyal Employees") all worked together at Rambler where they hatched and began executing their conspiracy to use Rambler's resources to develop the NGINX Enterprise and sell it to a third party for their own ill-gotten profit and to the exclusion of Rambler.  Co-Defendants Alexeev and Dounin were third-party acquaintances of the Disloyal Employees who joined their conspiracy at the outset.  Dounin was himself a former Rambler employee from November 1, 2004 until September 14, 2007, during which time he served as the Head of Rambler's Mail Development Department and worked with Sysoev on a variety of projects, including development of Open Source NGINX.   After he left Rambler, Dounin reconnected with Sysoev and the other Disloyal Employees to carry out the conspiracy. Accordingly, the Disloyal Employees along with Alexeev and Dounin are collectively referred to as the "Team."

**Defendant Konovalov's Employment with Rambler**

100.     Konovalov was employed by Rambler from March 18, 2008 until April 29, 2011.

101.     Konovalov was appointed CTO of Rambler on March 18, 2008 and formed part of Rambler's senior management.

102.     On March 18, 2008, Rambler and Konovalov entered into a written employment agreement, which is identified as Contract No. 27/08 (the "Konovalov Employment Agreement").  The Konovalov Employment Agreement contained restrictions prohibiting the disclosure of Rambler's proprietary information.

103.     Specifically, the Konovalov Employment Agreement required Konovalov to:

2.3.11 not disclose information constituting a trade secret owned by the employer and his counteractants, and not to use this information for personal purposes without their consent;

2.3.12 not disclose information constituting an official and/or commercial secret held by the Employer and his contractors after the termination of the Employment Contract within the period stipulated by the agreement between the employee and the employer concluded during the term of the Employment Contract, or within three years after the termination of the Employment Contract, if the specified agreement has not been concluded;

2.3.13 compensate the damage caused to the Employer, if the Employee has been guilty of divulging information constituting an official and/or commercial secret, which became known to him in connection with the performance of his labor duties;

2.3.14 transfer to the Employer the material information media used by the Employee containing information constituting official and/or commercial secrets, as well as all documents generated during the performance of the work, and material and technical means transferred to him by the Employer for the performance of labor duties upon termination of the Employment Contract.

104.    The Konovalov Employment Agreement also contains works for hire protection for Rambler.  Specifically, Section 5.1 of the Konovalov Employment Agreement provides: "As part of the Employee's performance of his duties, he may be entrusted with the Legal Entity's administration or its authorized person to create the works being the objects of copyright, such as computer programs, databases, photographs, videos, books, ringtones, articles and other works that are objects of copyright."

105.    In addition, Section 5.2 of the Konovalov Employment Agreement provides that "[t]he exclusive right to a computer program or database created by the Employee in connection with the performance of labor duties or on the instructions of the Employer shall belong to the Legal Entity, unless otherwise provided by an agreement between him or it and the Employee."

106.    The Board of Directors of Rambler Media Limited on September 14, 2007 adopted a "Rambler Code of Ethics" (the "Code of Ethics"), which expressly recites that "…it is the policy of Rambler Media Limited and all subsidiaries (the 'Company') that the Company's management (the

'Management') adhere to and advocate the following principles governing their conduct in the fulfillment of their responsibilities with the Company."

107.    Konovalov, as CTO, and therefore part of Management, signed and dated a copy of the Code of Ethics on March 19, 2008.

108.    Konovalov's signature appears on a one-page attachment to the Code of Ethics, entitled "Rambler Code of Ethics Compliance Statement" in which he states: "1. I have read and understand the Code of Ethics of Rambler Media Limited and affiliates (the "Company"). 2. I have been given and instructed to retain a copy of the Code of Ethics for my future reference. 3. I agree to abide by the Code of Ethics, as amended from time to time by written notice, and any other guidelines adopted by the Company."

109.    Section 1 of the Rambler Code of Ethics is entitled "Honest and Ethical Conduct." The introductory paragraph of such paragraph states as follows: "Management must conduct themselves honestly and ethically, and must strive to avoid the appearance of improper behavior in the conduct of their duties. This Code does not cover every issue that may arise, but sets out basic principles."

110.    In the same section, the subsection entitled "Conflict of Interest" provides, in part, as follows:  "Management must make business decisions based on the best interest of the Company and must not allow his or her personal interest to influence such decisions."  That section further provides "Management must avoid even the appearance of dishonest or unethical behavior in the conduct of their duties."

111.    In the same section, the subsection entitled "Corporate Opportunities" provides as follows:

"Management is prohibited from taking personal opportunities that are discovered through the use of corporate property, information or position without the consent of the Company. Management may not use corporate property, information or position for improper personal gain, and may not compete with the Company directly or indirectly."

112.    In the same section, the subsection entitled "Confidentiality" provides as follows:

Management must take reasonable measures to maintain the confidentiality of confidential information entrusted to them by the Company or its customers or suppliers, except when disclosure is authorized or required by laws or regulations.  Confidential information includes all non-public information that might be of use to competitors, or harmful to Company or its customers or suppliers, if disclosed.  The obligation to preserve confidential information continues even after employment ends.

113.    Lastly, Section 6 of the Rambler Code of Ethics provides as follows: "This Code is a policy of the Company. Management will be held responsible for any violation of this Code by the Company, which could include being relieved of his or her duties or termination of employment."

**Defendant Sysoev's Employment with Rambler**

114.    Sysoev is a former employee of Rambler.  As detailed below, Sysoev was the central figure in the development of the Open Source NGINX for Rambler.  Sysoev was employed by Rambler from November 14, 2000 until December 1, 2011.

115.    In 2000, Rambler hired Sysoev as a System Administrator.  Sysoev was highly talented, and rose steadily within Rambler.  As part of his employment duties, Sysoev was tasked with developing software to address internal technical issues experienced by Rambler at the time.

116.    On August 1, 2003, Rambler affiliate Rambler Telecom LLC ("Rambler Telecom") hired Sysoev on an external part time basis as System Administrator for its Engineering Department.

117.    As of December 29, 2004, Rambler promoted Sysoev to Lead Specialist of the Telecommunications Department/Server and Technology Network.

118.    Beginning in December 2004 and continuing until Sysoev's separation from Rambler in December 2011, Rambler paid Sysoev regular outsized bonuses on either a quarterly or semi-annual basis in recognition of his work in developing the NGINX Software for Rambler and the software code's utility in solving the company's various technical issues at that time related to hosting web traffic from Russia and the CIS territories.

119.    On January 10, 2006, Rambler Telecom transferred Sysoev from the Engineering Department to the Network Control Division effective as of January 1, 2006, where he also served as System Administrator.

120.    On September 14, 2006, Rambler transferred Sysoev to the position of Programmer within the DRT/Searching Systems Department.

121.    Sysoev separated from his part time position with Rambler Telecom at his request on October 2, 2006.  Sysoev continued his employment with Rambler.

122.    From October 1, 2007 until May 23, 2011, Sysoev was Lead System Administrator for Rambler's Server and Technology Network.

123.    In April 2011, while Sysoev was, unbeknownst to Rambler, scheming to launch a new company using Rambler's Open Source NGINX and NGINX Plus, Sysoev advised Rambler that he wished to terminate his employment contract with Rambler.

124.    On May 20, 2011, Sysoev separated from Rambler as a full-time employee.

125.    Given how integral Sysoev was to Rambler's operations, Rambler requested and Sysoev agreed to continue employment with Rambler on a part-time basis.  On May 23, 2011, Rambler engaged Sysoev on a part-time basis as the Lead System Administrator for Rambler's Server and Technology Network.

126.    On December 1, 2011, Sysoev separated entirely from Rambler and terminated his part-time employment.

127.    In connection with his employment with Rambler, Sysoev entered into multiple agreements with Rambler.

128.    Sysoev and Rambler entered into an employment agreement on August 9, 2001, identified as Contract No. 43 (as amended and supplemented, the "Sysoev Employment Agreement").

129.    Section 1.4 of the Sysoev Employment Agreement, contains the following non-disclosure covenant:

The Employee shall undertake not to disclose information constituting the Business Entity's official and commercial secret, which became known to the Employee in connection with the performance of his labor duties, both during and after the term of the employment relations with the Business Entity.  In addition, in the case of the implementation of reimbursable activities of other enterprises, organizations, institutions, the Employer shall notify the Business Entity in writing about this.

130.    Section 7.1 of the Sysoev Employment Agreement grants Rambler the following works for hire protection:

As part of the Employee's performance of his official duties, he may be entrusted with the Business Entity's administration or its authorized person to create works that are objects of copyright, such as computer programs and databases. Such works is an official work. The exclusive property rights for the use of such works belong to the Business Entity.

131.    Section 12.3 of the Sysoev Employment Agreement confirms that Sysoev's nondisclosure obligations survive the termination of his employment with Rambler:

The termination hereof shall not entail the termination of the obligation of the Employee not to disclose information constituting an official or commercial secret of the Business Entity, which became known to the Employee in connection with the performance of his labor duties, as long as the specified information has been an official or commercial secret of the Business Entity by virtue of the civil legislation of the Russian Federation.

132.    Similarly, Section 12.4 of the Sysoev Employment Agreement provides:

In the event of termination hereof before receipt of the work book and settlement of accounts, the Employee shall be obligated to transfer to the Employer all the property and documents of the Business Entity kept by the Employee in connection with the performance of labor duties.  The indicated property and documents shall also include documents, programs, databases, and their developments on magnetic media created as part of the Employee's performance of his duties.

133.    On August 9, 2001, Sysoev and Rambler entered into a Supplementary Employment Agreement (the "Sysoev Supplementary Agreement").  Section 2.1 of the Sysoev Supplementary Agreement states as follows:

An Employee given access to documentary or other carriers of confidential information and trade secrets shall be obliged:

--to keep the carriers of confidential data and trade secrets separate from other media;

--to ensure the impossibility of their loss;

--to ensure the impossibility of unauthorized access to the media;

--to destroy, in the prescribed manner, drafts and other storage media used to create draft documents;

--in case of employment termination, surrender all carriers of confidential data and trade secrets within one business day to the head of the structural unit or to the head of the Company.

134.    Section 2.2 of the Sysoev Supplementary Agreement states: "An employee given access to the carriers of confidential data shall be obligated to immediately inform the Company management of the fact of the loss of media or unauthorized access to them by third parties, as well as in relation to certificates, passes, seals, keys to office premises and safes."

135.    Section 2.3 of the Sysoev Supplementary Agreement states: "The employee must not disclose the confidential data in any form during the entire term of the labor agreement with the Company and within two years after its termination."

136.    Section 3.1 of the Sysoev Supplementary Agreement states: "Unauthorized access and/or disclosure of confidential information shall be a gross violation of the Employee's duties."

137.    Section 3.2 of the Sysoev Supplementary Agreement states: "For unauthorized access and/or disclosure of confidential information, the Employee may be disciplined."

138.    Section 3.4 of the Sysoev Supplementary Agreement states: "An employee of the Company who unauthorizedly discloses confidential information and/or who has allowed access to confidential information or commercial information of other person is obliged to compensate the Company in full, including actual damages and lost profits, losses incurred by the Company and its counteractants by the fact of disclosure."

139.    On November 1, 2004, Sysoev and Rambler entered into an Amendment to the Sysoev Employment Agreement ("Sysoev 2004 Supplemental Agreement"), which granted Sysoev a raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded

Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

140.    On September 14, 2006, in connection with Rambler's transfer of Sysoev to the position of Programmer within the DRT/Searching Systems Department, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev September 2006 Supplemental Agreement").

141.    The Sysoev September 2006 Supplemental Agreement granted Sysoev a raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

142.    As of July 2, 2007, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev July 2007 Supplemental Agreement"), which granted Sysoev a large raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

143.    On October 1, 2007, in connection with Rambler's appointment of Sysoev as Lead System Administrator for Rambler's Server and Technology Network, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev October 2007 Supplemental Agreement").

144.    The Sysoev October 2007 Supplemental Agreement reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

145.    As of July 31, 2009, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev July 2009 Supplemental Agreement"), which granted Sysoev a large raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

146.    In April 2011, Sysoev advised Rambler that he wished to separate from Rambler and terminate the Sysoev Employment Agreement.

147.    Effective May 20, 2011, Sysoev separated as a full-time employee from Rambler, and the Sysoev Employment Agreement was terminated.

148.    Of course, provisions of the Sysoev Employment Agreement that expressly survived termination of Sysoev's employment remained in effect.

149.    On May 23, 2011, Rambler appointed Sysoev on a part-time basis as the Lead Systems Administrator of Rambler's server-technological complex ("Lead System Administrator"), and Rambler and Sysoev entered into a new employment agreement.

150.    This new employment agreement between Sysoev and Rambler was effective as of May 18, 2011 (the "2011 Sysoev Employment Agreement").

151.    Section 1.3 of the 2011 Sysoev Employment Agreement states: "The work under the Contract is the external part-time work for the Employee."

152.    Section 2.1.3 of the 2011 Sysoev Employment Agreement states as follows:
During the term of execution and after the termination of the Employee's work with the Employer, the Employee shall be required to observe the strictest secrecy in relation to all information and/or documents that may become known to him, relating to the affairs, interests or operations of the Employer and any of its employees, customers or other persons or business partners associated with the Employer, and shall be obligated not to disclose such information, except upon receipt of the appropriate authority from the Employer, and as well as not use it for his personal purposes or for any purpose of the third party.  The Employee shall comply with the business secrets non-disclosure obligation (Appendix 1).

153.    Appendix No. 1 to the 2011 Sysoev Employment Agreement, entitled "Commitment of Business Secret Non-Disclosure," requires Sysoev to:
1. Refrain from disclosing the information that constitutes the Company's business secret, which will be conferred upon me [Sysoev] or will become known to me in the course of performance of the job duties;
2. Refrain from transfer to third parties and from public disclosures of the information that constitutes the Company's business secrets;

…

5. Refrain from using the Company's business secret for carrying out any business that may be prejudicial to the Company as a competitive action;

6. If any third parties try to get any information on the Company's business secret from me, promptly notify the Company's top management thereof.

      154.    Sysoev separated entirely from Rambler effective December 1, 2011.

      155.    As of November 28, 2011, Sysoev and Rambler entered into a separation agreement terminating the 2011 Sysoev Employment Agreement and memorializing the terms on which Sysoev separated from Rambler (the "Sysoev Separation Agreement").

      156.    The Sysoev Separation Agreement recited that the 2011 Agreement would terminate as of December 1, 2011.

      157.    Importantly, the Sysoev Separation Agreement contained, among other things, the following terms:

3. The Employee shall transfer all of the Company's assets and documents being in the Employee's possession in connection with the Employee's performance of the employment duties, including documents, software, databases and their developments in magnetic media, which were created as part of performance of job duties, to the Employer's representative on or before December 1, 2011.
…

8. The Employee recognizes and confirms that the Employee will regard the provisions of this Agreement as strictly confidential and will not disclose them to any persons whatsoever. The Employee recognizes and confirms his/her obligation to comply with the confidential information provisions with respect to the Employer, including, but not limited to, the Employer's confidential information (the Confidential Information under this Termination Agreement means any information pertaining to Rambler Group of Companies, including but not limited to, its documents, products, plans, customers, customer list, employees, strategy, marketing plans and strategy, pricing policy, business processes, intellectual property, business secret, product development plans, corporate and financial information), of which the Employee receives information in the course of his/her business

operations and the companies, for which the Employer is a legal successor, and shall not disclose this information other than to the representative of the Employer, Rambler Group of Companies, by any method, either before or after signing hereof.

…

9. This Agreement shall supersede all oral and/or written agreements concluded by the Parties before signing hereof.

…

11. This Agreement shall be governed by and construed in accordance with the laws of the Russian Federation.

**Defendant Smirnoff's Employment with Rambler**

158.    Smirnoff is a former employee of Rambler who was employed at the company from September 21, 2006 until his resignation on November 12, 2012.

159.    During his employment with Rambler, Smirnoff served as the Head of Rambler's Network Operations Center ("NOC").   Smirnoff was Sysoev's immediate supervisor.   Smirnoff reported directly to Konovalov.

160.    Smirnoff remained an employee of Rambler for approximately eleven months longer than Sysoev before he resigned to join Konovalov and Sysoev at NGINX BVI .

161.    Among the contractual obligations imposed on Smirnoff under his Rambler Employment Agreement, dated September 21, 2006 ("Smirnoff Employment Agreement") were:

2.3.1    Employee shall comply with the internal labor regulations of the Company.

2.3.2    Employee shall honestly and in good faith fulfill the labor duties assigned to him by the Employment Contract and job description, demonstrate the necessary initiative and perseverance in work constantly improving his professional qualification.

2.3.4    Employee shall take care of the property of the Employer and other employees; comply with the established procedure for the storage of material assets and documents.

2.3.5    Employee shall immediately inform the Company management of any theft of and damage to the Company's property.

2.3.13   Employee shall compensate for damages caused to the Employer, if the Employee is guilty of disclosing information constituting professional and/or trade secrets, which became known to him during performance of his labor duties.

2.3.14   Employee shall upon termination of the Employment Contract hand over to the Employer the material storage media used by the Employee and containing information constituting professional and/or trade secrets, as well as all documents created during the performance of work, as well as the material and technical means given to him by the Employer to perform his labor duties.

162.   In addition, the Smirnoff Employment Agreement explicitly contained "Work Made For Hire" provisions including:

5.1   As part of the Employee's official duties, he may be instructed by the Company management or its authorized person to create works protected by copyright, such as computer programs, databases, photographs, videos, books, ringtones, articles, and other works protected by copyright.

5.2   The exclusive right to a computer program or database created by the Employee during performance of his labor duties or as instructed by the Employer shall belong to the Company, unless otherwise provided by an agreement between the Company and the Employee.

**Rambler's Internal Labor Rules and Regulations**

163.   In addition to the contractual obligations set out above, Rambler established a written set of rules and regulations governing its employees' conduct, which the Disloyal Employees agreed to abide by in connection with their Rambler employment.

164.   As of September 1, 2008, Rambler issued a document entitled "Internal Labor Rules and Regulations" (the "Rambler Regulations").

165.   Article 18 of the Rambler Regulations provides:

"Each employee is obliged to maintain the confidentiality in relation to everything

that relates to the facts and information of an economic, commercial nature, the

know-how of the Company, which he became aware of during the performance or

in connection with the performance of his labor duties. The management of the

Company informs each employee of a list of information that is confidential.  Any use outside the employer's duties or transfer to third parties of any documents and information relating to the activities of the Company is strictly prohibited."

166.    Annex 1 to the Rambler Regulations is entitled "List of Confidential Information" and comprises a list of what is deemed to be Rambler's confidential information including:

10. Technologies used in the Company ... 15. Information contained in computer programs      and databases related to the Company's activities. This information, including information contained in computer programs and databases for PC, ORACLE, CRC, ADMIN, PILOT,   Access, OASIS, ACS, as well as reports and queries received from these programs and    databases. … 18. Information about the created objects of copyright and related rights, their elements  …  21.  Any  special knowledge, including practical experience of employees,    involved    specialists, applied not only in production, but also in other areas of entrepreneurial    activity: trade, marketing, management, having commercial value and the disclosure of which may result in damage to the Company.

167.    Article XIV of the Rambler Regulations, entitled "Conflict of Interest," states, in pertinent part: "In order to exclude the possibility of a conflict of interest, any employee of the Company who will be forced to assume obligations with respect to a competitor, supplier or client on terms that could damage his position in the Company should immediately notify his/her immediate boss or the HR department."

168.    In addition, the Rambler Regulations provide "[c]arrying out other professional activities by an employee shall not harm his work in the Company.  Other professional activities should not compete with work in the Company or cause a conflict of interest."

169.    Rambler issued various iterations of the Rambler Regulations beginning as early as 2000, as well as in 2005.  Each of those versions published and distributed to Rambler employees contained provisions which were similar in scope, and similarly protective of Rambler's rights, as those provisions contained in the September 1, 2008 Rambler Regulations.

**The Development of Open Source NGINX and Related Business Opportunities**

170.    Sysoev spent years developing Open Source NGINX for Rambler while he was a Rambler employee as part of his official duties at Rambler, and with the assistance of Rambler infrastructure, personnel, resources, and Internet traffic.   When the Disloyal Employees, with the assistance of Alexeev and Dounin, realized how valuable Open Source NGINX had become, they faithlessly turned on Rambler and misappropriated the NGINX Enterprise for their own commercial gain and with the intent of selling it to a large U.S. technology company.

171.    Sysoev is widely credited with developing Open Source NGINX.  He developed Open Source NGINX during his 2000 through 2011 tenure as an employee of Rambler.  Specifically, Sysoev wrote his first line of Open Source NGINX code on October 23, 2001 while employed at Rambler.

172.    Sysoev started working on Open Source NGINX to solve problems with Rambler's utilization of the widely used open source web server known as Apache.

173.    Apache was first released in 1995.

174.    Webservers are an integral part of the Internet, and everyone from Fortune 50 companies to startups and individuals utilize webservers to allow users to navigate their websites.

175.    Web pages are comprised of HTML documents.  The Internet works by allowing the visitor (or "web surfer") to request a document from a given web address, with domain name servers (i.e., a "DNS Server") and an Internet provider ("IP") system forwarding that request to the computer that hosts the requested web page.  The computer that hosts the requested web page then "serves" the requested web page back to the visitor.  To be able to serve different web pages to visitors, the "serving" computer requires a server program.  That is where Apache and more recently Open Source NGINX come in.

176.    Apache's open source web server software handles requests, analyzes them, and then delivers the requested web page (or HTML document) to the web surfer.

177.    And since 2004, Open Source NGINX has done the same thing.  NGINX now enjoys a larger market share than Apache.

178.    While web server software like Apache and Open Source NGINX are provided on an open-source basis, the software is commercialized primarily by offering proprietary fee-based enhanced enterprise features, functionality and services relating to the web server software.

179.    Companies use the web server software to enable efficient access to their websites, which of course have become increasingly more complex over time.

180.    In the early 2000's, technical experts and businesses alike began to worry about the ability of the Internet and websites to accommodate exponentially increasing traffic.

181.    The initial production version of Open Source NGINX was first released on the Internet in 2004 by Sysoev, without authorization from Rambler, after being made available to a small commercial software audience in Russia.

182.    The Open Source NGINX web server was originally created as a scaling tool for Rambler's Internet-related properties and services.

183.    After its open source release, Open Source NGINX was mostly used as a load balancer or reverse proxy in front of or on top of the Apache web server.  However, as Open Source NGINX and the Internet evolved, websites began employing Open Source NGINX in lieu of Apache.

184.    NGINX now comes in two categories: Open Source NGINX licensed under an open source Berkeley Software Distribution-style license ("BSD license"), and proprietary, non-open-source, fee-generating commercial products, made available only in executable form (i.e., not in source code form), including NGINX Plus and related commercial software products, which are licensed by defendants NGINX BVI, NGINX Software, Inc. and F5 to paying customers on a subscription basis and include fee-based support and additional revenue-generating enterprise features.

185.    Numerous goods and services have been built off of Open Source NGINX, and the opportunities for commercializing proprietary extensions to Open Source NGINX that Sysoev wrote for Rambler are virtually infinite.

186.    Following Sysoev's public release of Open Source NGINX in 2004, without authorization from Rambler, he spent the next seven years, during the time he was employed at

Rambler (and some years also part-time at Rambler Telecom), working on further developing, testing, improving and releasing Open Source NGINX, all with the assistance of other Rambler engineers, using Rambler resources, infrastructure and Rambler Internet traffic, during regular Rambler business hours.

187.    During that time, Sysoev received significant and ongoing technical assistance in this NGINX-focused endeavor to continuously test and improve Open Source NGINX from a number of senior Rambler computer/network department heads, software engineers and other technical staff, including, but certainly not limited to, his co-conspirators.

188.    Following the 2004 public release of Open Source NGINX, the open source community began to quickly embrace the solution, and it became viable as a web server solution by 2007.

189.    The birth of the smart phone market led to a massive growth of mobile Internet users, which in turn highlighted the problem of optimizing network sockets to handle large numbers of clients simultaneously – the so-called "C10k problem."  At that moment, Open Source NGINX was poised to help programmers and system administrators solve this problem, as an alternative to the then market-leading Apache web server.

190.    By 2010, Open Source NGINX already had six percent of the market share among all web servers.

191.    Sysoev has maintained that he authored ninety-seven percent of Open Source NGINX as of 2011.

**Sysoev Developed Open Source NGINX For Rambler Using Rambler's Resources**

192.    One of Sysoev's primary employment responsibilities as a Rambler employee was to develop Open Source NGINX as a key component of Rambler infrastructure.

193.    In software development parlance, the term "commit" means when a software developer finalizes revisions to software code and saves them to the revision history of a body of software residing in a designated code repository, which functions as a version control tool, such as Mercurial or GitHub.

194.     During the period from 2004 to mid-2011, all commits to Open Source NGINX were performed by Sysoev.  The first commit made by someone other than Sysoev was done on August 9, 2011, by Ruslan Ermilov (ru@nginx.com).  Thus, at least until that date, *i.e.,* nearly his entire tenure as an employee of Rambler, Sysoev exclusively authored Open Source NGINX.

195.     An analysis of Sysoev's work during normal Rambler business hours demonstrates that his primary occupation was developing and testing Open Source NGINX on Rambler servers. Specifically, the time stamps of the Mercurial repository reveal that Sysoev spent nine years of his Rambler employment working primarily on Open Source NGINX and related development.

196.     The open source software (OSS) code repositories (Mercurial and Github mirror) show that a significant number of modifications to Open Source NGINX were made by Sysoev during normal business hours (M-F 10:00-19:00).  The repositories show 3,629 total changes from the start of January 1, 2004 through December 31, 2010.  Narrowing the window to Monday-Friday, during the UTC time of 07:00-16:00 (+3:00 for Moscow Time), 2174 changes were committed, all by Sysoev.  This shows that approximately 60% of the code commits were done by Sysoev during a standard business-hours workday window at Rambler.

197.     Sysoev tested his changes, and then actually announced "Nginx Releases" once they were tested on the entirety of Rambler's infrastructure.

198.     Sysoev regularly and systematically used Rambler's resources, including infrastructure, Internet traffic, money, and human resources to develop, test, and improve Open Source NGINX.

199.     As Owen Garrett of NGINIX BVI and now F5 wrote: "NGINX was written specifically to address the performance limitations of Apache web servers.  It was created in 2002 by Igor Sysoev, a system administrator for a popular Russian portal site (Rambler.ru), as a scaling solution to help the site manage greater and greater volumes of traffic.  It was open sourced in October 2004, on the 47th anniversary of the launch of Sputnik."

200.     In a February 22, 2006 email to his NGINX list service, Sysoev disclosed that he originally wrote Open Source NGINX to solve Rambler-related problems utilizing the open source

Apache code, stating: "It was implement[ed], Nginx was planned not for mass-virtual hosting, but first of all for rambler.ru – what I did not like as an admin in Apache, is done differently in Nginx."

201.    By his own admissions, Sysoev's development of Open Source NGINX was within the scope of his employment with Rambler.  In early 2012, a few months after leaving Rambler, Sysoev admitted, this time in a media interview, that he had developed Open Source NGINX to solve Rambler-related problems:

> I started the initial work in 2002, and in 2004 I opened NGINX to the public. Back
> then, I was trying to overcome certain barriers of scaling the web infrastructure of a
> large online media company I worked for.[1] In particular, the difficulties of handling
> many concurrent connections, reducing latency and offloading static content, SSL
> and persistent connections were my main interest. There weren't any reliable
> production quality web server software to crack so-called C10K problem (handling
> of at least 10,000 of concurrent connections, outlined by Dan Kegel). So in a sense I
> decided to solve both practical and "academic" problems. I was very curious and
> excited to try it out and I'm really happy it turned to be a successful attempt and that
> NGINX is now used by the over 50,000,000 web sites on the Internet.

202.    The slide deck presentation for potential venture funders that Sysoev and his co-conspirators on the Team created in March and April 2011, before the Disloyal Employees left Rambler with the NGINX Enterprise, contained an even more blunt admission that Open Source NGINX was specifically developed for the benefit of Rambler.

203.    The slide deck, under the heading "history of development," stated that Open Source NGINX was "crafted to handle 500 million page requests per day for a Russian search engine/portal" – an obvious reference to Rambler. *See* Exhibit A, at 7.

204.    Dounin's email correspondence with Sysoev regarding Open Source NGINX- related topics date from as early as 2005.  For example, regarding Rambler mail, Dounin wrote "…I have good news – Nginx today worked as a por3 proxy for Rambler mail."

---

[1] Sysoev's reference to a large online media company is obviously his employer Rambler.

205.    Regarding patches in Open Source NGINX, Dounin wrote to Sysoev:  "Hello! I rolled out the patched Nginx…."

206.    Regarding test loads of Open Source NGINX output, Dounin wrote: "But after receiving the finished patch, in 1-2 days we update Nginx in battle and another 1-2 days – we write and roll out the changes to send the information to the Runner" and "add a sample line to the end, then test the nginix configuration and send it to the HUP master if everything is fine.  If necessary, all this also can be attached to mail.rambler.ru."

207.    These examples of emails are demonstrative of the fact that the Disloyal Employees and Dounin were actively working for Rambler, at Rambler's expense, to develop Open Source NGINX in furtherance of their employment responsibilities at Rambler.

208.    Sysoev regularly received enhanced compensation in the form of bonuses and outsized raises from Rambler for his work developing Open Source NGINX for Rambler beginning in 2004 until his separation from Rambler in December 2011.

209.    Sysoev's work developing Open Source NGINX was disclosed to Rambler as being only in connection with Open Source NGINX that the company utilized internally to solve its web traffic hosting capability issues.  It was for this reason that Rambler did not prevent Sysoev from releasing additional iterations of Open Source NGINX under a BSD license after he released the first version without Rambler's authorization in 2004 as the company was using it only as an internal tool.  Moreover, the open source nature of Open Source NGINX did not contravene Rambler's ownership rights to Open Source NGINX under Russian law as work made for hire.

210.    Rambler's management made a business decision to permit Sysoev to continue releasing Open Source NGINX under the free BSD-style license because such releases highlighted the technical achievements of Ramber and its employee Sysoev, which inured to Rambler's benefit for attracting top software programmers.  For example, on November 25, 2009, Konovalov and other members of Rambler's management, including Uliana Antonova (General Counsel), Pavel Rogozhin (Chief Business Development Officer) and Maxim Azarov (Chief Product Officer), held a meeting to discuss whether Rambler should permit Sysoev to continue releasing new iterations of Open

Source NGINX on an open source basis under a BSD license.  Konovalov convinced his colleagues that it was in Rambler's best interests to continue to allow Sysoev to release Open Source NGINX under the BSD license particularly since the ownership rights to the software belonged to Rambler under the Russian Civil Code governing works made for hire.

211.    In other words, Rambler viewed and used Open Source NGINX as an internal tool to solve its technical issues and to highlight its technical prowess, but did not conceive of such software as being capable of being monetized for sale or license to third-parties.

212.    The responsibility for developing software and other technology products at Rambler rested with Konovalov who misrepresented to Rambler that Open Source NGINX had no value even though he, Sysoev and their conspirators were clandestinely developing the NGINX Enterprise within the NOC department at Rambler, including the first proprietary commercial extension thereof, namely NGINX Plus.

213.    Therefore, during Sysoev's employment with Rambler, the company had been deceived into believing that Sysoev's time was devoted simply to improving Open Source NGINX for Rambler's internal use when in reality Sysoev, Konovalov and their conspirators were developing NGINX Plus and an entire business built around Open Source NGINX and NGINX Plus (i.e., the NGINX Enterprise) with the ultimate goal of misappropriating it and then selling it to a large U.S technology company.  Indeed, unbeknownst to Rambler, the Team had decided to pursue their "open core" strategy of monetizing Open Source NGINX.  As Konovalov stated in his 2019 GoTech interview: "We decided to explore the open core model.  Open core model is when you take an open-source software and build something paid like commercial software on top.  And this is what we have been doing since 2011." *See* Exhibit B, at 7-8.

**The Team Agrees to Conspire to Steal the NGINX Enterprise from Rambler and to Sell it to a Third Party for Their Own Ill-Gotten Profit**

214.    The Team and other Rambler employees conspired with one another to steal the valuable NGINX Enterprise and monetize it for themselves and at the exclusion of Rambler by selling it to a third-party.  The Team, namely Sysoev, Konovalov, Alexeev, Dounin and Smirnoff,

agreed that together they would start their own company in San Francisco, California to commercialize Open Source NGINX by commercializing NGINX Plus and other proprietary Open Source NGINX extensions, and then achieve their multimillion dollar "exit" or "payday" by selling the entire NGINX Enterprise to a large U.S. technology company.

215.    The Rambler employees who conspired with the Team in furtherance of their common plan were Galperin (Director of Strategic Development), Popov (Deputy Chief Technology Officer), and eight Rambler software programmers – at least three of whom staggered their resignations from Rambler after assisting the Disloyal Employees with removing and destroying evidence of the conspiracy – and years later in late 2013 and 2015 joined an affiliate of NGINX BVI (NGINX LLC Russia) as employees. These Rambler programmer conspirators were Fedor Dikarev, Oleg Mamontov, Konstantin Kukushkin, Alexander Nikoforenko, Konstantin Romamenko, Anton Ermolaev, Alexander Postnikov and Sergey Chesnokov (together with Galperin and Popov, the "Rambler Employee Conspirators").

216.    The common plan involved surreptitiously developing the NGINX Enterprise while the Disloyal Employees were employed at Rambler and then misappropriating the NGINX Enterprise to newly formed entities outside of Russia (and off Rambler's radar) where the Team would grow it using capital raised from outside venture capital firms for purposes of quickly selling it to a large U.S. technology company.  No later than early 2011, or earlier, the Team identified F5 as a possible purchaser of the built-out commercial NGNIX Enterprise they envisioned.

217.    The exit strategy (i.e., the sale to a large American technology company) was the object of the conspiracy and venture capital firms Runa Capital and E.Ventures joined in the common plan to achieve it.  While the conspirators aimed to accomplish the object of their conspiracy within five years of the Disloyal Employees' departure from Rambler with the misappropriated NGINX Enterprise, they achieved it in less than seven years when the Merger Agreement with F5 closed on May 8, 2019.

218.    The conspiracy was successful because its conspirators were well-placed within Rambler to develop the NGINX Enterprise without anyone else at Rambler knowing and then

concealing all evidence of their conduct once the Disloyal Employees left Rambler with the stolen NGINX Enterprise.

219.   Konovalov, was Sysoev's boss at the end of their Rambler tenure, and the Rambler CTO with oversight and responsibility for all of the company's technical departments tasked with developing new products.  Konovalov was the leader of the Team.

220.   Konovalov reported to and was answerable only to the CEO of Rambler. Konovalov's key senior management position at Rambler enabled him to provide Sysoev beginning in 2008 with an ecosystem within Rambler that was free from oversight or accountability.

221.   The insulated ecosystem was the NOC department where Konovalov surrounded Sysoev with the Disloyal Employees and the Rambler Employee Conspirators.  For example, co-defendant Smirnoff was Sysoev's immediate supervisor and "Team Leader" in the NOC department, the Rambler department responsible for the design and development of a variety of operating system management and other software products.  In turn, Smirnoff reported directly to Konovalov. Moreover, many of the Rambler Employee Conspirators were the NOC programmers who worked with Sysoev and were supervised by Smirnoff.

222.   In sum, everyone working in and overseeing the NOC department participated in the conspiracy.  As explained further below, even the NOC department's servers and information infrastructure were not integrated with the rest of Rambler.  Konovalov was the conduit between the technical NOC employees in this programming department and Rambler's senior management.

223.   The Disloyal Employees and Rambler Employee Conspirators were a tight-knit group, which allowed them to keep the Disloyal Employees' planned misappropriation of the NGINX Enterprise a secret while still utilizing Rambler's full array of resources and infrastructure to continue testing, developing and refining Open Source NGINX to ensure the financial success of their planned releases of NGINX Plus and other NGINX-related commercial improvements, enhancements and related products.

224.   Konovalov drove the effort to split off from Rambler, steal the NGINX Enterprise, solicit Silicon Valley investors, and destroy evidence of the Team's conspiracy.

225.    By the time Konovalov resigned from Rambler effective April 29, 2011, the Team was already underway to executing on its plan to covertly misappropriate the entire NGINX Enterprise so that it could ultimately be sold to a large U.S. technology company.

226.    By the time Sysoev separated from Rambler in December 2011, the Team had already secretly formed NGINX BVI, filed the first trademark application for the "NGINX" trademark, solicited and obtained outside venture capital investment to fund the Team, and garnered its first customer (Netflix, Inc.).

227.    As the CTO of Rambler, Konovalov enjoyed substantial autonomy and the ability to conceal information from Rambler about the work Sysoev was performing for Rambler, particularly the conception and development of what would become the centerpiece of the NGINX Enterprise – namely, NGINX Plus.

228.    Konovalov was thus able to, and did, conceal, and suppress from Rambler's senior management and board of directors the content and value of the code development Sysoev was creating using Rambler's infrastructure, and at Rambler's expense.

229.    Open Source NGINX was not a secret.  But the Disloyal Employees successfully hid from Rambler the fact that development of the NGINX Enterprise was the principal occupation of Sysoev at Rambler.  Rambler thought Sysoev was focused on improving Open Source NGINX to continue running Rambler's web-based services and releasing his latest iterations of the Open Source NGINX under the BSD license as a testament to his creativity and Rambler's accomplishments.  In reality, however, the Disloyal Employees concealed from Rambler the massive investment of time and resources that the Disloyal Employees were undertaking at Rambler's expense in developing Open Source NGINX  as the foundation for launching NGINX Plus and other commercial products, as well as on the development of NGINX Plus itself.

230.    The Disloyal Employees realized that the growing popularity of Open Source NGINX, *i.e.*, the "open core" –  the razor in the above- referenced razor/razor-blade analogy –  was what would open the door to monetizing proprietary commercial extensions of the core, including NGINX Plus; hence, the more Rambler-financed effort that went into enhancing and maintaining

Open Source NGINX, the more web site operators would become dependent on it, and that "sticky" dependency would drive demand for fee-based NGINX Plus and related support services.

231.    Unlike typical technology startups, the resources that the Disloyal Employees could devote to the foundation of their enterprise, were virtually unlimited, because Rambler was unwittingly funding the development program.   At the same time, the Disloyal Employees were collecting generous Rambler salaries and bonuses.   Thus, there was only upside for the Disloyal Employees.   In short, the situation was every entrepreneur's dream come true.

232.    Once Open Source NGINX was sufficiently popular, and once the conception and development of NGINX Plus and related enhancements had been sufficiently advanced, all of which was made possible only with the financial, personnel and infrastructure resources of Rambler, the time would be right to cut the cord with Rambler and spin out the NGINX Enterprise, solely for the Team's own benefit.

233.    Konovalov worked fast.  He joined Rambler as CTO in March 2008 but by the summer of 2008, he had already recognized the value of Open Source NGINX and conceived of the NGINX Enterprise.  Despite his senior management role and duties as CTO of Rambler, Konovalov abused his power and authority to lead the conspirators with laying plans to steal the NGINX Enterprise from Rambler.

234.    The Team agreed to form a conspiracy pursuant to which they would continue to use Rambler's resources to develop Open Source NGINX and NGINX Plus, and in turn, the NGINX Enterprise.

235.    The Disloyal Employees agreed that they would defraud Rambler by concealing the true nature and value of Open Source NGINX, NGINX Plus, and the NGINX Enterprise that they were building at Rambler's cost, but without Rambler's knowledge.

236.    The Disloyal Employees agreed that they would flagrantly violate their statutory and contractual obligations to Rambler and steal the NGINX Enterprise and sell it to a third party for their own ill-gotten gains.

237.    The Team further agreed that they would conceal their unlawful activity from Rambler by concealing their work and, even, destroying evidence.

238.    The Team agreed that they would secretly raise capital for the NGINX Enterprise, even while the Disloyal Employees were still employed by Rambler, to start a new business without Rambler's participation built on the software that the Team knew Rambler rightfully owned as works made for hire.

239.    The Disloyal Employees, utilizing Konovalov and his lofty position as camouflage, agreed to and did block the flow of information to Rambler about the immensely valuable open source and proprietary NGINX projects and the Team's scheme to steal the NGINX Enterprise.

240.    The Disloyal Employees agreed that they would exploit profitable business opportunities based upon Open Source NGINX, including the proprietary code and concepts incorporated in NGINX Plus and other commercial products.  In Konovalov's own words in 2019: "So but anyway, by 2011, like six or eight percent all internet use NGINX, and it was -- it became crystal clear that there were some business opportunities." *See* Exh. B, at 7:11-14.

241.    The Team agreed to launch the business in San Francisco to enhance their capital raising potential and ultimate sale prospects, all to the exclusion of Rambler, the rightful owner of the NGINX Enterprise.

242.    The Team agreed they would conceal from Rambler the causes of action for which the Team was and would become liable to Rambler as a result of their unlawful conduct.

243.    With their conspiracy formed, the Team set about establishing their new business around Open Source NGINX, NGINX Plus and other proprietary NGINX extensions and derivations, as well as various valuable goodwill and business opportunities comprising the NGINX Enterprise.

244.    Meanwhile, as further cover to the Team's secret conspiracy, Sysoev continued to portray himself to the world as a savant coder, when in reality he was an unethical businessman scheming to make his fortune on business opportunities he knew Rambler resourced and owned.

**The Team Launches the NGINX Enterprise and Runa Capital and E. Ventures**

**Join the Conspiracy**

245.     The Team received substantial assistance in carrying out their scheme from Rambler employee Galperin and former Rambler employee Korotkov.

246.     Galperin was Rambler's Director of Strategic Development and was friends with Sysoev and Konovalov.  The Disloyal Employees brought Galperin into their confidences and into the conspiracy on or about September 2010.  The Disloyal Employees disclosed to Galperin that Sysoev was clandestinely developing NGINX Plus at Rambler and that the Team was plotting to misappropriate the fledgling NGINX Enterprise for ultimate sale to a large American technology company.  In order to do so, the Disloyal Employees informed Galperin that they needed to quickly grow the misappropriated NGINX Enterprise in order to position it for a sale in the near future.

247.     Galperin offered to solicit Russian and American venture capital firms on behalf of the Team and in furtherance of their common plan.  Galperin solicited Runa Capital, a venture capital firm with offices in Moscow and Palo Alto, in the Fall of 2010 and informed its principals Sergui Beloussov and Dmitry Chikhachev of the Team's conspiracy to misappropriate the NGINX Enterprise, grow it and then quickly sell it to a large American technology company within five years.

248.     Beloussov and Chikhachev understood that the prospect of investing and then selling the purloined NGINX Enterprise would be wildly lucrative for Runa Capital.  Beloussov and Chikhachev agreed to have Runa Capital join the conspiracy.  That is, Beloussov and Chikhachev agreed to have Runa Capital not only finance the Team's entities that they were planning to form outside of Russia in the near term, but Runa Capital also agreed to assist the Team in its preparatory steps to surreptitiously misappropriate the NGINX Enterprise without triggering Rambler's suspicion.

249.     In order to ensure that Runa Capital was at least one of the venture capital firms partnering with the Team, Beloussov and Chikhachev hired Galperin in February 2011 to join Runa Capital as an employee and assigned him the responsibility of being the liaison between Runa Capital

and the Team.  From February 2011 onward, Runa Capital assisted and advised the Team in carrying out their conspiracy.

250.    In addition to Galperin, the Team also received assistance from the whistleblower Korotkov.

251.    Rambler hired Korotkov as its CIO on August 23, 2007.

252.    Korotkov was terminated by Rambler on June 29, 2009 as part of a staff reduction.

253.    After his termination from Rambler, Korotkov, who was a friend of Sysoev, joined the Team's conspiracy.  Korotkov served as a conduit throughout 2010 and 2011 between the Team and various outside Russian and American venture capital firms looking to fund the Team and their misappropriated NGINX Enterprise.  During this time, the Disloyal Employees were still employed at Rambler, but were actively executing their scheme to launch a new business outside Rambler that would be built on the shoulders of the NGINX Enterprise developed at Rambler and which they intended to misappropriate and ultimately sell to a third-party U.S. technology company.

254.    By early 2010, unbeknownst to Rambler, the efforts by Korotov and the Team to steal the NGINX Enterprise from Rambler and monetize it for themselves were well underway.

255.    On February 20, 2010, nearly two years before Sysoev exited Rambler in December 2011, Korotkov first registered the Internet domain name NGINXPLUS.com.

256.    Upon registering the NGINXPLUS.com domain name, Korotkov promptly began populating a Web site at the Internet address which promoted what he referred to as "Nginx+" (i.e., the Korotkov Site).

257.    Plaintiff Lynwood only discovered the NGINXPLUS.com domain and the Korotkov Site during its investigation in 2020 after the whistleblower Korotkov came forward to implicate the Disloyal Employees in 2019.

258.    Lynwood and Rambler only discovered the Disloyal Employees' actions in misappropriating Open Source NGINX, NGINX Plus and the NGINX Enterprise while in the employment of Rambler after Lynwood and Rambler in 2019 undertook and completed a forensic

investigation after Korotkov's revelations, which resulted in the recovery of electronic evidence that had been deleted and wiped by the Disloyal Employees before they left Rambler.

259.    The documents and correspondence identified below evidencing the Team's scheme to misappropriate Rambler's NGINX Enterprise with the knowledge and assistance of Runa Capital and E. Ventures comprise a portion of the Disloyal Employees' communications on Rambler company email that were recovered in late 2019 by Lynwood and Rambler in the course of their investigation.

260.    When Korotkov blew the whistle on the Disloyal Employees, he failed to mention that he, too, had been directly involved in the scheme before being snubbed by the Team.

261.    While the Korotkov Site is now inaccessible, one page of that site which Korotkov submitted to the United States Patent and Trademark Office in support of a U.S. trademark application for the NGINX trademark that he filed on March 16, 2011 prominently displayed the term "nginx+" and includes a category called "Pricing."

262.    Further, the Korotkov Site also reveals, in bold letters, that as of March 16, 2011, there were already 12,547 "ACTIVE APPLICATIONS" of "nginx+" "DEPLOYED", that were "[r]unning on the Nginx Hosted Platform."

263.    Korotkov's application to register the trademark NGINX provides additional evidence that by early 2010, Korotkov and the Team had already begun to execute their plan to steal the NGINX Enterprise, including NGINX Plus.

264.    Korotkov claimed in his NGINX trademark filing that the first use of the NGINX mark by his closely held company Infosens Inc., the applicant, in connection with the goods and services he described therein was February 1, 2010, and that the first use in commerce of same was March 1, 2011.

265.    Acting on behalf of the Team, in his application to register the NGINX trademark (which he eventually abandoned), in addition to identifications of computer software in Class 9, Korotkov also included an identification of services in Class 42.  That identification of services was as follows: "Computer services, namely, providing virtual and non-virtual application servers, web

servers, file servers, co-location servers, load balancing servers, redundancy servers, media servers and database servers of variable capacity to third-party computing and data storage facilities; Platform as a service (PAAS) featuring computer software platforms for web applications, web server applications, web server frameworks, cloud computing; Software as a service (SAAS) services featuring software in the field of web applications, web server applications, web server frameworks, cloud computing."

266.     Korotkov's identifications of goods and services and the information contained in the Korotkov Site go well beyond the open source model for Open Source NGINX that the Disloyal Employees were using as a ploy to divert Rambler's attention away from the true value of the NGINX Enterprise.

267.     Meanwhile, around the time of Korotkov's February 2010 registration of the NGINXPLUS.com domain and the February 1, 2010 date of first use of the NGINX trademark Korotkov claimed in his NGINX trademark application, he, Alexeev and Konovalov, each became active in surreptitiously communicating with various third-parties to potentially fund the NGINX Enterprise.

268.     In June 2010, for example, Korotkov, whose employment with Rambler, had been terminated approximately one year earlier, solicited investors Mathias Schilling and Thomas Gieselmann, partners of BV Capital based in New York, New York.  BV Capital changed its name to E.Ventures in 2012.

269.     In a joint email to Schilling dated June 6, 2010, Sysoev and Korotkov provided the following description of the Team and its intention to monetize the NGINX Enterprise:

> We have worked out a comprehensive plan how to take NGINX to the next level:
>
> It basically involves not only commercializing some of the NGINX advanced features, but also building more comprehensive infrastructure platform with several network layers around NGINX. (As well as CDN and Private Cloud application which Igor is really adamant about). Eucalyptus.com would be a good and successful example.

…

The NGINX team currently consists of a group of founders and developers with a passion to grow NGINX with adjacent technologies:

- Alex Korotkoff

- Igor Sysoev (inventor)

- Kurk McKusick (BSD UNIX founder and guru)

With a group of talented developers:

- Igor Golovko (works for OpenTable.com startup in SF)

- Leo Golubev (contracted for a long time for Hewlett Packard and CISCO in network dev.)

- Vladimir Venediktov (worked for many years for server dev. At UBS/Zurich, and now works for PIMCO)

-Andrei Kurzhonkov – a master of Erlang, Macros dev. and a network dev. pro

270.    The June 6, 2010 joint email from Sysoev and Korotkov was revelatory of the scope of the Team's scheme and the enterprise possibilities and value that the Team was concealing from Rambler:

In short, Igor has actually been contacted by BV Capital in the past, but he was reluctant to pursue the development path for NGINX which was offered – basically just trying to commercialize it with support contracts/subscriptions.  While this can be done at the initial phase, this doesn't reveal the *full potential of NGINX* – Igor and me have a *much broader vision for NGINX* as part of a Network Infrastructure stack for Real-Time Web and Wireless Acceleration of web content. (emphasis added).

271.    Korotkov and Sysoev's emphasis in their joint email on "NGINX as part of a Network Infrastructure stack …." was consistent with Korotkov's later May 27, 2011 registration of the Internet domain name "NGINXSTACK.com" – one of at least twelve domain name registrations that Korotkov obtained on behalf of the Team and which included the term "NGINX."

272.     In addition, the June 6, 2010 joint email from Sysoev and Korotkov shows the Team's fixation on anchoring the Russian-created NGINX Enterprise in the United States for commercialization:

> We've been recently approached by several US/Russian Venture Funds who are eager to invest in us – but Igor wants NGINX to be a purely US, Silicon Valley Start-Up with its full potential realized in the US market.

273.     Approximately one month later, in July 2010, Korotkov stressed to Gieselmann the need for secrecy, particularly in matters involving Sysoev: "For some reason he's either afraid or unwilling or driven by some not known consideration to meet for a 'US funded startup' in Moscow. That is what [Sysoev] briefly told me.  He's actually becoming increasingly uncomfortable discussing things on the phone/skype."

274.     Korotkov stated to Gieselmann: "we significantly underestimated the amount of close attention and spotlight Igor has been getting recently from Russian startup 'dealers.'  We really should have been more careful with communication channels."

275.     Notwithstanding Korotkov's early efforts at becoming involved with the founding and funding of the NGINX Enterprise, he was ultimately ejected by the Team, and thereafter, Alexeev and Konovalov took the lead on securing funding and corporate formation.

276.     Being discarded stuck with Korotkov, as he would later blow the whistle on the Team in 2019 to Rambler and Lynwood, sparking an investigation by Rambler and Plaintiff, and ultimately, this lawsuit.

277.     The object of the Team's conspiracy was always to sell the purloined NGINX Enterprise to a large U.S. technology company.  The raising of capital from outside venture capital firms was a means to that end.  The Team had no interest in simply misappropriating the NGINX Enterprise and building a company long-term based off the stolen enterprise.  To the contrary, the Team was interested in cashing in on a huge profit by selling the stolen enterprise.  Moreover, the Team had already used Rambler's resources and infrastructure instead of their own to develop

NGINX Plus and the NGINX Enterprise; so a sale to a third-party in approximately five years was the Team's goal and appeared feasible to the Team.

278.     For example, Konovalov emailed Sysoev on March 30, 2011 a forecast of the Team's exit strategy in which Sysoev, Alexeev and Konovalov stood to earn $30 million in profits after a sale to a third-party of the NGINX Enterprise at $100 million.  Konovalov's forecast modeled two rounds of venture capital investment before the exit strategy was completed with a sale to a third-party.  This email and accompanying excel spreadsheet were recovered as part of Rambler and Lynwood's internal investigation in 2019 that required the restoration of deleted emails and other data on the Yam Server.

279.     The Team knew that the venture capital firms they were soliciting would be eager to invest in an enterprise that was already developed and that had a short exit plan (i.e., the sale to a third-party technology company in approximately five years).

280.     By way of another example, the Team's slide deck presentation used with potential venture capital funders explicitly identified F5 as a potential acquirer that the Team and its venture capital partners intended on targeting as part of their exit strategy. *See* Exhibit A at 19.   In this slide deck presentation made to potential investors in 2011 *before the Disloyal Employees left Rambler*, Sysoev, Konovalov, Alexeev and Dounin referred to themselves as "The Team" as Plaintiff does in this Amended Complaint with the addition of Smirnoff.

281.     The aforementioned slide deck presentation to attract potential venture funders that Alexeev, together with Sysoev and Konovalov, created in March and April 2011, before the Disloyal Employees left Rambler with the NGINX Enterprise, emphasized what would become NGINX Plus as a primary driver of revenue for the purloined NGINX Enterprise.  Like all the other communications identified herein, these slide presentations were deleted by the Disloyal Employees but forensically recovered from the Yam Server by Lynwood and Rambler in late 2019.

282.     The Team's slide presentation, under the heading Business Model, explicitly referenced, in addition to fees from technical support, "new infrastructure products based on nginx" including "distributed storage", "high performance content filtering and manipulation", and "media

server functionality."  Another page of the slides, referring to "commercial products", referenced "paid services and products" and "new paid features (modules, custom features)"

283.    The slides further pointed to Open Source NGINX as the key driver of demand for proprietary commercial products designed to enhance its utility, such as NGINX Plus.  For example, one slide stated: "open source user community is key factor" and "community actively promotes nginx by word of mouth and makes the brand highly valuable."

284.    That is, the Team acknowledged that the underlying value of the NGINX Enterprise was the installed user base, notoriety and goodwill that had been generated over the years by Open Source NGINX – a fundamental asset that Rambler had funded on its own since the day that Sysoev began working at the company.

285.    The Team's March 2011 pitches to potential investors in Moscow and New York City regarding the revenue-generation capability of proprietary extensions to Open Source NGINX in the form that would come to be marketed under the NGINX Plus rubric were effective.  By April 2011, the Team signed a funding term sheet with United States-based venture capital firms Greycroft Partners II L.P.("Greycroft"), BV Capital and affiliates ("BV Capital", now E. Ventures) and Runa Capital.

286.    Defendants Runa Capital and BV Capital (now E. Ventures) took the lead in advising the Team on how to navigate through the thorny issues surrounding the Disloyal Employees' contractual and fiduciary duties to their employer Rambler and the core issue of Rambler's ownership rights to Open Source NGINX, NGINX Plus, and the NGINX Enterprise.

287.    Indeed, Runa Capital's leadership team of Beloussov, Chikhachev and Galperin and BV Capital's team of Gieselmann and Schilling became involved in the granular details of the Team's plans to misappropriate the NGINX Enterprise from Rambler and launch it under the banner of a new company formed by the Team and funded by its capital partners – Runa Capital and E. Ventures, which then become shareholders of the Team's newly formed entity.  For Runa Capital and BV Capital, the initial investment term sheet represented the first step in positioning Rambler's

NGINX Enterprise for an acquisition by an established American (preferably Silicon Valley) company – an objective the Team shared at the outset of their conspiracy.

288.    In furtherance of the Team's, Runa Capital's and BV Capital's interest in closing the definitive funding transaction, Runa Capital's Chikhachev introduced Konovalov, Sysoev and Alexeev to Leonard Grayver at the Torrance, CA law firm of Greenberg, Whitcombe & Takeuchi, LLP on April 14, 2011 to handle the legal issues surrounding the formation of the new entities, funding documents and related due diligence issues.

289.    The Team's Alexeev responded to Grayver on the same day and, copying Runa Capital's Chickhachev and Galperin, as well as Sysoev and Konovalov, stated, among other things:

In brief, we need the following:

1. Incorporation in Delaware, U.S. (all standard procedure), including help with office/postal contacts – Nginx, Inc.

2. Registration of the trademark (Nginx)

3. Additional legal opinion on some essential matters related to former employment and non-conflict with Nginx, Inc.

4. Legal support for investment round (issuing/selling securities to Greycroft)

5. Help with amending standard incorporation papers with the bylaws in accordance with investment/termsheet

6. Interaction with the Russian attorneys

7. Possibly also legal advice on a few matters related to work permits/immigration questions (optional)

Overall, we don't have anything now (no company, no IP anywhere, no bank account, no office etc.). We need to establish a company in the U.S. and register IP (trademark, just this – nothing else) in the U.S./Internationally for the first time. We're not going to register any IP in Russia (and the software has been open source/freeware/BSD license since the day one).  Next we'll be establishing a Russian legal entity that won't be a subsidiary or a branch, just a separate company

that will be doing services (software development) for the U.S. one, again without any transfer of IP, just implementation works in full accordance with the specifications provided by the "U.S. company."

290.    Konovalov, then still Rambler's CTO, was at the forefront of negotiating and finalizing the Term Sheet for Series A Preferred Stock Financing of the future NGINX entity with Runa Capital, BV Capital and Greycroft to raise a total of $3 million in Series A funds (the "Term Sheet").

291.    In March of 2011, Kirill Sheynkman, Venture Partner at Greycroft, began transmitting drafts of the Term Sheet to Konovalov.  A March 31, 2011 draft of the Term Sheet set the pre-money valuation of the NGINX Enterprise at $5 million.

292.    Rambler's ownership rights to Open Source NGINX, NGINX Plus and the NGINX Enterprise loomed over the Term Sheet negotiations as the investors were aware that the foregoing constituted Rambler property rights.

293.    Nevertheless, the Term Sheet was executed on or about April 6, 2011.

294.    The investors' concerns over Rambler's ownership rights to Open Source NGINX, NGINX Plus and the NGINX Enterprise persisted and both the Team and Runa Capital, BV Capital and Greycroft continued scheming to find a workaround to Russia's black-letter law concerning employer "work made for hire."

295.    Indeed, on April 15, 2011, Grayver, communicated to the Team two fundamental legal concerns on behalf of the investors following the execution of the Term Sheet:

The investors are particularly concerned about: 1. Your obligations to your current/former employers. I said that we would be prepared to submit a legal opinion from Russian counsel.  For your information, we use our Russian affiliate – Salomons Partners (www.salomons.ru) for such tasks. 2. The issue with the open source. The investors want the company to make a representation and warranty that the open source applications in the company's software won't present any problems…

296.    Grayver's email was not surprising to the Team as they were already aware of their obligations to Rambler and they had previously sought advice from another potential investor, Leon Zilber, in responding to the Series A investors' demand for some assurances that Rambler would not assert its rights to the NGINX Enterprise.  Specifically, on April 6, 2011, Konovalov wrote Zilber as follows:

>  Leon, for your consideration: attached is the termsheet we signed with Greycroft.  I think it's pretty usual for you but would like to mention one important point.  If you look at "Conditions to Close" section, page 4, you will find a paragraph GC [i.e., Greycroft] worries more about and they need an official document regarding this issue: 3. A legal opinion of Company counsel, satisfactory to the … It's about our current employer, Rambler.  *They want to be sure that Rambler will claim no rights for nginx and derived products.*  [Emphasis added].

297.    The Term Sheet section to which Konovalov referred in his email provided in Section 3 under Conditions to Closing, as follows: "A legal opinion of the Company counsel, satisfactory to the Investors, shall be delivered to the Investors stating that the Founders' activities with the Company do not and will not conflict with any agreement, commitment or other encumbrance placed on them by their current or former employer."

298.    Like the rest of documents identified above, Konovalov's email of April 6, 2011 along with the Term Sheet, were recovered from Konovalov's deleted Rambler emails from the Yam server by Lynwood and Rambler in late 2019 and unquestionably demonstrate that the Team and the Series A investors knew of Rambler's ownership rights to Open Source NGINX, NGINX Plus and the NGINX Enterprise.

299.    The Series A investors' concern in closing on the Series A financing without assurances or efforts made by the Team to minimize Rambler's future intervention to protect its ownership rights loomed large.  This concern contributed to the Team's coverup at Rambler that Konovalov directed so as to minimize the likelihood of Rambler discovering that the Team had misappropriated the NGINX Enterprise.

300.    On May 4, 2011, the Team formed NGINX Software, Inc.  The Team then formed NGINX BVI on July 6, 2011 and NGINX DE in August 2011.

301.    As of May 4, 2011, NGINX Software, Inc. established its initial headquarters at 600 Montgomery Street, 43rd Floor, San Francisco, California 94111.

302.    That same day, May 4, 2011, NGINX Software, Inc. filed an application to register the NGINX trademark on a use basis, pursuant to 15 U.S.C. § 1051(a), in the United States Patent and Trademark Office (the "USPTO"), which was assigned U.S. Application Number 85/312,802.

303.    On May 5, 2011, NGINX Software, Inc. filed an application to register the NGINX (Stylized) trademark on a use basis, pursuant to 15 U.S.C. § 1051(a), in the USPTO, which was assigned U.S. Application Number 85/312,806.

304.    Sysoev duplicitously remained an employee of Rambler accepting his salary and benefits while he actively stole the NGINX Enterprise from Rambler.

305.    On July 18, 2011, Sysoev announced to his list service recipients that he was going to "establish nginx as a company to fully dedicate [himself] to the [nginx] project" – a reference to Open Source NGINX and in keeping with the misrepresentations he made to Rambler's management when he left the company (i.e., that he was simply forming a company that would provide consultancy and support services to companies using Open Source NGINX).  Sysoev made no reference to NGINX Plus, the NGINX Enterprise or any of the steps that the Team was taking outside of Russia to form new entities, pursue customers and raise capital.  Despite Sysoev's July 18, 2011 announcement, he stayed on as a part-time employee of Rambler until December 2011.

306.    While the Team was busy laying the groundwork for misappropriating the NGINX Enterprise from Rambler and concealing their actions, Greycroft pulled out of the Series A financing shortly before it was scheduled to close in October 2011.

307.    Upon information and belief, Greycroft pulled out of the closing because its concerns over Rambler's ownership of Open Source NGINX, NGINX Plus and, more generally, the NGINX Enterprise remained unsatisfactorily addressed.

308.     In contrast, Runa Capital and BV Capital went forward and closed on the Series A financing on or about October 23, 2011 after conducting their own due diligence, with full knowledge that Rambler was the legal owner of the entire NGINX Enterprise and assuming the risk that one day there would be a dispute over the ownership of the NGINX Enterprise.

309.     To be clear, both Runa Capital and BV Capital knew that Rambler was the owner of the NGINX Enterprise under Russian law.  The Team was unable to procure any agreement or other legal document evidencing Rambler's knowing waiver of its ownership rights to Open Source NGINX, NGINX Plus and the NGINX Enterprise.  To the contrary, under applicable Russian law Rambler was the owner of same as explained in greater detail below.

310.     Runa Capital did not need to perform its own due diligence to know that Rambler was the owner of the NGINX Enterprise and that Rambler was unaware that this enterprise was being misappropriated by the Team.  Runa Capital knew of the particulars of the conspiracy since September 2010 when Galperin solicited Runa Capital on behalf of the Disloyal Employees and before Galperin joined Runa Capital explicitly to cement the relationship between the Team and Runa Capital.

311.     The so-called due diligence performed by Runa Capital, BV Capital and Greycroft were defensive in nature to ascertain if anything could be done to mitigate the risk of Rambler later discovering and filing suit over the misappropriation of the NGINX Enterprise.  Upon information and belief, Greycroft determined that the risk was too great and backed out of the Series A funding. Runa Capital and BV Capital went forward and agreed to fund the Team that had purloined the NGINX Enterprise from Rambler.

312.     In sum, while Sysoev and Smirnoff were still employed at Rambler, the Team had incorporated its company, opened a San Francisco office, closed its first round of venture capital, and signed up its first customer (Netflix).

**The Disloyal Employees Misrepresented Their Intentions to Rambler When They Separated**

313.     While Konovalov left Rambler on April 29, 2011, Sysoev did not separate from Rambler until December 2011 and Smirnoff did not resign from Rambler until November 2012.

314.    Notably, the Disloyal Employees misrepresented to Rambler the reasons for their separation from the company and their future intentions.

315.    In or about late April 2011, Konovalov and Sysoev separately met in-person with Rambler's Human Resources Director Julia Shulga concerning their resignations from Rambler.  As part of his exit interview process, Konovalov informed Shulga that he and Sysoev were going into business together and forming a new company that would provide support services to the existing Open Source NGINX for third-parties.   Konovalov characterized their intentions as purely an open source project that was not a profitable enterprise based on commercial add-on products.

316.    In Sysoev's separate meetings with Shulga and Smirnoff (his direct superior), Sysoev agreed to Rambler's request to remain employed until the end of 2011 and he reaffirmed that his future endeavors with Konovalov would not compete with Rambler and that they were exclusively related to Open Source NGINX.

317.    Neither Konovalov nor Sysoev disclosed that the Disloyal Employees had developed NGINX Plus and the NGINX Enterprise at Rambler.  Nor did Konovalov or Sysoev disclose that the Team already was pursuing customers for NGINX Plus, forming entities outside of Russia that would gain control of the purloined NGINX Enterprise and that the Team was actively raising capital in furtherance of their conspiracy to grow and then sell the misappropriated NGINX Enterprise.

318.    Rambler's management relied on Konovalov and Sysoev's misrepresentations because no one at Rambler besides the Disloyal and Rambler Employee Conspirators were aware that NGINX Enterprise was conceived and developed within the NOC department while the Disloyal Employees were employed at Rambler.

319.    Moreover, Rambler only utilized Open Source NGINX as an internal tool to solve the company's problems in hosting the large volume of web traffic in Russia and the CIS territories. Rambler never undertook efforts to monetize or commercialize Open Source NGINX based on Konovalov's representations to the company that Open Source NGINX had no value.  As Rambler's CTO, Konovalov was responsible for the development of Rambler's technological products (including software) and he was the officer responsible for advising the other senior management

and the board of directors about corporate opportunities arising from concepts and projects developed at Rambler by its employees.

320.   Between 2009 – 2011, numerous Rambler officers asked Konovalov whether Open Source NGINX had any commercial value for the company.  Konovalov consistently informed the Rambler board of directors, CEO (Nikolai Molibog), Chief Product Officer (Maxim Azarov), Andrey Terekhov (Chief Financial Officer), Pavel Rogozhin (Director of Development and Distribution), Sergei Khrusov (Commercial Director) and General Counsel (Ulyana Antonova) that Open Source NGINX software had no value beyond its internal utility to Rambler to resolve unique technical issues associated with Rambler's web hosting and internet streaming services.

321.   For years leading up to his departure from Rambler, Konovalov had been listing Open Source NGINX on Rambler's books and records as virtually worthless.  In preparation for Rambler's internal financials in 2010 and 2011, Konovalov provided a "no value" designation to Open Source NGINX.

322.   In fact, Konovalov repeatedly stated to the Rambler management identified above over the approximate two and one-half years period (2009-2011) that Open Source NGINX's only value to Rambler beyond its internal utility was Sysoev's successive releases of updated Open Source NGINX iterations under a BSD-style license because it publicized the talent of Rambler's programmers, which constituted an effective marketing and recruitment tool to attract top talent to the company.  In other words, Konovalov misrepresented to Rambler that Open Source NGINX had no commercial value and could not be monetized.

323.   During their separate exit interviews, Sysoev and Konovalov fraudulently concealed from Rambler that they were contemplating the prospect of providing proprietary products such as NGINX Plus and add-on services to Open Source NGINX in the future.  In an attempt to avoid triggering suspicion at Rambler, Sysoev and Konovalov couched their statements as aspirational and deeply prospective in nature.  Sysoev and Konovalov did so because they were cognizant of the fact that all of the proprietary information concerning the NGINX Enterprise belonged to Rambler.

324.    As a result of the foregoing misrepresentations and Rambler's belief that no NGINX Enterprise existed or was even possible, Rambler's CEO (Nikolai Molibog) did not object to Konovalov and Sysoev earning an income off of Open Source NGINX as part of their stated consultancy and support work in servicing future customers utilizing Open Source NGINX.   Neither Konovalov nor Sysoev asked Rambler to waive its ownership rights in Open Source NGINX either during their exit interviews or at any time thereafter.   Nor did Sysoev or (or any of the Disloyal Employees) ever notify or claim that Sysoev was the owner of the proprietary rights to Open Source NGINX itself.   The Team's silence on this point is in keeping with Sysoev's numerous public statements in which he merely claimed that he wrote, and was the author of, Open Source NGINX (as per the author-ownership dichotomy provided for under Russian law).

325.    In reality, the Disloyal Employees were already executing their scheme to lift the entire NGINX Enterprise away from Rambler and transfer it to their newly formed NGINX BVI entity. The Disloyal Employees never disclosed to Rambler that they misappropriated the proprietary software code that would be publicly released as "NGINX Plus" only twenty-one months later by NGINX BVI or that the Team had already filed a trademark application for the "NGINX trademark" in furtherance of their plan to misappropriate the entire NGINX Enterprise from Rambler for their own benefit.   Nor did the Disloyal Employees disclose that Korotkov had already registered the domain name NGINXPLUS.com and populated a Web site at that address that promoted Nginx+.

326.    Konovalov, Sysoev and Smirnoff all owed contractual and statutory fiduciary duties under Russian law to disclose their intentions and actions with respect to the Team's conspiracy to misappropriate and then sell the NGINX Enterprise to a large U.S. technology company.   None of them disclosed their wrongful conduct to Rambler.

327.    When Smirnoff separated from Rambler in November 2012, he participated in an exit interview with Popov and Julia Shulga.    During his exit interview, Smirnoff simply informed Rambler that he was planning on joining Konovalov and Sysoev at their new company NGINX LLC in Moscow performing consultancy and support services for Open Source NGINX.   At this time, NGINX LLC maintained approximately five employees and the Team had not formally released

NGINX Plus. Nor was Rambler aware of the fact that the Team had formed NGINX entities outside of Russia (i.e., NGINX BVI and NGINX Software, Inc.) or that they had stolen the NGINX Enterprise.

328. As explained below, Smirnoff remained behind at Rambler for an additional year after Konovalov and Sysoev separated from Rambler to remove and destroy all evidence of the conspirators' actions and to ensure that Rambler never discovered that they misappropriated the NGINX Enterprise. During his exit interview, Smirnoff never disclosed his participation in the conspiracy either with respect to misappropriating the NGINX Enterprise or his destruction of at least seven servers evidencing the Team's wrongful conduct.

**The Team Concealed its Misconduct from Rambler Including by Destroying Evidence**

329. In addition to concealing from Rambler that the Disloyal Employees had actively been preparing to steal the NGINX Enterprise from Rambler, Konovalov also made affirmative misrepresentations to Rambler during his tenure as CTO with respect to Open Source NGINX and the Disloyal Employees more generally. As the CTO of Rambler, Konovalov was responsible for generating regular internal reviews of Rambler's pipeline of technological products for the CEO and Board.

330. Even though Konovalov and the rest of the Disloyal Employees were fixated on misappropriating the NGINX Enterprise, which they viewed as a highly valuable business, Konovalov uniformly gave the Open Source NGINX software a rating of "1" on a scale of "1-5" with "1" being deemed "worthless" or "no value." Konovalov's designations were designed to and did lull Rambler into complacency with respect to the value of Open Source NGINX and to maintain the status quo at Rambler whereby the Disloyal Employees continued to operate in their own ecosystem, protected by Konovalov from any serious oversight by Rambler's senior management or board of directors.

331. By way of example, on April 5, 2011, when Konovalov was negotiating the investor Term Sheet for the Team and in the process of resigning from Rambler, the Chief Accountant Elena Sergeeva asked Konovalov to provide a report on Rambler's "Innovations, Patterns & Protections of

IP Rights."  As part of this request, the accountant requested that Konovalov fill out the form once again identifying what software programs belonged to Rambler, and rate them in importance on a scale of one to five.

332.    After delaying his response to the inquiry, Konovalov finally submitted a response in mid-April 2011 – roughly two weeks before he left Rambler – in which he fraudulently declined to identify Open Source NGINX as Rambler-owned software.  Instead, Konovalov ranked all NGINX software programs with an "1" for insignificant or no tangible value or importance.

333.    Konovalov fraudulently ranked the NGINX software programs with an "1" even though less than two weeks earlier he had emailed Sysoev an excel spreadsheet on March 30, 2011 with his own internal projections forecasting that he, Sysoev and Alexeev stood to conservatively earn roughly $30 million from the misappropriated NGINX Enterprise if the Team went through two projected rounds of venture capital financing and then sold the NGINX Enterprise for $100 million. This email and the accompanying spreadsheet were additional documents recovered from Konovalov's deleted emails by Rambler and Lynwood in 2019 after Korotkov's revelations sparked their investigations.

334.    Konovalov was Rambler's CTO and the executive responsible for overseeing Sysoev and his efforts at developing and improving Open Source NGINX.  Thus, it was incumbent on Konovalov to advise Rambler what it had with Open Source NGINX, including all of the work product (including existing and software code in development), proprietary information, future business plans and an honest assessment of Open Source NGINX and its enterprise value.

335.    However, in furtherance of the conspiracy, Konovalov concealed the nature, commercial possibilities, and value of Open Source NGINX, as well as the revenue-generating potential of proprietary extensions to Open Source NGINX that would come to be marketed and sold under the NGINX Plus moniker.  Konovalov's fraudulent misrepresentations to Rambler and fraudulent concealment from Rambler was simultaneous with his and the Team's presentations to potential venture capital backers in which they promoted such commercial extensions as a fundamental driver of revenue for the NGINX Enterprise.

336.     Konovalov's fraudulent duplicity in his dealings with Rambler were driven by a simple, selfish objective – he wanted the Team to fly below the radar at Rambler so that he and the rest of the Team could quietly steal the NGINX Enterprise from Rambler without raising the alarm, solely to enrich himself and the other members of the Team at Rambler's expense upon the sale of the NGINX Enterprise to a third-party technology company.

337.     The Team with the assistance of the Rambler Employee Conspirators went to great lengths to conceal their scheme by destroying evidence after they left Rambler.  The Rambler Employee Conspirators in the NOC department (i.e., the NOC software programmers) worked together in a tight-knit department within Rambler devoted to web software product development. The NOC department was just one of numerous product development departments at Rambler but it was the one where Sysoev and his conspirators operated autonomously under the protective cover afforded by Konovalov.

338.     The NOC department was ring-fenced from the rest of Rambler.  The NOC department utilized its own servers, including for internal NOC email communications, and these servers were not integrated with the rest of the company.  The gatekeepers responsible for providing oversight over the NOC department were Konovalov as the CTO, the Deputy CTO Popov, and Smirnoff, who was the Head of the NOC department.  All three of the gatekeepers were active participants in the conspiracy and played central roles in the evidence destruction and concealment of same.

339.     Although Smirnoff managed the NOC department, Konovalov was responsible for the allocation of resources, product development and advising Rambler's board of directors and CEO of any noteworthy developments from the NOC department or any of the other departments under his office.  Konovalov abused his position and provided Sysoev and Smirnoff with Rambler servers for Sysoev and Smirnoff to use in developing NGINX Plus as the first proprietary commercial add-on software to Open Source NGINX.

340.     No one else within Rambler had access to the Sysoev and Smirnoff "personal servers," which they used to develop NGINX Plus.  Furthermore, Konovalov provided Sysoev,

Smirnoff and the Rambler Employee Conspirators with additional servers where the Rambler Employee Conspirators assisted Sysoev and Smirnoff in testing and evaluating Sysoev's proprietary NGINX concepts and code.  Konovalov's ability to clandestinely arm Sysoev, Smirnoff and the Rambler Employee Conspirators with Rambler infrastructure to enable them to develop software on company time and expense (while being full-time employees) was successful because Deputy CTO Popov, who was responsible for ensuring the integrity of Rambler's equipment and recordkeeping of same, was compromised and formed part of the conspiracy.

341.    Popov's tenure as Rambler's Deputy CTO began in 2008.   Popov's responsibilities have included operating Rambler's enormous server farm in excess of ten thousand servers, the organization of server placement in the company's data centers, repair of servers and server equipment and the subsequent disposal of servers.  Popov was responsible for the recordkeeping, chain of custody forms and inventory documentation of all Rambler company equipment.  In short, Popov is the key employee who could identify the location and purpose behind a piece of Rambler equipment.

342.    Konovalov enlisted select Rambler employees including Smirnoff, Popov and Chesnokov into the conspiracy in 2008. Konovalov directed Popov not to record or otherwise memorialize in Rambler's records that he had provided Sysoev, Smirnoff and the Rambler Employee Conspirators with seven servers in 2008 that the conspirators would use to develop NGINX Plus, NGINX Open Source, and other NGINX-related concepts and work product.

343.    Popov complied and along with Smirnoff deleted these seven servers from Rambler's inventory of active servers among Rambler's server farm of ten thousand.  Therefore, there was no record of these seven "personal" servers in Rambler's records and no ability for someone other than Popov, the Disloyal Employees or the Rambler Employee Conspirators to reconcile them back to the conspirators who were utilizing them in furtherance of developing the NGINX Enterprise.

344.    Separately, the NOC department used its own server that hosted its own email system for intra-NOC department communications and for hosting NOC-related software developmental work.  This server was the Yam Server and it was not integrated with Rambler's company-wide

server. Therefore, if an email communication was sent between Sysoev and one of the Rambler Employee Conspirators in the NOC department, said email existed only on the Yam Server and not on Rambler's company-wide Microsoft Exchange server.  The Disloyal Employees and Rambler Employee Conspirators also maintained their regular Rambler email addresses that were hosted and integrated on the company-wide Rambler Microsoft Exchange server.  However, as explained below, the Disloyal Employees and Rambler Employee Conspirators did not use the Rambler Microsoft Exchange server to communicate regarding the conspiracy to steal and sell the NGINX Enterprise.

345.    The ring-fenced nature of the Yam Server was known only to the Disloyal Employees, Rambler Employee Conspirators (including Popov) and Rambler's Chief Information Officer, Korotkov (until his termination).    It was a legacy holdover feature from successive mergers and acquisitions involving other Russian technology companies that Rambler had acquired.  Konovalov ensured that he and the few Rambler Employee Conspirators outside of the NOC department were provided with email accounts hosted on the Yam server so that the Disloyal Employees and Rambler Employee Conspirators were able to communicate and operate in furtherance of their conspiracy without detection by Rambler.

346.    Between September 2011 and November 2012, Smirnoff coordinated the removal and destruction of all the servers used by the Disloyal Employees and Rambler Employee Conspirators to develop the NGINX Enterprise.  Popov, who remained at Rambler after the Disloyal Employees and Rambler Employee Conspirators all joined NGINX LLC in staggered stages, concealed the existence of these servers when Rambler performed investigations in 2012, 2014 and again in 2019 into Sysoev's and Konovalov's tenure at Rambler.

347.    For example, on September 20, 2011, Konovalov, who had already separated from Rambler, emailed Popov and Sergey Chesnokov (one of the Rambler Employee Conspirators) and copied Sysoev.  Konovalov directed Chesnokov and Popov to urgently remove one of the Rambler servers that hosted the "unique data" and provide it to one of the Team's representatives (Oleg Bunin) who stood ready to personally pick up the server from Rambler.  Chesnokov replied that he would remove and deliver the server to Bunin.

348.    On January 24, 2012, immediately after Sysoev separated from Rambler, another Rambler Employee Conspirator from the NOC department (Alexey Loginov) emailed Smirnoff and Rambler Employee Conspirator Alexander Postnikov at 2:53 AM to confirm that he "cleaned the discs on yam.park.old, it is now possible to dissemble it and send it to storage." The "yam.park.old" server, of course, is the same Yam Server that contained the ring-fenced NOC department emails and NGINX developmental code. Following whistleblower Korotkov's disclosures, Rambler and Lynwood found the Yam Server in the Summer of 2019, disconnected and idle, in an off-site Rambler server farm, with its data wiped and in queue for dismantlement.

349.    On March 16, 2012 at 3:21AM, Smirnoff emailed Postnikov and requested that one of Sysoev's servers be removed and personally handed to him at a provided address. Smirnoff wrote: "Please take out of the rack and without dissembling bring it to Danilovskaya Manifaktura and hand over to me personally." Smirnoff identified the location server in question as "Internal 2027" on Rack "I41008 I18I1BZDW60200264" in order for Postnikov to locate and retrieve for Smirnoff.

350.    On April 8, 2012 at 4:45AM, Smirnoff emailed Postnikov to inform him that Smirnoff removed the "other NOC Server from the server room" located at the first floor of building 3 of Rambler.

351.    On November 13, 2012, which was the day following Smirnoff's resignation from Rambler, Smirnoff emailed Anton Ermolaev (another Rambler Employee Conspirator) with instructions on how to handle four Rambler servers: (i) glebius.int.ru1U; (ii) behemoth.ramtel.ru 1U; (iii) glebius.int.ru.old 2U; (iv) jujik.ramtel.ry.1U.   Smirnoff instructed Ermolaev to store the first two servers until Smirnoff could take possession of them and to scrap the other two servers.

352.    In or about December 2012, the remaining Sysoev "personal server" (Server 2779), which hosted Sysoev's NGINX software code and related work product was wiped of all its data by Oleg Manontov (another Rambler Employee Conspirator) at the instruction of Sysoev and the wiped server was donated to Moscow State Technological University ("Stankin").

353.    None of the servers above were returned by the Team and only the Yam Server was found by Rambler and Lynwood in the course of their internal investigation in 2019 after Korotkov

blew the whistle on the Defendants.  The exemplar emails above detailing the stolen and destroyed Rambler servers were obtained from the forensically restored emails stored on the Yam Server.  The Yam Server had all its data deleted.  After it was located, Rambler suggested to Lynwood that it hire a specialist outside forensics firm to restore the data on the Yam Server.  Lynwood hired Group iB, a leading global forensics investigations firm to restore the data on the Yam Server and whose findings informed Lynwood and Rambler of the Defendants' actions.

354.    None of the stolen servers or the Yam Server were recorded in Rambler's inventory logs by Popov.  In fact, the only reason Rambler and Lynwood are aware of the stolen servers was because of Korotkov's disclosures and their own internal painstaking investigation that included an in-person manual review of the servers at Rambler's various facilities to reconcile the information contained in the restored Yam Server emails against Rambler's equipment on hand.  In other words, these servers did not appear in Rambler's inventory records despite the fact that they were company property.

355.    The lack of inventory records evidencing the existence and subsequent removal of the Rambler servers was deliberate and the result of Popov's and Smirnoff's actions taken to assist the Team in concealing their actions.  Popov took direction from Konovalov, Sysoev and Smirnoff, including after they separated from Rambler, to ensure that Rambler never discovered that the Team misappropriated the NGINX Enterprise.  Indeed, Rambler undertook two prior investigations before Korotkov came forward in 2019 and found nothing suspicious precisely because the Rambler Employee Conspirators had successfully covered up the Team's wrongful actions.

356.    After Sysoev left Rambler in December of 2011, Rambler's CEO directed that a review of Sysoev's and Konovalov's emails be conducted and sought confirmation that they had returned all company equipment.  Smirnoff, Chesnokov and Popov falsely reported to Rambler's management in 2012 that nothing out of the ordinary was found in such review and no equipment appeared to be missing from Rambler.  At Smirnoff's direction, Popov and Chesnokov failed to disclose to Rambler's management that the Disloyal Employees' communications and NGINX Plus proprietary code were hosted on the NOC servers and not Rambler's company-wide servers, which

contained the innocuous communications from Konovalov and Sysoev with Rambler employees at large.

357.    In the second-half of 2014, Sysoev appeared in local Russian industry journals that extolled his programming talent for writing Open Source NGINX.  Although the Russian industry journals did not mention NGINX Plus, Rambler at the direction of its majority shareholder A&NN Group (of which Lynwood was then a member) decided to perform another review of Sysoev and Konovalov's emails and a review of the company's equipment inventory records given the attention he was receiving in Russia over Open Source NGINX.

358.    In keeping with A&NN Group's instruction, Rambler's new CEO directed that such review once again be undertaken. However, the review of Sysoev's and Konovalov's Rambler company emails hosted on the Exchange Server revealed nothing unusual or suspicious.

359.    Neither Rambler nor Lynwood knew of the Yam Server and that it contained the Disloyal Employees' communications concerning their misappropriation of the NGINX Enterprise, that its data had been deleted without being backed up on any other Rambler server, and that it had been deactivated and placed in queue for dismantlement without any identifier information so that all of the information hosted on the Yam Server could never again be recovered.

360.    As explained further below, Popov sought to protect the Team once more in the summer of 2019 after Korotkov blew the whistle on the Defendants and provided Rambler and Lynwood with the particulars of the conspiracy.  However, Korotkov's disclosures sparked an internal investigation by Rambler and Lynwood that ultimately revealed that Popov was close to both Konovalov and Sysoev and that contrary to his prior denials to Rambler, was found on email communications with the Disloyal Employees plotting with them to cover up their development and theft of the NGINX Enterprise, including NGINX Plus.

**Robertson Joins the Conspiracy and the NGINX Enterprise Gets Positioned for a Sale to a Large American Technology Company**

361.    After the Disloyal Employees departed from Rambler and after the Team formed the various NGINX entities, the Team, Runa Capital and BV Capital (now E.Ventures) continued to

quietly raise outside capital in pursuit of their common plan and ultimate object of their conspiracy – a sale of Rambler's NGINX Enterprise to a large American technology company for their own ill-gotten gains, without any remuneration to Rambler.

362.    Runa Capital and BV Capital, which became shareholders in NGINX BVI as of October 23, 2011, knowingly participated in multiple future rounds of financing to grow the NGINX entities and set the table for the Merger transaction with F5 in 2019.  The two venture capital firms were anything but passive investors as both firms actively solicited and brought in outside investment into NGINX BVI despite their knowledge that NGINX BVI was anchored by the purloined NGINX Enterprise.

363.    In addition to Runa Capital and BV Capital's participation in future rounds of financings in October 2013, December 2014 and April 2016, Runa Capital's Dmitry Chikhachev and BV Capital's Thomas Gieselmann also held board seats on NGINX BVI's board of directors up to the time of the company's merger with F5 during which time Chikhachev and Gieselmann participated in material decisions undertaken by NGINX BVI including its public rollout of NGINX Plus that was owned by Rambler.

364.    One of the first decisions made by Runa Capital and BV Capital was to convince the Team to hire Robertson in 2012 to act as the CEO of NGINX Software, Inc., and later NGINX BVI.

365.    Runa Capital and BV Capital sought out Robertson because he had experience working in a start-up that culminated in a sale to Microsoft.  Robertson also more recently had been Vice President of Business Development for leading open source software vendor Red Hat.  That made Robertson appealing to Runa Capital and BV Capital as well as the Team.

366.    Robertson readily joined the conspiracy, taking an equity stake in the scheme so he would personally profit when the ultimate object of the conspiracy – a sale to a large technology company – was achieved.

367.    Through his nearly seven-year tenure with the NGINX entities, Robertson gained in-depth knowledge that Open Source NGINX, NGINX Plus, the NGINX Enterprise and all related

business opportunities were conceived of and developed by Sysoev during his employment with Rambler and belonged to, and were stolen from, Rambler.

368.    Despite this knowledge, Robertson proceeded to spearhead the unlawful commercial exploitation and ultimate sale of the NGINX Enterprise to the exclusion of its rightful owner, Rambler.

369.    Robertson, the Team, Runa Capital and BV Capital started forming new NGINX entities such as NGINX Ltd. in the United Kingdom in 2013, NGINX International Limited in Ireland in 2015 and NGINX Asia Pacific Pte. Ltd. in Singapore in 2017.

370.    On April 30, 2013, NGINX DE filed an application to register the NGINX PLUS trademark on an intent-to-use basis, pursuant to 15 U.S.C. § 1051(b), in the USPTO, which was assigned U.S. Application Number 85/918,273.  Subsequently, on December 14, 2017, a Section 7 Request Form was filed seeking to change the registrant to NGINX BVI.

371.    On July 28, 2017, NGINX BVI filed an application to register the NGINX CONTROLLER trademark on an intent-to-use basis, pursuant to 15 U.S.C. § 1051(b), in the USPTO, which was assigned U.S. Application Number 87/547,139.

372.    On July 28, 2017, NGINX BVI also filed an application to register the NGINX UNIT trademark on an intent-to-use basis, pursuant to 15 U.S.C. § 1051(b) in the USPTO, which was assigned U.S. Application Number 87/547,328.

373.    In sum, between 2013 – 2017, Robertson, the Team, Runa Capital and BV Capital engaged in successive capital raises, formed new entities and filed trademark applications in the United States in an effort to position the misappropriated NGINX Enterprise for a sale to a large American technology company as originally planned by the Team in 2011.

**Sysoev Coyly Only Asserts Authorship, Not Ownership of Open Source NGINX**

374.    From the beginning, Sysoev has been purposefully vague about Rambler's role in the development of Open Source NGINX and what rights, if any, he was claiming in the software or the basis of that claim.  Neither Sysoev nor any of the other co-conspirators ever communicated to Rambler or its representatives or successors to claim ownership rights in Open Source NGINX.

Moreover, Sysoev in multiple interviews with major media outlets throughout the world, repeatedly claimed that he wrote Open Source NGNIX while working at Rambler, but was always silent on the subject of ownership.

375.    Sysoev's downplaying of ownership rights, if any, he may claim in Open Source NGINX began in late September 2004 as he prepared to release it on October 4, 2004 pursuant to the terms of a FreeBSD version of the so-called 2 paragraph Berkeley Software Distribution (BSD) open source license.   After two years of working on Open Source NGINX as part of his Rambler responsibilities, Sysoev, for the first time, inserted a copyright notice in a read-me file in the Open Source NGINX that contained his name and creation dates to show his authorship of the code. Russian law distinguishes between authorship and ownership rights to a work.  Sysoev's choice of words were clearly designed to avoid a confrontation with Rambler over NGINX software ownership rights.

376.    Sysoev chose to use a FreeBSD version of the BSD-style license terms for Open Source NGINX that contains no reference to the term "copyright holder", a term that is included in more popular BSD-style license terms, such as those published by the Open Source Initiative.  The open source license language selected by Sysoev states that Open Source NGINX "… IS PROVIDED BY THE *AUTHOR AND CONTRIBUTORS* 'AS IS'…" and that "IN NO EVENT SHALL THE *AUTHOR OR CONTRIBUTORS* BE LIABLE FOR" consequential damages, etc. (emphasis added). In contrast, the Open Source Initiative 2-paragraph BSD open source license states that the software in question "IS PROVIDED BY THE *COPYRIGHT HOLDERS AND CONTRIBUTORS* 'AS IS', and that "IN NO EVENT SHALL THE *COPYRIGHT HOLDERS OR CONTRIBUTORS* BE LIABLE FOR" consequential damages, etc. (emphasis added).   In this manner, Sysoev could take authorship credit for Open Source NGINX, in accordance with Russian law, while avoiding an express assertion that he was the holder of copyright rights in Open Source NGINX.

**The Team Sells the NGINX Enterprise to F5 Through a Merger**

377.    On March 9, 2019, F5 entered into a Merger Agreement (the "Merger Agreement") with NGINX BVI, Neva Merger Sub Limited, a British Virgin Islands company and a wholly owned subsidiary of F5 ("Merger Sub"), and Fortis Advisors LLC, a Delaware limited liability company, as security holder representative (the "Securityholder Representative"), pursuant to which, Merger Sub merged with and into NGINX BVI (the "Merger"), with NGINX BVI surviving the Merger and becoming a wholly-owned subsidiary of F5.

378.    Before the Merger, F5 conducted extensive due diligence concerning the NGINX entities and its principals.

379.    Most importantly, F5 conducted extensive due diligence concerning Open Source NGINX and its proprietary companion code, NGINX Plus, and their origins, which of course revealed that Sysoev developed Open Source NGINX for Rambler and NGINX Plus with Rambler's resources while he was employed there.  Indeed, a reconciliation between the dates of the code commits in Open Source NGINX and NGINX Plus modules and the dates of Sysoev's employment at Rambler quickly and clearly demonstrate that the software was developed while he was an employee of Rambler.

380.    F5 reviewed and analyzed Open Source NGINX and NGINX Plus itself, and therefore F5 knew that Sysoev wrote much of Open Source NGINX and NGINX Plus during normal working hours while employed by Rambler – a fact which confirmed that, Open Source NGINX and NGINX Plus were works made for hire that Rambler owned.  Moreover, as to Open Source NGINX, F5, based on its due diligence, knew that Sysoev and/or the NGINX entities had never taken the overt position that they owned Open Source NGINX.

381.    F5's review and analysis of Open Source NGINX also revealed that the software code that was released publicly by Sysoev between 2004 and 2011 while employed by Rambler was still in the Open Source NGINX as of 2019 and, indeed, remained the core code driving the functionality of Open Source NGINX.  In fact, more than 75 percent of the source code contained in Open Source

NGINX today consists of software code that Sysoev wrote as works for hire while he was employed by Rambler.

382.    Moreover, F5's review and analysis of NGINX Plus and the financials of the NGINX Enterprise necessarily revealed that (i) NGINX Plus was conceived of, designed and/or written by Sysoev while he was employed by Rambler, and (ii) that NGINX Plus's core architecture, functionality and commercial success, are dependent on Open Source NGINX.

383.    F5 reviewed and analyzed Open Source NGINX itself, and therefore F5 knew that Sysoev and NGINX entities never overtly asserted a proprietary interest in it, either to Rambler or Lynwood or otherwise.

384.    Instead, F5's due diligence revealed that Sysoev and the NGINX entities only asserted authorship of Open Source NGINX under Russian law, a claim that is consistent with Open Source NGINX being a work made for hire that Rambler owned.

385.    F5 also had the opportunity to review Sysoev's admissions that he developed Open Source NGINX for Rambler to solve Rambler problems with Apache which impeded Rambler's ability to handle large quantities of web data and related user traffic.

386.    F5's due diligence revealed that Sysoev and the other Disloyal Employees designed and developed Open Source NGINX and NGINX Plus while in the employment of Rambler using Rambler resources and in furtherance of their employment responsibilities thereby making Open Source NGINX a work made for hire that Rambler owned.

387.    F5's due diligence thus revealed that the Team was seeking to sell a business that properly belonged to Rambler, not the Team.

388.    After conducting all its due diligence, F5, both legally and ethically, should have declined to close on the Merger transaction so as to not aid and abet the Team's conspiracy to steal the NGINX Enterprise and related business opportunities from Rambler in order to sell it to a third-party for a profit.

389.    Instead, with knowledge of the Team's conspiracy, F5 proceeded to provide the Team with substantial assistance toward the end goal of the Team's conspiracy – selling Rambler's

NGINX-related business opportunity. F5 was motivated by its own financial gain in acquiring control of the highly valuable NGINX Enterprise.

390. The Merger closed on May 8, 2019, as announced by F5.

391. The result of the Merger is that (i) NGINX BVI became the wholly owned subsidiary of F5, (ii) Merger Sub was merged out of existence and with and into NGINX BVI, (iii) NGINX, BVI was the "surviving corporation" in the Merger and, thus, the separate legal existence of NGINX BVI survived, and continues following, the Merger, and (iv) all of the assets (including property), rights, privileges, powers and franchises of NGINX BVI and Merger Sub and all claims, debts, liabilities and duties of NGINX BVI and Merger Sub becomes the debts, liabilities and duties of NGINX BVI.

392. Subject to the terms and conditions of the Merger Agreement, F5 paid an aggregate amount of consideration worth approximately $670,000,000 in cash, subject to certain adjustments set forth in the Merger Agreement, for all of the outstanding shares of NGINX BVI (excluding shares (i) owned by NGINX BVI or any subsidiary of NGINX BVI and (ii) held by NGINX BVI shareholders who perfected their dissenters' rights with respect to the Merger) and all of the other outstanding equity securities of NGINX BVI (the "Merger Consideration").

393. In its Form 10-K filing with the U.S. Securities and Exchange Commission for the fiscal year ended September 30, 2019, F5 allocated what it referred to as the total purchase price of $643,414,000 as follows: $44,494,000 to net tangible assets, $62,500,000 to developed technologies, $12,000,000 to customer relationships, $14,500,000 to trade name, and $509,414,000 to goodwill.

394. The terms of the Merger Agreement make apparent that F5 was cognizant of the legal risks associated with the history of Open Source NGINX and NGINX Plus having been developed by Sysoev and the other Disloyal Employees, while they were employed by Rambler, during work hours and with the resources and facilities of Rambler.

395. In its 8-K SEC filing in connection with the Merger, F5 described how, upon consummation of the Merger, "certain of Nginx's former security holders will undertake certain indemnity obligations."

396.    In addition, F5 stated, "at the closing of the Merger, F5 will deposit with an escrow agent (i) $2,000,000 of the Merger Consideration to fund potential payment obligations of certain former securityholders of NGINX BVI with respect to a post-closing purchase price adjustment, and (ii) 1% of the Merger Consideration to fund potential post-closing indemnification obligations of certain former securityholders of NGINX BVI, on the terms and conditions set forth in the Merger Agreement."  F5 added that it had obtained an insurance policy "[t]o supplement the potential post-closing indemnification obligations for breaches of Nginx's representations and warranties and certain other matters…."

397.    The Merger Agreement also recites that as a condition and inducement to F5's willingness to enter into the agreement, each of the "Founders", "Key Executives" and "Key Employees" was simultaneously entering into employment agreements with F5, "(including proprietary information and inventions assignment agreements)".  As a further condition of F5 entering into the Merger Agreement, each of the Founders and Key Executives also entered into a "Holdback Agreement" with F5.

398.    Defendant Konovalov, co-founder of NGINX BVI, is now Vice President of Engineering for F5.

399.    Defendant Sysoev, co-founder of NGINX BVI, is now a Senior Architect at F5.

400.    Defendant Alexeev, co-founder of NGINX BVI, is listed as the Product Owner for NGINX Amplify.

401.    Defendant Robertson, NGINX BVI's CEO, is a Senior Vice President of F5 and General Manager of the NGINX business for F5.

402.    Defendant Dounin, a longtime employee of NGINX BVI, is now a Principal Software Engineer for F5.

403.    The Merger Agreement contains a number of representations and warranties provided by NGINX BVI to F5 and the "Merger Sub" concerning intellectual property-related matters.  For example, NGINX BVI represents and warrants that each person who contributed to "Company IP" has executed an irrevocable assignment of intellectual property to NGINX BVI; that "no Employee

or former employer of any Employee has any claim, right or interest in or to any Company IP; and that "no employee or independent contractor of the Company or any Subsidiary is in breach of any Contract with any former employer or other Person concerning Intellectual Property Rights or confidentiality."

404.     A number of the representations and warranties in the Merger Agreement involve or encompass what the agreement defines as "Company Product", a term that is defined as "…each and every product or service marketed, licensed, or sold by the Company or any Subsidiary at any time and any product or service currently under development by the Company or any subsidiary, including nginx (open source), NGINX, NGINX Plus, NGINX Amplify, NGINX Controller, NGINX Unit."

405.     Article IX of the Merger Agreement is entitled "Post-Closing Indemnification." Section 9.1 provides, among other things, that representations and warranties regarding intellectual property matters survive the closing of the transaction for four years.

406.     Upon information and belief, F5 negotiated the Post-Closing Indemnification obligation from NGINX BVI because F5 had actual knowledge from its own due diligence that Sysoev wrote Open Source NGINX and NGINX Plus while he was a Rambler employee and that the NGINX Enterprise was owned by Rambler (not NGINX BVI). Like Runa Capital and BV Capital, however, F5 was willing to proceed with the acquisition of the NGINX Enterprise and take a calculated risk that Rambler would not pursue its ownership rights in the future, but it protected itself by negotiating an indemnity from NGINX BVI for any breaches in NGINX BVI's representations and warranties regarding the NGINX intellectual property.

**F5 Heavily Markets and Monetizes Open Source NGINX and NGINX Plus**

407.     In announcing its acquisition of NGINX, F5 announced it "will maintain the brand with current NGINX CEO, Gus Robertson, and founders, Igor Sysoev and Maxim Konovalov, joining F5 to continue to lead NGINX."

408.     F5 further stated: "Together, F5 and NGINX will enable multi-cloud application services across all environments, providing the ease-of-use and flexibility developers require while

also delivering the scale, security, reliability and enterprise readiness network operations teams demand."

409.    F5 stated it was "committed to continue innovation & investment in the NGINX open source project."

410.    F5 noted that at the time of the merger, "375 million sites globally run on NGINX," including "60% of the busiest 100k sites run on NGINX."

411.    F5 further stated that NGINX BVI "founded in 2011," had collected approximately $26 million in revenue in calendar year 2018, which represented a sixty-five percent growth in revenue levels from the previous calendar year.

412.    F5 has publicly stated that "NGINX…extends our reach to cloud-native and microservices environments and extends our role into application servers, web servers, and API gateways."

413.    According to F5:

> Under the NGINX brand we offer: * NGINX Plus, an all-in-one load balancer, web
> server, content cache, and API gateway for modern applications. * NGINX Controller,
> which provides centralized monitoring and management for NGINX Plus.  We believe
> the combined forces of F5 and NGINX will enable multi-cloud application services
> across a broader range of environments than either company could have addressed
> independently, providing the ease-of-use and flexibility developers require while also
> delivering the scale, security, reliability, and enterprise readiness network operations
> teams demand.

414.    F5 is exploiting the newly acquired NGINX Enterprise in a number of ways.

415.    One way is through licenses to customers, on a subscription basis or per-instance basis, of NGINX Plus.

416.    According to F5, NGINX PLUS is a software load balancer, web server, and content cache built on top of Open Source NGINX. NGINX Plus has exclusive enterprise-grade features beyond what's available in the open source offering, including session persistence, configuration via

API, and active health checks.  As F5 advertises, "[u]se NGINX Plus instead of your hardware load balancer and get the freedom to innovate without being constrained by infrastructure."

417.    NGINX CONTROLLER is a cloud-native, secure, and high-performance application delivery platform.

418.    NGINX UNIT is an App server, HTTP server, and reverse proxy that is designed from scratch around the needs of distributed applications.

419.    Open Source NGINX is an open source web server that powers 400 million websites.

420.    NGINX WAF is an App firewall providing security software for Apps by stopping SQL injection, LFI, RFI, and almost any Layer 7 attack—based on the widely used ModSecurity open source software.

421.    The scope of F5's market share in the open-source web server space, particularly after its acquisition of NGINX, is massive.  As F5 states in its Corporate Flyer, "[w]hen you combine F5's and NGINX's expertise powering more than half of the world's applications across all types of environments, with Shape's insight from mitigating one billion application attacks per day, you have a company that knows how to deliver and secure more applications, and more value, than any company in the industry."

422.    F5 describes NGINX Plus as "a software load balancer, web server, and content cache built on top of open source NGINX."

423.    NGINX Plus has "exclusive enterprise-grade features beyond what's available in the open source offering, including session persistence, configuration via API, and active health checks."

**Open Source NGINX and NGINX Plus Now Being Exploited and Monetized by F5 Contains the Code Developed by the Team (Primarily Sysoev) at and for Rambler and at Rambler's Expense**

424.    Open Source NGINX and NGINX Plus deployed today by F5 contains open source NGINX software and proprietary commercial code that Rambler owned and that Lynwood now owns.

AMENDED COMPLAINT, Case No. 20-CV-03778-LHK

425.    More than seventy-five percent (75%) of the current iteration of Open Source NGINX consists of the open source NGINX software that Sysoev developed and released prior to his exit from Rambler, during regular work hours and utilizing Rambler's facilities, employees, financial resources, and Internet traffic.

426.    NGINX Plus' dependency on Open Source NGINX that Sysoev developed while an employee at Rambler is shown repeatedly in the NGINX Plus release statements, benchmark tests, documentation, and other descriptive sources.  Sysoev and the other Disloyal Employees had already developed substantial portions of NGINX Plus while still employed at Rambler and using Rambler resources and infrastructure.

**Through Its Own Trademark Filings in The U.S. Patent and Trademark Office, F5 Confirmed That It Was Aware Prior To The Merger That the Team Had Begun To Commercialize Open Source NGINX And NGINX Plus While The Disloyal Employees Were Still Employed by Rambler**

427.    In its own filings with the United States Patent and Trademark Office following the Merger, F5 confirmed, based on its own pre-Merger diligence, that it knew the Team had begun using the NGINX trademark, including in connection with the software-as-a-service-type model that Korotkov had claimed in his own trademark application, while the Disloyal Employees were still employed at Rambler.

428.    In December 2019, F5 took over a trademark application for the NGINX trademark originally filed on June 14, 2017.  In connection with such application, F5's legal counsel to filed a Statement of Use in which he identified the dates of first use and first use in commerce of the NGINX trademark in connection with not only server software, but also in connection with various commercial software-as-a-service offerings.

429.    In the Statement of Use, F5's attorney declared that the first use of the NGINX trademark in connection with such goods and services took place on December 14, 2009, and that the first use in commerce took place on April 12, 2011.  These dates of first use closely track the date of first use (February 10, 2010) and the date of first use in commerce (March 1, 2011) cited by

Korotkov on his own trademark application in furtherance of his participation in the conspiracy with the Team as discussed above.  F5 and its attorney provided those dates based on their own diligence, not on dates that Team or the NGINX entities had selected and inserted in the trademark application prior to the Merger.

430.    In the trademark application, originally filed by NGINX BVI, F5 claims such dates of first use and first use in commerce apply to certain software-related products in Class 9, and also to certain services in Class 42.

431.    The identification of goods claimed in the F5 trademark application are as follows: Class 9 Server software for use in web serving, reverse proxying, caching, load balancing, application delivery and media streaming; computer software for controlling and managing web servers; computer software for use in HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of http and reverse proxy servers and mail proxy servers; software for providing data analysis, analytics, and reporting of information concerning web server performance; computer hardware; parts and fittings for all of the aforesaid.

432.    The identification of services claimed in the F5 trademark application are as follows: Class 42: Software as a service (SaaS) featuring software for use in web serving, reverse proxying, caching, load balancing, application delivery, media streaming and controlling and managing web servers; platform as a service featuring computer platforms for web serving, reverse proxying, caching, load balancing, application delivery and media streaming; Software as a service (SaaS) services featuring software for use in HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of http and reverse proxy servers and mail proxy servers; computer services, namely, providing web servers and load balancing servers; software as a service (SaaS) services featuring software for providing data analysis, analytics, and reporting of information concerning web server

performance, design and development of computer hardware and software information, consultancy and advisory services relating to all of the aforesaid.

433.    Thus, F5, which had conducted extensive due diligence in early 2019 in connection with the Merger, was well aware prior to the consummation of the Merger that the Team had taken concrete steps to steal the NGINX Enterprise from Rambler, and develop assets such as NGINX Plus, in furtherance of their monetization of the NGINX Enterprise, years before Sysoev exited Rambler to launch the Team's turnkey Open Source NGINX and NGINX Plus-based business enterprise.

434.    Indeed, F5's own counsel confirmed with the United States Patent and Trademark Office that the Team's use in conjunction with the NGINX trademark of the described goods and services – *the scope of which goes far beyond the mere development and maintenance of the Open Source NGINX repository – had first occurred two years before Sysoev exited Rambler.*

435.    Nevertheless, despite its possession of such information and knowledge, F5 proceeded with the Merger, in disregard of the fact that the Team was violating Rambler's rights.

**A Whistleblower Comes Forward to Rambler Revealing the Conspiracy**

436.    In the wake of the F5 Merger, during the late spring of 2019, Rambler was approached by Korotkov.

437.    Korotkov, having been cut from the Team despite his early efforts on their behalf, blew the whistle on the conspiracy and scheme.

438.    Korotkov informed Rambler that the Disloyal Employees conspired to conceal from Rambler that Open Source NGINX and NGINX Plus were developed by Sysoev and the Disloyal Employees while they were still employed at Rambler and at Rambler's expense.

439.    Korotkov informed Rambler that the Disloyal Employees conspired to conceal from Rambler the value of Open Source NGINX and NGINX Plus, and more generally the NGINX Enterprise.

440.    Korotkov further informed Rambler that the Disloyal Employees actively concealed their work on Open Source NGINX, NGINX Plus, and the NGINX Enterprise both during and after their employment with Rambler.

441.    Korotkov also explained that Konovalov's position as CTO facilitated the Disloyal Employees' concealment of their work on Open Source NGINX and NGINX Plus as well as the pervasive concealment of the true utility and value of the NGINX Enterprise to Rambler.

442.    Korotkov also disclosed to Rambler that during their employment with Rambler, the Disloyal Employees conspired to and consistently did conceal from Rambler the commercialization and monetization they recognized for Open Source NGINX and NGINX Plus and were planning to exploit.

443.    Korotkov further disclosed to Rambler that the Disloyal Employees developed Open Source NGINX and NGINX Plus during their work hours utilizing Rambler's infrastructure.

444.    In addition, Korotkov disclosed to Rambler that, in furtherance of their conspiracy, the Team directed Smirnoff who stayed behind at Rambler to help the Team cover their tracks, to misappropriate and then destroy the servers in the hope that it would conceal their scheme to steal the NGINX Enterprise from Rambler.

445.    Korotkov also disclosed to Rambler and Lynwood where to investigate to find any remaining evidence of the Disloyal Employees' wrongful conduct.  Specifically, Korotkov informed Rambler and Lynwood of the importance of the NOC department and its ring-fenced servers for hosting relevant information regarding the NGINX Enterprise.  Neither Rambler's nor Lynwood's senior management knew of the NOC department's Yam Server.

446.    Prior to Korotkov's disclosures, Rambler did not have reason to, and did not, understand the scope or value of the Disloyal Employees' work on Open Source NGINX and NGINX Plus code, which was developed at the expense and risk of Rambler, but under the office of Konovalov.

447.    With the cover of reporting to Konovalov, the Disloyal Employees were able to successfully conceal the utility, scope, and value of the NGINX Enterprise from Rambler.

448.     Immediately after Korotkov's disclosures, Rambler and Lynwood conducted extensive investigations regarding the whistleblower's assertions.

449.     Rambler and Lynwood's extensive investigations confirmed the veracity of the whistleblower's assertions, and this lawsuit followed.

**Lynwood Acquires Rambler's Rights to Open Source NGINX, NGINX Plus, Related Intellectual Property Rights, and The Claims Asserted Herein**

450.     Lynwood's former name prior to January 2, 2015 was A&NN Holdings Limited ("A&NN Holdings").  From 2013 until December 2014, A&NN Holdings indirectly owned 25% of Rambler while another 25% of Rambler was owned by A&NN Holdings' sister companies.  A&NN Holdings and its sister companies together formed a part of A&NN group of companies ("A&NN Group").  From 2013, A&NN Group was not only a 50% shareholder of Rambler but also a managing partner of Rambler.

451.     In January 2015, Lynwood ceased to be an indirect shareholder but A&NN Group remained a 50% shareholder of Rambler and would go on to increase its ownership stake to 100% in 2017.  Tekso Holdings Limited (one of the companies that comprised part of A&NN Group in 2017) sold its approximate 50% stake in Rambler in July 2020.

452.     Lynwood is a seasoned holding company that invests in a variety of industries across Europe.

453.     In the second-half of 2014, Sysoev appeared in industry specific media outlets to give interviews concerning his authorship of Open Source NGINX, which was gaining popularity.  In those interviews, Sysoev did not mention the Team's "open core" strategy or the existence and commercialization of NGINX Plus.  Nevertheless, as Rambler's largest shareholder and its managing partner at the time, A&NN Group asked Rambler to investigate its records concerning Sysoev and Konovalov and the development of Open Source NGINX.

454.     In January 2015, Rambler reported back to Lynwood (post-separation from A&NN Group) that its investigation revealed nothing out of the ordinary and that Sysoev's and Konovalov's

email communications concerning Open Source NGINX centered on Rambler's internal usage of Open Source NGINX to solve its web traffic issues.

455.    Neither Rambler nor Lynwood knew of NGNIX Plus, let alone that it and the NGINX Enterprise had been conceived and developed at Rambler before the Disloyal Employees left Rambler.

456.    Moreover, Rambler and Lynwood could not have known in 2015 that the reason their investigation did not uncover the Disloyal Employees' conspiracy to steal the NGINX Enterprise was that the Team, together with the Rambler Employee Conspirators, had deliberately walled themselves off in the NOC, separate from the rest of Rambler, and that they had meticulously covered up their misdeeds by deleting revealing emails and other electronic files, removing, relocating and dismantling incriminating servers, and routing conspiracy-related email traffic through the Yam Server domain.

457.    Nevertheless, Lynwood understood that Konovalov and Sysoev held important positions at Rambler, which gave both of them (especially Konovalov) access to Rambler's confidential information.  Given the importance of their former positions at Rambler and the fact that Sysoev was now appearing and giving interviews on his authorship of Open Source NGINX, Rambler and Lynwood prophylactically entered into an Assignment Agreement, dated January 15, 2015 and amended on January 23, 2015 (the "2015 Assignment").  The 2015 Assignment assigned Rambler's employment and intellectual property rights to Lynwood for enforcement in the event Sysoev or Konovalov would ever claim an ownership right to Open Source NGINX or had previously engaged in any illicit or wrongful conduct vis-à-vis their employment obligations or Russian law as it concerned Rambler and its proprietary information and products.

458.    At that time, however, neither Rambler nor Lynwood were aware that the Disloyal Employees had conceived and developed the NGINX Enterprise, including NGINX Plus while in the employment of Rambler.  Moreover, neither Sysoev nor any of the other Disloyal Employees had ever claimed to Rambler that Sysoev owned (as opposed to authored) Open Source NGINX .

459.    At that time, Rambler and Lynwood were also unaware of the value of the NGINX Enterprise precisely because Konovalov had consistently given it a "1" or worthless value in his internal reports as the company CTO responsible for product development and because neither Konovalov nor Sysoev ever disclosed the scope and magnitude of the Open Source NGINX project the Disloyal Employees were working on at Rambler; and also because the Disloyal Employees removed the servers containing the NGINX-related work product in 2012 before Smirnoff left Rambler.  Moreover, Rambler had previously directed Popov and Chesnokov  to perform a review of Sysoev and Konovalov's emails and to ensure that they had returned their Rambler equipment, with no revealing evidence of wrongdoing to show for it.  Unbeknownst to Rambler and Lynwood, Popov, Chesnokov and the other Rambler Employee Conspirators were active participants in the Team's conspiracy and concealed from Rambler that the Team had misappropriated the NGINX Enterprise.

460.    Therefore, as of January 15, 2015, Rambler reasonably understood it had lost considerable technical talent with Sysoev's departure, but it reasonably did not suspect that talent was working on a massive heist from Rambler that would play out over the next several years.

461.    It was only after the whistleblower Korotkov came forward in April 2019 and detailed to Rambler and Lynwood the scope of the Team's conspiracy, and informed them, for the first time, of where the incriminating evidence of the conspiracy could be found, including the Yam server, and after Rambler and Lynwood conducted yet another investigation in 2019 based on Korotkov's revelations, that evidence of the Team's conspiracy and massive coverup was finally discovered.

462.    Korotkov's disclosure was the spark that lead Rambler and Lynwood to investigate his assertions and the possibility that Rambler (now Lynwood) had potential claims against the Team and potentially other participants.  Rambler and Lynwood did not simply take Korotkov at his word. They assumed Korotkov had an axe to grind toward the Team.  However, Korotkov provided Rambler and Lynwood with specific information about the extent to which the Team went to conceal the NGINX Enterprise and their misconduct from Rambler.   Thus, Rambler and Lynwood investigated Korotkov's allegations.

463.    It was only after the completion of these time-consuming and expensive forensic investigations that Rambler and Lynwood independently verified and corroborated the information Korotkov provided them in April 2019.

464.    The company-wide investigation that Rambler and Lynwood conducted in 2019, unlike the second-half 2014 investigation, had the game-changing benefit of the detailed conspiracy description and evidence roadmap provided by Korotkov.  It also confirmed that without Korotkov's assistance in describing how the conspiracy was hatched and executed, including by using and then removing servers that were never accounted for in Rambler's inventory records and that no one outside of the conspirators had access to, including an entirely ring-fenced NOC email server (Yam), Rambler would have never discovered the Defendants' misconduct.

465.    In Phase 1 of the 2019 investigation, Rambler searched for: email servers that could have contained email traffic for the years 2001 through 2012; backups in Unix infrastructure; inventory databases; rm.rambler-co.ru (new); invkur.rambler.ru (old), and mediawiki.park.rambler.ru (old).  In addition, Rambler storage facilities in Malino, Stupino urban district in the Moscow Region and Ostapoviskiy DC in Moscow were searched to identify any servers that contained storage media and/or unutilized hard disks.  No relevant information concerning the Disloyal Employees' conspiracy was contained in these repositories of information.

466.    In Phase 2 of the 2019 investigation, Rambler and Lynwood searched for documents concerning the assignment of tasks related to the development, debugging and testing of Open Source NGINX from 2001 through 2012.  In particular, the Rambler application systems jira.rambler-co.ru and otrs.park.rambler.ru, otrs.park.rambler.ru, and otrs2.park.rambler.ru were analyzed.  No relevant information concerning the Disloyal Employees' conspiracy was contained in these repositories of information either.

467.    In Phase 3 of the 2019 investigation, a search was conducted for servers on which Open Source NGINX could have been developed.  During the course of such search, 120 hard drives found in Rambler storage facilities were analyzed.  Once again, no relevant information concerning the conspiracy to steal and then sell the NGINX Enterprise was found.

468.     The most significant find, by far, during the 2019 investigation was the Yam Server. In the course of the 2019 investigation, based on specific information from Korotkov, Rambler located the Yam Server, an aging, non-descript server located in an off-site Rambler server farm, disconnected from any network and in queue to be dismantled.  It was discovered that the Yam Server had been used by Disloyal Employees and the Rambler Employee Conspirators to conduct and store internal NOC communications.   The reason that the Yam Server had not been located in late 2014/2015 was that it was not identified on Rambler's inventory of servers or anywhere else in Rambler's records. This omission was by design – the Disloyal Employees, in conjunction with the other Rambler Employee Conspirators, had ensured that the Yam Server was "off the grid" and was not identified in Rambler corporate records.  The 2019 investigation revealed that the Yam Server had been shut down, was no longer in use, and was slated for disposal.

469.     Once the Yam Server was identified, it became a focal point of Phase 4 of the 2019 investigation (i.e., Fall of 2019).  Rambler and Lynwood first examined the Yam Server for any information related to Open Source NGINX.  As part of that analysis, it searched for traces of correspondence and/or email boxes of the Disloyal Employees, Popov, Korotkov, NOC personnel and other Rambler software programmers.   While traces of correspondence were found, most mailboxes were not located, *i.e.*, had been removed, or their contents had been mostly or entirely deleted.   Therefore, Lynwood hired outside forensics investigations firm Group iB, a leading cyber forensics firm to restore the Yam server so its contents could be reviewed.

470.     Phase 5 of the 2019 investigation involved extensive searches in Rambler's corporate-wide Exchange email server for mailboxes for those the same individuals and all other key Rambler employees and officers who could have had potential information concerning NGINX from 2001 until 2019, including from backed-up email systems.  The investigation found that the Disloyal Employees' and Rambler Employee Conspirators' Exchange emails contained only the innocuous communications. All of the illicit communications concerning the Disloyal Employees' and Rambler Employee Conspirators' misappropriation of the NGINX Enterprise were hosted and stored on the Yam server, which was walled-off from the Rambler company-wide server and never integrated.

Nor was the information on the Yam server backed-up prior to the Rambler Employee Conspirators deleting its data, moving it into an off-site server rack, disconnecting it and slating it to be dismantled.

471.    In other words, Rambler and Lynwood undertook a full-blown internal investigation and uncovered no evidence of the Disloyal Employees' and Rambler Employee Conspirators' actions until they discovered the disabled Yam server in an off-site Rambler server farm, disconnected, with its data wiped, and in queue to be dismantled.  The Rambler internal investigations team only knew to search for the Yam server because of Korotkov's revelations.

472.    Moreover, the 2019 investigation re-confirmed that nothing existed on Rambler's integrated systems in 2012 or second-half of 2014/January 2015 when the company conducted its prior investigations.  The only way Rambler would have discovered the conspiracy is if one of the co-conspirators had blown the whistle, like Korotkov finally did in April 2019.  Instead, Rambler's previous searches in 2012 and second-half 2014/January 2015, unbeknownst to Rambler and Lynwood, had been obstructed by the Rambler Employee Conspirators at the explicit directions of Konovalov, Sysoev and Smirnoff.

473.    While Rambler and Lynwood's internal investigation was underway, Popov was questioned anew by Rambler and Lynwood on May 17, 2019 in light of Korotkov's disclosures concerning the destruction of Rambler servers containing information concerning the development of the NGINX Enterprise.  Popov denied knowledge of finding anything suspicious involving Sysoev and Konovalov and reaffirmed that he exhaustively searched Rambler's records including the company's inventory records and found nothing.  Popov also denied that he assisted the Team in concealing their misappropriation of the NGINX Enterprise and evidence destruction.

474.    After Group iB restored the deleted files stored on the Yam server, Rambler and Lynwood found electronic communications evidencing that Chesnokov and Popov had been actively assisting the Team to conceal their actions from 2008 until 2019 (at the direction of the Disloyal Employees).  The contents of the Yam Server also revealed that the Team misappropriated the NGINX Enterprise, which was conceived and developed at Rambler by the Disloyal Employees.

475. Based on their own forensic investigatory findings and an internal investigation within Rambler, a new assignment agreement was entered into by Rambler and Lynwood to replace and supersede the 2015 Assignment.

476. On April 20, 2020, Rambler and Lynwood entered into an Assignment Agreement (the "Assignment"), pursuant to which Rambler on behalf of itself and its affiliates irrevocably assigned to Lynwood any and all rights to Open Source NGINX, derivative works derived therefrom, and related intellectual property and business opportunities, as well as any and all claims for damages arising out of or relating to, Rambler's rights in or to Open Source NGINX, NGINX Plus and intellectual property and related business opportunities, and the exclusive right as the owner thereof to enforce all rights Rambler holds with respect to all related intellectual property and/or the legal and contractual duties owed to Rambler by Rambler's former employees. The Assignment was authorized unanimously by the Rambler Board of Directors.

477. By virtue of the Assignment, Lynwood owns the causes of action asserted in this Complaint, and Lynwood is the proper Plaintiff to maintain this action against Defendants.

**Under Russian Law, Rambler Owned Open Source NGINX, NGINX Plus and Related Intellectual Property and Business Opportunities**

478. Under Russian law, Open Source NGINX and NGINX Plus were owned *ab initio* by Rambler, the employer of Sysoev, from the moment of its creation, as a work made for hire. The applicable Russian law to the Defendants' conduct is law of the Russian Federation from July 9, 1993 "On Copyright and Neighboring Rights" (the "1993 Law") as well as the Law of the Russian Federation from September 23, 1992 No. 3523-1 "On Legal Protection of Computer's Programs and Databases" (the "1992 Law").

479. Both the 1992 Law and the 1993 Law were in effect at the time Sysoev first wrote Open Source NGINX for Rambler in 2001, and continued to govern the Disloyal Employees' misconduct as employees and Rambler's ownership rights (and thus Lynwood's ownership rights) throughout the relevant time period in this Complaint.

480.     While Sysoev could rightfully claim under Russian law the right to be identified as the author of Open Source NGINX or NGINX Plus, neither he nor any other member of the Team could claim the proprietary copyright thereto, which always belonged to Sysoev's employer, Rambler, and is now owned by Lynwood.

481.     Sysoev's unauthorized release of Open Source NGINX to the public, under the BSD open source license, and the Team's continued commercial exploitation thereof and of NGINX Plus, eventually through NGINX Software, Inc. and NGINX BVI, and now through F5, constituted a gross violation under Russian law of Sysoev's and the Disloyal Employees' obligations as employees of Rambler as well as violations of the Rambler Code of Conduct, the Rambler Regulations and Russian civil law provisions governing "works made for hire."

482.     Section 2 of the 1992 Law and Section 7 of the 1993 Law includes programs for computational devices ("computer programs") in literary works and recognizes them as objects of copyright.

483.     Rights related to computer programs arise from the mere fact of their creation (and from the moment of their creation) and do not require separate registration with a relevant government authority (in Russia, – RosPatent).

484.     Section 11 of the 1992 Law and Section 16 of the 1993 Law provides for the owner of copyright to exclusively use and/or dispose of such rights in any way that he or she deems appropriate, provided such use or disposal does not otherwise violate the law.

485.     Copyright under Russian law consists of two elements: (i) the authorship right and (ii) the "exclusive proprietary right" to exploit the work.

486.     Under Section 13 of the 1992 Law, the copyright for a computer program can be registered with RosPatent at any time, but failure to do so does not cancel or undermine the owner's rights.

487.     Under Russian law, protection of the proprietary rights/right of usage of the computer program applies to the program codes, as distinct from the authorship right, and may be assigned, passed on under contract, inherited, or otherwise transferred.

488.    Pursuant to Section 9 of the 1993 Law and Section 13 of the 1992 Law, if the author of the computer program is employed at the time of the computer program creation, then the employer holds the proprietary rights to the program, unless the employee and the employer agree otherwise.  The program then becomes a copyrighted object made while in employment and is then regulated by the applicable provisions of the Russian civil law.

489.    Sections 12 of the Russian Civil Code, Sections 18 & 20 of the 1992 Laws, and Sections 48-49.1 of the 1993 Law provide remedies for the legitimate copyright owner in the event of the breach of copyright, including the recognition of rights, the restitution of the rights as they existed prior to the breach, compensatory damages, and the recovery of damages based on a violation of moral rights.

490.    In addition, Section 20 of the 1992 Law and Section 50 of the 1993 Law provide protection of computer programs by authorizing the issuance of a preliminary protective court order or general civil law compensation provisions.

491.    The basis for filing of the corresponding claim is the actual damage caused to the claimant per Section 15 of the Russian Civil Code and may be recovered in full.

492.    Under Russian law, recoverable damages include costs that the person whose right is breached has incurred and will have to incur in order to remedy the breached right, loss or damage to the property of such person as well as unrealized profits gains that such person should have received if his or right was not violated.

493.    Russia, like the United States, is a signatory to the Berne Convention.

494.    Article 5 of the Berne Convention provides: "Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals," but the "extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed."  Berne Convention Art. 5(*l* )–5(2).

495.    Accordingly, with valid copyright claims in hand under Russian law against Defendants, U.S. Copyright law applies to a copyright infringement claim against those parties brought in United States federal courts based on infringing activity that occurs within the United States.

496.    Plaintiff meets the standing test of 17 U.S.C. § 501(b), "which accords standing only to the legal or beneficial owner of an 'exclusive right.'"

497.    Where a work was created in a foreign country, the plaintiff's ownership of the copyright in the work is governed by the law of the jurisdiction where the work was "'created' and 'first published.'"

498.    Open Source NGINX and NGINX Plus were created and/or first published and/or deployed in the Russian Federation, and therefore Russian law is the applicable law to determine issues of ownership of rights.

499.    Under Russian law, Rambler was the owner of Open Source NGINX and NGINX Plus copyrights when they were developed and when the Team formed NGINX Software, Inc. in 2011.

500.    Sysoev developed Open Source NGINX and NGINX Plus while Sysoev was a full-time employee of Rambler.

501.    The Sysoev Employment Agreement with Rambler, in pertinent part, states as follows:  "7. WORKS FOR HIRE.  As part of the Employee's performance of his official duties, he may be entrusted with the Business Entity's administration or his or her authorized person to create works that are objects of copyright, such as computer programs and databases. Such works is an official work.  The exclusive property rights of such works belong to the Business Entity."

502.    The Sysoev Employment Agreement with Rambler contains the standard set of rights and obligations under Russian law that replicate the provisions of the Russian Labor Code.  Under Russian law, the copyright in a work made for hire belongs to the employer.

503.    As a matter of Russian intellectual property law, the exclusive proprietary right to work made for hire (in Russian, this is phrased *sluzhebnoye proizvedeniye*) belongs to the employer from the moment the work is created by the employee.

504.    Under Section 14 of the 1993 Law and Section 12 of the 1992 Law, the legal tests for determining the existence of a work made for hire are: (i) whether the work was made in the course of performance by the employee of his or her employment duties or (ii) by a job direction (instruction) issued to the employee by the employer.

505.    Pursuant to Russian law, if the relevant work was created by the employee while in the employer's employment, the exclusive right to commercially exploit the work will therefore automatically pass to the employer regardless of the payment of compensation for such work.

506.    Over nearly 10 years of employment with Rambler, Sysoev had several job titles, all of which at various periods of time involved "programming" and "system administration."

507.    In Russia, employers often rely on general descriptions of the employee's duties and responsibilities provided in the supporting sources such as the Unified Qualifications Register ("EKS").

508.    EKS provides a very detailed account of Sysoev's job description, in particular, when addressing the functions of "Engineer – System Programmer" and "Administrator of the Computer Network."

509.    This description for System Programmer as found in EKS includes "development and tuning of applied program software," "development of software components," "modernization of standard software configurations, devices, networks, protocols and programs," and "participation in the development and [...] design of the new technical media."

510.    For Computer Network Administrator, the EKS description includes "support and, where necessary further work on the program media; development of programs for support of computer networks and network applications."

511.    As even Sysoev has admitted, he developed Open Source NGINX to solve issues he observed with Rambler's use of Apache.

95

512.    Konovalov has previously proclaimed in statements made to the Russian open source community that Rambler is the "Alma Mater of the popular NGINX web-server."

513.    Sysoev developed, tested, and used Open Source NGINX during his normal working hours and within the scope of his employment duties to Rambler.

514.    The nginx.org website was hosted on the server hardware belonging to Rambler and at IP addresses belonging to Rambler, including (a) during the period from September 8, 2005 until October 24, 2009, IP address: 81.19.69.70; and (b) during the period from October 24, 2009 until July 28, 2011, at IP address: 81.19.68.137; (both of the aforementioned IP addresses belonged to Rambler).

515.    The websites "sysoev.ru" and "nginx.org" were actually hosted on a Rambler server with the inventory number 2779, which from 2002 to 2012, was located in Rambler's server hardware center (Data Center) at the address: 10 Vostochnaya Street, Moscow.

516.    The first public version of Open Source NGINX was released by Sysoev in October 2004 without Rambler's authorization, while Sysoev was working full time for Rambler.

517.    Open Source NGINX was developed in response to the professional tasks and challenges Rambler faced at a time when approximately twenty percent of overall Russian Internet traffic was routed *via* Rambler servers.

518.    By that time, Rambler had launched many on-line products (ranging from photo apps to news to specialized mailing services) that required high levels of website responsiveness and lack of denials of service.  Open Source NGINX was an important tool that Rambler used to provide adequate throughput and scalability to address this issue.

519.    The NGINX Plus software was also designed and developed by Sysoev with assistance from the Disloyal Employees all of whom were employed by Rambler and utilized Rambler's infrastructure and resources in the development thereof.

520.    Although substantially completed, the NGINX Plus software may not have been fully developed by Sysoev or the Disloyal Employees while employed at Rambler.  Under Russian law, the fact that the employees did not complete the development of the software program does not

invalidate an employer's proprietary right to the code as a work made for hire particularly where, as here, the NGINX Plus software was derivative of the original work made for hire, Open Source NGINX.  In addition, here the Disloyal Employees deliberately delayed the completion of NGINX Plus so they could continue concealing its existence and prevent Rambler from discovering and utilizing it so that they could execute on their scheme of misappropriating the entirety of the NGINX Enterprise.  Under such faithless-servant situations, Russian law provides that Rambler retains the ownership rights to NGINX Plus and any derivative works thereof.

521.    Accordingly, under Russian law, Rambler was the owner of all proprietary copyright rights in and to Open Source NGINX, NGINX Plus and the related business opportunities comprising the NGINX Enterprise, and now Lynwood owns Open Source NGINX, NGINX Plus and the NGINX Enterprise by virtue of the assignment from Rambler to Lynwood.

**NGINX Software, Inc., NGINX DE, NGINX BVI and F5 Fraudulently Seek to Register Trademarks and Claim Rambler's History As Its Own**

522.    In addition to the employment agreements under which Sysoev and the other members of the Team were operating while employed at Rambler, Rambler's Internal Policies and Procedures provided that: "The employee confirms that the exclusive property rights to all objects of copyright and related rights developed by him/her or with his/her participation are owned by the Company.  The said objects are considered to have been developed as part of the employee's job assignment … and shall make every effort so that the Company can receive everywhere, at its own expense, patents, copyrights and other forms of the protection of intellectual property owned by the Company and acknowledges that all the material benefits from such inventions shall be owned exclusively by the Company."

523.    The NGINX trademark and NGINX (Stylized) trademark were first conceived of, developed as a work for hire, and first used by Rambler in connection with Open Source NGINX dating back to 2002 and first used in U.S. commerce by Rambler in connection with Open Source NGINX dating back to 2004.

524.    Surreptitiously, NGINX Software, Inc. subsequently filed applications to register the NGINX trademark and the NGINX (Stylized) trademark in the U.S. in 2011, while Sysoev and the other members of the Team were still employed at Rambler and claimed a date of first use of the NGINX and NGINX (Stylized) trademarks as of May 1, 2002 and claimed a date of first use in U.S. commerce of the NGINX and NGINX (Stylized) trademarks as of May 1, 2004 while Sysoev was employed by Rambler.

525.    The claim of ownership by NGINX Software, Inc. of the NGINX and NGINX (Stylized) trademarks is fraudulent where it did not own the marks as claimed, yet submitted sworn declarations to the USPTO regarding such ownership.

526.    Subsequent applications to register the NGINX, NGINX PLUS, NGINX UNIT and NGINX CONTROLLER trademarks were also filed with the USPTO on similar fraudulent bases by NGINX DE and NGINX BVI.

527.    By causing NGINX Software, Inc., NGINX DE, and NGINX BVI to use and fraudulently register the aforementioned NGINX-formative trademarks, the Team misappropriated the valuable name recognition and goodwill associated with the NGINX mark.

528.    Through such misuse and wrongful appropriation of the NGINX-formative trademarks and NGINX brand and the name recognition and goodwill attendant thereto, the Team deliberately maximized the value of the stolen enterprise in order to make it as attractive as possible for potential acquisition by a large U.S. technology company.

529.    Because of the notoriety of the NGINX trademark, F5 recognized that it would automatically have a compelling business case for completing the merger with NGINX BVI, as well as an engine for monetizing years of forthcoming commercial releases of NGINX Plus.  By acquiring and deploying the NGINX formative trademarks, F5 would instantly raise its profile and financial value across a broad audience of the software development world, from the largest Internet and networking companies to the smallest software development companies.

530.     NGINX Software, Inc. and NGINX BVI subsequently assigned the foregoing NGINX-formative trademarks to F5 at the end of 2019, which continued to make fraudulent statements to the USPTO regarding ownership of such trademarks.

531.     As part of the scheme to circumvent Rambler, deprive it of the recognition that should be rightfully attributed to it and have the value of its achievements, Defendants have caused advertisements for Open Source NGINX and NGINX Plus to expressly exclude Rambler and only refer to "NGINX" "NGINX, Inc." or "F5 Networks, Inc." as the companies behind such products, even though such products would not have existed but for Rambler.

532.     By the Defendants failing to attribute the history of Open Source NGINX and NGINX Plus to Rambler and claiming it for themselves, the Defendants have engaged in false advertising of the products.

**The Trademarks Used by Defendants Are Confusingly Similar**

533.     The NGINX and NGINX (Stylized) trademarks used by Defendants are exactly the same in appearance, sound and commercial impression to the NGINX trademarks owned by Lynwood as the successor-in-interest to Rambler's trademark rights.

534.     The NGINX and NGINX (Stylized) trademarks used by Defendants are used in connection with the exact same software goods and related services as used by Rambler.

535.     The NGINX PLUS trademark used by Defendants is exactly the same in appearance, sound and commercial impression to the NGINX PLUS trademark owned by Lynwood as Rambler's successor-in-interest.  Further, the goods and services are the same as or are closely related to as the goods and services of Rambler (now Lynwood).

536.     The NGINX CONTROLLER trademark used by Defendants is confusingly similar in sound, appearance and commercial impression to the NGINX and NGINX (Stylized) trademarks owned by Lynwood as Rambler's successor-in-interest.  Further, the goods and services are the same as or are closely related to the goods and services provided in connection with the NGINX and NGINX (Stylized) trademarks of Rambler (now Lynwood).

537.    The NGINX UNIT trademark used by Defendants is confusingly similar in sound, appearance and commercial impression to the NGINX and NGINX (Stylized) trademarks owned by Lynwood as Rambler's successor-in-interest.  Further, the goods and services are the same as or are closely related to the goods and services provided in connection with the NGINX and NGINX (Stylized) trademarks of Rambler (now Lynwood).

538.    Defendants' use of the NGINX-formative trademarks is in bad faith.

**The Team, Robertson, Runa Capital, E. Ventures, NGINX BVI, NGINX DE and NGINX Software, Inc. Joined in the Conspiracy to Misappropriate from Rambler the NGINX Enterprise so that the Conspirators Could Then Sell the NGINX Enterprise to a Large U.S. Technology Company and Are Therefore Jointly and Severally Liable For Each of the Co-Conspirator's Acts Taken in Furtherance of the Conspiracy**

539.    Konovalov joined Rambler as its CTO in 2008, at which time he began supervising Sysoev, including Sysoev's ongoing development of Open Source NGINX.

540.    The Team recognized that Open Source NGINX was gaining recognition and use in Russia and internationally.

541.    The Team further recognized that there were highly valuable business opportunities associated Open Source NGINX and NGINX Plus, which was already under development by Sysoev, additional enhancements and commercial applications that could be licensed on subscription and other fee bases, support services, and the intellectual property rights inherent in Open Source NGINX, NGINX Plus, NGINX trademarks, and the overall NGINX Enterprise.

542.    The Team knew that Open Source NGINX, NGINX Plus, business opportunities and therefore the NGINX Enterprise were owned by Rambler and not Sysoev or any member of the Disloyal Employees or Team

543.    However, the Disloyal Employees wished to cash in on the NGINX Enterprise to the exclusion of their employer.

544.    Specifically, by the summer of 2008, the Disloyal Employees in conjunction with Alexeev and Dounin, agreed that they would violate their duties to Rambler and divest Rambler of

the highly valuable NGINX Enterprise, move its epicenter to Northern California, and ultimately sell the enterprise to a large American technology company for their own ill-gotten profit and at the exclusion of their employer, Rambler.

545.    The sale to a large U.S. technology or Silicon Valley-type company was always the end goal of the Team's conspiracy.

546.    The Team recognized and agreed that they could use Konovalov's position as Rambler's CTO and supervisor of Sysoev, as well as Rambler's lack of institutional understanding of Sysoev's work and the possibilities of the various NGINX software code products to plan, execute, and ultimately conceal their theft of the NGINX Enterprise, which is exactly what the Team did as Rambler and Plaintiff's investigation in 2019 and 2020 confirms.

547.    Konovalov fraudulently represented to Rambler as its CTO that Open Source NGINX was virtually worthless, despite the fact that he and the rest of the Team knew it was highly valuable and gaining mass recognition within the technical community, and that the NGINX Enterprise inclusive of both Open Source NGINX and the proprietary NGINX Plus had vast promise as a lucrative business.

548.    The Team recognized and agreed that in addition to concealing the value and opportunities associated with the NGINX Enterprise, they would need to conceal their activities in secretly launching their new company.

549.    The Team concealed their activity by, among other things, enlisting former Rambler employee Korotkov to solicit investors, destroying evidence, concealing from Rambler that Open Source NGINX, NGINX Plus and related business opportunities were the predominant work Sysoev performed for Rambler, concealing their intention to offshore Open Source NGINX, NGINX Plus and related business opportunities to the United States to ultimately sell the NGINX Enterprise to a large American technology company, lying to Rambler about the value and commercialization of Open Source NGINX and related corporate opportunities, fraudulently misrepresenting to Rambler that their only intentions with NGINX were to support an open source project, and concealing from Rambler that instead of working for Rambler and in Rambler's interests they were really scheming

against Rambler so they could eventually steal from Rambler what they knew to be an extremely valuable business in the NGINX Enterprise.

550.    While members of the Team remained employees of Rambler, the Team engaged California legal counsel to form NGINX Software, Inc. on May 4, 2011 and formed NGINX BVI on July 6, 2011 and NGINX DE in August 2011.

551.    These entities joined the conspiracy as co-conspirators with the Team.

552.    The intra-corporate conspiracy doctrine is inapplicable to NGINX Software, Inc., NGINX DE and NGINX BVI (collectively, the "NGINX Conspirators") because the entities were incorporated after the formation of the conspiracy and thus cannot constitute single actors.

553.    During the time when the Disloyal Employees remained employees of Rambler, NGINX Software, Inc. established its headquarters in San Francisco, California.

554.    While members of the Disloyal Employees remained employees of Rambler, NGINX Software, Inc. engaged California legal counsel to facilitate NGINX Software, Inc.'s fraudulent filing of an application to register the trademark NGINX, which in reality was owned by Rambler.

555.    From the headquarters in San Francisco, California, the conspirators continued to execute their plan of further building out, funding, and then selling to a large American technology company the NGINX Enterprise the Team was hijacking from Rambler.

556.    The Team was able to and did operate out of the view of Rambler.  Based on the Disloyal Employees' affirmative misrepresentations that Open Source NGINX was virtually worthless and not susceptible to meaningful commercialization, and their concealment of their efforts to the contrary, including the wholesale concealment of NGINX Plus, Rambler had no reason to track the Team and the NGINX Conspirators' progress.

557.    The Team hid from Rambler the true nature of what it owned – a valuable enterprise built around Open Source NGINX on the basis of an "open core" model – and therefore Rambler reasonably did not know to investigate (or even where to investigate) when it went missing until Korotkov came forward and the F5 Merger occurred.

558.    Konovalov, Sysoev and Smirnoff owed statutory fiduciary duties under Russian law to deal honestly and fairly with Rambler during and after their employment ended at Rambler. Accordingly, Konovalov, Sysoev and Smirnoff had a duty to correct their affirmative misrepresentations made to Rambler and to disclose the facts that they concealed from Rambler (i.e., that the Team misappropriated the NGINX Enterprise from Rambler to sell to a third-party technology company).

559.    In late March 2011, the Team invited Runa Capital and BV Capital (now E.Ventures) to join the conspiracy by soliciting their outside investment in exchange for an ownership stake in the NGINX Conspirators and the opportunity to actively participate in growing the NGINX Conspirators with Rambler's stolen intellectual property for the ultimate objective of selling the NGINX Enterprise to a large American technology company.

560.    Runa Capital and BV Capital knowingly joined the conspiracy in April 2011 by agreeing to financially invest in the Team and becoming the Series A investors for NGINX BVI. Runa Capital and BV Capital also advised the Team on how to misappropriate the NGINX Enterprise while the Disloyal Employees remained employed at Rambler and how to quietly lay the groundwork for the formation of the NGINX Conspirators without triggering Rambler's attention.

561.    Runa Capital was not only aware that the NGINX Enterprise was purloined from Rambler by the Team but Runa Capital was a key decision-maker and advisor to the Team through Galperin whom it hired in February 2011 in a deliberate move to gain influence over the Team going forward.  Separate and aside from the information received by Runa Capital from the Team directly, Galperin provided Runa Capital with detailed information of Rambler's inner workings and the Team's conspiracy of clandestinely developing the NGINX Enterprise within the NOC department and under Konovalov's protective cover.

562.    Runa Capital and BV Capital remained in the conspiracy from April 2011 until the objective of the conspiracy was completed in the form of the Merger transaction with F5.  Runa Capital and BV Capital made investments in NGINX BVI in October 2011, October 2013, December

2014, and April 2016 and became active in the management of NGINX BVI by each securing a board seat on the company through Chikhachev and Gieselmann.

563.    In 2012, the Team invited Robertson to join the conspiracy by hiring Robertson as the CEO of the NGINX Enterprise.

564.    Robertson, who was fully familiar with the origins of Open Source NGINX, NGINX Plus and the Team's conspiracy, willingly joined as a co-conspirator.

565.    As Robertson boasts on F5's website: "Robertson joined NGINX as CEO in 2012 when the company had no commercial offerings or revenue and a staff of 8.  Over the next 6 years, he grew NGINX to more than 250 employees and raised over $100 million in venture capital from such investors as Goldman Sachs and NEA."

566.    Throughout Robertson's reign as CEO, NGINX BVI continued to grow market share and develop commercial products and service offerings that made it poised for high profitability and the ultimate object of the conspirators' conspiracy – a sale of Rambler's NGINX Enterprise.

567.    In furtherance of the conspirators' exit strategy, Robertson formed new NGINX entities in the United Kingdom in 2013 (NGINX Ltd.), Ireland in 2015 (NGINX International Limited) and Singapore in 2017 (NGINX Asia Pacific Pte. Ltd.).  Furthermore, Robertson directed NGINX DE and NGINX BVI to file successive trademark applications between 2013 and 2017 with the USPTO for NGINX Plus, NGINX Controller and NGINX UNIT in further effort at building the NGINX Enterprise's goodwill and brand.

568.    In 2019, the conspirators achieved the ultimate object of their conspiracy when they sold Rambler's NGINX Enterprise to F5 through the Merger for $670 million.  The NGINX Enterprise, which Konovalov repeatedly represented to Rambler as being worthless was, as the conspirators knew all along, immensely valuable.

569.    The conspirators conspired to breach the Disloyal Employees' duties to Rambler, to tortiously interfere with Rambler's contractual rights, to tortiously interfere with Rambler's prospective business advantage, and to defraud Rambler.

570.     Under California law, the Team, the NGINX Conspirators, Runa Capital, BV Capital (now E.Ventures) and Robertson are guilty of carrying out a civil conspiracy, and therefore are jointly and severally liable to Plaintiff for all damages caused to Plaintiff through the conduct described in the causes of action Plaintiff pleads below.

## FIRST CLAIM FOR RELIEF

### *Breach of Employment Obligations Owed by Konovalov to Rambler*

571.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 570 above as if fully set forth and repeated herein.

572.     Konovalov is bound by the obligations set forth in the Konovalov Employment Agreement, the Rambler Code of Ethics and the Rambler Regulations.

573.     Rambler performed all of its obligations under the Konovalov Employment Agreement and otherwise as Konovalov's employer.

574.     Konovalov owed Rambler duties of loyalty and honesty in carrying out his duties as an officer and employee of Rambler.

575.     As the CTO of Rambler, Konovalov had heightened duties of loyalty and honesty to Rambler.

576.     Konovalov breached his obligations to Rambler under the Konovalov Employment Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as an executive of Rambler, by lying to Rambler about the value and utility of Open Source NGINX, NGINX Plus and their associated business opportunities.

577.     Konovalov breached his obligations to Rambler under the Konovalov Employment Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as an executive of Rambler, by concealing from Rambler the Team's scheme to steal and then sell the NGINX Enterprise in the United States.

578.     Konovalov breached his obligations to Rambler under the Konovalov Employment Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as an executive of Rambler, by encouraging, assisting, and persuading Sysoev and Smirnoff to breach their

obligations to Rambler and hijack Rambler's business opportunities which Rambler resourced and for which Rambler compensated the Disloyal Employees to create.

579.   Konovalov breached his obligations to Rambler under the Konovalov Employment Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as an executive of Rambler, by failing to protect Rambler's rights in the various intellectual property associated with Rambler's NGINX Enterprise, but on the contrary by actively subverting those rights, including by fraudulently seeking and/or assisting in the seeking of dominion and control over Rambler's intellectual property rights for the benefit of himself, Sysoev, the NGINX Conspirators, and F5.

580.   Konovalov breached his obligations to Rambler under the Konovalov Employment Agreement, the Rambler Regulations, the Rambler Code of Ethics, and in his capacity as an executive of Rambler, by selling Rambler's NGINX Enterprise for his own ill-gotten profits at the exclusion of Rambler.

581.   Konovalov's breaches of his obligations to Rambler under the Konovalov Employment Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as an executive of Rambler have caused Rambler vast damages, and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

## SECOND CLAIM FOR RELIEF

### *Breach of Employment Obligations Owed by Sysoev to Rambler*

582.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 581 above as if fully set forth and repeated herein.

583.   Sysoev is bound by the obligations set forth in the Sysoev Employment Agreement[2], Sysoev Separation Agreement, the Rambler Code of Ethics and the Rambler Regulations.

---

[2]   The "Sysoev Employment Agreement" hereinafter defined includes the Sysoev Employment Agreement, the Supplementary Agreement, the Sysoev 2004 Supplemental Agreement, the Sysoev 2006 Supplemental Agreement, the Sysoev July 2007 Supplemental Agreement, the Sysoev October 2007 Supplemental Agreement, the Sysoev July 2009 Supplemental Agreement, the 2011 Sysoev Employment Agreement.

584.     Rambler performed all of its obligations under the Sysoev Employment Agreement and otherwise as Sysoev's employer.

585.     Sysoev owed Rambler duties of loyalty and honesty in carrying out his duties as an employee of Rambler.

586.     As Lead System Administrator for Rambler's Server and Technology Network of Rambler and the top software programmer within Rambler's NOC department, Sysoev had heightened duties of loyalty and honesty to Rambler.

587.     Sysoev breached his obligations to Rambler under the Sysoev Employment Agreement, Sysoev Separation Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as a high-level employee of Rambler, by lying to Rambler about the value and utility of Open Source NGINX, NGINX Plus and their associated business opportunities.

588.     Sysoev breached his obligations to Rambler under the Sysoev Employment Agreement, Sysoev Separation Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as a high-level employee of Rambler, by concealing from Rambler the Team's scheme to steal and then sell the NGINX Enterprise in the United States.

589.     Sysoev breached his obligations to Rambler under the Sysoev Employment Agreement, Sysoev Separation Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as a high-level employee of Rambler, by conspiring with the other Team members to breach their obligations to Rambler and hijack Rambler's business opportunities which Rambler resourced and for which Rambler compensated the Team to create.

590.     Sysoev breached his obligations to Rambler under the Sysoev Employment Agreement, Sysoev Separation Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as a high level employee of Rambler, by failing to protect Rambler's rights in the various intellectual property associated with Rambler's NGINX Enterprise, but on the contrary actively subverting those rights including by fraudulently seeking and/or assisting in the seeking of dominion and control over Rambler's intellectual property rights for the benefit of himself, Konovalov, the NGINX Conspirators, and F5.

591.   Sysoev breached his obligations to Rambler under the Sysoev Employment Agreement, Sysoev Separation Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as a high-level employee of Rambler, by selling Rambler's NGINX Enterprise for his own ill-gotten profits at the exclusion of Rambler.

592.   Sysoev's breaches of his obligations to Rambler under the Sysoev Employment Agreement, Sysoev Separation Agreement, the Rambler Code of Ethics, the Rambler Regulations and in his capacity as a high-level employee of Rambler have caused Rambler vast damages and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

### THIRD CLAIM FOR RELIEF

***Breach of Employment Obligations Owed by Smirnoff to Rambler***

593.   Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 592 above as if fully set forth and repeated herein.

594.   Smirnoff is bound by the obligations set forth in the Smirnoff Employment Agreement, Rambler Code of Ethics and Rambler Regulations.

595.   Rambler performed all of its obligations as Smirnoff's employer.

596.   Smirnoff owed Rambler duties of loyalty and honesty in carrying out his duties as an officer of Rambler, namely the Head of the NOC department.

597.   Smirnoff breached his obligations to Rambler under the Smirnoff Employment Agreement, Rambler Code of Ethics and Rambler Regulations by concealing from Rambler the Team's scheme to steal and then sell the NGINX Enterprise in the United States.

598.   Smirnoff breached his obligations to Rambler under the Smirnoff Employment Agreement, Rambler Code of Ethics and Rambler Regulations by providing substantial assistance to the Team and himself participating in the Team's conspiracy to steal and then sell the NGINX Enterprise in the United States.

599.   Smirnoff breached his obligations to Rambler under the Smirnoff Employment Agreement, Rambler Code of Ethics and Rambler Regulations by conspiring with the other Team

members to breach their obligations to Rambler and hijack Rambler's business opportunities which Rambler resourced and for which Rambler compensated the Team to create.

600.    Smirnoff breached his obligations to Rambler under the Smirnoff Employment Agreement, Rambler Code of Ethics and Rambler Regulations by failing to protect Rambler's rights in the various intellectual property associated with Rambler's NGINX Enterprise, but on the contrary actively subverting those rights including by providing substantial assistance to the Team and NGINX Conspirators in fraudulently seeking and/or assisting in the seeking of dominion and control over Rambler's intellectual property rights for the benefit of himself, Sysoev, Konovalov, the NGINX Conspirators, and F5.

601.    For example, Smirnoff stayed behind at Rambler and helped the Team destroy evidence of their ongoing conspiracy.

602.    Smirnoff breached his obligations to Rambler under the Smirnoff Employment Agreement, Rambler Code of Ethics and Rambler Regulations by providing substantial assistance to the Team and the NGINX Conspirators in selling Rambler's NGINX Enterprise for their own ill-gotten profits at the exclusion of Rambler.

603.    Smirnoff's breaches of his obligations to Rambler under the Smirnoff Employment Agreement, Rambler Code of Ethics and Rambler Regulations have caused Rambler vast damages and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

**FOURTH CLAIM FOR RELIEF**

***Breach of Konovalov's Duty to Act Fairly and Honestly With Rambler***

604.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 603 above as if fully set forth above and repeated herein.

605.    Konovalov in his capacity as CTO of Rambler was a high-level officer of Rambler. As such, he owed Rambler a heightened duty under Russian statutory law to behave in a fair and reasonable way vis-à-vis Rambler in accordance with the Rambler Regulations and Articles 53.1 and 53.3 of the Russian Civil Code.  Konovalov owed Article 53.1 and 53.3 duties by virtue of his senior

management position as CTO of Rambler, his access to confidential information, extensive discretion afforded by Rambler to Konvalov's decision-making authority and because Rambler provided Konovalov with a Power of Attorney with high financial thresholds to act on behalf of the company.

606.    Under Russian law, Konovalov's Article 53.1 and 53.3 duties continued after he left the employment of Rambler.  Konovalov was still under the legal duty to act fairly and honestly vis-à-vis Rambler and refrain from misappropriating corporate opportunities and assets such as the NGINX Enterprise and to disclose any harmful actions he undertook to the detriment of Rambler.

607.    Konovalov had a duty under Articles 53.1 and 53.3 to pursue the NGINX Enterprise for the financial benefit of Rambler, to timely and accurately disclose to Rambler the value of the NGINX Enterprise, to refrain from misappropriating the NGINX Enterprise and to refrain from participating in the Team's subsequent acts of concealment wherein the Team destroyed evidence of its fraud perpetrated against Rambler.

608.    Konovalov breached his duties to act fairly, reasonably and in the best interests of Rambler by concealing from Rambler the scope of the NGINX Enterprise developed by the Disloyal Employees while they were still employed at Rambler, by participating in the conspiracy with the Team whereby the Team misappropriated Rambler's NGINX Enterprise and by covering up their actions through the destruction of evidence so as to prevent Rambler and Lynwood from timely discovering the Team's misconduct.

609.    Konovalov's breaches of his duties of fairness and reasonableness under Articles 53.1 and 53.3 of the Russian Civil Code have caused Rambler vast damages and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

### FIFTH CLAIM FOR RELIEF

***Breach of the Duty to Act Fairly and Honestly With Rambler As To Sysoev and Smirnoff***

610.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 609 above as if fully set forth above and repeated herein.

611.    Sysoev was treated uniquely at Rambler.  He was the company's top talent in terms of product and software development.  In recognition of his value and importance to the company, Rambler compensated Sysoev accordingly by regularly providing him with substantial raises and bonuses tied to his work, including the development of Open Source NGINX.  As such, he owed Rambler a heightened duty under Russian statutory law to behave in a fair and reasonable way vis-à-vis Rambler in accordance with the Rambler Regulations and Articles 53.1 and 53.3 of the Russian Civil Code.

612.    During his employment at Rambler, Smirnoff served as the company's Head of the NOC department.  As such, Smirnoff owed Rambler a heighted duty under Russian statutory law to behave in a fair and reasonable way vis-à-vis Rambler in accordance with the Rambler Regulations and Article 53.1 and 53.3 of the Russian Civil Code.

613.    Sysoev's and Smirnoff's Article 53.1 and 53.3 duties existed during and after their employment with Rambler and they both were obligated to continue to act fairly and honestly vis-à-vis Rambler after they separated from the company.

614.    Sysoev and Smirnoff owed Rambler duties under Articles 53.1 and 53.3 to pursue the NGINX Enterprise for the financial benefit of Rambler, to timely and accurately disclose to Rambler the value of the NGINX Enterprise, to refrain from misappropriating the NGINX Enterprise and to refrain from participating in the Team's subsequent acts of concealment wherein the Team destroyed evidence of its fraud perpetrated against Rambler.

615.    Sysoev and Smirnoff breached their duties to act fairly, reasonably and in the best interests of Rambler by concealing from Rambler the scope of the NGINX Enterprise developed by the Disloyal Employees while they were still employed at Rambler, by participating in the conspiracy with the Team whereby the Team misappropriated Rambler's NGINX Enterprise and by covering up their actions through the destruction of evidence so as to prevent Rambler and Lynwood from timely discovering the Team's misconduct.

616.    Sysoev's and Smirnoff's breaches of their duties of fairness and reasonableness under Articles 53.1 and 53.3 of the Russian Civil Code have caused Rambler vast damages and Lynwood

is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

### SIXTH CLAIM FOR RELIEF

#### *Aiding and Abetting by Alexeev and Dounin of the Disloyal Employees' Breaches of Their Duties of Honesty and Loyalty to Rambler*

617.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 616 above as if fully set forth and repeated herein.

618.    Alexeev and Dounin were longtime acquaintances of Konovalov and Sysoev.  Dounin had even worked with Sysoev at Rambler up until 2007.  Both Alexeev and Dounin knew that Rambler owned the rights to Open Source NGINX, NGINX Plus and the NGINX Enterprise.

619.    Alexeev and Dounin knew Konovalov, Sysoev, and Smirnoff owed duties to deal honestly and fairly with Rambler under Russian Civil Code Articles 53.1 and 53.3.  Prior to joining the Team, Alexeev and Dounin were informed by Konovalov and Sysoev of their employment obligations to Rambler and Russian law concerning "works made for hire."  Moreover, in the course of the Team's efforts at securing financing from various potential venture capital investors, including Runa Capital, BV Capital and Greycroft, Alexeev and Dounin were informed by the venture capital investors themselves and the Team's own lawyers that their plans concerning the misappropriation of the NGINX Enterprise was violative of the Disloyal Employees' employment duties and obligations to their employer Rambler and ran afoul of Russian law.

620.    Nevertheless, Alexeev and Dounin went forward and provided substantial assistance to Konovalov, Sysoev and Smirnoff in breach their duties of honesty and loyalty to Rambler by collaborating with Runa Capital and BV Capital in securing funding, aiding the Disloyal Employees and Korotkov in pursuing trademarks for the NGINX Enterprise and working with the Disloyal Employees in forming the Team's various NGINX entities and simultaneously pursuing customers for the NGINX Enterprise.  Specifically, Alexeev provided substantial assistance to the Disloyal Employees in the pursuit of seed capital to further develop the NGINX Enterprise after lifting it out of Rambler and in forming all of the NGINX-related entities.  Alexeev and Dounin engaged in this

conduct with knowledge that the Disloyal Employees were disclosing Rambler's confidential and proprietary information to venture capital firms, including Runa Capital, BV Capital and Greycroft and ultimately F5, and with knowledge that the Disloyal Employees were acting in contravention of Rambler's intellectual property rights.

621.    Rambler was harmed by the Disloyal Employees' breaches of their obligations to Rambler and Alexeev and Dounin's aiding and abetting thereof.

622.    Alexeev and Dounin were substantial factors in causing the harm suffered by Rambler.

623.    As a result of Alexeev and Dounin's aiding and abetting of the Disloyal Employees' wrongful conduct, Rambler suffered vast damages and Lynwood as assignee is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

## SEVENTH CLAIM FOR RELIEF

### *Aiding and Abetting by Runa Capital and E.Ventures of the Disloyal Employees' Fraud and Breaches of Their Duties of Honesty and Loyalty to Rambler*

624.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 623 above as if fully set forth and repeated herein.

625.    Runa Capital and BV Capital (now E.Ventures) conducted extensive due diligence leading up to their Series A investment in October 2011 concerning the Team and the Disloyal Employees' contractual obligations to Rambler and the development of Open Source NGINX, NGINX Plus and the NGINX Enterprise more generally.

626.    As a result of the due diligence, Runa Capital and BV Capital knew that Rambler owned the NGINX Enterprise, that the Disloyal Employees were breaching their contractual and statutory obligations to Rambler and that the Disloyal Employees were defrauding Rambler.

627.    Runa Capital had actual knowledge of the Disloyal Employees' fraudulent conduct and breaches of their Article 53 duties from sources that were independent of its due diligence.  For example, Rambler Employee and Conspirator, Dmitry Galperin, whom Runa Capital hired in

February 2011 for the explicit purpose of cementing Runa Capital's relationship with the Team disclosed to Runa Capital the granular details of the Disloyal Employees' scheme.

628.    Galperin informed Runa Capital that the NGINX Enterprise was being developed by the Disloyal Employees clandestinely at Rambler's NOC department even though Konovalov misrepresented to Rambler's senior management and board of directors that it had no commercial value.  Galperin also informed Runa Capital of the agreement the Disloyal Employees had in place with Rambler Employee Conspirators who assisted the Disloyal Employees in concealing their fraudulent activities from Rambler in exchange for promises of future employment at the entities formed with the purloined NGINX Enterprise.

629.    As sophisticated entities with international offices, Runa Capital and BV Capital also knew that the Disloyal Employees' obligations were ongoing.  Indeed, the Disloyal Employees' obligations to Rambler and the Russian law protecting Rambler's rights as the employer to the NGINX Enterprise were extensively discussed by Runa Capital and BV Capital with the Team prior to the initial Series A investment.

630.    Moreover, Runa Capital and BV Capital knew that the Disloyal Employees would be violating those obligations to Rambler by misappropriating the NGINX Enterprise from Rambler and that the Team would succeed in its fraudulent scheme aimed at victimizing Rambler if the Team were able to misappropriate the NGINX Enterprise for themselves for the purpose of then selling the NGINX Enterprise to a large U.S. technology or Silicon Valley company.

631.    Nevertheless, Runa Capital and BV Capital sought to cash in on Rambler's NGINX Enterprise so they provided the Disloyal Employees and Team with substantial assistance in achieving the ultimate goal of their conspiracy – the misappropriation of Rambler's NGINX Enterprise and its ultimate sale to F5 for their own ill-gotten profits at the exclusion of Rambler.

632.    Indeed, Runa Capital and BV Capital not only advised the Team on how to execute on their conspiracy for misappropriating the NGINX Enterprise from Rambler beginning in March 2011 but fueled the conspiracy through their financings from 2011 through 2016 and active participation on NGINX BVI's board of directors up to and including 2019 when they along with

the Team ultimately achieved their objective – the sale of the NGINX Enterprise to F5 via the Merger transaction.

633.    As Runa Capital and BV Capital intended and knew would happen as a result of their substantial assistance, the Disloyal Employees violated their ongoing obligations to Rambler, including by, without limitation, divesting Rambler of the NGINX Enterprise, disclosing Rambler's confidential information to third-parties, including other venture capital investors and later F5, and acting in contravention of Rambler's intellectual property rights.

634.    Rambler was harmed by the Disloyal Employees' breaches of their obligations to Rambler and Runa Capital and BV Capital's aiding and abetting thereof.

635.    Runa Capital and BV Capital's misconduct was a substantial factor in causing the harm suffered by Rambler.

636.    As a result of Runa Capital and BV Capital's aiding and abetting of the Disloyal Employees' wrongful conduct and the Team's fraudulent conduct, Rambler was harmed and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

## EIGHTH CLAIM FOR RELIEF

### *Aiding and Abetting by F5 of the Disloyal Employees' Fraud and Breaches of Their Duties of Honesty and Loyalty to Rambler*

637.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 636 above as if fully set forth and repeated herein.

638.    F5 conducted extensive due diligence leading up to the Merger concerning the Team and the Disloyal Employees, including with respect to the Disloyal Employees' contractual obligations to Rambler and the development of Open Source NGINX NGINX Plus and the NGINX Enterprise more generally.

639.    F5's due diligence included a review of the Disloyal Employees' past employment and separation agreements with Rambler and an analysis of Open Source NGINX and NGINX Plus along with the other proprietary NGINX commercial add-on software developed from the purloined

NGINX Enterprise.  The software modules from Open Source NGINX and NGINX Plus revealed that the code commits by Sysoev for the software in question were performed while he was a Rambler employee.

640.    F5's due diligence included a review of the Disloyal Employees' contemporaneous electronic communications from the time when the Disloyal Employees were scheming to lift the NGINX Enterprise out of Rambler.

641.    As a result of the due diligence, F5 knew about the Disloyal Employees' Article 53 duties to act fairly and honestly with Rambler, the Disloyal Employees' violations of those duties, and their fraudulent conduct against Rambler.

642.    As a sophisticated entity with international offices, F5 also knew that the Disloyal Employees' obligations were ongoing and postdated their respective separations from Rambler.

643.    Moreover, F5 knew that the Disloyal Employees would be violating those obligations to Rambler by selling Rambler's NGINX Enterprise to F5 and that the Disloyal Employees would succeed in their fraudulent scheme aimed at enriching themselves and victimizing Rambler if the Team were able to sell the NGINX Enterprise to F5.

644.    Nevertheless, F5 sought to seize Rambler's NGINX Enterprise so it provided the Disloyal Employees and Team with substantial assistance in achieving the ultimate goal of their conspiracy – a sale of Rambler's NGINX Enterprise to a large American technology company like F5 for their own ill-gotten profits at the exclusion of Rambler.

645.    As F5 intended and knew would happen as a result of its assistance, the Disloyal Employees violated their ongoing obligations to Rambler, including by, without limitation, divesting Rambler of the NGINX Enterprise and selling the NGINX Enterprise to F5, disclosing Rambler's confidential and proprietary information to F5, and acting in contravention of Rambler's intellectual property rights.

646.    Rambler was harmed by the Disloyal Employees' breaches of their obligations to Rambler and F5's aiding and abetting thereof.

647.    F5's conduct was a substantial factor in causing the harm suffered by Rambler.

648.    As a result of F5's aiding and abetting of the Disloyal Employees' wrongful conduct, Rambler was harmed and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

## NINTH CLAIM FOR RELIEF

*Tortious Interference with Contract Against Konovalov, Robertson, NGINX Software, Inc., NGINX BVI, and NGINX DE*

649.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 648 above as if fully set forth and repeated herein.

650.    Sysoev and Rambler were parties to and bound by the Sysoev Employment Agreement, the Sysoev Separation Agreement, the Rambler Code of Ethics and the Rambler Regulations.

651.    As Sysoev's superior, Konovalov knew about the Sysoev Employment Agreement, the Rambler Code of Ethics and the Rambler Regulations.  Konovalov also knew that Sysoev and Rambler entered into the Sysoev Separation Agreement.

652.    Konovalov knew Sysoev's obligations to Rambler under the Sysoev Employment Agreement, the Sysoev Separation Agreement, the Rambler Code of Ethics and the Rambler Regulations.

653.    Konovalov knew that Sysoev's obligations to Rambler under the Sysoev Employment Agreement, the Sysoev Separation Agreement, the Rambler Code of Ethics and the Rambler Regulations survived his separation from Rambler in December 2011.

654.    As of its incorporation on May 4, 2011, Konovalov became the CEO of NGINX Software, Inc. which was headquartered in California, and Konovalov became the CEO of NGINX BVI when it was incorporated on July 6, 2011.   Upon information and belief, Konovalov also became the CEO of NGINX DE when it was incorporated in August 2011.

655.    Robertson became CEO of the NGINX Conspirators in 2012.

656.    Konovalov's knowledge concerning Sysoev's ongoing obligations to Rambler is imputed onto the NGINX Conspirators and/or the NGINX Conspirators otherwise knew of Sysoev's ongoing obligations.

657.    In addition, based on his knowledge of Sysoev's employment history, the conspiracy, concerns raised by investors over the fact that Sysoev developed Open Source NGINX and NGINX Plus at Rambler, and his own experience in business, Robertson knew of Sysoev's ongoing obligations to Rambler.

658.    Beginning in the summer of 2008 and continuing through 2019, Konovalov actively encouraged and persuaded Sysoev to breach his obligations to Rambler by concealing the true utility and value of Open Source NGINX, concealing the existence of NGINX Plus as a work made for hire and related business opportunities from Rambler, refusing to assist Rambler in protecting its intellectual property rights associated with the NGINX Enterprise, secretly planning to divest Rambler of the NGINX Enterprise so the Team could sell it to a third-party for their own ill-gotten profits, and disclosing Rambler's confidential and proprietary information.

659.    Beginning in May 2011 and continuing through 2019, the NGINX Conspirators and (beginning in 2012) Robertson actively encouraged and persuaded Sysoev to breach his obligations to Rambler by concealing the true utility and value of Open Source NGINX, concealing the existence of NGINX Plus as a work made for hire and related business opportunities from Rambler, refusing to assist Rambler in protecting its intellectual property rights associated with the NGINX Enterprise, secretly planning to divest Rambler of the NGINX Enterprise so the Team and Robertson could sell it to a third-party for their own ill-gotten profits, and disclosing Rambler's confidential and proprietary information.

660.    Konovalov, Robertson, and the NGINX Conspirators intended to cause Sysoev to breach his obligations to Rambler so that they could profit from the unlawful sale of Rambler's NGINX Enterprise and reap ill-gotten profits for themselves to the exclusion of Rambler.

661.    Konovalov, Robertson, and the NGINX Conspirators knew that as a result of their conduct disruption of Sysoev's performance of his ongoing obligations to Rambler was certain or substantially certain to occur.

662.    Sysoev breached his ongoing obligations to Rambler, including by, without limitation, concealing the true utility and value of Open Source NGINX, concealing the existence of NGINX Plus as a work made for hire and related business opportunities from Rambler, refusing to assist Rambler in protecting its intellectual property rights associated with the NGINX Enterprise, secretly planning to divest Rambler of the NGINX Enterprise so the Team could sell it to a third party for their own ill-gotten profits, and disclosing Rambler's confidential and proprietary information.

663.    Rambler was harmed by Sysoev's breaches of his obligations to Rambler and Konovalov, Robertson, and the NGINX Conspirators' tortious interference.

664.    Konovalov, Robertson, and the NGINX Conspirators' conduct was a substantial factor in causing the harm suffered by Rambler.

665.    As a result of Konovalov, Robertson, and the NGINX Conspirators' tortious interference with contract, Rambler was harmed and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

**TENTH CLAIM FOR RELIEF**

**Tortious Interference with Contract Against Runa Capital and E. Ventures**

666.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 665 above as if fully set forth and repeated herein.

667.    Sysoev and Rambler were parties to and bound by the Sysoev Employment Agreement, the Sysoev Separation Agreement, the Rambler Code of Ethics and the Rambler Regulations.

668.    Konovalov and Rambler were parties to and bound by the Konovalov Employment Agreement, the Rambler Code of Ethics and the Rambler Regulations.

669.    Smirnoff and Rambler were parties to and bound by the Smironoff Employment Agreement, the Rambler Code of Ethics and Rambler Regulations.

670.    Leading up to their Series A investment, Runa Capital and BV Capital (later renamed E. Ventures) conducted extensive due diligence concerning the Team and the Disloyal Employees, including the Disloyal Employees' contractual obligations to Rambler and the development of Open Source NGINX, NGINX Plus and related business opportunities.  As a result of the due diligence, Runa Capital and BV Capital knew about the Disloyal Employees' contractual obligations to Rambler.  Moreover, Runa Capital and BV Capital knew that the Disloyal Employees would be breaching those obligations to Rambler by misappropriating Rambler's NGINX Enterprise.

671.    For the avoidance of doubt, Runa Capital and BV Capital each separately demanded, received and reviewed all of the Rambler employment and separation agreements for Sysoev, Konovalov and Smirnoff.  Runa Capital and BV Capital each separately knew that Sysoev, Konovalov and Smirnoff were each separately violating their respective employment agreements, separation agreements, Rambler Code of Ethics and the Rambler Regulations.

672.    Separately, Runa Capital was aware of Sysoev, Konovalov, and Smirnoff's contractual obligations under the employment and separation agreements from former Rambler employee Dmitry Galperin who joined Runa Capital as a principal of the firm.  Upon joining Runa Capital in February 2011, Galperin informed Runa Capital's Beloussov and Chikhachev of each of the Disloyal Employees' contractual obligations.

673.    Runa Capital and BV Capital intended to cause the Disloyal Employees to breach their contractual obligations to Rambler so that they could capitalize on the misappropriated NGINX Enterprise by investing in the Team and the NGINX Conspirators with an exit strategy of selling the NGINX Enterprise to a large American technology company for a substantial profit and to the detriment and exclusion of Rambler.

674.    Runa Capital and BV Capital knew that as a result of their conduct disruption of the Disloyal Employees' performance of their ongoing obligations to Rambler was certain or substantially certain to occur.

675.    As Runa Capital and BV Capital intended and knew would happen as a result of their interference, the Disloyal Employees breached their ongoing obligations to Rambler, including by, without limitation, divesting Rambler of the NGINX Enterprise and ultimately selling the NGINX Enterprise to F5, disclosing Rambler's confidential and proprietary information to various other venture capital investors and F5, and acting in contravention of Rambler's intellectual property rights.

676.    Rambler was harmed by the Disloyal Employees' breaches of their obligations to Rambler, and by Runa Capital's and BV Capital's tortious interference.

677.    Runa Capital's and BV Capital's conduct were substantial factors in causing the harm suffered by Rambler.

678.    As a result of Runa Capital's and BV Capital's tortious interference with contract, Rambler was harmed and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

## ELEVENTH CLAIM FOR RELIEF

### Tortious Interference with Contract Against F5

679.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 678 above as if fully set forth and repeated herein.

680.    Sysoev and Rambler were parties to and bound by the Sysoev Employment Agreement, the Sysoev Separation Agreement, the Rambler Code of Ethics and the Rambler Regulations.

681.    Konovalov and Rambler were parties to and bound by the Konovalov Employment Agreement, the Rambler Code of Ethics and the Rambler Regulations.

682.    Smirnoff and Rambler were parties to and bound by the Smirnoff Employment Agreement, the Rambler Code of Ethics and Rambler Regulations.

683.    Leading up to the Merger, F5 conducted extensive due diligence concerning the Team, NGINX Conspirators and the Disloyal Employees, including the Disloyal Employees' contractual obligations to Rambler and the development of Open Source NGINX, NGINX Plus and

related business opportunities.  As a result of the due diligence, F5 knew about the Disloyal Employees' contractual obligations to Rambler.  Moreover, F5 knew that the Disloyal Employees would be breaching those obligations to Rambler by selling Rambler's NGINX Enterprise to F5.

684.    For the avoidance of doubt, F5 separately demanded and received all of the Rambler employment and separation agreements for Sysoev, Konovalov and Smirnoff from NGINX BVI as part of its due diligence during the Merger negotiations.  F5 knew that Sysoev, Konovalov and Smirnoff were each separately violating their respective employment agreements, separation agreements, Rambler Code of Ethics and the Rambler Regulations.

685.    F5 intended to cause the Disloyal Employees to breach their contractual obligations to Rambler so that F5 could seize Rambler's NGINX Enterprise.

686.    F5 knew that as a result of its conduct disruption of Disloyal Employees' performance of their ongoing obligations to Rambler was certain or substantially certain to occur.

687.    As F5 intended and knew would happen as a result of its interference, the Disloyal Employees breached their ongoing obligations to Rambler, including by, without limitation, divesting Rambler of the NGINX Enterprise and selling the NGINX Enterprise to F5, disclosing Rambler's confidential and proprietary information to F5, and acting in contravention of Rambler's intellectual property rights.

688.    Rambler was harmed by the Disloyal Employees' breaches of their obligations to Rambler and F5's tortious interference.

689.    F5's conduct was a substantial factor in causing the harm suffered by Rambler.

690.    As a result of F5's tortious interference with contract, Rambler was harmed and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

## **TWELFTH CLAIM FOR RELIEF**

### *Tortious Interference with Prospective Business Advantage Against All Defendants*

691.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 690 above as if fully set forth and repeated herein.

692.    Plaintiff's predecessor-in-interest, Rambler, had a prospective economic advantage in the form of the NGINX Enterprise that, but for Defendants' unlawful conduct detailed herein, Rambler could have and would have sold for a massive profit.

693.    Defendants knew full well the existence and value of Rambler's prospective economic advantage with the NGINX Enterprise and that it could be sold for a massive profit.

694.    Defendants engaged in repeated illegal conduct as detailed herein in order to interfere with Rambler's prospective economic advantage with the NGINX Enterprise, including, without limitation, breaches of the Disloyal Employees' duties of honesty and loyalty to Rambler; aiding and abetting those breaches; fraud; aiding and abetting fraud; fraud on the USPTO; tortious interference with contract; false advertising; copyright infringement; fraudulent concealment, and civil conspiracy.

695.    Defendants engaged in this unlawful activity intending to interfere with Rambler's prospective economic advantage or knew that this unlawful activity was substantially certain to interfere with Rambler's prospective economic advantage.

696.    By the Team members' own admissions, as reflected in their slide presentations to potential venture capital investors in early 2011, if Rambler had been informed of the existence of the NGINX Enterprise, it would have had many options for developing and selling the NGINX Enterprise to a number of large American technology companies.

697.    In their slide presentation, the Team identified the following potential purchasers of the fully financed and developed NGINX Enterprise: (i) networking vendors: Cisco, Juniper Networks; Defendant F5, Brocade and Radware; (ii) software vendors: Citrix, Parallels, EMC/VM Ware; (iii) "big corporations":  IBM, Oracle, Hewlett-Packard; and (iv) telco/ISP/CDN: AT&T, Level 3, Comcast, and Akamai.

698.    The Team sold Runa Capital and E. Ventures, among other potential investor partners, on the idea of funding and developing the NGINX Enterprise to the point where one of the U.S. technology companies identified in its slide presentation would purchase the NGINX Enterprise.

699.     The NGINX Conspirators' sale of the NGINX Enterprise to Defendant F5 confirms that Rambler, had it been informed of the existence and value of the NGINX Enterprise, would have had the same or similar opportunities to benefit from such sale, if only the Defendants had not covertly stolen the NGINX Enterprise and monetized it for themselves.

700.     A number of the American technology companies identified in the Team's 2011 slide presentation to venture capital firms use Open Source NGINX as a building block for their networking, telecom and software application products and services.  By way of example, Juniper Networks, in publicly available documentation, explains how the NGINX HTTP Server may be integrated with Juniper Networks' JSA line of Secure Analytics Appliances.  As another example, Cisco, with which Defendant Alexeev met in early 2011 to discuss business opportunities around the development and sale of the NGINX Enterprise, publishes documentation describing the integration of NGINX/HTTP Web security features with Cisco's own line of networking hardware and software. Any one of these identified companies would have benefitted from purchasing the NGINX Enterprise from Rambler.

701.     Another potential buyer of the NGINX Enterprise from Rambler would have been leading open source software vendor Red Hat, where Defendant Robertson was Vice President of Business Development before exiting to join the conspirators.

702.     In addition, Rambler had deep commercial ties with many leading American and Russian technology companies that would have had an interest in acquiring the NGINX Enterprise if the Disloyal Employees had disclosed its existence.

703.     For example, since 2015, Rambler became the biggest commercial partner of Yandex (Russia's largest search engine company that generates 50% of the search traffic in Russia) in the ads network space.  Similarly, Rambler partnered with Mail.ru (another Russian technology company focusing on email, instant messaging apps, online games and social media sites) in 2015 to launch a MyTarget (a Russian advertising platform targeted to social media networks).

704.     By way of another example, since 2013, Rambler has been one of the major partners for Google AdWords (an advertising platform developed by Google where advertisers pay to place

124

ads in the results of search engines like Google Search) through Rambler's subsidiary Price.ru. Moreover, NGINX Plus is available to customers on a paid subscription basis for deployment on the Google Cloud Platform.

705.     These American and Russian technology companies are just illustrative examples of Rambler's business partners in the digital media space where the NGINX Enterprise could have been sold by Rambler to a receptive buyer given the software's load balancer attributes.

706.     Defendants' unlawful activity did in fact disrupt and interfere with Rambler's prospective economic advantage with the NGINX Enterprise.

707.     Rambler was harmed by Defendants' interference with Rambler's prospective economic advantage with the NGINX Enterprise.

708.     Defendants' misconduct was a substantial factor in causing the harm suffered by Rambler.

709.     As a result of Defendants' tortious interference with Rambler's prospective business advantage, Rambler was harmed and Lynwood, through its assignment from Rambler, is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

## THIRTEENTH CLAIM FOR RELIEF

### Fraud Against the Disloyal Employees, NGINX Software, Inc.,

### NGINX DE and NGINX BVI

710.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 709 above as if fully set forth and repeated herein.

711.     The Disloyal Employees engaged in a continuous campaign of fraud against Rambler that culminated with the Disloyal Employees, Alexeev, Dounin, Runa Capital, E.Ventures and the NGINX Conspirators selling Rambler's NGINX Enterprise to F5 in 2019.

712.     Substantial acts and concealments in furtherance of the Disloyal Employees' fraud campaign occurred in California after they moved Rambler's NGINX Enterprise to California in the spring of 2011 unbeknownst to Rambler.

713.    The Disloyal Employees intentionally misrepresented to Rambler the value of Open Source NGINX and related business opportunities both before and after the incorporation and headquartering of NGINX Software, Inc. in San Francisco on May 4, 2011.  The Disloyal Employees also fraudulently concealed the existence of NGINX Plus that had been developed by Sysoev with the assistance of the Disloyal Employees as part of their employment with Rambler and utilizing Rambler's infrastructure and resources.

714.    The Disloyal Employees fraudulently concealed from Rambler the existence of the lucrative business opportunities associated with Open Source NGINX and NGINX Plus both before and after the incorporation and headquartering of NGINX Software, Inc. in San Francisco.

715.    The Disloyal Employees fraudulently concealed from Rambler the existence and ongoing development of the proprietary, commercial enhancements and extensions to Open Source NGINX including the proprietary, commercial NGINX Plus software, as well as the existence of the NGINX Enterprise, both before and after the incorporation and headquartering of NGINX Software, Inc. in San Francisco.

716.    The Disloyal Employees fraudulently induced Rambler to continue investing resources in Open Source NGINX and NGINX Plus both before and after the incorporation and headquartering of NGINX Software, Inc. in San Francisco despite the fact that the Disloyal Employees were already executing their plan to divest Rambler of the NGINX Enterprise and sell it to a third-party American company.

717.    Even after Sysoev separated from Rambler, the Disloyal Employees brazenly and unlawfully stole server equipment from Rambler and had it destroyed to cover up their unlawful activities.

718.    The Disloyal Employees and the NGINX Conspirators engaged in the fraud by directing the theft of Rambler's equipment and destruction of evidence.  In addition, the NGINX Conspirators are also vicariously liable for the fraudulent acts and concealments conducted by the Disloyal Employees.

719.    The Disloyal Employees and the NGINX Conspirators fraudulently concealed Rambler's causes of action against them by hiding the true nature, utility, and value of Open Source NGINX, the existence of the NGINX Plus software and the existence and value of the NGINX Enterprise; misrepresenting their true intentions to commercialize products and services relating to Open Source NGINX and then sell that enterprise to an American company; and stealing and destroying evidence of their unlawful activities.

720.    By concealing the true nature, utility, and value of Open Source NGINX, NGINX Plus and the NGINX Enterprise more generally, Rambler was never on notice, until the whistleblower came forward, that it had such a valuable suite of assets that warranted protection or that the Disloyal Employees could be embarking on such a nefarious conspiracy that would justify Rambler undertaking an investigation.

721.    Konovalov, Sysoev and Smirnoff owed Rambler statutory duties under Article 53.1 and 53.3 to act honestly and fairly with Rambler before and after they separated from Rambler. Accordingly, Konovalov, Sysoev and Smirnoff were under an obligation to disclose to Rambler that the Disloyal Employees misappropriated the NGINX Enterprise and destroyed Rambler equipment in furtherance of their conspiracy and to conceal their actions to avoid detection.

722.    The Team formed NGINX Software, Inc. on May 4, 2011.  The Team also formed NGINX BVI on July 6, 2011 and NGINX DE in August 2011.  At the time that the NGINX Conspirators were all formed, Sysoev and Smirnoff were still employees of Rambler.  Since the Team were the principals of all three of the NGINX Conspirators, Sysoev and Smirnoff's duties to disclose their fraudulent conduct were imputed to the NGINX Conspirators.

723.    As a direct and proximate cause of the Disloyal Defendants' and the NGINX Conspirators' fraud, Rambler has been damaged and Lynwood is entitled to collect damages in an amount to be determined at trial but presently believed to be well in excess of $750 million.

724.    In addition, the Disloyal Defendants and the NGINX Conspirators' actions as alleged herein were willful, fraudulent, and malicious and were done with the intent to injure and oppress Rambler and improve their own economic opportunities.  Thus, Lynwood should be awarded

punitive damages in an amount to be determined at trial to punish these defendants and deter similar unlawful conduct by others in the future.

### FOURTEENTH CLAIM FOR RELIEF

***Berne Convention for the Protection of Literary and Artistic Works and the Copyright Act (17 U.S.C. § 101, et seq.) based on Direct Copyright Infringement Against Defendants Konovalov, Sysoev, Alexeev, Dounin, Smirnoff, NGINX BVI, NGINX Software, Inc., NGINX DE,  Robertson and F5***

***(collectively, the "Direct Copyright Infringement Defendants")***

725.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 724 above as if fully set forth and repeated herein.

726.    The Berne Convention for the Protection of Literary and Artistic Works (the "Berne Convention") Article 5(1) provides that "[a]uthors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as rights specifically granted by this Convention."

727.    The Berne Convention provides further that "[t]he enjoyment and exercise of those rights shall not be subject to any formality; such enjoyment and such exercise shall be independent of the existence of protection in the country of origin of the work."  Berne Convention, Article 5(2).

728.    For infringing acts occurring in the U.S., ownership of a copyright right is determined based on the jurisdiction of the creation (*i.e.,* Russia); whether infringement has occurred is evaluated under U.S. copyright law.

729.    According to Section 2 of the 1992 Law and Section 7 of the 1993 Law, "programs for computational devices" ("computer programs") are protected under the same copyright regulations as literary works and are entitled to copyright protection.  Rights related to computer programs arise from the mere fact of their creation (and from the moment of their creation) and do not require separate registration or any other formality (i.e., registration with RosPatent).

730.     Section 10 of the 1992 Law and Section 16 of the 1993 Law provides for the owner of a copyright to exclusively use, copy and/or dispose of such rights in any way that the copyright owner, similar to the exclusive rights of a copyright owner set out in the United States Copyright Act, 17 U.S.C. § 106, which rights include the exclusive rights to reproduce the copyrighted work, prepare derivative works based on the copyrighted work, distribute copies of the copyrighted work to the public, and/or display the copyrighted work publicly, provided such use or disposal does not otherwise violate the law.

731.     Under Sections 9-10 of the 1992 Law and Sections 15-16 of the 1993 Law, copyright under Russian law consists of two rights: (i) the authorship right and (ii) the "exclusive proprietary right" to exploit the work.  Unlike the authorship right, the exclusive proprietary right may be transferred, assigned or inherited.  The authorship right under Russian law, on the other hand, is personal to the author and may never be transferred, assigned or inherited.

732.     Pursuant to Section 12 of the 1992 Law, if the author of the computer program is employed at the time of the computer program creation, then the employer holds the proprietary rights to the program, absent an explicit agreement otherwise.  The program then becomes a copyrighted object made while in employment and is then regulated by the applicable provisions of the Russian civil law, 1992 Law, and 1993 Law.

733.     Sysoev, Konovalov and the other Disloyal Employees signed, and were legally bound under Russian law, to employment agreements with Rambler, and Rambler internal policies and procedures, which designated everything that they worked on or produced in connection with their job responsibilities to Rambler during their tenure with the company as confidential works made for hire owned entirely by Rambler.

734.     Sysoev developed NGINX Plus and Open Source NGINX pursuant to his job duties at Rambler in Russia and first made the source code for Open Source NGINX available internally to Rambler and on Rambler-owned servers located in Moscow, Russia, as early as 2002, and Rambler owned NGINX Plus and Open Source NGINX based on his employment agreement and/or Russian law.

735.   Sysoev then elected to release Open Source NGINX as publicly available open source code on his own volition and without authorization from Rambler in 2004.

736.   Sysoev continued to test and improve Open Source NGINX using Rambler resources, infrastructure, personnel and Internet traffic, during normal business hours, in connection with the further development of Open Source NGINX and the development of NGINX Plus, as first revealed through the Rambler/Lynwood investigations following Korotkov's revelations in 2019.

737.   As Korotkov's promotion of NGINX Plus beginning in early 2010 confirms, and as Korotkov's and F5's trademark filings re-confirm, by late 2009 or early 2010 at the latest, the Disloyal Employees and the Team had already commenced their commercialization of NGINX Plus, which itself was, and still is, heavily reliant, both technically and commercially, on Open Source NGINX, which Rambler paid Sysoev to develop.

738.   The Disloyal Employees held back the NGINX Plus modules that Sysoev had conceived and developed at Rambler as part of his employment duties at Rambler prior to Sysoev's departure from Rambler so that the Team could quickly kick-start their commercial operation with the introduction of such proprietary products to the market promptly after their departure from Rambler.

739.   The Team used the promise of forthcoming NGINX Plus to help sell their business plan to potential investors.  The venture capital investors such as Runa Capital and BV Capital bought into the plan and funded it, and within twenty-one (21) months of Sysoev's departure from Rambler, with only a skeleton development crew, the Team formally introduced their first tranche of commercial NGINX Plus products, which was the purloined commercial NGINX code initially conceived and developed by Sysoev while employed at Rambler.

740.   The first formal announcement of the general commercial availability of the initial release of NGINX Plus (a prior version of which Konovalov acknowledged in his November 2019 GoTech interview was being commercially exploited by 2011) by the Direct Copyright Infringement Defendants was issued on August 22, 2013 – just two weeks after Robertson joined NGINX BVI as CEO.  The release notes to that initial "R1" release of NGINX Plus stated: "NGINX Plus is the fully

supported, commercial version of NGINX. It includes most NGINX open source modules and adds further features".  The R1 release notes also stated that NGINX Plus was "[b]ased on NGINX Open Source 1.5.3-1".  Among the "further features" identified as being part of R1 of NGINX Plus were "Application health checks"; "Live activity monitoring (implemented in the Extended Status module)"; "Advanced load balancing"; "On-the-fly reconfiguration of load-balanced upstream groups"; "Extended logging capabilities"; "High availability setup"; and "Adaptive media streaming".

741.    The R1 Release of NGINX Plus – like all successive NGINX Plus releases – was and are provided to customers of NGINX BVI and NGINX Software, Inc. and, since 2019, F5, in binary, executable form (*i.e.*, not the source code but rather in binary form that only computers can understand) on a paid subscription basis, along with revenue-generating support services and professional customization services.  The Direct Copyright Infringement Defendants' decision to release NGINX Plus in proprietary, pre-built, binary packages only, rather than in source code form that can be understood and manipulated by humans (like Open Source NGINX) was part of what Konovalov described in his 2019 GoTech interview as their "open core" strategy for monetizing Open Source NGINX, which the Disloyal Employees hatched behind closed doors in the Rambler NOC when they were employed there.

742.    NGINX Plus is the linchpin of that "open core" strategy, as highlighted in Robertson's September 6, 2017 announcement of "NGINX Application Platform", in which he described NGINX Plus as "the commercial variant of our popular NGINX Open Source offering".  *See* https://www.nginx.com/blog/introducing-nginx-application-platform/.    According    to    the announcement, NGINX Application Platform is a "suite of four products", namely NGINX Plus, NGINX ModSecurity, NGINX Unit, and NGINX Controller, the latter of which was "built to manage NGINX Plus instances".  The entire NGINX Application Platform suite is centered around NGINX Plus – without NGINX Plus, NGINX Controller and the other commercial NGINX product offerings under the NGINX Application Platform umbrella would not exist.

743.    As verified by Konovalov's GoTech interview admissions, while NGINX Plus was not formally announced by any of the Direct Copyright Infringement Defendants until August of 2013, by 2011, it had been in development for some time and was quietly being deployed by customers such as Netflix.

744.    NGINX Plus is based to a large extent on Open Source NGINX.  This dependency is evidenced repeatedly in NGINX Plus release statements, benchmark tests, documentation, and other descriptive sources.  Indeed, in his own Twitter feed, Sysoev has publicly admitted that "[t]he two products have a lot of overlap."

745.    Based on the Disloyal Employees' employment and separation agreements with Rambler, Rambler internal policies and procedures, and applicable Russian law, Rambler, which has assigned its rights to Lynwood, was the owner, and Lynwood is now the owner by assignment, of all right, title and interest in and to NGINX Plus and Open Source NGINX, in both source code and executable form, conceived and/or developed before the end of 2011, when Sysoev left the employ of Rambler (collectively, "Pre-2012 NGINX Software"), including all copyright rights inherent therein or appurtenant thereto.

746.    Up until the time that the Disloyal Employees left Rambler with the NGINX Enterprise secreted away for themselves, Open Source NGINX was used by Rambler in Russia to conduct its business and such software resided on Rambler-owned servers located in Moscow, Russia.

747.    Sysoev made Release 0.1.0 of Open Source NGINX available to the public in early October 2004, without authorization from Rambler.  Sysoev has claimed in various media interviews that, prior to such publication, without Rambler's knowledge or authorization, Open Source NGINX was deployed on the Russian Internet music portal located at the Web address zvuki.ru.

748.    The Rambler and Lynwood investigations in 2019 and 2020 following Korotkov's disclosures revealed email communications indicating that as to the alleged zvuki.ru implementation of Open Source NGINX, such use involved Sysoev's then colleague at Rambler, Andrey Kopeyko,

the Head of Network Operations, who publicly stated on May 10, 2004, in an email from his Rambler email address, that he had "been using nginx on http://www.zvuki.ru for almost a year*.mp3".

749.    Soon after Kopeyko was hired by Rambler Telecom on or about August 1, 2003, he began communicating extensively with Sysoev via email to and from their rambler-co.ru email accounts, during regular business hours, regarding Open Source NGINX development.  Topics of such communications include NGINX-related beta testing, debugging, algorithms, functionality, syntax, processing, deployment and uses of Open Source NGINX within Rambler.  At one point, in an email dated July 22, 2005, Kopeyko exclaimed: "I look – all around in Rambler nginxs are used everywhere …."

750.    Open Source NGINX was used by Rambler and stored on Rambler-owned servers located in Moscow, Russia, including the creation of DNS-zones "nginx.org" and "sysoev.ru" from at least 2002 until shortly after Sysoev's separation from Rambler.

751.    In light of Sysoev's alleged first deployment and publication of Open Source NGINX, with the involvement of other Rambler employees, on the Russian music portal zvuki.ru in Russia, and Rambler's heavy use of Open Source NGINX in Moscow prior to Sysoev's October 2004 public general release, and given the admitted significant overlap between Open Source NGINX and NGINX Plus, pursuant to the terms of the Berne Convention, Open Source NGINX and NGINX Plus are foreign works that are exempt from registration in the United States Copyright Office as a prerequisite to Lynwood commencing this action for copyright infringement.

752.    Rambler has assigned to Plaintiff all of its rights, including all intellectual property rights and the right to sue for past and present infringement, and to seek and collect damages, with respect to NGINX Plus and Open Source NGINX.

753.    17 U.S.C. § 106 provides a list of exclusive rights the owner of a copyright holds, including the right to copy the work, prepare derivative works, to distribute copies, and other acts.

754.    17 U.S.C. § 501 provides that the owner of a copyright may bring a cause of action against a party who violates the owner's exclusive rights under § 106.

755.   The Direct Copyright Infringement Defendants have engaged in and are engaging in reckless, blatant, willful, and repeated infringement of Plaintiff's copyright rights in and to the Pre-2012 NGINX Software, under both international and U.S. law.

756.   The Direct Copyright Infringement Defendants have reproduced, distributed, offered for sale and/or license, sold, licensed, and/or provided to customers and business partners on a paid subscription basis, the Pre-2012 NGINX Software and derivative works thereof, and have developed derivative works thereof, in an unauthorized manner for commercial use, in violation of Rambler's, and now Plaintiff's, exclusive rights, in violation of 17 U.S.C. § 106.

757.   Such infringement has occurred both in the United States and internationally, including because individuals and entities in the United States have downloaded the Pre-2012 NGINX Software and derivatives thereof, as well as copied, distributed and created derivative works of same, without the Plaintiff's or Rambler's authorization.

758.   Further, the Direct Copyright Infringement Defendants have downloaded the Pre-2012 NGINX Software and derivatives thereof, as well as copied, distributed and created derivative works of same, from their respective offices and servers located in the U.S. and have imported and/or exported such infringing works to and from others throughout the world without authorization via such U.S. offices.

759.   Further, from 2013 through the present, the Direct Copyright Infringement Defendants, including F5 since the Merger, have introduced 20 or more commercial releases of NGINX Plus and related extensions that are based on, and to a significant degree are derived from and/or dependent upon, the Pre-2012 NGINX Software.

760.   The Direct Copyright Infringement Defendants' conduct has been without the permission, consent, or license of Plaintiff or the previous owner of the Pre-2012 NGINX Software, Rambler.

761.   The Direct Copyright Infringement Defendants, by virtue of the above-described acts, directly infringed upon Plaintiff's copyright rights in and to the Pre-2012 NGINX Software, in violation of 17 U.S.C. § 101 *et seq.*, including 17 U.S.C. § 501.

762.   The Direct Copyright Infringement Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of, and with indifference to, the rights of Rambler and now Plaintiff.

763.   The Direct Copyright Infringement Defendants will continue their infringing activity throughout the course of this action, further demonstrating their reckless disregard of Plaintiff's intellectual property rights.

764.   As a direct and proximate result of the Direct Copyright Infringement Defendants' infringement of Plaintiff's copyrights in the Pre-2012 NGINX Software, Plaintiff is entitled to the election of its actual damages or to statutory damages pursuant to 17 U.S.C. § 504(c).  Plaintiff is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

765.   The Direct Copyright Infringement Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2), and any statutory damages against the Direct Copyright Infringement Defendants should be enhanced in accordance with that section.

766.   As a result of Direct Copyright Infringement Defendants' acts of infringement of the Pre-2012 NGINX Software, Plaintiff has suffered injury to its business and property in an amount to be determined at trial as damages pursuant to 17 U.S.C. § 504, presently believed to be well in excess of $750 million, and will continue to suffer damages in the future.

767.   The Direct Copyright Infringement Defendants' conduct is causing, and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated or measured in money.  Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§'s 502 and 503, Plaintiff is entitled to injunctive relief prohibiting the Direct Copyright Infringement Defendants from further infringement of Plaintiff's copyright rights in the Pre-2012 NGINX Software, and ordering the Direct Copyright Infringement Defendants to destroy all copies of the Pre-2012 NGINX Software and all derivative works thereof made in violation of Plaintiff's exclusive rights.

768.   Unless an injunction pursuant to 17 U.S.C. § 502 is issued enjoining the Direct Copyright Infringement Defendants and their officers, agents, servants, employees, and attorneys,

and all those persons in active concert or participation with them from directly or indirectly infringing the Pre-2012 NGINX Software, Plaintiff will suffer irreparable injury for which there is no adequate remedy at law.

## FIFTEENTH CLAIM FOR RELIEF

***Berne Convention for the Protection of Literary and Artistic Works and the Copyright Act (17 U.S.C. § 101, et seq.) based on Contributory Copyright Infringement Against Defendants Runa Capital and E. Ventures***

769.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 768 above as if fully set forth and repeated herein.

770.    As detailed above, the Berne Convention allows the owner of a foreign copyright to bring infringement claims in the U.S.

771.    In August 2010, Galperin left Rambler's employment in furtherance of the conspiracy to approach targeted venture capital firms, including Defendant Runa Capital.  Galperin solicited Runa Capital on behalf of Konovalov and Sysoev and disclosed their intentions and the object of the conspiracy (i.e., the misappropriation from Rambler and subsequent sale of the NGINX Enterprise to an American technology company).

772.    Runa Capital joined the conspiracy and hired Galperin directly in February 2011 explicitly for the purpose of inducing, coordinating with, and assisting Sysoev and Konovalov to carry out the conspirators' common plan (i.e., the misappropriation and subsequent sale of the NGINX Enterprise, including the infringement of Rambler's, and now Lynwood's, copyright rights in the Pre-2012 NGINX Software).

773.    Runa Capital and Defendant E.Ventures, Silicon Valley venture capital firms, knew of Sysoev's and Konovalov's duties owed to Rambler and that Rambler maintained the ownership rights to NGINX Plus, Open Source NGINX and the NGINX Enterprise.  Nevertheless, Runa Capital and E. Ventures assisted, encouraged, enabled, and induced Sysoev and Konovalov, while they were still employees at Rambler, to breach their duties to Rambler and to misappropriate the NGINX

Enterprise for the benefit of the fledgling business that the Team was forming and that Runa Capital and E. Ventures intended on funding and ultimately did fund.

774.    Defendants Runa Capital and BV Capital (now E.Ventures), which became shareholders in NGINX BVI as of October 23, 2011, knowingly participated in multiple future rounds of financing to grow the NGINX entities and set the table for the Merger transaction with F5 in 2019, as a result of which they profited handsomely.  In addition to Runa Capital and BV Capital's participation in future rounds of financing in October 2013, December 2014 and April 2016, Runa Capital's Chikhachev and BV Capital's Gieselmann also held board seats on NGINX BVI's board of directors up to the time of the company's merger with F5.  During that time, Chikhachev and Gieselmann participated in material decisions undertaken by NGINX BVI including its commercial rollout of NGINX Plus, which was owned by Rambler.

775.    Runa Capital, in particular, drove and supported the conspiracy since Day One, both monetarily, through millions of dollars in investments, and by providing its expertise in pursuing exit strategies (*i.e.*, ultimate sale or IPO) for the Team's NGINX startup, as confirmed in an article that Chikhachev posted online on March 12, 2019, within 24 hours of F5 publicly announcing the Merger with NGINX BVI. *See* https://medium.com/runacapital/nginx-and-runa-story-6e27e2a4ab5d.

776.    In his article, Chikhachev wrote that by the time Sysoev exited Rambler in 2011, "…we already knew this team [Sysoev, Konovalov and Alexeev] well and were impressed with the technical expertise and vision of the founders."  Chikhachev added that "…due to our strong enthusiasm on opportunity to turn NGINX into a global leader (we were impressed by the beauty of the product and felt confident about its potential) and support from the founders, Runa became part of a syndicate and co-led [a] $3M Series A round together with [E. Ventures] and MSD Capital (as part of our due diligence process, we introduced Michael Dell to the founders and he then became part of the syndicate). The deal was closed in August 2011, and we invested our first $1M into the company."

777.    In other words, even before Sysoev and Konovalov had left Rambler, the Runa Capital team had established deep ties with the Disloyal Employees, including through Galperin,

whom they had poached from Rambler in furtherance of the conspiracy, and had coached, counseled, encouraged, induced, enabled, facilitated and caused the Disloyal Employees to steal the NGNIX Enterprise from Rambler and monetize it for the benefit of themselves and their investors, including Runa Capital and E. Ventures.

778.    As a shareholder of NGINX BVI, Runa Capital also participated in the identification and recruitment of Robertson as CEO.

779.     Through their actions, Defendants Runa Capital and E. Ventures enabled, induced, facilitated, and materially contributed to the Direct Copyright Infringement Defendants' infringements of Plaintiff's copyrights in the Pre-2012 NGINX Software.

780.    At all times when they enabled, induced, facilitated, and materially contributed to the Direct Copyright Infringement Defendants' infringements of Plaintiff's copyrights in the Pre-2012 NGINX Software, Runa Capital and E. Ventures knew that Rambler, not any of the Direct Copyright Infringement Defendants, was the true owner of the Pre-2012 NGINX Software.

781.    Defendants Runa Capital and E. Ventures are liable as contributory copyright infringers for the infringing acts of the Direct Copyright Infringement Defendants.

782.    Runa Capital and E. Ventures' acts of contributory infringement were willful, intentional, and purposeful, in disregard of, and with indifference to, the rights of Plaintiff.

783.    As a direct and proximate result of Runa Capital's and E. Ventures' contributory infringement of the Pre-2012 NGINX Software, Plaintiff is entitled to the election of its actual damages or to statutory damages pursuant to 17 U.S.C. § 504(c).  Plaintiff is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

784.    Runa Capital's and E. Ventures' contributory infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2), and any statutory damages against Defendants should be enhanced in accordance with that section.

785.    As a result of Runa Capital's and E. Ventures' acts of contributory infringement of the Plaintiff's copyright rights in the Pre-2012 NGINX Software, Plaintiff has suffered injury to its business and property in an amount to be determined at trial as damages pursuant to 17 U.S.C. § 504,

presently believed to be well in excess of $750 million, and will continue to suffer damages in the future.

786.    Runa Capital's and E. Ventures' conduct is causing, and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated or measured in money.  Plaintiff has no adequate remedy at law.  Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting Runa Capital and E. Ventures from further contributing to the infringement of the Pre-2012 NGINX Software.

## SIXTEENTH CLAIM FOR RELIEF

***Berne Convention for the Protection of Literary and Artistic Works and the Copyright Act (17 U.S.C. § 101, et seq.) based on Vicarious Copyright Infringement Against Defendants NGINX BVI, NGINX Software, Inc. and F5***

787.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 786 above as if fully set forth and repeated herein.

788.    As detailed above, the Berne Convention allows the owner of a foreign copyright to bring infringement claims in the U.S.

789.    Defendants NGINX BVI and NGINX Software, Inc., beginning at least as early as 2011, and F5 immediately following the Merger until the present, have provided NGINX Plus and derivative works thereof to their customers, on a paid subscription basis, pursuant to written terms of use set forth in subscription and/or license agreements (the "NGINX Plus Terms"). *See., e.g.*, F5 End User License Agreement, DOC-0355-16, at https://www.f5.com/pdf/customer-support/end-user-license-agreement.pdf.

790.    Pursuant to the NGINX Plus Terms, NGINX BVI, NGINX Software, Inc. and F5 have the right and ability to supervise and/or control their customers' use of NGINX Plus and its derivatives.

791.    The uses of NGINX Plus and its derivatives by customers of NGINX BVI, NGINX Software, Inc. and F5 constitute infringements of Plaintiff's copyright rights in and to NGINX Plus.

792.   Pursuant to the NGINX Plus Terms, among other means, NGINX BVI, NGINX Software, Inc. and F5 could have prevented their customers from continuing to use and make copies of NGINX Plus and its derivatives in violation of Plaintiff's copyright rights in NGINX Plus.

793.   NGINX BVI, NGINX Software, Inc. and F5 directly benefit from their customers' use and copying of NGINX Plus and its derivatives because those customers pay NGINX BVI, NGINX Software, Inc. and F5 license, subscription and support fees in consideration for such use. Stated differently, NGINX BVI, NGINX Software, Inc. and F5 benefit financially by their customers' infringing uses of NGINX Plus and its derivatives.

794.   NGINX BVI, NGINX Software, Inc. and F5 are vicariously liable for the infringing acts of their customers arising from their infringing uses of NGINX Plus and its derivatives.

795.   NGINX BVI's, NGINX Software, Inc.'s and F5's acts of vicarious infringement have been willful, intentional, and purposeful, in disregard of, and with indifference to, the rights of Plaintiff in and to NGINX Plus.

796.   As a direct and proximate result of NGINX BVI's, NGINX Software, Inc.'s and F5's vicarious infringement of Plaintiff's copyright rights in NGINX Plus, Plaintiff is entitled to the election of its actual damages or to statutory damages pursuant to 17 U.S.C. § 504(c).  Plaintiff is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

797.   NGINX BVI's, NGINX Software, Inc.'s and F5's vicarious infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2), and any statutory damages against NGINX BVI, NGINX Software, Inc. and F5 should be enhanced in accordance with that section.

798.   As a result of NGINX BVI's, NGINX Software, Inc.'s and F5's  acts of vicarious infringement of Plaintiff's copyright rights in NGINX Plus, Plaintiff has suffered injury to its business and property in an amount to be determined at trial as damages pursuant to 17 U.S.C. § 504, presently believed to be well in excess of $750 million, and will continue to suffer damages in the future.

799.     NGINX BVI's, NGINX Software, Inc.'s and F5's conduct is causing, and, unless enjoined and restrained by this Court, will continue to cause Plaintiff great and irreparable injury that cannot be fully compensated or measured in money.   Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. §§ 502 and 503, Plaintiff is entitled to injunctive relief prohibiting NGINX BVI, NGINX Software, Inc. and F5 from further vicariously infringing NGINX Plus., and ordering NGINX BVI, NGINX Software, Inc. and F5 to destroy all copies of NGINX Plus made in violation of Plaintiff's exclusive rights, including all derivative works thereof.

## SEVENTEENTH CLAIM FOR RELIEF

*Cancellation of NGINX Trademark Registration, U.S. Reg. No. 4,196,757, and Payment of Damages for Fraud, 15 U.S.C. §§ 1064, 1119, 1120, as to NGINX Software, Inc. and F5*

800.     Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through 799 above as is fully repeated and realleged herein.

801.     Plaintiff is the owner of the NGINX trademark by assignment of the trademark and all other intellectual property rights from its predecessor-in-interest, Rambler.

802.     On May 4, 2011, while Sysoev and the other Disloyal Employees were still employed by Rambler, the Team incorporated NGINX Software, Inc. in Delaware.

803.     That same day, May 4, 2011, NGINX Software, Inc. filed an application to register the NGINX trademark on a use basis, pursuant to 15 U.S.C. § 1051(a), in the USPTO, which was assigned U.S. Application Number 85/312,802.

804.     As of May 4, 2011, NGINX Software, Inc. disclosed its headquarters as 600 Montgomery Street, 43rd Floor, San Francisco, California.

805.     In the application, NGINX Software, Inc. alleged that the date of first use of the NGINX trademark was May 1, 2002, while Sysoev was employed by Rambler, and that the date of first use in commerce of the NGINX trademark was May 1, 2004, while Sysoev was employed by Rambler and about four months before he released Open Source NGINX to the public.  Accordingly, such uses of the NGINX trademark and the goodwill that arose from such uses inured to the benefit of Rambler.

806.    The NGINX trademark application, U.S. Application Number 85/312,802,  covers the following goods in Class 9:  "Computer software for HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of HTTP and reverse proxy servers and mail proxy servers."

807.    In U.S. Application Number 85/312,802, Nginx Software, Inc. signed the application declaration through its Silicon Valley attorney, Leonard Grayver.

808.    The declaration in the NGINX trademark application stated in relevant part: "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true."

809.    These statements were false as applied to the NGINX trademark and known to be false by Sysoev and the other members of the Team that comprised NGINX Software, Inc. and authorized Grayver to make those representations on behalf of NGINX Software, Inc.

810.    Sysoev was still working for Rambler at that time U.S. Application Number 85/312,802 was filed for the NGINX trademark, and he and the rest of the Team knew well that Sysoev had developed Open Source NGINX for Rambler using Rambler's resources.

811.    The Sysoev Employment Agreement and Rambler's Internal Company Policies and Procedures explicitly provided that Sysoev's work product for Rambler was the property of Rambler and required Sysoev to disclose and turnover his work to Rambler.

812.    There was no transfer of trademark rights from Rambler to Sysoev or to any of the other Disloyal Employees in the NGINX trademark such that any such rights could have been subsequently transferred to NGINX Software, Inc. giving it a right to seek registration of the NGINX trademark.

813.    To the Team, Rambler's rights to Open Source NGINX and associated NGINX trademark were clearly established.

814.    Despite this knowledge, and more directly despite the Disloyal Employees' knowledge that Open Source NGINX and the associated NGINX trademark were properly owned by Rambler because the Disloyal Employees had developed such software and associated trademark for Rambler as part of their duties as Rambler employees, NGINX Software, Inc. fraudulently, and with an intent to deceive, represented to the USPTO that no other person or entity had any rights to the NGINX trademark.

815.    NGINX Software, Inc. had engaged Grayver as its legal counsel for the trademark application.  Upon information and belief, Grayver advised NGINX Software, Inc. and the Team of the importance of the representations they were making to the USPTO.

816.    The NGINX trademark was registered in the name of NGINX Software, Inc. on August 28, 2012 under U.S. Registration Number 4,196,757.

817.    NGINX Software, Inc. continued its fraudulent misrepresentations to the USPTO by continuing to maintain U.S. Registration Number 4,196,757 for the NGINX trademark by filing the "Combined Declaration of Use and Incontestability under Sections 8 & 15" of the Trademark Act on July 5, 2018.

818.    By signing the requisite declarations for U.S. Registration Number 4,196,757, NGINX Software, Inc. made knowingly false statements to the USPTO that no one else had the right to use the NGINX trademark.  This was not true in view of the knowledge of Rambler's ownership rights in the NGINX trademark.

819.    Subsequently, U.S. Registration Number 4,196,757 was purportedly assigned to F5 on January 22, 2020, which assignment was recorded in the USPTO on February 6, 2020 at reel/frame 006858/0385.

820.    F5 had conducted extensive due diligence in early 2019 prior to the Merger and knew that the Team had stolen Open Source NGINX, NGINX Plus and related intellectual property rights, including the NGINX trademark, from Rambler.

821.    F5 could not have acquired any legitimate rights in the NGINX trademark, because the Team had no rights to transfer to NGINX Software, Inc. such that it could have assigned rights in the NGINX trademark to F5.

822.    U.S. Registration Number 4,196,757 should be cancelled in view of the fraudulent representations of exclusive ownership of the NGINX trademark to the USPTO.

823.    Defendants NGINX Software, Inc. and F5 should pay Plaintiff all damages caused by the fraudulent registration of the NGINX trademark in an amount to be determined at trial.

## EIGHTEENTH CLAIM FOR RELIEF

*Cancellation of NGINX (Stylized) Trademark Registration, U.S. Reg. No. 4,200,791 and*

*Payment of Damages for Fraud, 15 U.S.C. §§ 1064, 1119, 1120 as to*

*NGINX Software, Inc. and F5*

824.    Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through 823 above as is fully repeated and realleged herein.

825.    Plaintiff is the owner of the NGINX (Stylized) trademark by assignment of the trademark and all other intellectual property rights from its predecessor-in-interest, Rambler.

826.    On May 5, 2011, the newly-formed NGINX Software, Inc. filed an application to register the NGINX (Stylized) trademark on a use basis, pursuant to 15 U.S.C. 1051(a), in the USPTO, which was assigned U.S. Application Number 85/312,806.

827.    As of May 5, 2011, NGINX Software, Inc. disclosed its headquarters as 600 Montgomery Street, 43rd Floor, San Francisco, California.

828.    As of May 5, 2011, Sysoev and other of the Disloyal Employees were still employed by Rambler.

829.    In the application for the NGINX (Stylized) trademark, NGINX Software, Inc. alleged that the date of first use of the trademark was May 1, 2002, while Sysoev was employed by Rambler, and that the date of first use in commerce was May 1, 2004, while Sysoev was employed by Rambler. Accordingly, such uses of the NGINX (Stylized) trademark and the goodwill that arose from such uses inured to the benefit of Rambler.

830.    The application for the NGINX (Stylized) trademark covers the following goods in Class 9: "Computer software for HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of HTTP and reverse proxy servers and mail proxy servers."

831.    In U.S. Application Number 85/312,802, Nginx Software, Inc. signed the application declaration through its Silicon Valley attorney, Leonard Grayver.

832.    The declaration in the NGINX (Stylized) trademark application stated in relevant part: "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true."

833.    These statements as applied to the NGINX (Stylized) trademark were false and known to be false by Sysoev and the other members of the Team who authorized Grayver to make that representation on behalf of NGINX Software, Inc.

834.    Sysoev was still working for Rambler at that time the U.S. Application Number 85/312,806 was filed for the NGINX (Stylized) trademark, and he and the rest of the Team knew well that Sysoev had developed Open Source NGINX for Rambler using Rambler's resources.

835.    The Sysoev Employment Agreement and Rambler's Internal Company Policies and Procedures explicitly provided that Sysoev's work product for Rambler was the property of Rambler and required Sysoev to disclose and turnover his work to Rambler.

836.    There was no transfer of trademark rights from Rambler to Sysoev or to any of the other Disloyal Employees in the NGINX (Stylized) trademark such that any such rights could have been subsequently transferred to NGINX Software, Inc. giving it a right to seek registration of the NGINX (Stylized) trademark.

837.    To the Team, Rambler's rights to Open Source NGINX and associated NGINX (Stylized) trademark were clearly established.

838.    Despite this knowledge, and more directly despite the Disloyal Employees' knowledge that Open Source NGINX and the associated NGINX (Stylized) trademark were properly owned by Rambler because the Disloyal Employees had developed such software and associated trademark for Rambler as part of their duties as Rambler employees, NGINX Software, Inc. fraudulently, and with an intent to deceive, represented to the USPTO that no other person or entity had any rights to the NGINX (Stylized) trademark.

839.    NGINX Software, Inc. had engaged Grayver as its legal counsel for the trademark application.  Upon information and belief, Grayver advised NGINX Software Inc. and the Team of the importance of the representations they were making to the USPTO.

840.    The NGINX (Stylized) trademark was registered in the name of NGINX Software, Inc. on September 4, 2012 under U.S. Registration Number 4,200,791.

841.    NGINX Software, Inc. continued its fraudulent misrepresentations to the USPTO by continuing to maintain U.S. Registration No. 4,200,791 for the NGINX (Stylized) trademark by filing the "Combined Declaration of Use and Incontestability under Sections 8 & 15" of the Trademark Act on July 5, 2018.

842.    By signing the requisite declarations for U.S. Registration No. 4,200,791, NGINX Software, Inc. made knowingly false statements to the USPTO that no one else had the right to use the NGINX (Stylized) trademark.  This was not true in view of the knowledge of Rambler's ownership rights in the NGINX (Stylized) trademark.

843.    Subsequently, U.S. Registration Number 4,200,791 was purportedly assigned to F5 on January 22, 2020, which was recorded in the USPTO on February 6, 2020 at reel/frame 006858/0385.

844.    F5 had conducted extensive due diligence in early 2019 prior to the Merger and knew that the Team had stolen Open Source NGINX, NGINX Plus and related intellectual property rights, including the NGINX trademark, from Rambler.

845.    F5 could not have acquired any legitimate rights in the NGINX (Stylized) trademark because the Team had no rights to transfer to NGINX Software, Inc. such that it could have assigned rights in the NGINX trademark to F5.

846.    U.S. Registration Number 4,200,791 should be cancelled in view of the fraudulent representations of exclusive ownership of the NGINX (Stylized) trademark to the USPTO.

847.    Defendants NGINIX Software, Inc. and F5 should pay Plaintiff all damages caused by the fraudulent registration of the NGINX (Stylized) trademark in an amount to be determined at trial.

## NINETEENTH CLAIM FOR RELIEF

*Cancellation of NGINX PLUS Trademark Registration, U.S. Reg. No. 4,837,175 and Payment of*

*Damages for Fraud, 15 U.S.C. §§ 1064, 1119, 1120*

*as to NGINX DE, NGINX BVI and F5*

848.    Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through 847 above as is fully repeated and realleged herein.

849.    Plaintiff is the owner of the NGINX PLUS and NGINX+ trademarks by assignment of the trademarks and all other intellectual property rights from its predecessor-in-interest, Rambler.

850.    NGINX PLUS and NGINX+ are the trademarks associated with NGINX Plus, which was conceived of, developed as a work for hire, and owned by Rambler.

851.    On April 30, 2013, NGINX DE filed an application to register the NGINX PLUS trademark on an intent-to-use basis, pursuant to 15 U.SC. § 1051(b), in the USPTO, which was assigned U.S. Application Number 85/918,273.  NGINX DE engaged Leonard Grayver to file the application.

852.    The application for the NGINX PLUS trademark covers the following goods in Class 9: "Computer software for HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of HTTP and reverse proxy servers and mail proxy servers."

853.    In the application for the NGINX PLUS trademark, NGINX DE subsequently filed a Statement of Use and alleged that the date of first use of the NGINX PLUS trademark was April 13, 2013 and that the date of first use in commerce of the NGINX PLUS trademark was August 22, 2013.

854.    NGINX DE fraudulently claimed that the NGINX PLUS trademark was owned and first used by it with the intent to deceive the USPTO.

855.    Both the application declaration to register the NGINX PLUS trademark and declaration in support of the Statement of Use were signed by NGINX DE through its attorney, Grayver.

856.    The declaration in the application for the NGINX PLUS trademark stated in relevant part: "to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true."

857.    The declaration for the Statement of Use for the NGINX PLUS trademark contained similar language in relevant part, as follows: "to the best of the signatory's knowledge and belief, no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive."

858.    These statements were false and known to be false by Sysoev and the other members of the Team who authorized Grayver to make the representations on behalf of NGINX DE.

859.    There was no transfer of trademark rights from Rambler to Sysoev or to any of the other Disloyal Employees in the NGINX trademark, the NGINX PLUS trademark or the NGINX+ trademark such that any such rights could have been subsequently transferred to NGINX DE giving it a right to seek registration of the NGINX PLUS trademark.

860.     The April 13, 2013 alleged date of first use of the NGINX PLUS trademark and the August 22, 2013 alleged date of first use in commerce of the NGINX PLUS trademark were falsely claimed by NGINX DE, as confirmed by the whistleblower Alexander Korotkov's prior USPTO application to register the NGINX trademark, U.S. Application Serial No. 85/268,567, which he later abandoned after being snubbed by the Team.  Korotkov filed the application as part of the conspiracy to steal the NGINX Enterprise from Rambler.  Such application was filed through Korotkov's own company, Infosens Inc.

861.     In reality, well before 2013, the conspirators were using the *nginxplus.com* domain name in connection with a Web site, along with the "NGINX+" trademark, to promote and sell NGINX Plus, as shown in the Web page specimen that Korotkov submitted in support of his trademark application.  Korotkov's specimen shows that those earlier iterations of the NGINX PLUS trademark were being used as early as February 1, 2010, and used in commerce as early as March 1, 2011, in connection with the promotion and sale of NGINX Plus.  These dates coincide with when Sysoev and the other Disloyal Employees were still employed with Rambler.

862.     NGINX DE's claim that the NGINX PLUS trademark was used in commerce more than two years later than Korotkov's specimen constitutes a blatant attempt to place the first commercialization of the NGINX Plus software more than 20 months after Sysoev exited Rambler, rather than the during the period when the Disloyal Employees still worked at Rambler.  In doing so, NGINX DE sought to make it seem that the NGINX Plus software was first developed and commercialized outside of Rambler after the Disloyal Employees had exited, rather than as a work made for hire owned by Rambler.

863.     The false first-use dates submitted to the USPTO by NGINX DE establish that NGINX DE's claim of ownership of the NGINX PLUS trademark based on use in 2013 is fraudulent because, as shown by the Korotkov trademark application, the conspirators' use of the NGINX PLUS trademark in connection with the NGINX Plus software occurred in 2010 and 2011, while the Disloyal Employees were still employed by Rambler.  As such, use of the NGINX PLUS mark inured solely to the benefit of Rambler, the true owner of the NGINX PLUS trademark.

864.    Accordingly, the NGINX PLUS trademark was fraudulently registered in the name of NGINX DE on October 20, 2015 under Registration Number 4,837,175 and such registration should therefore be cancelled.

865.    On December 14, 2017, Sally M. Abel, Esq. of Fenwick & West LLP, filed a Section 7 Request form claiming that Grayver had mistakenly listed NGINX DE as the applicant and asked that the registrant be changed to NGINX BVI.  The Section 7 Request form incorrectly states that the registrant should be changed to NGINX BVI because NGINX DE did not exist as of the registration filing date.  In reality, NGINX DE was incorporated in Delaware on August 8, 2011 (four months before Sysoev left Rambler's employment) and remains in existence as of April 2021.

866.    Even if the change of entities was accurate, it was meaningless where NGINX BVI also had no rights to the NGINX, NGINX PLUS or NGINX+ trademarks.  Rambler had not assigned its rights to such trademark to Sysoev or any of the other Disloyal Employees such that there could have been any transfer of such trademark rights to NGINX BVI.

867.    The NGINX PLUS trademark registration was then purportedly assigned from NGINX BVI to F5 on November 27, 2019, which assignment was recorded with the USPTO on December 3, 2019 at reel/frame number 006807/0517.

868.    As there was no legitimate transfer of trademark rights to NGINX BVI, there could be no further transfer of rights to F5.

869.    Having done extensive due diligence prior to the Merger, F5 had knowledge that none of the Disloyal Employees or their subsequent companies, NGINX DE and NGINX BVI had any rights to the NGINX, NGINX PLUS or NGINX + trademarks.  F5 knowingly turned a blind eye to the fraudulent misrepresentations filed by NGINX DE and/or NGINX BVI and continued the fraud upon the USPTO by filing the purported assignment of the NGINX PLUS trademark registration.

870.    U.S. Registration Number 4,837,175 should be cancelled in view of the fraudulent representations of ownership of the NGINX PLUS trademark made to the USPTO.

871.    Defendants NGINX DE, NGINX BVI and F5 should pay Plaintiff all damages caused by the fraudulent registration of the NGINX PLUS trademark in an amount to be determined at trial.

1

**TWENTIETH CLAIM FOR RELIEF**

2

*Cancellation of NGINX Trademark Registration, U.S. Reg. No. 5,973,515 and Payment of*

3

*Damages for Fraud, 15 U.S.C. §§ 1064, 1119, 1120 as to NGINX BVI and F5*

4

872.    Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through

5

871 above as is fully repeated and realleged herein.

6

873.    Plaintiff is the owner of the NGINX trademark by assignment of the trademark and

7

all other intellectual property rights from its predecessor-in-interest, Rambler.

8

874.    The first use of the NGINX trademark dates back to 2002, and the first use in U.S.

9

commerce of the NGINX trademark dates back to 2004.  Such uses of the NGINX trademark and

10

the goodwill that arose from such uses had inured to the benefit of Rambler.

11

875.    On June 14, 2017, NGINX BVI applied to register the NGINX trademark, on an

12

intent-to-use basis, pursuant to 15 U.S.C. § 1051(b), in the USPTO, which was assigned U.S.

13

Application Number 87/487,184.

14

876.    U.S. Application Number 87/487,184 covers the following goods and services:

15

Class 9: Server software for use in web serving, reverse proxying, caching, load

16

balancing, application delivery and media streaming; computer software for

17

controlling and managing web servers; computer software for use in HTTP and

18

reverse proxy servers and mail proxy servers, namely, for controlling and managing

19

server applications in the nature of http and reverse proxy servers and mail proxy

20

servers; software for providing data analysis, analytics, and reporting of information

21

concerning web server performance; computer hardware; parts and fittings for all of

22

the aforesaid.

23

Class 42: Software as a service (SaaS) featuring software for use in web serving,

24

reverse proxying, caching, load balancing, application delivery, media streaming and

25

controlling and managing web servers; platform as a service featuring computer

26

platforms for web serving, reverse proxying, caching, load balancing, application

27

delivery and media streaming; Software as a service (SaaS) services featuring software

28

for use in HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of http and reverse proxy servers and mail proxy servers; computer services, namely, providing web servers and load balancing servers; software as a service (SaaS) services featuring software for providing data analysis, analytics, and reporting of information concerning web server performance; design and development of computer hardware and software; information, consultancy and advisory services relating to all of the aforesaid.

877.    The declaration in U.S. Application No. 87/487,184 for the NGINX trademark stated in relevant part:

The signatory believes that the applicant is entitled to use the mark in commerce; The applicant has a bona fide intention to use the mark in commerce on or in connection with the goods/services in the application; and To the best of the signatory's knowledge and belief, the facts recited in the application are accurate…  To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support….

878.    These statements were false and known to be false by the Team when such declaration was signed by Mark Elchinoff, CFO, of NGNIX BVI, where Rambler was the rightful owner of the NGINX trademark.

879.    U.S. Application Number 87/487,184 was then purportedly assigned from NGINX BVI to F5 on November 27, 2019, which assignment was recorded with the USPTO on December 3, 2019 at reel/frame number 006807/0517. Subsequently, on December 11, 2019, a Statement of Use for the NGINX trademark was filed by F5.

880.    F5 recited the following in the Statement of Use for the NGINX trademark: "The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 12/14/2009, and first used in commerce at least as early as 04/12/2011, and is now in use in such commerce."  These first-use dates were independently selected and asserted

by F5 – prior to such assertion, no dates of use or dates of first use in commerce had been include in such trademark application.

881.    The date of first use claimed as of December 14, 2009 was while Sysoev and the other Disloyal Employees were still employed by Rambler, and the date of first use in commerce claimed as of April 12, 2011 was also while Sysoev and the other Disloyal Employees were still employed by Rambler.  Accordingly, such uses of the NGINX trademark inured to the benefit of Rambler – not to the benefit of the Disloyal Employees.

882.    In view of its pre-merger due diligence, F5 knew that the Disloyal Employees were still employed at Rambler during those dates and that such dates were all before any of the entities: NGINX DE, NGINX BVI or NGINX Software, Inc. were formed.

883.    Further, the identification of goods in Class 9 is virtually identical to the identification of goods in U.S. Trademark Registration No. 4,196,757 for the NGINX trademark in which the dates of first use and first use in commerce were claimed as of May 1, 2002 and May 1, 2004, respectively, and such uses of the NGINX mark inured to the benefit of Rambler.

884.    The declaration in the Statement of Use stated in relevant part:

To the best of the signatory's knowledge and belief, no other persons, except, if applicable, authorized users, members, and/or concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services/collective membership organization of such other persons, to cause confusion or mistake, or to deceive.

To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

885.    The declaration was signed on behalf of F5 by its attorney, Eugene Beliy.

886.    The Statement of Use declaration statements were false as applied to the ownership of the NGINX trademark where such trademark rights were with Rambler and were never assigned

to Sysoev or anyone else on the Team such that there could have been a transfer of rights to NGINX

BVI and then to F5.  Neither NGINX BVI nor F5 had the right to register the NGINX trademark.

887.    F5's independent assertion of, and reliance on, the alleged dates of first use of the

NGINX trademark (which information it had learned through the pre-Merger due diligence process)

when Sysoev and the other Disloyal Employees were still employed at Rambler is further definitive

proof that F5 does not have any ownership rights in the NGINX trademark and underscores F5's

intent to deceive the USPTO.

888.    F5 is not the rightful owner of the NGINX trademark.

889.    The NGINX trademark was fraudulently registered in the name of F5 on January 28,

2020 under U.S. Registration Number 5,973,515.

890.    U.S. Registration Number 5,973,515 should be cancelled in view of the fraudulent

representations of ownership of the NGINX trademark made to the USPTO.

891.    Defendants NGINX BVI and F5 should pay Plaintiff all damages caused by the

fraudulent registration of the NGINX trademark in an amount to be determined at trial.

## **TWENTY-FIRST CLAIM FOR RELIEF**

***Cancellation of NGINX CONTROLLER Trademark Registration, U.S. Reg. No. 5,973,527 and***

***Payment of Damages, 15 U.S.C. §§ 1064, 1119, 1120, as to NGINX BVI and F5***

892.    Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through

891 above as is fully repeated and realleged herein.

893.    Plaintiff is the owner of the NGINX trademark by assignment of the trademark and

all other intellectual property rights from its predecessor-in-interest, Rambler.

894.    The first use of the NGINX trademark dates back to 2002, and the first use in U.S.

commerce of the NGINX trademark dates back to 2004.  Such uses of the NGINX trademark and

the goodwill that arose from such uses inured to the benefit of Rambler.

895.    On July 28, 2017, NGINX BVI filed an application to register the NGINX

CONTROLLER trademark, on an intent-to-use basis, pursuant to 15 U.S.C. § 1051(b), in the

USPTO, which was assigned U.S. Application Number 87/547,319.  The word "controller" in the

Trademark was required to be disclaimed because it is descriptive of the goods and services.  The predominant portion of the trademark is NGINX.

896.    The NGINX CONTROLLER trademark registration covers the following goods and services:

> Class 9: Server software for use in web serving, reverse proxying, caching, load balancing, application delivery and media streaming; computer software for controlling and managing web servers; computer software for use in HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of http and reverse proxy servers and mail proxy servers; software for providing data analysis, analytics, and reporting of information concerning web server performance; computer hardware; parts and fittings for all of the aforesaid.
>
> Class 42: Software as a service (SaaS) featuring software for use in web serving, reverse proxying, caching, load balancing, application delivery, media streaming and controlling and managing web servers; platform as a service featuring computer platforms for web serving, reverse proxying, caching, load balancing, application delivery and media streaming; Software as a service (SaaS) services featuring software for use in HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of http and reverse proxy servers and mail proxy servers; computer services, namely, providing web servers and load balancing servers; software as a service (SaaS) services featuring software for providing data analysis, analytics, and reporting of information concerning web server performance; design and development of computer hardware and software; information, consultancy and advisory services relating to all of the aforesaid."

897.    The declaration for the NGINX CONTROLLER application stated in relevant part: "The signatory believes that the applicant is entitled to use the mark in commerce; The applicant has a bona fide intention to use the mark in commerce on or in connection

with the goods/services in the application; and To the best of the signatory's knowledge and belief, the facts recited in the application are accurate…

898.    These statements were false and known to be false by Sysoev and the Team when such application declaration was signed by Mark Elchinoff, CFO, of NGNIX BVI.

899.    The NGINX CONTROLLER trademark application was purportedly assigned from NGINX BVI to F5 on November 27, 2019, which assignment was recorded with the USPTO on December 3, 2019 at reel/frame number 006807/0517.

900.    Curiously, on December 11, 2019, a Statement of Use was filed by F5 claiming a date of first use of use and date of first use in commerce as of June 26, 2018.

901.    Further, the declaration in the Statement of Use stated in relevant part:

The signatory believes that the applicant is the owner of the mark sought to be registered. For a trademark or service mark application, the mark is in use in commerce on or in connection with all the goods/services in the application or notice of allowance, or as subsequently modified… To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support...

902.    The NGINX CONTROLLER trademark covers the exact same goods and services as the NGINX trademark, U.S. Registration No. 5,973,515, for which F5 claimed a date of first use as of December 14, 2009, while Sysoev and the other Disloyal Employees were still employed by Rambler, and a date of first use in commerce claimed as of April 12, 2011 also while Sysoev and all the Disloyal Employees were still employed by Rambler.

903.    In view of its pre-merger due diligence, F5 knew that the Disloyal Employees were still employed at Rambler during those dates and that such dates were all before any of the entities: NGINX DE, NGINX BVI or NGINX Software, Inc. were formed.

904.    There had been no transfer of trademark rights in the NGINX trademark from Rambler to Sysoev or any of the other Disloyal Employees such that any rights could have been

subsequently transferred to NGINX BVI and then to F5 to support seeking to register the NGINX CONTROLLER trademark.

905.    The claimed dates of first use and first use in commerce by F5 of the NGINX CONTROLLER trademark of June 26, 2018 was an attempt by it to circumvent the actual earlier first use dates of the NGINX CONTOLLER trademark in 2009 and 2011, respectively, when Sysoev and the other Disloyal Employees were still employed with Rambler, and such use of the mark inured to the benefit of Rambler, and with the intent to deceive the USPTO.

906.    The NGINX CONTROLLER trademark was fraudulently registered in the name of F5 on January 28, 2020 under U.S. Registration Number 5,973,527.

907.    F5 is not the rightful owner of the NGINX CONTROLLER trademark.

908.    U.S. Registration Number 5,973,527 should be cancelled in view of the fraudulent representations of ownership of the NGINX CONTROLLER trademark made to the USPTO.

909.    Defendants NGINX BVI and F5 should pay Plaintiff all damages caused by the fraudulent registration of the NGINX CONTROLLER trademark in an amount to be determined at trial.

## TWENTY-SECOND CLAIM FOR RELIEF

*Cancellation of NGINX UNIT Trademark Registration, U.S. Reg. No. 5,978,630 and Payment of Damages for Fraud, 15 U.S.C. §§ 1064, 1119, 1120 as to NGINX BVI and F5*

910.    Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through 909 above as is fully repeated and realleged herein.

911.    Plaintiff is the owner of the NGINX trademark by assignment of the trademark and all other intellectual property rights from its predecessor-in-interest, Rambler.

912.    The first use of the NGINX trademark dates back to 2002, and the first use in U.S. commerce of the NGINX trademark dates back to 2004.  Such uses of the NGINX trademark and the goodwill that arose from such uses inured to the benefit of Rambler.

913.    On July 28, 2017, NGINX BVI filed an application to register the NGINX UNIT trademark on an intent-to-use basis pursuant to 15 U.S.C., which was assigned U.S. Application

Number 87/547,328 The word "unit" was required to be disclaimed in the trademark because it is descriptive of the goods and services. The predominant portion of the trademark is NGINX.

914.   The NGINX UNIT trademark registration covers the following goods and services: Class 9: Server software for use in web serving, reverse proxying, caching, load balancing, application delivery and media streaming; computer software for controlling and managing web servers; computer software for use in HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of http and reverse proxy servers and mail proxy servers; software for providing data analysis, analytics, and reporting of information concerning web server performance; computer hardware; parts and fittings for all of the aforesaid.

Class 42: Software as a service (SaaS) featuring software for use in web serving, reverse proxying, caching, load balancing, application delivery, media streaming and controlling and managing web servers; platform as a service featuring computer platforms for web serving, reverse proxying, caching, load balancing, application delivery and media streaming; Software as a service (SaaS) services featuring software for use in HTTP and reverse proxy servers and mail proxy servers, namely, for controlling and managing server applications in the nature of http and reverse proxy servers and mail proxy servers; computer services, namely, providing web servers and load balancing servers; software as a service (SaaS) services featuring software for providing data analysis, analytics, and reporting of information concerning web server performance; design and development of computer hardware and software; information, consultancy and advisory services relating to all of the aforesaid.

915.   The declaration in the NGINX UNIT trademark application stated in relevant part: The signatory believes that the applicant is entitled to use the mark in commerce; The applicant has a bona fide intention to use the mark in commerce on or in connection with the goods/services in the application; and To the best of the signatory's

knowledge and belief, the facts recited in the application are accurate…   To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

916.    These statements were false and known to be false by Sysoev and the other members of the Team when such declaration was signed by Mark Elchinoff, CFO, of NGNIX BVI.

917.    The NGINX UNIT trademark application was purportedly assigned from NGINX BVI to F5 on November 27, 2019, which assignment was recorded with the USPTO on December 3, 2019 at reel/frame number 006807/0517.

918.    Subsequently, on December 10, 2019, a Statement of Use was filed by F5. As to the dates of first use and first use in commerce claimed for the NGINX UNIT mark, F5 stated in relevant part: "The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 09/22/2017, and first used in commerce at least as early as 09/22/2017, and is now in use in such commerce."

919.    Further, the declaration in the Statement of Use stated in relevant part:

The signatory believes that the applicant is the owner of the mark sought to be registered.   For a trademark or service mark application, the mark is in use in commerce on or in connection with all the goods/services in the application or notice of allowance, or as subsequently modified…To the best of the signatory's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the allegations and other factual contentions made above have evidentiary support.

920.    The NGINX UNIT trademark covers the exact same goods and services as the NGINX trademark, U.S. Registration No. 5,973,515, for which F5 claimed a date of first use as of December 14, 2009 while Sysoev and the other Disloyal Employees were still employed by Rambler, and a date of first use in commerce claimed as of April 12, 2011, also while Sysoev and all the Disloyal Employees were still employed by Rambler.

921.    In view of its pre-merger due diligence, F5 knew that the Disloyal Employees were still employed at Rambler during those dates and that such dates were all before any of the entities: NGINX DE, NGINX BVI or NGINX Software, Inc. were formed.

922.    There had been no transfer of trademark rights in the NGINX trademark from Rambler to Sysoev or to any of the other Disloyal Employees such that any rights could have been subsequently transferred to NGINX BVI and then to F5 to support registration of the NGINX UNIT trademark.

923.    The claimed dates of first use and first use in commerce by F5 of the NGINX UNIT trademark of September 22, 2017 was an attempt by it to circumvent the actual earlier first use dates of the NGINX UNIT trademark in 2009 and 2011, respectively, when Sysoev and the other Disloyal Employees were still employed with Rambler, and such use of the mark inured to the benefit of Rambler, and with the intent to deceive the USPTO.

924.    The NGINX UNIT trademark was fraudulently registered in the name of F5 on February 4, 2020 under U.S. Registration Number 5,978,630.

925.    F5 is not the rightful owner of the NGINX UNIT trademark.

926.    U.S. Registration Number 5,978,630 should be cancelled in view of the fraudulent representations of ownership of the NGINX UNIT trademark made to the USPTO.

927.    Defendants NGINX BVI and F5 should pay Plaintiff all damages caused by the fraudulent registration of the NGINX UNIT trademark in an amount to be determined at trial.

**TWENTY-THIRD CLAIM FOR RELIEF**

*False Advertising, 15 U.S.C. § 1125(a)(1)(B) as to All Defendants*

928.    Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through 927 above as is fully repeated and realleged herein.

929.    Plaintiff is Rambler's successor-in-interest to Open Source NGINX, NGINX Plus and the NGINX suite of trademarks.

930.    Defendants have used the NGINX suite of trademarks to advertise and market to relevant licensees of Open Source NGINX and NGINX Plus and services associated therewith as if such accomplishments were theirs.

931.    Defendants have systematically claimed as their own, Rambler's (and now Plaintiff's) Open Source NGINX and NGINX Plus software.

932.    All promotion and advertising of Open Source NGINX and NGINX Plus by the Defendants which attributes such accomplishments as their own, rather than Rambler's, are literally false.

933.    For example, it was touted on the "nginx.com" website in 2019 that "NGINX, Inc. is the company behind NGINX, the popular open source project trusted by more than 400 million sites."

934.    Subsequently in 2020, F5 has touted the exact same advertising message on the "nginx.com" website, only substituting in itself for NGINX, Inc.: "F5 Networks, Inc. is the company behind NGINX, the popular open source project trusted by more than 400 million sites."

935.    By Sysoev's own admissions, Open Source NGINX was developed within the scope of his employment at Rambler.  In addition, NGINX Plus was also developed by Sysoev with assistance from the Disloyal Employees within the scope of their employment responsibilities at Rambler and using Rambler resources and infrastructure.  Hence, both software products are Rambler's.  Yet, commercial advertisements for the products by the Defendants falsely designate themselves for the history and achievement of Open Source NGINX and falsely attribute credit for NGINX Plus to themselves.

936.    The Sysoev Employment Agreement and Rambler's Internal Company Policies and Procedures mandate that Open Source NGINX, NGINX Plus, the NGINX Enterprise, and all related corporate opportunities were and are owned by Rambler and now Lynwood.

937.    Rambler, and now in turn Lynwood, have been denied the advertising value and goodwill that would come from the public knowledge of Open Source NGINX and NGINX Plus having been Rambler's and now Lynwood's.

938.   Consumers have been deceived where they have not known the true source of Open Source NGINX and NGINX Plus.

939.   Defendants have violated the Lanham Act by falsely and misleadingly designating Open Source NGINX and NGINX Plus as their own in advertising.

940.   Defendants' false and misleading designations regarding Open Source NGINX and NGINX Plus as their own are material.

941.   Defendants' false and misleading designation of the NGINX suite of trademarks, Open Source NGINX and NGINX Plus as their own occurred in interstate commerce.

942.   As a result of Defendants' false and misleading advertising, Rambler, and Plaintiff as its assignee, has suffered vast economic damages in an amount to be determined at trial, but presently believed to be well in excess of $750 million.

## TWENTY-FOURTH CLAIM FOR RELIEF

### *Infringement of the NGINX, NGINX (Stylized) and NGINX PLUS Trademarks, 15 U.S.C. §§ 1125(a)(1)(A) as to All Defendants*

943.   Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through 942 above as if fully repeated and realleged herein.

944.   Plaintiff is the legitimate owner of the NGINX trademark, the NGINX (Stylized) trademark, the NGINX PLUS (including NGINX+) trademark and any associated and derivative trademarks by assignment from its predecessor-in-interest, Rambler.

945.   NGNIX is a coined term and is known worldwide in connection with NGINX software and related services offered in connection with such trademark.

946.   The NGINIX and NGINX (Stylized) trademarks are valid trademarks owned by Rambler, and now Lynwood by assignment. Use of the NGINX and NGINX (Stylized) trademarks began in 2002 and use of the trademarks in U.S. commerce began in 2004.  Such uses of the NGINX and NGINX (Stylized) trademarks inured to the benefit of Rambler.

947.   The NGINX PLUS trademark is a valid trademark owned by Rambler, and now Lynwood by assignment.  Use of the NGINX PLUS trademark began in February 2010 and use of

the NGINX PLUS trademark in U.S. commerce began in March 2011. Such uses of the NGINX PLUS trademark inured to the benefit of Rambler.

948.    Defendants have been using the NGINX trademark, NGINX (Stylized) trademark, NGINX PLUS trademark, NGINX UNIT trademark and NGINX CONTROLLER trademark in U. S. commerce in connection with Open Source NGINX, NGINX Plus, and related software goods and services in violation of Rambler's and now Lynwood's rights.

949.    Such uses have caused confusion, mistake, and deception where Lynwood is the actual owner of the NGINX, NGINX (Stylized) and NGINX PLUS trademarks.

950.    The NGINX, NGINX (Stylized) and NGINX PLUS trademarks used by Defendants are identical in sound, appearance, and commercial impression to Lynwood's NGINX, NGINX (Stylized) and NGINX PLUS trademarks.

951.    The NGINX CONTROLLER and NGINX UNIT trademarks used by Defendants are confusingly similar in sound, appearance, and commercial impression to Lynwood's NGINX trademark.

952.    The goods and services offered in connection with the NGINX trademarks by Defendants are identical to Open Source NGINX, NGINX Plus and related services and/or are closely related to such goods and services.

953.    Consumers are actually confused because consumers have been deceptively told and have been misled to believe that NGINX Software, Inc., NGINX DE, NGINX BVI, and/or F5 were or are the owners of the NGINX-formative trademarks and software offered in connection therewith, when in fact Rambler, and now Lynwood, is the legitimate owner.

954.    Consumers continue to be actually confused because Defendant F5 has continued the false designation of the origin of the NGINX trademarks, Open Source NGINX and NGINX Plus after having acquired NGINX BVI through the Merger and purportedly having the NGINX, NGINX (Stylized), NGINX PLUS, NGINX CONTROLLER, and NGINX UNIT trademarks assigned to it.

955.    Defendant NGINX Software, Inc.'s and the Team's intent in selecting the NGINX and NGINX (Stylized) trademark was in bad faith, including because the Team knew they were

stealing these trademarks from Rambler as part of their conspiracy to sell Rambler's NGINX Enterprise for their own ill-gotten profit.

956.   Defendant NGINX Software, Inc.'s and the Team's intent in selecting the NGINX and NGINX (Stylized) trademarks was in bad faith, including because the Team knew they used the marks and registered the marks in direct contravention of their employment obligations with Rambler.

957.   Defendants NGINX DE, NGINX BVI and F5's continued actions in expanding the unauthorized use of the NGINX trademark by also selecting and using the NGINX PLUS, NGINX CONTROLLER and NGINX UNIT trademarks was with an intention of seeking, in bad faith, to build on the stolen trademark rights of Rambler.

958.   Lynwood has been damaged by the years of unauthorized use of the NGINX trademark, NGINX (Stylized) trademark, NGINX PLUS trademark, NGINX CONTROLLER trademark and NGINX UNIT trademark by NGINX BVI, NGINX DE, NGINX Software, Inc. and now F5, and the other Defendants in an amount to be determined at trial, but presently believed to be well in excess of $750 million.

959.   Defendants should be permanently enjoined from further use of the NGINX trademark, the NGINX (Stylized) trademark, the NGINX PLUS trademark, the NGINX CONTROLLER trademark, the NGINX UNIT trademark, the NGINX APP PROTECT trademark and from any other trademark that includes the NGINX trademark, and any trademark confusingly similar therewith.

## TWENTY-FIFTH CLAIM FOR RELIEF

### Unjust Enrichment as to All Defendants

960.   Plaintiff incorporates and realleges the allegations contained in paragraphs 1 through 959 above as if fully repeated and realleged herein.

961.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Rambler, and by assignment, Plaintiff.

962.    All revenues and profits earned by the Defendants from their misconduct were at the expense of Rambler, and by assignment, Plaintiff.

963.    Accordingly, Plaintiff, as the assignee of Rambler's claims against the Defendants, is entitled to a recovery against the Defendants in an amount, to be determined at trial, equal to the benefits and profits the Defendants have unjustly received as a result of their aforementioned actions, which amount is presently believed to be in excess of $750 million.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief against the Defendants as follows:

A.    A finding that Defendants are jointly and severally liable to Plaintiff as a result of the civil conspiracy among the Team, Robertson, Runa Capital, E. Ventures, NGINX BVI, NGINX DE and NGINX Software, Inc. and as a result of F5's aiding and abetting;

B.    Compensatory damages in an amount to be determined at trial but presently believed to be well in excess of $750 million;

C.    Enhanced damages based on the willfulness of Defendants' wrongful acts;

D.    Disgorgement of all profits earned by Defendants through their wrongful acts;

E.    Punitive damages in an amount to be determined at trial;

F.    A declaration that Lynwood owns all copyright rights and/or other rights in and to Open Source NGINX, NGINX Plus, and all related business opportunities comprising the NGINX Enterprise;

G.    A permanent injunction prohibiting Defendants from further infringement of Lynwood's copyright rights in or to Open Source NGINX and NGINX Plus, and ordering Defendants to destroy all copies of such works, and all derivative works thereof, made in violation of Plaintiff's exclusive rights;

H.    Cancellation of the fraudulent trademarks registered by Defendants;

I.    A permanent injunction prohibiting Defendants from use of the NGINX trademark, the NGINX (Stylized) trademark, the NGINX PLUS trademark, the NGINX CONTROLLER trademark,

1    the NGINX UNIT trademark, the NGINX APP PROTECT trademark and any other trademark that

2    includes NGINX or any mark confusingly similar therewith;

3        J.    A declaration that Lynwood owns the NGINX trademark, the NGINX (Stylized) trademark,

4    the NGINX PLUS trademark, the NGINX CONTROLLER trademark, the NGINX UNIT trademark,

5    the NGINX APP PROTECT trademark and any other trademark that includes NGINX;

6        K.    Plaintiff's Attorneys' Fees and costs; and

7        L.    A grant to Plaintiff of such other and further relief as the Court may deem just and proper.

8    Dated:  April 29, 2021

9                            By:  /s/ Brian M. Affrunti

10                         Douglas W. Dal Cielo (CA Bar No. 157109)
ddalcielo@bwslaw.com

11                         Brian M. Affrunti (CA Bar No. 227072)
baffrunti@bwslaw.com

12                         **BURKE, WILLIAMS & SORENSEN, LLP**
60 South Market Street, Suite 1000

13                         San Jose, CA  95113

14                         Telephone: (408) 606-6300
Fax: (408) 606-6333

15

16                         Patricia L. Peden (CA Bar No. 206440)
ppeden@bwslaw.com

17                         **BURKE, WILLIAMS & SORENSEN, LLP**
1901 Harrison Street, Suite 900

18                         Oakland, CA 94612-3501

19                         Telephone: (510) 273-8780
Fax: (510) 839-9104

20

21                         Alexander D. Pencu (*pro hac vice*)
adp@msf-law.com

22                         Christopher J. Major (*pro hac vice*)
cjm@msf-law.com

23                         Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com

24                         **MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor

25                         New York, NY 10017

26                         Telephone: (212) 655-3500
Fax: (646) 539-3649

27                         *Attorneys for Plaintiff*

28

AMENDED COMPLAINT, Case No. 20-CV-03778-LHK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  April 29, 2021

By:  /s/ Douglas W. Dal Cielo
     /s/ Brian M. Affrunti

Douglas W. Dal Cielo (CA Bar No. 157109)
ddalcielo@bwslaw.com
Brian M. Affrunti (CA Bar No. 227072)
baffrunti@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
60 South Market Street, Suite 1000
San Jose, CA  95113
Telephone: (408) 606-6300
Fax: (408) 606-6333

Patricia L. Peden (CA Bar No. 206440)
ppeden@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Telephone: (510) 273-8780
Fax: (510) 839-9104

Alexander D. Pencu (*pro hac vice*)
adp@msf-law.com
Christopher J. Major (*pro hac vice*)
cjm@msf-law.com
Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com
**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff*