Douglas W. Dal Cielo (CA Bar No. 157109)
ddalcielo@bwslaw.com
Brian M. Affrunti (CA Bar No. 227072)
baffrunti@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
60 South Market Street, Suite 1000
San Jose, CA  95113
Telephone: (408) 606-6300
Fax: (408) 606-6333

Patricia L. Peden (CA Bar No. 206440)
ppeden@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Telephone: (510) 273-8780
Fax: (510) 839-9104

Alexander D. Pencu (*pro hac vice*)
adp@msf-law.com
Christopher J. Major (*pro hac vice*)
cjm@msf-law.com
Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com
**MEISTER SEELIG & FEIN PLLC**
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

LYNWOOD INVESTMENTS CY LIMITED,

        Plaintiff,

        vs.

MAXIM KONOVALOV, IGOR SYSOEV, ANDREY ALEXEEV, MAXIM DOUNIN, GLEB SMIRNOFF, ANGUS ROBERTSON, NGINX, INC. (BVI), NGINX SOFTWARE, INC., NGINX, INC. (DE), BV NGINX, LLC, RUNA CAPITAL, INC., EVENTURE CAPITAL PARTNERS II LLC and F5 NETWORKS, INC.,

        Defendants.

Case No. 20-CV-03778-MMC

**SECOND AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

## SECOND AMENDED COMPLAINT

Plaintiff HF Investments CY Limited f/k/a Lynwood Investments CY Limited ("Plaintiff" or "Lynwood"), as the assignee of Rambler Internet Holding LLC and its affiliates ("Rambler"), as and for its Second Amended Complaint against Defendants F5 Networks, Inc. ("F5"), NGINX, Inc. (BVI) ("NGINX BVI"), NGINX Software, Inc. ("NGINX Software, Inc."), and NGINX, Inc.. (DE) ("NGINX DE") (NGINX BVI, NGINX Software, Inc. and NGINX DE, collectively, the "NGINX Defendants", and together with F5, the "F5 Defendants"), Maxim Konovalov ("Konovalov"), Igor Sysoev ("Sysoev"), Maxim Dounin ("Dounin"), Andrey Alexeev ("Alexeev"), Gleb Smirnoff ("Smirnoff"), Angus Robertson ("Robertson" and, together with Konovalov, Sysoev, Dounin, Alexeev and Smirnoff, the "Individual Defendants", and collectively with the F5 Defendants, the "Defendants"), alleges as follows:

## INTRODUCTION

1.    Defendants Igor Sysoev, Maxim Konovalov and Gleb Smirnoff (collectively, the "Disloyal Employees"), along with their co-conspirators, brazenly stole an entire popular web server software code base, used by operators of millions of websites around the world, from their employer Rambler Internet Holding LLC ("Rambler") in Russia, where the computer software, known as NGINX (pronounced "Engine-X"), was conceived and developed by the Disloyal Employees as works made for hire owned by Rambler.

2.    The Disloyal Employees initially established NGINX as an ostensible "open source" project (without permission from Rambler) in which certain NGINX source code ("Open Source NGINX") was made available to the public under a non-restrictive, open source license. But within a few years of starting the NGINX project, as part of Defendant Sysoev's job duties to solve technical issues experienced by his employer Rambler, he and his co-conspirators hatched a secret plan to keep the most advanced and valuable NGINX software code out of the open-source repository, steal it from Rambler for their own benefit, and sell it to a large U.S. technology company. That proprietary, non-open-source NGINX code, developed by the Disloyal Employees as works made for hire before

they left Rambler, became known as "NGINX Plus", and, for purposes of this Second Amended Complaint, is hereinafter referred to collectively as "Pre-Exit NGINX Plus".

3.      The Disloyal Employees spent years prior to their separation from Rambler conspiring and covertly developing Pre-Exit NGINX Plus (unbeknownst to Rambler), testing and debugging it on Rambler's massive Internet traffic, and stockpiling it on internal Rambler computer servers which they secretly commandeered and later stole to conceal their misdeeds.  Prior to their separation from Rambler, the Disloyal Employees secretly licensed portions of Pre-Exit NGINX Plus on the side, to third-party commercial customers, in exchange for unsanctioned cash payments.

4.      The Disloyal Employees agreed to pursue forming a new business built around the misappropriated Pre-Exit NGINX Plus and Open Source NGINX that had been developed by the Disloyal Employees while at Rambler and within the scope of their employment duties.

5.      By mid-2009, the Disloyal Employees were ready to pitch Pre-Exit NGINX Plus, Open Source NGINX, their NGINX experience and expertise, and related business opportunities (collectively, the "NGINX Enterprise") to potential venture capital and strategic investors.

6.      The Disloyal Employees, while still employed by Rambler (Plaintiff's assignor), with the help of their co-conspirators, including Defendants Andrey Alexeev and Maxim Dounin, secretly convinced their early investors of the value in pursuing an "open core" strategy to steal and monetize Pre-Exit NGINX Plus for themselves.  The strategy involved keeping the basic NGINX software in the public Open Source NGINX repository as a smokescreen and to build name recognition and goodwill, and when acceptance and use of Open Source NGINX was widely in place around the world, providing proprietary, non-open-source Pre-Exit NGINX Plus and related support services to large commercial customers in exchange for substantial license and consulting fees for themselves. In other words, the Disloyal Employees envisioned Open Source NGINX as the "open core" that would lay the foundation and generate demand for the development and commercialization of "closed" or proprietary software modules, *i.e.,* Pre-Exit NGINX Plus and derivatives thereof, that would operate on top of, and in conjunction with, the public or "open core" Open Source NGINX layer.

7.      The Disloyal Employees waited patiently until they had the opportunity to complete Pre-Exit NGINX Plus and fully test the Pre-Exit NGINX Plus code on Rambler's massive Internet traffic, without Rambler's knowledge, before they launched their theft of that code, along with the balance of the NGNIX Enterprise.  Unbeknownst to Rambler, Sysoev and his co-conspirators left nothing to chance; he ensured that Pre-Exit NGINX Plus was tested and ready for commercial use before he separated from Rambler on December 1, 2011, and pulled the trigger on the Disloyal Employees' scheme to misappropriate the entire NGINX Enterprise.  Consequently, the conspirators were able to quickly begin generating revenue through license and support fees derived from commercializing Pre-Exit NGINX Plus.

8.      The Disloyal Employees and their co-conspirators achieved the object of their conspiracy when, after quietly raising approximately $100 million in a series of venture capital financing rounds, they ultimately sold the purloined NGINX Enterprise, including Pre-Exit NGINX Plus, in 2019 for $670 million to Defendant F5 Networks, Inc. ("F5"), a publicly traded United States company.

9.      The Disloyal Employees fraudulently concealed their plan and conduct (as well as those of their conspirators) from their former employer Rambler in a highly coordinated manner by hiding the existence and value of the NGINX Enterprise, including Pre-Exit NGINX Plus, and associated business opportunities, that they had developed while employed at Rambler.  The Disloyal Employees were able to conceal their activities at Rambler (i.e., the development of Pre-Exit NGINX Plus and the NGINX Enterprise) because they worked in a ring-fenced department at Rambler ("NOC department") led by Smirnoff and Konovalov who provided the Disloyal Employees and their conspirators with cover to carry out their scheme, including by enabling them to develop Pre-Exit NGINX Plus on commandeered Rambler servers that were not integrated with Rambler infrastructure at large.

10.     Indeed, the Disloyal Employees were able to develop and misappropriate the NGINX Enterprise, including Pre-Exit NGINX Plus by walling off their activities and work product from the rest of Rambler's informational technology infrastructure and oversight, lying to Rambler

management about the extent and value of their activities and work product, and, upon their well-planned and staggered exit, leaving Defendant Smirnoff behind as their cleanup man until November 12, 2012 to remove all the commandeered Rambler servers and Pre-Exit NGINX Plus code and delete all communications concerning their fraudulent scheme to misappropriate the NGINX Enterprise, including Pre-Exit NGINX Plus.

11.     As a result, Rambler and Lynwood were unaware of the Disloyal Employees' development of Pre-Exit NGINX Plus or their scheme to steal and monetize the NGINX Enterprise, including Pre-Exit NGINX Plus, until Alexander Korotkov, another former Rambler employee, came forward in 2019 and blew the whistle to Rambler and Lynwood concerning the scheme. Korotkov was an early conspirator who assisted the Disloyal Employees in soliciting investors for the NGINX Enterprise, including Pre-Exit NGINX Plus secretly developed at Rambler before he was ultimately ejected from the conspiracy by the Disloyal Employees shortly before they separated from Rambler. Once Korotkov's disclosures laid bare Defendants' wrongful and covert acts, Rambler and Lynwood promptly conducted in-depth, company-wide investigations, with the assistance of forensic experts.

12.     In the course of their investigations, Rambler and Lynwood located one of the ringfenced NOC email servers the Disloyal Employees and their conspirators used to communicate concerning the NGINX Enterprise, including Pre-Exit NGINX Plus ("YAM Server"). The YAM Server's data had been wiped by the Disloyal Employees and their conspirators at the time they left Rambler, but Lynwood and Rambler's outside forensic investigators were able to restore the YAM Server's data. The YAM Server's content and the investigations' subsequent findings confirmed Korotkov's revelations, which then prompted this action against Defendants in early 2020.

13.     As described further below, the Defendants have misappropriated and infringed Rambler's, and by assignment, Lynwood's exclusive ownership rights in the NGINX Enterprise, including its exclusive copyrights in and to Pre-Exit NGINX Plus, which have generated hundreds of millions of dollars in subscription, licensing and consulting fees for Defendants that rightfully belong to Lynwood.

14.     Lynwood, as Rambler's assignee, brings this action against the Defendants to recover its damages and lost profits suffered as a result of Defendants' ongoing, willful infringement of Lynwood's exclusive copyright rights in and to Pre-Exit NGINX Plus and to permanently enjoin Defendants from continuing to wrongfully commercially exploit Pre-Exit NGINX Plus and/or its derivatives, to the exclusion and ongoing detriment of Lynwood.

## THE PARTIES

15.     Plaintiff Lynwood is a Cyprus limited company with a principal place of business located at Saifi, 1, Porto Bello, Floor 3, Flat 302 3042, Limassol, Cyprus.  Until January 2015, Lynwood was known as A&NN Holdings Limited.  On November 17, 2023, Plaintiff changed its name to HF Investments CY Limited.

16.     Lynwood is prosecuting this action in its capacity as assignee of all rights and interests of Rambler and its affiliates, which are located in Moscow, Russia.

17.     Defendant Maxim Olegovich Konovalov ("Konovalov") is a citizen of the Russian Federation who resides in San Jose, California.

18.     Defendant Igor Vladimirovich Sysoev ("Sysoev") is a citizen of the Russian Federation who resides in Moscow, Russia.

19.     Defendant Andrey Victorovich Alexeev ("Alexeev") is a citizen of the Russian Federation who resides in Germany.

20.     Defendant Maxim Sergeevich Dounin ("Dounin") is a citizen of the Russian Federation who resides in Moscow, Russia.

21.     Defendant Gleb Alexandrovich Smirnoff ("Smirnoff") is a citizen of the Russian Federation who resides in Los Gatos, California.

22.     Defendant NGINX BVI is a British Virgin Islands corporation incorporated by Konovalov, Alexeev, and Sysoev on July 6, 2011.  NGINX BVI is now a wholly-owned subsidiary of Defendant F5 Networks, Inc.  NGINX BVI maintains its principal place of business at 795 Folsom Street, 6th Floor, San Francisco, California 94107.  F5 refers to this office as "NGINX San

Francisco."  NGINX BVI previously maintained an office at 85 Federal Street, San Francisco, California 94107.

23.     Defendant NGINX Software, Inc. ("NGINX Software, Inc.") is a Delaware corporation with a principal place of business located at 795 Folsom Street, Suite 600, San Francisco, California.  NGINX Software, Inc. was incorporated in Delaware on May 4, 2011.  NGINX Software, Inc. opened an office in San Francisco, California around that time.  As part of registering to do business in California, on May 23, 2011 NGINX Software, Inc. filed a Statement and Designation by Foreign Corporation.  The Statement and Designation by Foreign Corporation appointed an agent for service of process in California and it was executed on behalf of NGINX Software, Inc. by Konovalov as its Chief Executive Officer ("CEO").  NGINX Software, Inc. has appointed CT Corporation System as its agent for service in the State of California.

24.     Defendant NGINX, Inc. is a Delaware corporation ("NGINX DE") with a principal place of business located at 795 Folsom Street, Suite 600, San Francisco, California.  NGINX DE was incorporated on August 8, 2011.  Upon information and belief, NGINX DE did not register to do business in California.

25.     Defendant Angus "Gus" James Bruce Robertson ("Robertson") is a citizen of the State of Florida, and resides at 300 South Point Drive, Apartment 2706, Miami Beach, Florida 33139. Robertson joined NGINX as CEO in 2012.  Robertson joined F5 as a result of the merger between F5 and NGINX BVI, and like Konovalov and Sysoev, received restricted F5 stock as part of the transaction.  Robertson served as a Senior Vice President and General Manager of NGINX at F5 until November 2021.

26.     Defendant F5 is a Washington corporation headquartered at 801 5th Avenue, Seattle, Washington 98104.  F5 is publicly traded on the NASDAQ exchange under the symbol FFIV.  F5 is registered to do business in the State of California, does business in the State of California, and has appointed CT Corporation System as its agent for service of process in California.

1

**JURISDICTION AND VENUE**

2      27.    This action arises under the Copyright Laws of the United States, 17 U.S.C. §§ 1, *et*

3   *seq*., as well as under the Berne Convention for the Protection of Literary and Artistic Works (the

4   "Berne Convention"). This Court therefore has subject matter jurisdiction over this action pursuant

5   to 28 U.S.C. §§ 1331 and 1338.

6      28.    This Court has personal jurisdiction over Defendants under Cal. Code Civ. Proc.

7   § 410.10 and the United States Constitution because Defendants regularly and systematically

8   conduct business in California, including by maintaining headquarters, offices, and conducting

9   commerce within California.   Moreover, Defendants committed a substantial portion of the

10  misconduct described in this Second Amended Complaint in California.

11     29.    In addition, NGINX Software, Inc. and F5 are registered to do business in California

12  and have appointed agents for service of process in California.

13     30.    Konovalov and Smirnoff reside in California.

14     31.    NGINX BVI and NGINX DE have maintained their headquarters in California and

15  regularly conducted business in California and therefore should have registered to do business in

16  California and appoint an agent for service of process in California.  By default, NGINX BVI and

17  NGINX DE have appointed the California Secretary of State as their agent for service of process in

18  California.

19     32.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because

20  multiple defendants reside in this District and, additionally, pursuant to 28 U.S.C. § 1391(b)(2)

21  because a substantial part of the events giving rise to the claims set forth herein occurred in this

22  District.

23

**FACTUAL BACKGROUND**

24     33.    Rambler is a limited liability company organized and existing under the laws of the

25  Russian Federation and headquartered in Moscow, Russia.

26

27

28

SECOND AMENDED COMPLAINT, Case No. 20-CV-03778-MMC

34. Rambler is one of the largest media companies and web portals in Russia. Rambler was also the largest technology company and search engine in Russia during Sysoev's employment with the company.

35. Lynwood with its affiliated companies owned 50% of Rambler up until December 2014.

36. The Disloyal Employees all worked together at Rambler where they hatched and began executing their conspiracy to use Rambler's resources to develop the NGINX Enterprise, including Pre-Exit NGINX Plus, and sell it to a third party for their own ill-gotten profit and to the exclusion of Rambler. Co-Defendants Alexeev and Dounin were third-party acquaintances of the Disloyal Employees who joined their conspiracy at the outset. Dounin was himself a former Rambler employee from November 1, 2004 until September 14, 2007, during which time he served as the Head of Rambler's Mail Development Department and worked with Sysoev on a variety of projects, including development of Open Source NGINX. After he left Rambler, Dounin reconnected with Sysoev and the other Disloyal Employees to carry out the conspiracy. Accordingly, as referenced above, the Disloyal Employees along with Alexeev and Dounin are collectively referred to as the "Team."

**Defendant Konovalov's Employment with Rambler**

37. Konovalov was employed by Rambler from March 18, 2008 until April 29, 2011.

38. Konovalov was appointed CTO of Rambler on March 18, 2008 and formed part of Rambler's senior management.

39. On March 18, 2008, Rambler and Konovalov entered into a written employment agreement, which is identified as Contract No. 27/08 (the "Konovalov Employment Agreement"). The Konovalov Employment Agreement contained restrictions prohibiting the disclosure of Rambler's proprietary information.

40. Specifically, the Konovalov Employment Agreement required Konovalov to:
2.3.11 not disclose information constituting a trade secret owned by the employer and his counteractants, and not to use this information for personal purposes without their consent;

2.3.12 not disclose information constituting an official and/or commercial secret held by the Employer and his contractors after the termination of the Employment Contract within the period stipulated by the agreement between the employee and the employer concluded during the term of the Employment Contract, or within three years after the termination of the Employment Contract, if the specified agreement has not been concluded;

2.3.13 compensate the damage caused to the Employer, if the Employee has been guilty of divulging information constituting an official and/or commercial secret, which became known to him in connection with the performance of his labor duties;

2.3.14 transfer to the Employer the material information media used by the Employee containing information constituting official and/or commercial secrets, as well as all documents generated during the performance of the work, and material and technical means transferred to him by the Employer for the performance of labor duties upon termination of the Employment Contract.

41.    The Konovalov Employment Agreement also contains works for hire protection for Rambler.  Specifically, Section 5.1 of the Konovalov Employment Agreement provides: "As part of the Employee's performance of his duties, he may be entrusted with the Legal Entity's administration or its authorized person to create the works being the objects of copyright, such as computer programs, databases, photographs, videos, books, ringtones, articles and other works that are objects of copyright."

42.    In addition, Section 5.2 of the Konovalov Employment Agreement provides that "[t]he exclusive right to a computer program or database created by the Employee in connection with the performance of labor duties or on the instructions of the Employer shall belong to the Legal Entity, unless otherwise provided by an agreement between him or it and the Employee."

43.    The Board of Directors of Rambler Media Limited on September 14, 2007 adopted a "Rambler Code of Ethics" (the "Code of Ethics"), which expressly recites that "…it is the policy of Rambler Media Limited and all subsidiaries (the 'Company') that the Company's management (the 'Management') adhere to and advocate the following principles governing their conduct in the fulfillment of their responsibilities with the Company."

44.    Konovalov, as CTO, and therefore part of Management, signed and dated a copy of the Code of Ethics on March 19, 2008.

45.    Konovalov's signature appears on a one-page attachment to the Code of Ethics, entitled "Rambler Code of Ethics Compliance Statement" in which he states: "1. I have read and understand the Code of Ethics of Rambler Media Limited and affiliates (the "Company"). 2. I have been given and instructed to retain a copy of the Code of Ethics for my future reference. 3. I agree to abide by the Code of Ethics, as amended from time to time by written notice, and any other guidelines adopted by the Company."

46.    Section 1 of the Rambler Code of Ethics is entitled "Honest and Ethical Conduct." The introductory paragraph of such paragraph states as follows: "Management must conduct themselves honestly and ethically, and must strive to avoid the appearance of improper behavior in the conduct of their duties. This Code does not cover every issue that may arise, but sets out basic principles."

47.    In the same section, the subsection entitled "Conflict of Interest" provides, in part, as follows: "Management must make business decisions based on the best interest of the Company and must not allow his or her personal interest to influence such decisions." That section further provides "Management must avoid even the appearance of dishonest or unethical behavior in the conduct of their duties."

48.    In the same section, the subsection entitled "Corporate Opportunities" provides as follows:

"Management is prohibited from taking personal opportunities that are discovered through the use of corporate property, information or position without the consent of the Company. Management may not use corporate property, information or position for improper personal gain, and may not compete with the Company directly or indirectly."

49.    In the same section, the subsection entitled "Confidentiality" provides as follows: Management must take reasonable measures to maintain the confidentiality of confidential information entrusted to them by the Company or its customers or suppliers, except when disclosure

is authorized or required by laws or regulations.  Confidential information includes all non-public information that might be of use to competitors, or harmful to Company or its customers or suppliers, if disclosed.  The obligation to preserve confidential information continues even after employment ends.

50.    Lastly, Section 6 of the Rambler Code of Ethics provides as follows: "This Code is a policy of the Company. Management will be held responsible for any violation of this Code by the Company, which could include being relieved of his or her duties or termination of employment."

**Defendant Sysoev's Employment with Rambler**

51.    Sysoev is a former employee of Rambler.  As detailed below, Sysoev was the central figure in the development of the Open Source NGINX and Pre-Exit NGINX Plus for Rambler. Sysoev was employed by Rambler from November 14, 2000 until in or around November 28, 2011.

52.    In 2000, Rambler hired Sysoev as a System Administrator.  Sysoev was highly talented, and rose steadily within Rambler.  As part of his employment duties, Sysoev was tasked with developing software to address internal technical issues experienced by Rambler at the time.

53.    On August 1, 2003, Rambler affiliate Rambler Telecom LLC ("Rambler Telecom") hired Sysoev on an external part time basis as System Administrator for its Engineering Department.

54.    As of December 29, 2004, Rambler promoted Sysoev to Lead Specialist of the Telecommunications Department/Server and Technology Network.

55.    Beginning in December 2004 and continuing until Sysoev's separation from Rambler in December 2011, Rambler paid Sysoev regular outsized bonuses on either a quarterly or semi-annual basis in recognition of his work in developing the NGINX Software for Rambler and the software code's utility in solving the company's various technical issues at that time related to hosting web traffic from Russia and the CIS territories.

56.    On January 10, 2006, Rambler Telecom transferred Sysoev from the Engineering Department to the Network Control Division effective as of January 1, 2006, where he also served as System Administrator.

57.     On September 14, 2006, Rambler transferred Sysoev to the position of Programmer within the DRT/Searching Systems Department.

58.     Sysoev separated from his part time position with Rambler Telecom at his request on October 2, 2006.  Sysoev continued his employment with Rambler.

59.     From October 1, 2007 until May 23, 2011, Sysoev was Lead System Administrator for Rambler's Server and Technology Network.

60.     In April 2011, while Sysoev was, unbeknownst to Rambler, scheming to launch a new company using Rambler's Open Source NGINX and Pre-Exit NGINX Plus, Sysoev advised Rambler that he wished to terminate his employment contract with Rambler.

61.     On May 20, 2011, Sysoev separated from Rambler as a full-time employee.

62.     Given how integral Sysoev was to Rambler's operations, Rambler requested and Sysoev agreed to continue employment with Rambler on a part-time basis.  On May 23, 2011, Rambler engaged Sysoev on a part-time basis as the Lead System Administrator for Rambler's Server and Technology Network.

63.     On December 1, 2011, Sysoev separated entirely from Rambler and terminated his part-time employment.

64.     In connection with his employment with Rambler, Sysoev entered into multiple agreements with Rambler.

65.     Sysoev and Rambler entered into an employment agreement on August 9, 2001, identified as Contract No. 43 (as amended and supplemented, the "Sysoev Employment Agreement").

66.     Section 1.4 of the Sysoev Employment Agreement, contains the following non-disclosure covenant:

The Employee shall undertake not to disclose information constituting the Business Entity's official and commercial secret, which became known to the Employee in connection with the performance of his labor duties, both during and after the term of the employment relations with the Business

1    Entity.  In addition, in the case of the implementation of reimbursable activities of other enterprises,

2    organizations, institutions, the Employer shall notify the Business Entity in writing about this.

3          67.      Section 7.1 of the Sysoev Employment Agreement grants Rambler the following

4    works for hire protection:

As part of the Employee's performance of his official duties, he may be entrusted with the Business

Entity's administration or its authorized person to create works that are objects of copyright, such as

computer programs and databases. Such works is an official work. The exclusive property rights for

the use of such works belong to the Business Entity.

9          68.      Section 12.3 of the Sysoev Employment Agreement confirms that Sysoev's

10   nondisclosure obligations survive the termination of his employment with Rambler:

The termination hereof shall not entail the termination of the obligation of the Employee not to

disclose information constituting an official or commercial secret of the Business Entity, which

became known to the Employee in connection with the performance of his labor duties, as long as

the specified information has been an official or commercial secret of the Business Entity by virtue

of the civil legislation of the Russian Federation.

16         69.      Similarly, Section 12.4 of the Sysoev Employment Agreement provides:

In the event of termination hereof before receipt of the work book and settlement of accounts, the

Employee shall be obligated to transfer to the Employer all the property and documents of the

Business Entity kept by the Employee in connection with the performance of labor duties.  The

indicated property and documents shall also include documents, programs, databases, and their

developments on magnetic media created as part of the Employee's performance of his duties.

22         70.      On August 9, 2001, Sysoev and Rambler entered into a Supplementary Employment

23   Agreement (the "Sysoev Supplementary Agreement").  Section 2.1 of the Sysoev Supplementary

24   Agreement states as follows:

An Employee given access to documentary or other carriers of confidential information and

trade secrets shall be obliged:

--to keep the carriers of confidential data and trade secrets separate from other media;

--to ensure the impossibility of their loss;

--to ensure the impossibility of unauthorized access to the media;

--to destroy, in the prescribed manner, drafts and other storage media used to create draft documents;

--in case of employment termination, surrender all carriers of confidential data and trade secrets within one business day to the head of the structural unit or to the head of the Company.

71.    Section 2.2 of the Sysoev Supplementary Agreement states: "An employee given access to the carriers of confidential data shall be obligated to immediately inform the Company management of the fact of the loss of media or unauthorized access to them by third parties, as well as in relation to certificates, passes, seals, keys to office premises and safes."

72.    Section 2.3 of the Sysoev Supplementary Agreement states: "The employee must not disclose the confidential data in any form during the entire term of the labor agreement with the Company and within two years after its termination."

73.    Section 3.1 of the Sysoev Supplementary Agreement states: "Unauthorized access and/or disclosure of confidential information shall be a gross violation of the Employee's duties."

74.    Section 3.2 of the Sysoev Supplementary Agreement states: "For unauthorized access and/or disclosure of confidential information, the Employee may be disciplined."

75.    Section 3.4 of the Sysoev Supplementary Agreement states: "An employee of the Company who unauthorizedly discloses confidential information and/or who has allowed access to confidential information or commercial information of other person is obliged to compensate the Company in full, including actual damages and lost profits, losses incurred by the Company and its counteractants by the fact of disclosure."

76.    On November 1, 2004, Sysoev and Rambler entered into an Amendment to the Sysoev Employment Agreement ("Sysoev 2004 Supplemental Agreement"), which granted Sysoev a raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

77.    On September 14, 2006, in connection with Rambler's transfer of Sysoev to the position of Programmer within the DRT/Searching Systems Department, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev September 2006 Supplemental Agreement").

78.    The Sysoev September 2006 Supplemental Agreement granted Sysoev a raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

79.    As of July 2, 2007, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev July 2007 Supplemental Agreement"), which granted Sysoev a large raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

80.    On October 1, 2007, in connection with Rambler's appointment of Sysoev as Lead System Administrator for Rambler's Server and Technology Network, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev October 2007 Supplemental Agreement").

81.    The Sysoev October 2007 Supplemental Agreement reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

82.    As of July 31, 2009, Sysoev and Rambler entered into a Supplementary Agreement (the "Sysoev July 2009 Supplemental Agreement"), which granted Sysoev a large raise in salary and reaffirmed that "[t]he remaining conditions of the previously concluded Employment Contract that have not been affected by this amendment shall not be subject to revision, and the parties shall confirm their obligations."

83.    In April 2011, Sysoev advised Rambler that he wished to separate from Rambler and terminate the Sysoev Employment Agreement.

84.    Effective May 20, 2011, Sysoev separated as a full-time employee from Rambler, and the Sysoev Employment Agreement was terminated.

85.     Of course, provisions of the Sysoev Employment Agreement that expressly survived termination of Sysoev's employment remained in effect.

86.     On May 23, 2011, Rambler appointed Sysoev on a part-time basis as the Lead Systems Administrator of Rambler's server-technological complex ("Lead System Administrator"), and Rambler and Sysoev entered into a new employment agreement.

87.     This new employment agreement between Sysoev and Rambler was effective as of May 18, 2011 (the "2011 Sysoev Employment Agreement").

88.     Section 1.3 of the 2011 Sysoev Employment Agreement states: "The work under the Contract is the external part-time work for the Employee."

89.     Section 2.1.3 of the 2011 Sysoev Employment Agreement states as follows:

During the term of execution and after the termination of the Employee's work with the Employer, the Employee shall be required to observe the strictest secrecy in relation to all information and/or documents that may become known to him, relating to the affairs, interests or operations of the Employer and any of its employees, customers or other persons or business partners associated with the Employer, and shall be obligated not to disclose such information, except upon receipt of the appropriate authority from the Employer, and as well as not use it for his personal purposes or for any purpose of the third party.  The Employee shall comply with the business secrets non-disclosure obligation (Appendix 1).

90.     Appendix No. 1 to the 2011 Sysoev Employment Agreement, entitled "Commitment of Business Secret Non-Disclosure," requires Sysoev to:

1. Refrain from disclosing the information that constitutes the Company's business secret, which will be conferred upon me [Sysoev] or will become known to me in the course of performance of the job duties;

2. Refrain from transfer to third parties and from public disclosures of the information that constitutes the Company's business secrets;

…

5. Refrain from using the Company's business secret for carrying out any business that may be prejudicial to the Company as a competitive action;

6. If any third parties try to get any information on the Company's business secret from me, promptly notify the Company's top management thereof.

91.    Sysoev separated entirely from Rambler effective December 1, 2011.

92.    As of November 28, 2011, Sysoev and Rambler entered into a separation agreement terminating the 2011 Sysoev Employment Agreement and memorializing the terms on which Sysoev separated from Rambler (the "Sysoev Separation Agreement").

93.    The Sysoev Separation Agreement recited that the 2011 Agreement would terminate as of December 1, 2011.

94.    Importantly, the Sysoev Separation Agreement contained, among other things, the following terms:

3. The Employee shall transfer all of the Company's assets and documents being in the Employee's possession in connection with the Employee's performance of the employment duties, including documents, software, databases and their developments in magnetic media, which were created as part of performance of job duties, to the Employer's representative on or before December 1, 2011.

…

8. The Employee recognizes and confirms that the Employee will regard the provisions of this Agreement as strictly confidential and will not disclose them to any persons whatsoever. The Employee recognizes and confirms his/her obligation to comply with the confidential information provisions with respect to the Employer, including, but not limited to, the Employer's confidential information (the Confidential Information under this Termination Agreement means any information pertaining to Rambler Group of Companies, including but not limited to, its documents, products, plans, customers, customer list, employees, strategy, marketing plans and strategy, pricing policy, business processes, intellectual property, business secret, product development plans, corporate and financial information), of which the Employee receives information in the course of his/her business operations and the companies, for which the Employer is a legal successor, and shall not disclose

this information other than to the representative of the Employer, Rambler Group of Companies, by any method, either before or after signing hereof.

…

9. This Agreement shall supersede all oral and/or written agreements concluded by the Parties before signing hereof.

…

11. This Agreement shall be governed by and construed in accordance with the laws of the Russian Federation.

**Defendant Smirnoff's Employment with Rambler**

95.     Smirnoff is a former employee of Rambler who was employed at the company from September 21, 2006 until his resignation on November 12, 2012.

96.     During his employment with Rambler, Smirnoff served as the Head of Rambler's Network Operations Center ("NOC").   Smirnoff was Sysoev's immediate supervisor.   Smirnoff reported directly to Konovalov.

97.     Smirnoff remained an employee of Rambler for approximately eleven months longer than Sysoev before he resigned to join Konovalov and Sysoev at NGINX BVI .

98.     Among the contractual obligations imposed on Smirnoff under his Rambler Employment Agreement, dated September 21, 2006 ("Smirnoff Employment Agreement") were:

2.3.1     Employee shall comply with the internal labor regulations of the Company.

2.3.2     Employee shall honestly and in good faith fulfill the labor duties assigned to him by the Employment Contract and job description, demonstrate the necessary initiative and perseverance in work constantly improving his professional qualification.

2.3.4     Employee shall take care of the property of the Employer and other employees; comply with the established procedure for the storage of material assets and documents.

2.3.5     Employee shall immediately inform the Company management of any theft of and damage to the Company's property.

2.3.13    Employee shall compensate for damages caused to the Employer, if the Employee is guilty of disclosing information constituting professional and/or trade secrets, which became known to him during performance of his labor duties.

2.3.14    Employee shall upon termination of the Employment Contract hand over to the Employer the material storage media used by the Employee and containing information constituting professional and/or trade secrets, as well as all documents created during the performance of work, as well as the material and technical means given to him by the Employer to perform his labor duties.

99.    In addition, the Smirnoff Employment Agreement explicitly contained "Work Made For Hire" provisions including:

5.1    As part of the Employee's official duties, he may be instructed by the Company management or its authorized person to create works protected by copyright, such as computer programs, databases, photographs, videos, books, ringtones, articles, and other works protected by copyright.

5.2    The exclusive right to a computer program or database created by the Employee during performance of his labor duties or as instructed by the Employer shall belong to the Company, unless otherwise provided by an agreement between the Company and the Employee.

**Rambler's Internal Labor Rules and Regulations**

100.    In addition to the contractual obligations set out above, Rambler established a written set of rules and regulations governing its employees' conduct, which the Disloyal Employees agreed to abide by in connection with their Rambler employment.

101.    As of September 1, 2008, Rambler issued a document entitled "Internal Labor Rules and Regulations" (the "Rambler Regulations").

102.    Article 18 of the Rambler Regulations provides:

"Each employee is obliged to maintain the confidentiality in relation to everything that relates to the facts and information of an economic, commercial nature, the know-how of the Company, which he became aware of during the performance or in connection with the performance of his labor duties. The management of the

Company informs each employee of a list of information that is confidential. Any use outside the employer's duties or transfer to third parties of any documents and information relating to the activities of the Company is strictly prohibited."

103. Annex 1 to the Rambler Regulations is entitled "List of Confidential Information" and comprises a list of what is deemed to be Rambler's confidential information including:

10. Technologies used in the Company ... 15. Information contained in computer programs    and databases related to the Company's activities. This information, including information contained in computer programs and databases for PC, ORACLE, CRC, ADMIN, PILOT,   Access, OASIS, ACS, as well as reports and queries received from these programs and    databases. ... 18. Information about the created objects of copyright and related rights, their elements ... 21. Any special knowledge, including practical experience of employees,    involved    specialists, applied not only in production, but also in other areas of entrepreneurial    activity: trade, marketing, management, having commercial value and the disclosure of which may result in damage to the Company.

104. Article XIV of the Rambler Regulations, entitled "Conflict of Interest," states, in pertinent part: "In order to exclude the possibility of a conflict of interest, any employee of the Company who will be forced to assume obligations with respect to a competitor, supplier or client on terms that could damage his position in the Company should immediately notify his/her immediate boss or the HR department."

105. In addition, the Rambler Regulations provide "[c]arrying out other professional activities by an employee shall not harm his work in the Company. Other professional activities should not compete with work in the Company or cause a conflict of interest."

106. Rambler issued various iterations of the Rambler Regulations beginning as early as 2000, as well as in 2005. Each of those versions published and distributed to Rambler employees contained provisions which were similar in scope, and similarly protective of Rambler's rights, as those provisions contained in the September 1, 2008 Rambler Regulations.

1

**The Development of NGINX Software**

2      107.    One of Sysoev's primary employment responsibilities as a Rambler employee was to

3   develop NIGINX software code as a key component of Rambler infrastructure, particularly with

4   respect to Rambler's ability to fix technical issues caused by the ever increasing web traffic flowing

5   through Rambler's infrastructure.

6      108.    Sysoev spent years developing NGINX software code for Rambler while he was a

7   Rambler employee as part of his official duties at Rambler, and with the assistance of Rambler

8   infrastructure, personnel, resources, and Internet traffic, as works made for hire owned by Rambler.

9      109.    When writing NGINX software code to address Rambler internal technical issues,

10  Sysoev determined what, if any, software code he would commit to Open Source NGINX and what

11  code he would leave out of Open Source NGINX and reserve for inclusion in Pre-Exit NGINX Plus.

12     110.    Sysoev is widely credited with developing Open Source NGINX.  He developed Open

13  Source NGINX during his 2000 through 2011 tenure as an employee of Rambler.  Specifically,

14  Sysoev wrote his first line of Open Source NGINX code on October 23, 2001 while employed at

15  Rambler.

16     111.    Sysoev started working on Open Source NGINX to solve problems with Rambler's

17  utilization of the widely used open source web server known as Apache.

18     112.    Apache was first released in 1995.

19     113.    Webservers are an integral part of the Internet, and everyone from Fortune 50

20  companies to startups and individuals utilize webservers to allow users to navigate their websites.

21     114.    Web pages are comprised of HTML documents.  The Internet works by allowing the

22  visitor (or "web surfer") to request a document from a given web address, with domain name servers

23  (i.e., a "DNS Server") and an Internet provider ("IP") system forwarding that request to the computer

24  that hosts the requested web page.  The computer that hosts the requested web page then "serves"

25  the requested web page back to the visitor.  To be able to serve different web pages to visitors, the

26  "serving" computer requires a server program.  That is where Apache and more recently Open Source

27  NGINX come in.

28

115.    Apache's open source web server software handles requests, analyzes them, and then delivers the requested web page (or HTML document) to the web surfer.

116.    And since 2004, Open Source NGINX has done the same thing.  NGINX now enjoys a larger market share than Apache.

117.    While web server software like Apache and Open Source NGINX are provided on an open-source basis, the software is commercialized primarily by offering proprietary, fee-based modules that include unique, advanced features and functionality and services relating to the web server software.

118.    Companies use the web server software to enable efficient access to their websites, which of course have become increasingly more complex over time.

119.    In the early 2000's, technical experts and businesses alike began to worry about the ability of the Internet and websites to accommodate exponentially increasing traffic.

120.    The initial production version of Open Source NGINX was first released on the Internet in 2004 by Sysoev, without authorization from Rambler, after being made available to a small commercial software audience in Russia.

121.    The Open Source NGINX web server was originally created as a scaling tool for Rambler's Internet-related properties and services.

122.    After its open source release, Open Source NGINX was mostly used as a load balancer or reverse proxy in front of or on top of the Apache web server.  However, as Open Source NGINX and the Internet evolved, websites began employing Open Source NGINX in lieu of Apache.

123.    As detailed below, beginning in or about 2009, the Disloyal Employees conspired to use Open Source NGINX as a path toward surreptitiously incubating an "open core" business for themselves at Rambler and using Rambler resources pursuant to which the Disloyal Employees would simultaneously develop proprietary, commercial NGINX-related software modules and/or customizations that provided advanced features and functionality – software in the form of Pre-Exit NGINX Plus which Sysoev would selectively deploy to meet Rambler information technology needs

but which he would withhold from Open Source NGINX and stockpile for the conspirators' later commercial use and personal financial gain.

124.    NGINX now comes in two categories: Open Source NGINX licensed under an open source Berkeley Software Distribution-style license ("BSD license"), and proprietary, non-open-source, fee-generating commercial products, made available only in executable form (i.e., not in source code form), including NGINX Plus and related commercial software products, which are licensed by defendants NGINX BVI, NGINX Software, Inc. and F5 to paying customers on a subscription basis and include fee-based support and additional revenue-generating enterprise features.

125.    Numerous goods and services have been built off of Open Source NGINX, and the opportunities for commercializing proprietary extensions to Open Source NGINX that Sysoev wrote for Rambler are virtually infinite.

126.    Following Sysoev's public release of Open Source NGINX in 2004, without authorization from Rambler, he spent the next seven years, during the time he was employed at Rambler (and some years also part-time at Rambler Telecom), as part of his Rambler job responsibilities, working on further developing, testing, improving and releasing Open Source NGINX, all with the assistance of other Rambler engineers, using Rambler resources, infrastructure and Rambler Internet traffic, during regular Rambler business hours.

127.    During this period, Sysoev was stockpiling the NGINX code that he wrote at Rambler but that he did not commit and release as Open Source NGINX.  All or most of this stockpiled code beginning from in or around 2009 until Sysoev's separation from Rambler on December 1, 2011, constitutes Pre-Exit NGINX Plus.

128.    Sysoev received significant and ongoing technical assistance in this NGINX-focused endeavor to continuously test and improve Open Source NGINX and Pre-Exit NGINX Plus from a number of senior Rambler computer/network department heads, software engineers and other technical staff, including, but certainly not limited to, his co-conspirators.  From 2009 onward, Sysoev conspired with the Disloyal Employees to determine which of his NGINX software code to

release as Open Source NGINX and which of the code should be held back in furtherance of their "open core" business strategy, including the ultimate development and testing (including production testing) at Rambler of Pre-Exit NGINX Plus.

129.    Following the 2004 public release of Open Source NGINX, the open source community began to quickly embrace the solution, and it became viable as a web server solution by 2007.

130.    The birth of the smart phone market led to a massive growth of mobile Internet users, which in turn highlighted the problem of optimizing network sockets to handle large numbers of clients simultaneously – the so-called "C10k problem."  At that moment, Open Source NGINX was poised to help programmers and system administrators solve this problem, as an alternative to the then market-leading Apache web server.

131.    By 2010, Open Source NGINX already had six percent of the market share among all web servers.

132.    Sysoev has maintained that he authored ninety-seven percent of Open Source NGINX as of 2011.

133.    In software development parlance, the term "commit" means when a software developer finalizes revisions to software code and saves them to the revision history of a body of software residing in a designated code repository, which functions as a version control tool, such as Mercurial or GitHub.

134.    During the period from 2004 to mid-2011, all commits to Open Source NGINX were performed by Sysoev.  The first commit made by someone other than Sysoev was done on August 9, 2011, by Ruslan Ermilov (ru@nginx.com).  Thus, at least until that date, *i.e.,* nearly his entire tenure as an employee of Rambler, Sysoev exclusively authored Open Source NGINX.

135.    An analysis of Sysoev's work during normal Rambler business hours demonstrates that his primary occupation was developing and testing NGINX code on Rambler servers, some of which he ultimately decided to release as Open Source NGINX.  Specifically, the time stamps of the Mercurial repository reveal that Sysoev spent nine years of his Rambler employment working on

NGINX software code development that he released as Open Source NGINX. However, as 2010 dawned, Sysoev's commits of new Open Source NGINX in his open source repository began to dramatically taper off as he devoted more and more time to writing, testing, selectively deploying, and stockpiling Pre-Exit NGINX Plus in preparation for the conspirators' theft of the NGINX Enterprise, including Pre-Exit NGINX Plus, from Rambler.

136.    The open source software (OSS) code repositories (Mercurial and Github mirror) show that a significant number of modifications to Open Source NGINX were made by Sysoev during normal business hours (M-F 10:00-19:00). The repositories show 3,629 total changes from the start of January 1, 2004 through December 31, 2010. Narrowing the window to Monday-Friday, during the UTC time of 07:00-16:00 (+3:00 for Moscow Time), 2174 changes were committed, all by Sysoev. This shows that approximately 60% of the code commits were done by Sysoev during a standard business-hours workday window at Rambler.

137.    Sysoev tested his changes, and then actually announced "Nginx Releases" once they were tested on the entirety of Rambler's infrastructure.

138.    Sysoev regularly and systematically used Rambler's resources, including infrastructure, Internet traffic, money, and human resources to develop, test, and improve Open Source NGINX.

139.    As Owen Garrett of NGINIX BVI and now F5 wrote: "NGINX was written specifically to address the performance limitations of Apache web servers. It was created in 2002 by Igor Sysoev, a system administrator for a popular Russian portal site (Rambler.ru), as a scaling solution to help the site manage greater and greater volumes of traffic. It was open sourced in October 2004, on the 47th anniversary of the launch of Sputnik."

140.    In a February 22, 2006 email to his NGINX list service, Sysoev disclosed that he originally wrote Open Source NGINX to solve Rambler-related problems utilizing the open source Apache code, stating: "It was implement[ed], Nginx was planned not for mass-virtual hosting, but first of all for rambler.ru – what I did not like as an admin in Apache, is done differently in Nginx."

141.     By his own admissions, Sysoev's development of Open Source NGINX was within the scope of his employment with Rambler.  In early January 2012, only one month after leaving Rambler, Sysoev admitted, this time in a media interview published in Free Software Magazine (the "FSM Interview"), that he had developed Open Source NGINX to solve Rambler-related problems:

> I started the initial work in 2002, and in 2004 I opened NGINX to the public. Back then, I was trying to overcome certain barriers of scaling the web infrastructure of a large online media company I worked for.[1] In particular, the difficulties of handling many concurrent connections, reducing latency and offloading static content, SSL and persistent connections were my main interest. There weren't any reliable production quality web server software to crack so-called C10K problem (handling of at least 10,000 of concurrent connections, outlined by Dan Kegel). So in a sense I decided to solve both practical and "academic" problems. I was very curious and excited to try it out and I'm really happy it turned to be a successful attempt and that NGINX is now used by the over 50,000,000 web sites on the Internet.

*See* FSM Interview at pp. 1-2.  A copy of the FSM Interview is attached as Exhibit A hereto.

142.     The content in a slide deck for potential venture capital investors created by Sysoev and his co-conspirators on the Team in March 2011, before the Disloyal Employees left Rambler with the NGINX Enterprise (the "March 2011 Slide Deck"), contained an even more blunt admission that Open Source NGINX was specifically developed for the benefit of Rambler and that NGINX Plus would be the key to unlocking its commercial value.  A copy of the March 2011 Slide Deck is attached as Exhibit B hereto.

143.     A prior draft of the March 2011 Slide Deck stated that Open Source NGINX was "crafted to handle 500 million page requests per day for a Russian search engine/portal" – an obvious reference to Rambler.

144.     Such evidence is demonstrative of the fact that the Disloyal Employees and Dounin were actively working for Rambler, at Rambler's expense, to develop and test NIGNIX software

---

[1]  Sysoev's reference to a large online media company is obviously his employer Rambler.

code in furtherance of their employment responsibilities at Rambler.  Some of this code was released to the public as Open Source NGINX, but some, i.e., Pre-Exit NGINX Plus, was held back by Sysoev (unbeknownst to Rambler) in furtherance of the Team's scheme to commercialize it for their own personal financial gain.

145.    Sysoev regularly received enhanced compensation in the form of bonuses and outsized raises from Rambler for his work developing NGINX for Rambler beginning in 2004 until his separation from Rambler in December 2011.

146.    Sysoev's work developing Open Source NGINX was disclosed to Rambler as being only in connection with Open Source NGINX that the company utilized internally to solve its web traffic hosting capability issues.  It was for this reason that Rambler did not prevent Sysoev from releasing additional iterations of Open Source NGINX under a BSD license after he released the first version without Rambler's authorization in 2004 as the company was using it only as an internal tool.  Moreover, the open source nature of Open Source NGINX did not contravene Rambler's ownership rights to Open Source NGINX or Pre-Exit NGINX Plus under Russian law as work made for hire.

147.    Rambler's management made a business decision to permit Sysoev to continue releasing Open Source NGINX under the free BSD-style license because such releases highlighted the technical achievements of Rambler and its employee Sysoev, which inured to Rambler's benefit for attracting top software programmers.  For example, on November 25, 2009, Konovalov and other members of Rambler's management, including Uliana Antonova (General Counsel), Pavel Rogozhin (Chief Business Development Officer) and Maxim Azarov (Chief Product Officer), held a meeting to discuss whether Rambler should permit Sysoev to continue releasing new iterations of Open Source NGINX on an open source basis under a BSD license.  Konovalov convinced his colleagues that it was in Rambler's best interests to continue to allow Sysoev to release Open Source NGINX under the BSD license particularly since the ownership rights to the software belonged to Rambler under the Russian Civil Code governing works made for hire.

148.    In other words, Rambler viewed and used Open Source NGINX as an internal tool to solve its technical issues and to highlight its technical prowess, but did not conceive of such software as being capable of being monetized for sale or license to third-parties.

149.    The responsibility for developing software and other technology products at Rambler rested with Konovalov who misrepresented to Rambler that Open Source NGINX had no value even though he, Sysoev, Smirnoff and their conspirators were clandestinely developing the NGINX Enterprise within the NOC department at Rambler, including the first proprietary commercial extension thereof, namely Pre-Exit NGINX Plus.

150.    Therefore, during Sysoev's employment with Rambler, the company had been deceived into believing that Sysoev's time was devoted simply to improving Open Source NGINX for Rambler's internal use when in reality the Disloyal Employees and their conspirators were developing Pre-Exit NGINX Plus and an entire business built around Open Source NGINX and Pre-Exit NGINX Plus (i.e., the NGINX Enterprise) with the ultimate goal of misappropriating it and then selling it to a large U.S technology company.  Indeed, unbeknownst to Rambler, the Team had decided to pursue their "open core" strategy of monetizing NGINX.  As Konovalov stated in a 2019 GoTech interview: "We decided to explore the open core model.  Open core model is when you take an open-source software and build something paid like commercial software on top.  And this is what we have been doing since 2011."  A copy of a transcript of Konovalov's GoTech interview (the "Konovalov Tr.") is attached as Exhibit C hereto.  The foregoing quote appears at pp. 7-8.

**The Team Agrees to Conspire to Steal the NGINX Enterprise, Including Pre-Exit NGINX Plus, from Rambler and to Sell it to a Third Party for Their Own Ill-Gotten Profit**

151.    The Team and other Rambler employees conspired with one another to steal the valuable NGINX Enterprise, including fully developed Pre-Exit NGINX Plus, and monetize it for themselves and at the exclusion of Rambler by selling it to a third-party.  The Team, namely Sysoev, Konovalov, Alexeev, Dounin and Smirnoff, agreed that together they would start their own company in San Francisco, California to commercialize Open Source NGINX by commercializing Pre-Exit NGINX Plus and other proprietary NGINX extensions, and then achieve their multimillion dollar

"exit" or "payday" by selling the entire NGINX Enterprise, including Pre-Exit NGINX Plus and derivative works thereof, to a large U.S. technology company.

152.    The Rambler employees who conspired with the Team in furtherance of their common plan were Dmitry Galperin (Director of Strategic Development), Viktor Popov (Deputy Chief Technology Officer), and eight Rambler software programmers – at least three of whom staggered their resignations from Rambler after assisting the Disloyal Employees with removing and destroying evidence of the conspiracy – and years later in late 2013 and 2015 joined an affiliate of NGINX BVI (NGINX LLC Russia) as employees. These Rambler programmer conspirators were Fedor Dikarev, Oleg Mamontov, Konstantin Kukushkin, Alexander Nikoforenko, Konstantin Romamenko, Anton Ermolaev, Alexander Postnikov and Sergey Chesnokov (together with Galperin and Popov, the "Rambler Employee Conspirators").

153.    The common plan involved surreptitiously developing the NGINX Enterprise, including Pre-Exit NGINX Plus, while the Disloyal Employees were employed at Rambler and then misappropriating the NGINX Enterprise, including Pre-Exit NGINX Plus, to newly formed entities outside of Russia (and off Rambler's radar) where the Team would grow it using capital raised from outside venture capital firms for purposes of quickly selling it to a large U.S. technology company. No later than early 2011, or earlier, the Team identified F5 as a possible purchaser of the built-out commercial NGNIX Enterprise they envisioned.

154.    The exit strategy (i.e., the sale to a large American technology company) was the object of the conspiracy and venture capital firms Runa Capital, Inc. ("Runa Capital") and E.Ventures Capital Partners II LLC, formerly known as BV Capital ("E.Ventures") joined in the common plan to achieve it.  While the conspirators aimed to accomplish the object of their conspiracy within five years of the Disloyal Employees' departure from Rambler with the misappropriated NGINX Enterprise, they achieved it in less than seven years when the Merger Agreement with F5 closed on May 8, 2019.

155.    The conspiracy was successful because its conspirators were well-placed within Rambler to develop the NGINX Enterprise, including software that comprised Pre-Exit NGINX Plus,

without anyone else at Rambler knowing and then concealing all evidence of their conduct once the Disloyal Employees left Rambler with the stolen NGINX Enterprise.

156.    Konovalov, was Sysoev's boss at the end of their Rambler tenure, and the Rambler CTO with oversight and responsibility for all of the company's technical departments tasked with developing new products.  Konovalov was the leader of the Team.

157.    Konovalov reported to and was answerable only to the CEO of Rambler. Konovalov's key senior management position at Rambler enabled him to provide Sysoev beginning in 2008 with an ecosystem within Rambler that was free from oversight or accountability.

158.    The insulated ecosystem was the NOC department where Konovalov surrounded Sysoev with the Disloyal Employees and the Rambler Employee Conspirators.  For example, co-defendant Smirnoff was Sysoev's immediate supervisor and "Team Leader" in the NOC department, the Rambler department responsible for the design and development of a variety of operating system management and other software products.  In turn, Smirnoff reported directly to Konovalov. Moreover, many of the Rambler Employee Conspirators were the NOC programmers who worked with Sysoev and were supervised by Smirnoff.

159.    In sum, everyone working in and overseeing the NOC department participated in the conspiracy.  As explained further below, even the NOC department's servers and information infrastructure were not integrated with the rest of Rambler.  Konovalov was the conduit between the technical NOC employees in this programming department and Rambler's senior management.

160.    The Disloyal Employees and Rambler Employee Conspirators were a tight-knit group, which allowed them to keep the Disloyal Employees' planned misappropriation of the NGINX Enterprise a secret while still utilizing Rambler's full array of resources and infrastructure to continue testing, developing and refining Open Source NGINX  and Pre-Exit NGINX Plus.

161.    Konovalov drove the effort to split off from Rambler, steal the NGINX Enterprise, including Pre-Exit NGINX Plus,  solicit Silicon Valley investors, and destroy evidence of the Team's conspiracy.

162.    As revealed by Rambler and Lynwood's forensic investigations conducted after Korotkov blew the whistle on the conspirators in 2019, by the time Konovalov resigned from Rambler effective April 29, 2011, the Team was already executing on its plan to covertly misappropriate the entire NGINX Enterprise, including Pre-Exit NGINX Plus, so that it could ultimately be sold to a large U.S. technology company.

163.    As revealed by Rambler's post-whistleblower investigations, by the time Sysoev separated from Rambler in December 2011, Pre-Exit NGINX Plus had been developed (i.e., written), the Team had already secretly formed NGINX BVI, NGINX Software and NGINX DE, filed the first trademark application for the "NGINX" trademark, solicited and obtained outside venture capital investment to fund the Team, and the first customer (Netflix, Inc.) was booked by NGINX BVI and/or NGINX Software.

164.    As the CTO of Rambler, Konovalov enjoyed substantial autonomy and the ability to conceal information from Rambler about the work Sysoev was performing for Rambler, particularly the conception, development and testing of what would become the centerpiece of the NGINX Enterprise – namely, NGINX Plus.

165.    Konovalov was thus able to, and did, conceal, and suppress from Rambler's senior management and board of directors the content and value of the code development Sysoev was creating using Rambler's infrastructure, and at Rambler's expense.

166.    Open Source NGINX was not a secret.  But the Disloyal Employees successfully hid from Rambler the fact that development of the NGINX Enterprise was the principal occupation of Sysoev at Rambler.  Rambler thought Sysoev was focused on improving Open Source NGINX to continue running Rambler's web-based services and releasing his latest iterations of the Open Source NGINX under the BSD license as a testament to his creativity and Rambler's accomplishments.  In reality, however, the Disloyal Employees concealed from Rambler the massive investment of time and resources that the Disloyal Employees were undertaking at Rambler's expense in developing and testing Open Source NGINX and Pre-Exit NGINX Plus as the foundation for launching the purloined NGINX Enterprise.

167.    The Disloyal Employees realized that the growing popularity of Open Source NGINX, *i.e.*, the "open core" was what would open the door to monetizing proprietary commercial extensions of the core, including NGINX Plus; hence, the more Rambler-financed effort that went into enhancing and maintaining Open Source NGINX, the more web site operators would become dependent on it, and that "sticky" dependency would drive demand for fee-based NGINX Plus and related support services.

168.    Unlike typical technology startups, the resources that the Disloyal Employees could devote to the foundation of their enterprise, were virtually unlimited, because Rambler was unwittingly funding the development program.  For example, Rambler provided Sysoev with the luxury, resources and time to decide what NGINX code to release as Open Source NGINX and what code to hold back for Pre-Exit NGINX Plus. At the same time, the Disloyal Employees were collecting generous Rambler salaries and bonuses.  Thus, there was only upside for the Disloyal Employees.   In short, the situation was every entrepreneur's dream come true.

169.    Once Open Source NGINX was sufficiently popular, and once the conception and development of Pre-Exit NGINX Plus and related enhancements had been sufficiently advanced, all of which was made possible only with the financial, personnel and infrastructure resources of Rambler, the time would be right to cut the cord with Rambler and spin out the NGINX Enterprise, solely for the Team's own benefit.

170.    Konovalov worked fast.  He joined Rambler as CTO in March 2008 but by later that year, he had already recognized the value of Open Source NGINX and conceived of the NGINX Enterprise and "open core" strategy.  Despite his senior management role and duties as CTO of Rambler, Konovalov abused his power and authority to lead the conspirators with laying plans to steal the NGINX Enterprise from Rambler.

171.    The Team agreed to form a conspiracy pursuant to which they would continue to use Rambler's resources to develop Open Source NGINX and Pre-Exit NGINX Plus, and in turn, the NGINX Enterprise.

172.    The Disloyal Employees agreed that they would defraud Rambler by concealing the true value of Open Source NGINX and the existence of Pre-Exit NGINX Plus and the NGINX Enterprise that they were building and testing at Rambler's cost.

173.    The Disloyal Employees agreed that they would flagrantly violate their statutory and contractual obligations to Rambler and steal the NGINX Enterprise and sell it to a third party for their own ill-gotten gains.

174.    The Team further agreed that they would conceal their unlawful activity from Rambler by concealing their work and, even, destroying evidence.

175.    The Team agreed that they would secretly raise capital for the NGINX Enterprise, even while the Disloyal Employees were still employed by Rambler, to start a new business without Rambler's participation built on the software that the Team knew Rambler rightfully owned as works made for hire.

176.    The Disloyal Employees, utilizing Konovalov and his lofty position as camouflage, agreed to and did block the flow of information to Rambler about the immensely valuable open source and proprietary NGINX projects and the Team's scheme to steal the NGINX Enterprise, including Pre-Exit NGINX Plus.

177.    The Disloyal Employees agreed that they would exploit profitable business opportunities based upon Open Source NGINX, including the proprietary code incorporated in Pre-Exit NGINX Plus and other commercial products.  In Konovalov's own words in 2019: "So but anyway, by 2011, like six or eight percent all internet use NGINX, and it was -- it became crystal clear that there were some business opportunities." *See* Exhibit C at 7:11-14.

178.    The Team agreed to launch the business in San Francisco to enhance their capital raising potential and ultimate sale prospects, all to the exclusion of Rambler, the rightful owner of the NGINX Enterprise, including Pre-Exit NGINX Plus.

179.    The Team agreed they would conceal from Rambler the causes of action for which the Team was and would become liable to Rambler as a result of their unlawful conduct.

180.    With their conspiracy formed, the Team set about establishing their new business around Open Source NGINX, Pre-Exit NGINX Plus and other proprietary NGINX extensions and derivations, as well as various valuable goodwill and business opportunities comprising the NGINX Enterprise.

181.    Meanwhile, as further cover to the Team's secret conspiracy, Sysoev continued to portray himself to the world as a savant coder, when in reality he was an unethical businessman scheming to make his fortune on business opportunities he knew Rambler resourced and owned.

**The Team Launches the NGINX Enterprise, Including Pre-Exit NGINX Plus**

182.    The development of Pre-Exit NGINX Plus, including the writing of software code that comprised Pre-Exit NGINX Plus, occurred in 2009, 2010 and 2011, with the active involvement of the Disloyal Employees while they were still employed by Rambler.

183.    Sysoev, the master architect and author of NGINX software code, was employed at Rambler until December 1, 2011.  All Open Source NGINX and Pre-Exit NGINX Plus software code that he wrote, or assisted others with writing, while he was still employed by Rambler, constituted works made for hire and were owned exclusively by Rambler, and now by Lynwood through assignment from Rambler, and as specified in Sysoev's employment contract with Rambler. The same is true for Konovalov and Smirnoff, the other Disloyal Employees, who left Rambler on April 29, 2011 and November 12, 2012, respectively.

184.    Through Rambler and Lynwood's in-depth internal investigations following the whistleblower Korotkov's revelations in 2019, Rambler ad Lynwood discovered that the Disloyal Employees were active beginning in 2009 and through mid-November 2012 – while they were still employed by Rambler – with planning and implementing their business operation to lift the NGINX Enterprise, including Pre-Exit NGINX Plus, out of Rambler.

185.    Such activities included writing business plans, fielding communications with potential venture capital investors and meeting with them, actively developing, testing and stockpiling proprietary NGNIX software that comprised Pre-Exit NGINX Plus, and then, after the fact, with hiding their theft to keep Rambler in the dark.

186.    The NGINX Defendants and the Individual Defendants have openly admitted that they developed and provided proprietary, commercial NGINX "custom code", i.e., Pre-Exit NGINX Plus – including code that contained features and functionality touted by the Defendants in NGINX Plus, to their paying customers, including to Netflix, in 2011 – when the Disloyal Employees were still employees of Rambler.

187.    For example, as discussed further below, Rambler and Lynwood's post-whistleblower investigations revealed that Konovalov openly admitted, *in public statements that were video recorded and placed online with his knowledge in November 2019*, that the Disloyal Employees and Defendant Alexeev were developing Pre-Exit NGINX Plus in 2011 when they were still employees of Rambler.  *See* Konovalov Tr., Exhibit C.

188.    Rambler and Lynwood also discovered through their investigations that Smirnoff had openly admitted, *in a presentation he made in 2014 at an NGINX conference in San Francisco entitled "Why did Netflix use NGINX and FreeBSD to build their own CDN?"* (the "Smirnoff Presentation") that the Netflix "Open Connect" Content Delivery Network, or CDN, which began in 2011 or earlier contained both Open Source NGINX and additional, "custom" NGINX software modules. According to Smirnoff, those custom NGINX modules were produced in 2011, or earlier, with "development support" from the "core engineering team at NGINX, Inc." in Moscow, when the Disloyal Employees were still employed by Rambler in Moscow.  Those modules became part of Pre-Exit    NGINX    Plus.    The    Smirnoff    Presentation    is    available    at https://www.youtube.com/watch?v=KP_bKvXkoC4.

189.     Rambler and Lynwood's investigations revealed that the Team actively sought financing from outside venture capital firms to form their own company with the misappropriated NGINX Enterprise beginning in mid-2009 when they enlisted the assistance of Korotkov.

190.    Korotkov was a former Chief Information Officer of Rambler that resided in the United States.  Sysoev brought Korotkov into the Team's conspiracy and Korotkov served as the Team's partner in the United States in their efforts to raise capital for their spin out from Rambler with the misappropriated NGINX Enterprise.

191.    Beginning in mid-2009, Sysoev held Korotkov out to third-parties (including potential venture capital investors) as his "business partner" both verbally and in writing and dispatched Korotkov to solicit venture capital investors in the United States for the Team.

192.    Korotkov at Sysoev's direction met with numerous venture capital firms, including but not limited to Accel Partners, FTV Capital and Mayfield Capital between May 2009 and July 2010 in the United States regarding their potential investment in the Team's NGINX Enterprise ambitions.

193.    Sysoev traveled to the United States in mid-March 2010 and accompanied Korotkov to numerous meetings with venture capital firms in California to seek funding for the Team's NGINX Enterprise-focused startup.  Korotkov paid for Sysoev's travel expenses and the two spent considerable time together discussing and marketing the NGINX Enterprise business plan.  By this time, Sysoev was already underway in writing Pre-Exit NGINX Plus, which was the central commercial NGINX-related software component to the open-core business strategy.

194.    As part of their joint efforts, paid for by Korotkov, to raise funds aimed at monetizing NGINX, with their focus being non-open-source, commercial NGINX, in or around January 2010, Sysoev and Korotkov began collaborating on a slide deck together that they shared with a host of various VC firms.  A copy of such slide presentation (the "Sysoev-Korotkov Deck") is attached as Exhibit D hereto.

195.    Sysoev and Korotkov developed the Sysoev-Korotkov Deck together over a number of months, and they continued to hone it as they received feedback from potential investors during their joint pitches in the first half of 2010.

196.    The Sysoev-Korotkov Deck reflected the proprietary NGINX code that Sysoev had already written and was contemporaneously developing in 2010 (i.e., Pre-Exit NGINX Plus).  Sysoev heavily contributed to multiple drafts of the Sysoev-Korotkov Deck, and it contained only information that Sysoev himself had approved for presentation to potential investors.

197.    The Sysoev-Korotkov Deck, which Sysoev and Korotkov periodically revised from January to approximately June 2010, provided a detailed roadmap of features and functionality that

1    commercial, non-open source "NGINX+ 1.0" provided, including as follows: "NGINX+ 1.0 will

2    make commercial offerings to customers running high-load websites (hundreds of CPUs like

3    HULU.com) based on: - Stable and scalable REAL-Time Web SERVER PUSH modules -advanced

4    back-end management and monitoring with dynamic (no restart) configurations – advanced load-

5    balancing features, VPN and SSL features – advanced comprehensive support for Web 2.0

6    frameworks – Ruby, PHP5, PERLmodules, Python and JAVA/Lua in the future". *See* Exhibit D at

7    p. 19.

8         198.    The Sysoev-Korotkov Deck repeatedly refers to development of commercial NGINX

9    software that had already been developed or was then under development by the Disloyal Employees

10    in 2010.

11         199.    For example, slide 13 of the Sysoev-Korotkov Deck calls out an "Integrated

12    Distributed Network Cache (made up of NGINX internal caches), **benchmark proven** to perform

13    much faster than Varnish or Memcached caching solutions." [Emphasis added]    In the software

14    development world, benchmarking refers to the act of running a computer program, a set of

15    programs, or other operations, in order to assess its/their relative performance. Indeed, Sysoev and

16    the Disloyal Employees had already developed at Rambler advanced Pre-Exit NGINX Plus caching

17    code using Rambler's infrastructure and resources. *See* Exhibit D at p. 13.

18         200.    Korotkov, with Sysoev's knowledge and consent, also developed and populated a

19    Web site, located at the Internet domain nginxplus.com, which he registered on February 22, 2010,

20    and which promoted "**NGINX+**" (the "Korotkov Site").    A copy of the home page of the Korotkov

21    Site is below:

22

23

24

25

26

27

28



201.    The Disloyal Employees' work in 2010 and 2011 on code comprising Pre-Exit NGINX Plus reflected Sysoev's then-focus on the urgent need for potential corporate customers they targeted such as Netflix and FourSquare.com to manage and deliver enormous amounts of digital content to their growing subscriber bases at lightning-fast speeds.  Sysoev and the Team delivered custom NGINX code to numerous third-party customers (including but not limited to Netflix and FourSquare.com) while the Disloyal Employees remained employees at Rambler.

202.    Sysoev provided Korotkov with periodic updates on the Team's activities to assist Korotkov in his fundraising efforts such that by June 2010, Korotkov confidently reported via email to a prospective venture capital funding source in the United States that "We've been working with some of startups in San Francisco who were keen on seeing custom features in NGINX. Recent project – we worked with FourSquare.com to deliver them custom NGINX server with advanced Operational Commands/Monitoring."

203.    In other words, as confirmed in a contemporaneous writing by Korotkov, by June 2010, Sysoev and the other Disloyal Employees had already developed non-open-source, proprietary, custom NGINX code for commercial, paying customers, including FourSquare.  That custom code was then incorporated into Pre-Exit NGINX Plus.

204.    The "Operational Commands/Monitoring" functionality, as called out by Korotkov, in the custom NGINX code delivered in or around 2010 to FourSquare by the Disloyal Employees (while still employed by Rambler) was and is what the Defendants have long touted as being a central selling-point feature of NGINX Plus, *i.e.*, "live activity monitoring."

205.    For example, when announcing their first "official" release (R1) of NGINX Plus in August 2013, the NGINX Defendants and the Individual Defendants emphasized that the application featured "live active monitoring", *i.e.*, the same type of functionality that had been delivered to FourSquare in 2010 as part of Pre-Exit NGINX Plus, when the Disloyal Employees were employed by Rambler.

206.    Rambler records show that the Disloyal Employees were busily working on "live active monitoring" and other features of NGINX Plus in 2011, while still collecting Rambler paychecks.  Prime among these features was "application health checks" – functionality which headlined the R1 NGINX Plus release notes in 2013.  *See* https://docs.nginx.com/nginx/releases/#nginxplus-initial-release-r1 for the R1 NGINX Plus release notes in 2013.

207.    As discussed further below, according to incriminating Rambler records recovered by Rambler and Lynwood as part of their post-whistleblower investigations in 2019, the Team, beginning in 2010 and, with the NGINX Defendants, continuing into 2011 were developing and promoting active monitoring, application health checks, and load balancing software as part of Pre-Exit NGINX Plus.

208.    Evidence of the Team's early development of Pre-Exit NGINX Plus features and functionality is consistent with the admissions of Defendant Konovalov, in a videotaped interview he gave in November 2019 during a GoTech 19 conference in Moscow, six months after the F5 merger, as revealed by Rambler and Lynwood's post-whistleblower investigations.  As confirmed in the 2019 Konovalov interview, Sysoev and the conspirators were hard at work in 2010 and 2011 developing Pre-Exit NGINX Plus product offerings well before they departed Rambler.  *See* Konovalov Tr., attached as Exhibit C.

209.    In the interview, Konovalov stated: "In parallel, we – in 2011, we started to build commercial product, NGINX Plus, and started to sell it to enterprises and corporates." *See* Konovalov Tr., Exhibit C at p. 8.

210.    Konovalov in his GoTech interview stated further:

As I said previously, NGINX customer base -- it's not really customers but user base because it was an open-source and freeware project.  So we can talk about users, not customers.  So but anyway, by 2011, like six or eight percent all internet use NGINX, and it was -- it became crystal clear that there were some business opportunities.  And three of us came together, Igor, myself and one -- we had a sort of co-founder -- and started to talk about that.  And at some point we decided, okay, let's try.  Let's try and explore these opportunities.   And so that is how we decided to build a company and there are many -- there was a bunch of ideas of how to extract money from open-source and freeware product.  But we decided to take like an easy one probably.  We decided to explore the open core model.  Open core model is when you take an open-source software and build something paid like commercial software on top.  And this is what we have been doing since 2011.  No changes surprisingly in our strategy.  So we continue to develop NGINX open-source these days and continue to build a great open-source freeware software.  ***In parallel, we -- in 2011, we started to build commercial product, NGINX Plus, and started to sell it to enterprises and corporates.***  So this is what we are doing today, yeah.

*Id.* at pp. 7-8 [Emphasis added].

211.    Konovalov's admissions are consistent with Sysoev's FSM Interview, published on January 5, 2012, which Rambler discovered through its post-whistleblower investigations. In the FSM Interview, Sysoev reported that the conspirators already had customers and were making money in 2011, stating: "I can't disclose the names of our clients as of yet, but we've got contracts signed for technical support, consulting ***and for the first proprietary extensions based on NGINX as well.***

1    *The latter mostly fall into the area of CDN and media streaming acceleration.*"  *See* Exhibit A at

2    pp. 3-4 [Emphasis added].

3        212.    Rambler and Lynwood's investigations revealed that one of the customers to which

4    Sysoev referred in his interview was Netflix.

5        213.    Defendant F5, in its blog entitled "Celebrating 20 Years of NGINX", located at

6    https://blog.nginx.org/blog/celebrating-20-years-of-nginx (the "NGINX Blog"), confirmed that the

7    NGINX Defendants and the Team began to work with Netflix as its first customer, in September

8    2011, while the Disloyal Employees were still employed by Rambler.  In the Blog, F5 further stated

9    as follows:

10              Between 2009 and 2010, NGINX continued to gain popularity in

11              the open source community. On April 12, 2011, NGINX 1.0.0

12              was released on the 50-year anniversary of the first human in

13              space. Then, Igor decided to start the company NGINX, Inc. *and*

14              *formalize the software development structure*. He opened the

15              first office in Moscow, later expanding to San Francisco,

16              California.

17

18              Initially, NGINX, Inc. focused on the continuous development of

19              NGINX while providing professional services and support for a

20              few large internet companies. *The first US employees started to*

21              *work on investments, sales, and marketing, while engineers in*

22              *Russia worked on the software, support, and services. In*

23              *October 2011, NGINX, Inc. announced Series A funding and*

24              *our first customer – Netflix – started using our services.*

25              [Emphasis added].

26

27

28

As time went on, the NGINX team found that traffic management software, rather than static web serving, had a better chance of commercial success. In 2013, NGINX released its first commercial product, NGINX Plus. With this commercial release, we focused on **load balancing enhancements, dynamic configuration, and monitoring** – the most requested features for our customers.

214.    In truth and in fact, the features and functionality of NGINX Plus in 2013 as described in the NGINX Blog had been under development as part of Pre-Exit NGINX Plus for years by the Disloyal Employees when they were employees of Rambler.

215.    For example, the Team and Korotkov aggressively promoted (i) active monitoring, (ii) application health checks, and (iii) load balancing software functionality in commercial NGINX to prospective venture capital investors in the first six months of 2010. Indeed, the Sysoev-Korotkov Deck written by Korotkov and Sysoev in early 2010 described "NGINX 1.1" as a "Custom-built, preconfigured technology stack" that included: "Advanced load balancing algorithms" and "Ability to Health-monitor and 'fast fail' HTTP requests to back ends", *i.e.*, active monitoring and health checks. *See* Exhibit D p. 12.

216.    Another area in which Sysoev began writing software code as early as 2009 was in connection with sophisticated caching and/or CDN-related functionality. As Sysoev noted in the FSM Interview, the development of CDN-related functionality in the form of "custom" NGINX code was one of the areas in which the Team and the NGINX Defendants serviced Netflix, one of their early customers, leading up to September 2011. Such CDN-related code was withheld by Sysoev and incorporated into what became Pre-Exit NGINX Plus. *See* Exhibit A at pp. 1-2.

217.    Sysoev recognized the importance of CDN-related functionality in commercial releases of NGINX, i.e., Pre-Exit NGINX Plus, and he wrote the software code before the Team and the NGINX Defendants began to work with Netflix in 2011 to provide CDN-related "custom" add-ons to Open Source NGINX.

218.   A prime focus of the 2010 Sysoev-Korotkov Deck, for example, was NGINX Software Planning, including CDN and Video Streaming, as part of "NGINX 2.0" entitled "Content delivery for Mobile Networks".   The Sysoev-Korotkov Deck states: "Phase 2 will focus on a much larger commercial opportunity – using NGINX platform for Mobile Network Web Content Delivery, i.e., CDN type application for Cellular Networks."  *See* Exhibit D at p. 13.

219.   The Sysoev-Korotkov Deck continues: "Latencies remain large for most of Web Content – images, videos, .CSS, Java-script libraries – and effectively caching all these content at cellular towers with geo-aware and cache-driven Distributed NGINX CDN is an elegant cost-effective solution.  We basically mean a Distributed Edge Network (CDN type) of a pool of NGINX custom-built servers (on special Linux kernal) …." *See* Exhibit D p. 13.

220.   Rambler and Lynwood discovered following their post-whistleblower investigations that Smirnoff, one of the Disloyal Employees, who left Rambler in November 2012, actively worked on proprietary CDN-related functionality as part of Pre-Exit NGINX Plus while he was employed by Rambler.

221.   According to the Smirnoff Presentation, a "Distributed NGINX CDN" is exactly what the NGINX Defendants and the Team provided to Netflix in or around September 2011.

222.   During the Smirnoff Presentation, Smirnoff, the last of the conspirators to leave Rambler, in or around November 2012, and who in 2014 was employed by one or more of the NGINX Defendants and then later (and today) by Netflix, disclosed the following regarding Defendants' involvement in the Netflix "Open Connect Initiative": "The Open Connect initiative started in 2011 and there were just two developers in the team.  In June 2012, the first open connect cache -- the open connect was announced and the first open connect started to serve."

223.   Smirnoff was still employed by Rambler when he worked on the custom NGINX code delivered to Netflix in 2011 that was part of Pre-Exit NGINX Plus.

224.   Netflix's goal, according to Smirnoff, was to "build a CDN specialized in Netflix content delivery" and to "put the content closer to a client" via caching.

225.    According to the Smirnoff Presentation, the Disloyal Employees loaded "a package of NGINX and additional modules for NGINX to run" on network hardware appliances, i.e., servers, that were painted red and dubbed the Netflix "OpenConnect Appliances."

226.    The NGINX software loaded onto the Netflix OpenConnect Appliances included an "NGINX web server" and other unspecified "custom modules" of NGINX.  Another slide in the Smirnoff Presentation entitled "Software choice" included "NGINX", and under that heading, the slide stated "Commercial support from Nginx, Inc." and "Flexible framework for custom modules".

227.    In the Smirnoff Presentation, Smirnoff went on to state: "NGINX is somewhat unique. I think everyone here knows it. It's open source BSD license software, and at the same time, all the developers are working as full time employees of a legal body, and this legal body offers a super commercial support for the product that is somewhat unique, and actually, the combination of the most beneficial things of open source and commercial software at one piece of software."

228.    Smirnoff added: "What else is very important for Netflix video streaming is the flexible framework for the custom modules because we have a couple of modules that are specific to video streaming."

229.    Making a "punch" in the "CDN space" with commercial partners such as Netflix was exactly one of the points the Team pitched to potential venture backers in March of 2011 before any of the Disloyal Employees left Rambler.

230.    In the March 2011 Slide Deck covertly made and presented by the Team to potential venture capital backers in March 2011, after the Team jettisoned Korotkov from their group of conspirators, the Team laid out their vision for commercial releases of NGINX, with a significant focus on commercial NGINX opportunities in the CDN space.  The Team's March 2011 Slide Deck was recovered by Rambler and Lynwood as part of their post-whistleblower investigations in 2019 from a server the Disloyal Employees and their conspirators wiped at the time of their separation from Rambler.

231.    In the March 2011 Slide Deck, Konovalov, Sysoev and Alexeev stressed the opportunity for a "commercial tuned up and fully supported version of NGINX", combined with a

"CDN management suite", to "really make a punch in the CDN space." That statement from an unnamed CDN vendor in the March 2011 Slide Deck was under the heading "strategic partnership: example". *See* Exhibit B p. 27.

232.    While the CDN vendor was not named, it is likely Netflix, which only six months later – when Sysoev and Smirnoff were still employed at Rambler – signed a contract with one or more of the NGINX Defendants to build out its CDN.

233.    The March 2011 Slide Deck also highlighted the Team's plans to "create" "NEW PRODUCTS" in 2011 that could be "monetized" in the first quarter of 2012 and lead to "$$$" in the form of "SUPPORT + LICENSEE FEES". The extremely short product development cycle for such products revealed that the NEW PRODUCTS, in the form of Pre-Exit NGINX Plus, were already well underway or completed at the time of the presentation. *See* Exhibit B at p. 15.

234.    The highlighted product features of commercial Pre-Exit NGINX Plus products in the March 2011 Slide Deck match the features and functionality promoted by the Individual Defendants and the NGINX Defendants in Release 1 of NGINX Plus in August 2013. Such matching features include: in the March 2011 Deck, "Advanced load balancing", with a "control panel/dashboard" – identified in the deck with "$$$"; in the March 2011 Slide Deck, "performance monitoring" with "extended statistics" (with the "$$$" symbol), i.e., in the R1 release notes, referred to as "Live active monitoring"; and "video content transformation- media/streaming server (paid) in the March 2011 Slide Deck, referred to as "Adaptive media streaming" in the release notes for Release R1 of NGINX Plus. *See* Exhibit B at p. 16.

235.    Thus, the record is clear that the Team (i.e., the Disloyal Employees, Dounin and Alexeev) in 2010 and early 2011 were far along in pitching the stolen NGINX Enterprise and then-existing Pre-Exit NGINX Plus functionality, including in the March 2011 Slide Deck, to potential venture capital backers.

236.    The Team was consistently focused on the development of CDN and video streaming during the period when the Disloyal Employees remained employees at Rambler as evidenced by: (i) the Sysoev-Korotkov Deck in early 2010, (ii) the Team's March 2011 Slide Deck in 2011, (iii)

the Team's work with Netflix in 2011, (iv) Sysoev's and Konovolov's public admissions in 2012 and 2019 respectively concerning the Team's open-core strategy and the existence of proprietary NGINX code for license to third-party customers in 2011, (v) the 2014 Smirnoff Presentation regarding the connection between "custom modules" of NGINX and the Netflix CDN in 2011, (vi) the services and software that the conspirators provided to FourSquare in 2010, and (vii) the software features and functionality highlighted in both their fundraising pitches in both 2010 and 2011 and in the NGINX Defendants' release notes for R1 of NGINX Plus in 2013. The foregoing examples confirm that the Disloyal Employees developed and stockpiled commercial NGINX software in 2010 and 2011 that comprised Pre-Exit NGINX Plus while the Disloyal Employees were employed at Rambler.

237. It was no accident, then, that when Sysoev approached Netflix in 2011 while he was still working at Rambler, regarding its CDN-related needs, he was quick to go to contract with Netflix and provide the "custom modules" related to caching that Netflix required and which had been previously written by Sysoev and his follow-conspirator Smirnoff, who worked on the Netflix project in 2011 while he was still employed by Rambler.

238. But there is more. In reality, by the time Korotkov and the Team began pitching venture capital firms in 2010 and 2011, Sysoev had already been secretly writing custom proprietary NGINX code on the side for commercial customers and was being paid for those modules. That software became part of Pre-Exit NGINX Plus.

239. In return for writing "one-off builds" of NGINX that he never included in Open Source NGINX, Sysoev received what he referred to as "donations" of money from his paying customers. Sysoev provided such covert software development services to Australia-based Fastmail and Last.fm, as well as to other "private" customers in return for payments of thousands of dollars in or around 2009.

240. In 2010, Sysoev also met with other targeted customers amenable to purchasing commercial, custom, pre-exit NGINX code including Turner Broadcasting and Cloudant, the latter of which is based on the Apache-backed Couch DB project and the open-source Big Couch project.

In fact, Sysoev and Korotkov met with Cloudant several times in Santa Clara in 2010 with its founders to discuss custom NGINX code that they were seeking from Sysoev. Upon information and belief, Sysoev delivered to both Turner Broadcasting and Cloudant custom NGINX code in exchange for payment he pocketed for himself.

241. Sysoev kept his private commercial NGINX development projects secret, and he did not disclose to Rambler such activities or the money he received for providing such custom NGINX software to commercial customers.

242. In short, Sysoev and his co-conspirators hid behind the altruistic notion that he was writing open source software that he made freely available to the public under a non-restrictive open source license when in reality, while he was still working at Rambler, he was profiting off his knowledge of Open Source NGINX by developing non-open source, proprietary modules of NGINIX, *i.e.*, Pre-Exit NGINX Plus, for commercial customers and getting paid for it.

243. Sysoev's actions show that he was unilaterally deciding what software code would be released to the public as Open Source NGINX, and what NGINX software he would keep out of Open Source NGINX, and stockpile as Pre-Exit NGINX Plus, so that he would be ready to provide the latter to commercial customers under license and profit from it. And it was this proprietary code, in whole or in part, that became Pre-Exit NGINX Plus or portions thereof – well before the Disloyal Employees ever left Rambler.

244. In order to facilitate his deceptive form of "open source", Sysoev used at least two repositories for NGINX-related software code that he and/or the other Disloyal Employees wrote prior to their departures from Rambler.

245. In addition to maintaining the public repository of Open Source NGINX source code in the Mercurial repository, the Team maintained another, private repository for NGINX software code, i.e., Pre-Exit NGNIX Plus, that Sysoev kept out of the public eye so that (i) it could be used within Rambler to support Rambler's operations and thereby help to justify Sysoev's inflated Rambler salary; (ii) Sysoev could secretly license it to his own private customers to line his own pockets; and (iii) the Team could profit from it when after they stole it from Rambler and licensed it

to paying commercial clients in the form of Pre-Exit NGINX Plus and other related and/or dependent add-ons.

246.    The Team's use of a private repository for their commercial NGINX software code while at Rambler is consistent with the development history of Open Source NGINX in the years leading up to Sysoev's departure from Rambler at the end of 2012.  Beginning in early 2010, when Sysoev and Korotkov began meeting with potential financial backers in Silicon Valley, the number of "commits" of Open Source NGINX code that Sysoev made to the Open Source NGINX repository in Mercurial repository began to drop off dramatically.   And yet, by all accounts, Sysoev continued to dedicate his working hours at Rambler to developing NGINX code and dealing almost exclusively with NGINX-related issues.

247.    The difference was that instead of devoting his time to making public "commits" of Open Source NGINX code to Mercurial, leading up to his departure Rambler, Sysoev devoted most of his efforts to developing commercial, non-open source NGINX code that comprised and/or became Pre-Exit NGINX Plus.  In this way, Sysoev could both be rewarded financially from Rambler for continuing to hone the internal configurations of NGINX in Rambler to meet Rambler's internal needs, with the help of Rambler's huge volume of daily Web traffic, while also setting the stage for the Team's self-enriching theft of Pre-Exit NGINX Plus code and the balance of the NGINX Enterprise from Rambler.

**The Team Ejects Korotkov From The Conspiracy; Konovalov and Alexeev Take Over The Team's Fundraising and Business Development Efforts**

248.    Notwithstanding Korotkov's early efforts at becoming involved with the founding and funding of the NGINX Enterprise, he was ultimately ejected by the Team in late 2010, and thereafter, Alexeev and Konovalov took the lead on securing funding and corporate formation.

249.    Being discarded stuck with Korotkov, as he would later blow the whistle on the Team in 2019 to Rambler and Lynwood, sparking an investigation by Rambler and Lynwood, and ultimately, this lawsuit.

1
2
3
4
5
6
7
8
9

250.    The object of the Team's conspiracy was always to sell the purloined NGINX Enterprise, including Pre-Exit NGINX Plus and its derivatives, to a large U.S. technology company. The raising of capital from outside venture capital firms was a means to that end.  The Team had no interest in simply misappropriating the NGINX Enterprise and building a company long-term based off the stolen enterprise.  To the contrary, the Team was interested in cashing in on a huge profit by selling the stolen enterprise.  Moreover, the Team had already used Rambler's resources and infrastructure instead of their own to develop Pre-Exit NGINX Plus and the NGINX Enterprise; so a sale to a third-party in approximately five years was the Team's goal and appeared feasible to the Team.

10
11
12
13
14
15
16

251.    For example, Konovalov emailed Sysoev on March 30, 2011 a forecast of the Team's exit strategy in which Sysoev, Alexeev and Konovalov stood to earn $30 million in profits after a sale to a third-party of the NGINX Enterprise at $100 million.  Konovalov's forecast modeled two rounds of venture capital investment before the exit strategy was completed with a sale to a third-party.  This email and accompanying excel spreadsheet were recovered as part of Rambler and Lynwood's internal investigation in 2019 that required the restoration of deleted emails and other data on the Yam Server.

17
18
19

252.    The Team knew that the venture capital firms they were soliciting would be eager to invest in an enterprise that was already developed and that had a short exit plan (i.e., the sale to a third-party technology company in approximately five years).

20
21
22
23
24
25

253.    By way of another example, the Team's March 2011 Slide Deck used with potential venture capital funders explicitly identified F5 as a potential acquirer that the Team and its venture capital partners intended on targeting as part of their exit strategy. *See* Exhibit B at 22.  In a draft of this slide deck presentation made to potential investors in 2011 ***before the Disloyal Employees left Rambler***, Sysoev, Konovalov, Alexeev and Dounin referred to themselves as "The Team" as Lynwood does in this Second Amended Complaint with the addition of Smirnoff.

26
27

254.    The March 2011 Slide Deck emphasized what would become NGINX Plus as a primary driver of revenue for the purloined NGINX Enterprise.  Like all the other communications

28

identified herein, these slide presentations were deleted by the Disloyal Employees, but following Korotkov's 2019 revelations, were forensically recovered from the Yam Server by Lynwood and Rambler in late 2019.

255.    The March 2011 Slide Deck, under the heading "revenue model", explicitly referenced, in addition to fees from technical support, "new paid feature (modules, custom features)"; and "new products in a partnership with software and hardware vendors," including "cdn functionality," "embedded version (e.g. with cpe vendors)" and "load balancing." Another page of the slides, referring to "commercial products", referenced "paid services, features and products." *See* Exhibit B at pp. 13, 17.

256.    The Team's March 2011 pitches to potential investors in Moscow and New York City regarding the revenue-generation capability of proprietary extensions to Open Source NGINX in the form that would come to be marketed under the NGINX Plus rubric were effective.  By April 2011, the Team signed a funding term sheet with United States-based venture capital firms Greycroft Partners II L.P.("Greycroft"), BV Capital and affiliates ("BV Capital", now E. Ventures) and Runa Capital.  Sysoev only agreed to enter into the term sheet and begin lifting the NGINX Enterprise, including Pre-Exit NGINX Plus, out of Rambler, after he was satisfied that he had fully tested Pre-Exit NGINX Plus on Rambler's Internet traffic and that it was ready to be commercialized as the foundation of his new business.

257.    Runa Capital and BV Capital (now E. Ventures) took the lead in advising the Team on how to navigate through the thorny issues surrounding the Disloyal Employees' contractual and fiduciary duties to their employer Rambler and the core issue of Rambler's ownership rights to the NGINX Enterprise, including Pre-Exit NGINX Plus.

258.    Runa Capital's Dmitry Chikhachev introduced Konovalov, Sysoev and Alexeev to Leonard Grayver at the Torrance, CA law firm of Greenberg, Whitcombe & Takeuchi, LLP on April 14, 2011 to handle the legal issues surrounding the formation of the new entities, funding documents and related due diligence issues.

259.    The Team's Alexeev responded to Grayver on the same day and, copying Runa Capital's Chickhachev and Galperin, as well as Sysoev and Konovalov, stated, among other things:

In brief, we need the following:

1. Incorporation in Delaware, U.S. (all standard procedure), including help with office/postal contacts – Nginx, Inc.

2. Registration of the trademark (Nginx)

3. Additional legal opinion on some essential matters related to former employment and non-conflict with Nginx, Inc.

4. Legal support for investment round (issuing/selling securities to Greycroft)

5. Help with amending standard incorporation papers with the bylaws in accordance with investment/termsheet

6. Interaction with the Russian attorneys

7. Possibly also legal advice on a few matters related to work permits/immigration questions (optional)

Overall, we don't have anything now (no company, no IP anywhere, no bank account, no office etc.). We need to establish a company in the U.S. and register IP (trademark, just this – nothing else) in the U.S./Internationally for the first time. We're not going to register any IP in Russia (and the software has been open source/freeware/BSD license since the day one).  Next we'll be establishing a Russian legal entity that won't be a subsidiary or a branch, just a separate company that will be doing services (software development) for the U.S. one, again without any transfer of IP, just implementation works in full accordance with the specifications provided by the "U.S. company."

260.    Konovalov, then still Rambler's CTO, was at the forefront of negotiating and finalizing the Term Sheet for Series A Preferred Stock Financing of the future NGINX entity with Runa Capital, BV Capital and Greycroft to raise a total of $3 million in Series A funds (the "Term Sheet").

261.    In March of 2011, Kirill Sheynkman, Venture Partner at Greycroft, began transmitting drafts of the Term Sheet to Konovalov.  A March 31, 2011 draft of the Term Sheet set the pre-money valuation of the NGINX Enterprise at $5 million.

262.    Rambler's ownership rights to the NGINX Enterprise, including Pre-Exit NGINX Plus, loomed over the Term Sheet negotiations as the investors were aware that the foregoing constituted Rambler property rights.

263.    Nevertheless, the Term Sheet was executed on or about April 6, 2011.

264.    The investors' concerns over Rambler's ownership rights to NGINX Enterprise, including Pre-Exit NGINX Plus, persisted and both the Team and Runa Capital, BV Capital and Greycroft continued scheming to find a workaround to Russia's black-letter law concerning employer "work made for hire."

265.    Indeed, on April 15, 2011, Grayver, communicated to the Team two fundamental legal concerns on behalf of the investors following the execution of the Term Sheet:

> The investors are particularly concerned about: 1. Your obligations to your current/former employers. I said that we would be prepared to submit a legal opinion from Russian counsel.  For your information, we use our Russian affiliate – Salomons Partners (www.salomons.ru) for such tasks. 2. The issue with the open source. The investors want the company to make a representation and warranty that the open source applications in the company's software won't present any problems…

266.    Grayver's email was not surprising to the Team as they were already aware of their obligations to Rambler and they had previously sought advice from another potential investor, Leon Zilber, in responding to the Series A investors' demand for some assurances that Rambler would not assert its rights to the NGINX Enterprise.  Specifically, on April 6, 2011, Konovalov wrote Zilber as follows:

> Leon, for your consideration: attached is the term sheet we signed with Greycroft.  I think it's pretty usual for you but would like to mention one important point.  If you look at "Conditions to Close" section, page 4, you will find a paragraph GC [i.e.,

Greycroft] worries more about and they need an official document regarding this issue: 3. A legal opinion of Company counsel, satisfactory to the … It's about our current employer, Rambler. *They want to be sure that Rambler will claim no rights for nginx and derived products.* [Emphasis added].

267.    The Term Sheet section to which Konovalov referred in his email provided in Section 3 under Conditions to Closing, as follows: "A legal opinion of the Company counsel, satisfactory to the Investors, shall be delivered to the Investors stating that the Founders' activities with the Company do not and will not conflict with any agreement, commitment or other encumbrance placed on them by their current or former employer."

268.    Like the rest of documents identified above, Konovalov's email of April 6, 2011 along with the Term Sheet, were recovered from Konovalov's deleted Rambler emails from the Yam server by Lynwood and Rambler in late 2019 and unquestionably demonstrate that the Team and the Series A investors knew of Rambler's exclusive ownership rights to Open Source NGINX, Pre-Exit NGINX Plus and the NGINX Enterprise.

269.    The Series A investors' concern in closing on the Series A financing without assurances or efforts made by the Team to minimize Rambler's future intervention to protect its ownership rights loomed large.  This concern contributed to the Team's coverup at Rambler that Konovalov directed so as to minimize the likelihood of Rambler discovering that the Team had misappropriated the NGINX Enterprise, including Pre-Exit NGINX Plus.

270.    On May 4, 2011, the Team formed NGINX Software, Inc.  The Team then formed NGINX BVI on July 6, 2011 and NGINX DE in August 2011.

271.    As of May 4, 2011, NGINX Software, Inc. established its initial headquarters at 600 Montgomery Street, 43rd Floor, San Francisco, California 94111.

272.    That same day, May 4, 2011, NGINX Software, Inc. filed an application to register the NGINX trademark on a use basis, pursuant to 15 U.S.C. § 1051(a), in the United States Patent and Trademark Office (the "USPTO"), which was assigned U.S. Application Number 85/312,802.

273.    On May 5, 2011, NGINX Software, Inc. filed an application to register the NGINX (Stylized) trademark on a use basis, pursuant to 15 U.S.C. § 1051(a), in the USPTO, which was assigned U.S. Application Number 85/312,806.

274.    Sysoev duplicitously remained an employee of Rambler accepting his salary and benefits while he actively stole the NGINX Enterprise, including Pre-Exit NGINX Plus, from Rambler.

275.    Smirnoff also duplicitously remained an employee of Rambler accepting his salary and benefits while he actively stole the NGINX Enterprise, including Pre-Exit NGINX Plus, from Rambler and then covered up the conspirators' theft.

276.    On July 18, 2011, Sysoev announced to his list service recipients that he was going to "establish nginx as a company to fully dedicate [himself] to the [nginx] project" – a reference to Open Source NGINX and in keeping with the misrepresentations he made to Rambler's management when he left the company (i.e., that he was simply forming a company that would provide consultancy and support services to companies using Open Source NGINX).  Sysoev made no reference to NGINX Plus, the NGINX Enterprise or any of the steps that the Team was taking outside of Russia to form new entities, pursue customers and raise capital.  Despite Sysoev's July 18, 2011 announcement, he stayed on as a part-time employee of Rambler until December 2011.  Smirnoff stayed on as an employee of Rambler until November 2012.

277.    While the Team was busy laying the groundwork for misappropriating the NGINX Enterprise from Rambler and concealing their actions, Greycroft pulled out of the Series A financing shortly before it was scheduled to close in October 2011.

278.    Upon information and belief, Greycroft pulled out of the closing because of its concerns over Rambler's ownership of Open Source NGINX, Pre-Exit NGINX Plus and, more generally, the NGINX Enterprise remained unsatisfactorily addressed.

279.    In contrast, Runa Capital and BV Capital went forward and closed on the Series A financing on or about October 23, 2011 after conducting their own due diligence, with full knowledge that Rambler was the legal owner of the entire NGINX Enterprise, including Pre-Exit NGINX Plus,

1    and assuming the risk that one day there would be a dispute over the ownership of the NGINX

2    Enterprise.

3         280.    The Team was unable to procure any agreement or other legal document evidencing

4    Rambler's knowing waiver of its ownership rights to Open Source NGINX, Pre-Exit NGINX Plus

5    and the NGINX Enterprise.  To the contrary, under applicable Russian law Rambler was the owner

6    of same as explained in greater detail below.

7         281.    The so-called due diligence performed by Runa Capital, BV Capital and Greycroft

8    were defensive in nature to ascertain if anything could be done to mitigate the risk of Rambler later

9    discovering and filing suit over the misappropriation of the NGINX Enterprise.  Upon information

10   and belief, Greycroft determined that the risk was too great and backed out of the Series A funding.

11   Runa Capital and BV Capital went forward and agreed to fund the Team that had purloined the

12   NGINX Enterprise, including Pre-Exit NGINX Plus, from Rambler.

13        282.    In sum, while Sysoev and Smirnoff were still employed at Rambler, the Team had

14   developed and tested Pre-Exit NGINX Plus, incorporated its company, opened a San Francisco

15   office, closed its first round of venture capital, and signed up Netflix as a paying customer.

16   **The Disloyal Employees Misrepresented Their Intentions to Rambler When They Separated**

17        283.    While Konovalov left Rambler on April 29, 2011, Sysoev did not separate from

18   Rambler until December 2011 and Smirnoff did not resign from Rambler until November 2012.

19        284.    Notably, the Disloyal Employees misrepresented to Rambler the reasons for their

20   separation from the company and their future intentions.

21        285.    In or about late April 2011, Konovalov and Sysoev separately met in-person with

22   Rambler's Human Resources Director Julia Shulga concerning their resignations from Rambler.  As

23   part of his exit interview process, Konovalov informed Shulga that he and Sysoev were going into

24   business together and forming a new company that would provide support services to the existing

25   Open Source NGINX for third-parties.   Konovalov falsely characterized their intentions as purely

26   an open source project that was not a profitable enterprise based on commercial add-on products.

27

28

286.    In Sysoev's separate meetings with Shulga and Smirnoff (his direct superior), Sysoev agreed to Rambler's request to remain employed until the end of 2011 and he reaffirmed that his future endeavors with Konovalov would not compete with Rambler and that they were exclusively related to Open Source NGINX.

287.    Neither Konovalov nor Sysoev disclosed that the Disloyal Employees had developed Pre-Exit NGINX Plus and the NGINX Enterprise at Rambler.  Nor did Konovalov or Sysoev disclose that Sysoev had already licensed Pre-Exit NGINX Plus, or portions thereof, to private customers in exchange for cash payments and that the Team already was pursuing additional customers for Pre-Exit NGINX Plus, forming entities outside of Russia that would gain control of the purloined NGINX Enterprise, and that the Team was actively raising capital in furtherance of their conspiracy to grow and then sell the misappropriated NGINX Enterprise, including Pre-Exit NGINX Plus.

288.    Rambler's management relied on Konovalov and Sysoev's misrepresentations because no one at Rambler besides the Disloyal and Rambler Employee Conspirators were aware that NGINX Enterprise, including Pre-Exit NGINX Plus, was conceived and developed within the NOC department while the Disloyal Employees were employed at Rambler.

289.    Moreover, Rambler utilized Open Source NGINX as an internal tool to solve the company's problems in hosting the large volume of web traffic in Russia and the CIS territories. Rambler never undertook efforts to monetize or commercialize Open Source NGINX based on Konovalov's representations to the company that Open Source NGINX had no value.  As Rambler's CTO, Konovalov was responsible for the development of Rambler's technological products (including software) and he was the officer responsible for advising the other senior management and the board of directors about corporate opportunities arising from concepts and projects developed at Rambler by its employees.

290.    Between 2009 – 2011, numerous Rambler officers asked Konovalov whether Open Source NGINX had any commercial value for the company.  Konovalov consistently informed the Rambler board of directors, CEO (Nikolai Molibog), Chief Product Officer (Maxim Azarov), Andrey Terekhov (Chief Financial Officer), Pavel Rogozhin (Director of Development and Distribution),

Sergei Khrusov (Commercial Director) and General Counsel (Ulyana Antonova) that Open Source NGINX software had no value beyond its internal utility to Rambler to resolve unique technical issues associated with Rambler's web hosting and internet streaming services.

291.    For years leading up to his departure from Rambler, Konovalov had been listing Open Source NGINX on Rambler's books and records as virtually worthless.  In preparation for Rambler's internal financials in 2010 and 2011, Konovalov provided a "no value" designation to Open Source NGINX.  Nor did Konovalov make any reference to Pre-Exit NGINX code developed and/or implemented at Rambler.

292.    During that period, Konovalov also concealed the fact that Sysoev and Smirnoff had already developed software code comprising Pre-Exit NGINX Plus, which the Team intended to commercialize for Team's own benefit, notwithstanding Rambler's ownership of all copyright and other rights inherent therein and/or appurtenant thereto.

293.    Konovalov repeatedly stated to the Rambler management identified above over the approximate two and one-half years period (2009-2011) that Open Source NGINX's only value to Rambler beyond its internal utility was Sysoev's successive releases of updated Open Source NGINX iterations under a BSD-style license because it publicized the talent of Rambler's programmers, which constituted an effective marketing and recruitment tool to attract top talent to the company.  In other words, Konovalov misrepresented to Rambler that Open Source NGINX had no commercial value and could not be monetized – even though Konovalov and the rest of the Team were simultaneously scheming to commercialize Pre-Exit NGINX Plus as part of the Team's "open core" strategy.

294.    During their separate exit interviews, Sysoev and Konovalov fraudulently concealed from Rambler that they were contemplating the prospect of providing proprietary products such as NGINX Plus and add-on services to Open Source NGINX.  In an attempt to avoid triggering suspicion at Rambler, Sysoev and Konovalov couched their statements as aspirational and deeply prospective in nature.  Sysoev and Konovalov did so because they were cognizant of the fact that all

of proprietary rights with respect to Pre-Exit NGINX Plus, including all copyright rights, belonged to Rambler.

295.    As a result of the foregoing misrepresentations and Rambler's belief that no NGINX Enterprise existed or was even possible, Rambler's CEO (Nikolai Molibog) did not object to Konovalov and Sysoev earning an income off of Open Source NGINX as part of their stated consultancy and support work in servicing future customers utilizing Open Source NGINX.  Neither Konovalov nor Sysoev asked Rambler to waive its ownership rights in Open Source NGINX or Pre-Exit NGINX Plus either during their exit interviews or at any time thereafter.  Nor did Sysoev or (or any of the Disloyal Employees) ever notify or claim that Sysoev was the owner of the proprietary rights to Pre-Exit NGINX Plus that he and Smirnoff had developed while they were still employees of Rambler.  The Team's silence on this point is in keeping with Sysoev's numerous public statements in which he merely claimed that he wrote, and was the author of, Open Source NGINX (as per the author-ownership dichotomy provided for under Russian law) as well as his public silence about ownership rights in Pre-Exit NGINX Plus.

296.    In reality, the Disloyal Employees were already executing their scheme to lift the entire NGINX Enterprise, including Pre-Exit NGINX Plus, away from Rambler and transfer it to their newly formed NGINX BVI entity.  The Disloyal Employees never disclosed to Rambler that they misappropriated the proprietary software code they had developed that would be publicly released as "NGINX Plus".

297.    Konovalov, Sysoev and Smirnoff all owed contractual and statutory fiduciary duties under Russian law to disclose their intentions and actions with respect to the Team's conspiracy to misappropriate and then sell the NGINX Enterprise, including Pre-Exit NGINX Plus, to a large U.S. technology company.  None of them disclosed their wrongful conduct to Rambler.

298.    When Smirnoff separated from Rambler in November 2012, he participated in an exit interview with Popov and Julia Shulga.   During his exit interview, Smirnoff simply informed Rambler that he was planning on joining Konovalov and Sysoev at their new company NGINX LLC in Moscow performing consultancy and support services for Open Source NGINX.  At this time,

NGINX LLC maintained approximately five employees and the Team had not formally released NGINX Plus.  Nor was Rambler aware of the fact that the Team had formed NGINX entities outside of Russia (i.e., NGINX BVI and NGINX Software, Inc.) or that they had stolen the NGINX Enterprise, or that the Disloyal Employees had developed and stolen Pre-Exit NGINX Plus.

299.    As explained below, Smirnoff remained behind at Rambler for an additional year after Konovalov and Sysoev separated from Rambler to remove and destroy all evidence of the conspirators' actions and to ensure that Rambler never discovered that they misappropriated the NGINX Enterprise, including Pre-Exit NGINX Plus.  During his exit interview, Smirnoff never disclosed his participation in the conspiracy either with respect to misappropriating the NGINX Enterprise or his destruction of at least seven computer servers evidencing the Team's wrongful conduct.

**The Team Concealed its Misconduct from Rambler Including by Destroying Evidence**

300.    In addition to concealing from Rambler that the Disloyal Employees had actively been preparing to steal the NGINX Enterprise, including the Pre-Exit NGINX Plus, from Rambler, Konovalov also made affirmative misrepresentations to Rambler during his tenure as CTO with respect to Open Source NGINX and the Disloyal Employees more generally.  As the CTO of Rambler, Konovalov was responsible for generating regular internal reviews of Rambler's pipeline of technological products for the CEO and Board.

301.    Even though Konovalov and the rest of the Disloyal Employees were fixated on misappropriating the NGINX Enterprise, which they viewed as a highly valuable business, Konovalov uniformly gave the Open Source NGINX software a rating of "1" on a scale of "1-5" with "1" being deemed "worthless" or "no value." Konovalov's designations were designed to and did lull Rambler into complacency with respect to the value of Open Source NGINX and to maintain the status quo at Rambler whereby the Disloyal Employees continued to operate in their own ecosystem, protected by Konovalov from any serious oversight by Rambler's senior management or board of directors.

302.    By way of example, on April 5, 2011, when Konovalov was negotiating the investor Term Sheet for the Team and in the process of resigning from Rambler, the Chief Accountant Elena Sergeeva asked Konovalov to provide a report on Rambler's "Innovations, Patterns & Protections of IP Rights."  As part of this request, the accountant requested that Konovalov fill out the form once again identifying what software programs belonged to Rambler, and rate them in importance on a scale of one to five.

303.    After delaying his response to the inquiry, Konovalov finally submitted a response in mid-April 2011 – roughly two weeks before he left Rambler – in which he fraudulently declined to identify Open Source NGINX as Rambler-owned software.  Instead, Konovalov ranked all NGINX software programs with an "1" for insignificant or no tangible value or importance.  He also failed to mention the existence of Pre-Exit NGINX Plus, which the Disloyal Employees had already developed.

304.    Konovalov fraudulently ranked the NGINX software programs with an "1" even though less than two weeks earlier he had emailed Sysoev an excel spreadsheet on March 30, 2011 with his own internal projections forecasting that he, Sysoev and Alexeev stood to conservatively earn roughly $30 million from the misappropriated NGINX Enterprise if the Team went through two projected rounds of venture capital financing and then sold the NGINX Enterprise for $100 million.  This email and the accompanying spreadsheet were additional documents recovered from Konovalov's deleted emails by Rambler and Lynwood in 2019 after Korotkov's revelations sparked their investigations.

305.    Konovalov was Rambler's CTO and the executive responsible for overseeing Sysoev and his efforts at developing and improving NGINX.  Thus, it was incumbent on Konovalov to advise Rambler what it had with Open Source NGINX and Pre-Exit NGINX Plus, including all of the work product (including existing and software code in development), proprietary information, future business plans and an honest assessment of Open Source NGINX and its enterprise value.

306.    However, in furtherance of the conspiracy, Konovalov concealed the nature, commercial possibilities, and value of Open Source NGINX, as well as the revenue-generating

potential of proprietary extensions to Open Source NGINX that would come to be marketed and sold under the NGINX Plus moniker.  Konovalov's fraudulent misrepresentations to Rambler and fraudulent concealment from Rambler was simultaneous with his and the Team's presentations to potential venture capital backers in which they promoted Pre-Exit NGINX Plus as a fundamental driver of revenue for the NGINX Enterprise.

307.    Konovalov's fraudulent duplicity in his dealings with Rambler were driven by a simple, selfish objective – he wanted the Team to fly below the radar at Rambler so that he and the rest of the Team could quietly steal the NGINX Enterprise, including Pre-Exit NGINX Plus, from Rambler without raising the alarm, solely to enrich himself and the other members of the Team at Rambler's expense upon the sale of the NGINX Enterprise, including Pre-Exit NGINX Plus, to a third-party technology company.

308.    The Team with the assistance of the Rambler Employee Conspirators went to great lengths to conceal their scheme by destroying evidence after they left Rambler.  The Rambler Employee Conspirators in the NOC department (i.e., the NOC software programmers) worked together in a tight-knit department within Rambler devoted to web software product development. The NOC department was just one of numerous product development departments at Rambler but it was the one where Sysoev and his conspirators operated autonomously under the protective cover afforded by Konovalov.

309.    The NOC department was ring-fenced from the rest of Rambler.  The NOC department utilized its own servers, including for internal NOC email communications, and these servers were not integrated with the rest of the company.  The gatekeepers responsible for providing oversight over the NOC department were Konovalov as the CTO, the Deputy CTO Popov, and Smirnoff, who was the Head of the NOC department.  All three of the gatekeepers were active participants in the conspiracy and played central roles in the evidence destruction and concealment of same.

310.    Although Smirnoff managed the NOC department, Konovalov was responsible for the allocation of resources, product development and advising Rambler's board of directors and CEO

of any noteworthy developments from the NOC department or any of the other departments under his office. Konovalov abused his position and provided Sysoev and Smirnoff with Rambler servers for Sysoev and Smirnoff to use in developing Pre-Exit NGINX Plus as the first proprietary commercial add-on software to Open Source NGINX.

311.    No one else within Rambler had access to the Sysoev and Smirnoff "personal servers," which they used to develop Pre-Exit NGINX Plus. Konovalov essentially gifted the servers to Sysoev and Smirnoff for their personal use, in violation of his duties to Rambler and Rambler's ownership rights, so that no one else at Rambler had access to the Pre-Exit NGINX Plus software code or related development-related information stored on them. Sysoev and Smirnoff treated the servers as their personal property, and Smirnoff arranged for their removal from Rambler after the Disloyal Employees departed Rambler as part of his extensive coverup activities.

312.    Furthermore, Konovalov provided Sysoev, Smirnoff and the Rambler Employee Conspirators with additional servers where the Rambler Employee Conspirators assisted Sysoev and Smirnoff in testing and evaluating the proprietary Pre-Exit NGINX Plus code. Konovalov's ability to clandestinely arm Sysoev, Smirnoff and the Rambler Employee Conspirators with Rambler infrastructure to enable them to develop software on company time and expense (while being full-time employees) was successful because Deputy CTO Popov, who was responsible for ensuring the integrity of Rambler's equipment and recordkeeping of same, was compromised and formed part of the conspiracy.

313.    Popov's tenure as Rambler's Deputy CTO began in 2008. Popov's responsibilities have included operating Rambler's enormous server farm in excess of ten thousand servers, the organization of server placement in the company's data centers, repair of servers and server equipment and the subsequent disposal of servers. Popov was responsible for the recordkeeping, chain of custody forms and inventory documentation of all Rambler company equipment. In short, Popov is the key employee who could identify the location and purpose behind a piece of Rambler equipment.

314.    Konovalov enlisted select Rambler employees including Smirnoff, Popov and Chesnokov into the conspiracy in late 2008/early 2009. Konovalov directed Popov not to record or otherwise memorialize in Rambler's records that he had provided Sysoev, Smirnoff and the Rambler Employee Conspirators with seven servers in late 2008/early 2009 that the conspirators would use to develop Pre-Exit NGINX Plus, NGINX Open Source, and other NGINX-related code.

315.    Popov complied and along with Smirnoff deleted these seven servers from Rambler's inventory of active servers among Rambler's server farm of ten thousand. Therefore, there was no record of these seven "personal" servers in Rambler's records and no ability for someone other than Popov, the Disloyal Employees or the Rambler Employee Conspirators to reconcile them back to the conspirators who were utilizing them in furtherance of developing Pre-Exit NGINX Plus.

316.    Separately, the NOC department used its own server that hosted its own email system for intra-NOC department communications and for hosting NOC-related software developmental work. This server was the Yam Server and it was not integrated with Rambler's company-wide server. Therefore, if an email communication was sent between Sysoev and one of the Rambler Employee Conspirators in the NOC department, said email existed only on the Yam Server and not on Rambler's company-wide Microsoft Exchange server. The Disloyal Employees and Rambler Employee Conspirators also maintained their regular Rambler email addresses that were hosted and integrated on the company-wide Rambler Microsoft Exchange server. However, as explained below, the Disloyal Employees and Rambler Employee Conspirators did not use the Rambler Microsoft Exchange server to communicate regarding the conspiracy to steal and sell the NGINX Enterprise, including Pre-Exit NGINX Plus.

317.    The ring-fenced nature of the Yam Server was known only to the Disloyal Employees, Rambler Employee Conspirators (including Popov) and Rambler's Chief Information Officer, Korotkov (until his termination).    It was a legacy holdover feature from successive mergers and acquisitions involving other Russian technology companies that Rambler had acquired. Konovalov ensured that he and the few Rambler Employee Conspirators outside of the NOC department were provided with email accounts hosted on the Yam server so that the Disloyal Employees and Rambler

Employee Conspirators were able to communicate and operate in furtherance of their conspiracy without detection by Rambler.

318.    Between September 2011 (when the Team entered into a customer agreement with Netflix and secured their first round of venture funding) and November 2012, Smirnoff coordinated the removal and destruction of all the servers used by the Disloyal Employees and Rambler Employee Conspirators to develop the NGINX Enterprise, including Pre-Exit NGINX Plus.  Popov, who remained at Rambler after the Disloyal Employees and Rambler Employee Conspirators all joined NGINX LLC in staggered stages, concealed the existence of these servers when Rambler performed investigations in 2012, 2014 and again in 2019 into Sysoev's and Konovalov's tenure at Rambler.

319.    For example, on September 20, 2011, Konovalov, who had already separated from Rambler, emailed Popov and Sergey Chesnokov (one of the Rambler Employee Conspirators) and copied Sysoev.  Konovalov directed Chesnokov and Popov to urgently remove one of the Rambler servers that hosted the "unique data" and provide it to one of the Team's representatives (Oleg Bunin) who stood ready to personally pick up the server from Rambler.  Chesnokov replied that he would remove and deliver the server to Bunin.

320.    On January 24, 2012, immediately after Sysoev separated from Rambler, another Rambler Employee Conspirator from the NOC department (Alexey Loginov) emailed Smirnoff and Rambler Employee Conspirator Alexander Postnikov at 2:53 AM to confirm that he "cleaned the discs on yam.park.old, it is now possible to dissemble it and send it to storage."  The "yam.park.old" server, of course, is the same Yam Server that contained the ring-fenced NOC department emails and other NGINX-related information.  Following whistleblower Korotkov's disclosures, Rambler and Lynwood found the Yam Server in the Summer of 2019, disconnected and idle, in an off-site Rambler server farm, with its data wiped and in queue for dismantlement.

321.    On March 16, 2012 at 3:21AM, Smirnoff emailed Postnikov and requested that one of Sysoev's servers be removed and personally handed to him at a provided address.  Smirnoff wrote: "Please take out of the rack and without dissembling bring it to Danilovskaya Manifaktura and hand

over to me personally."  Smirnoff identified the location server in question as "Internal 2027" on Rack "I41008 I18I1BZDW60200264" in order for Postnikov to locate and retrieve for Smirnoff.

322.    On April 8, 2012 at 4:45AM, Smirnoff emailed Postnikov to inform him that Smirnoff removed the "other NOC Server from the server room" located at the first floor of building 3 of Rambler.

323.    On November 13, 2012, which was the day following Smirnoff's resignation from Rambler, Smirnoff emailed Anton Ermolaev (another Rambler Employee Conspirator) with instructions on how to handle four Rambler servers: (i) glebius.int.ru1U; (ii) behemoth.ramtel.ru 1U; (iii) glebius.int.ru.old 2U; (iv) jujik.ramtel.ry.1U.    Smirnoff instructed Ermolaev to store the first two servers until Smirnoff could take possession of them and to scrap the other two servers.

324.    In or about December 2012, the remaining Sysoev "personal server" (Server 2779), which hosted Sysoev's NGINX software code and related work product was wiped of all its data by Oleg Mamontov (another Rambler Employee Conspirator) at the instruction of Sysoev and the wiped server was donated to Moscow State Technological University ("Stankin").

325.    None of the servers above were returned by the Team and only the Yam Server was found by Rambler and Lynwood in the course of their internal investigation in 2019 after Korotkov blew the whistle on the Defendants.  The exemplar emails above detailing the stolen and destroyed Rambler servers were obtained from the forensically restored emails stored on the Yam Server.  The Yam Server had all its data deleted.  After it was located, Rambler suggested to Lynwood that it hire a specialist outside forensics firm to forensically restore the data on the Yam Server.  Lynwood hired Group iB, a leading global forensics investigations firm to restore the data on the Yam Server and whose findings informed Lynwood and Rambler of the Defendants' actions.

326.    None of the stolen servers or the Yam Server were recorded in Rambler's inventory logs by Popov.  In fact, the only reason Rambler and Lynwood are aware of the stolen servers was because of Korotkov's disclosures and their own internal painstaking investigation that included an in-person manual review of the servers at Rambler's various facilities to reconcile the information contained in the restored Yam Server emails against Rambler's equipment on hand.  In other words,

these servers did not appear in Rambler's inventory records despite the fact that they were company property.

327.    The lack of inventory records evidencing the existence and subsequent removal of the Rambler servers was deliberate and the result of Popov's and Smirnoff's actions taken to assist the Team in concealing their actions.  Popov took direction from Konovalov, Sysoev and Smirnoff, including after they separated from Rambler, to ensure that Rambler never discovered that the Team misappropriated the NGINX Enterprise, including Pre-Exit NGINX Plus.  Indeed, Rambler undertook two prior investigations before Korotkov came forward in 2019 and found nothing suspicious precisely because the Rambler Employee Conspirators had successfully covered up the Team's wrongful actions.

328.    After Sysoev left Rambler in December of 2011, Rambler's CEO directed that a review of Sysoev's and Konovalov's emails be conducted and sought confirmation that they had returned all company equipment.  Smirnoff, Chesnokov and Popov falsely reported to Rambler's management in 2012 that nothing out of the ordinary was found in such review and no equipment appeared to be missing from Rambler.  At Smirnoff's direction, Popov and Chesnokov failed to disclose to Rambler's management that the Disloyal Employees' communications and Pre-Exit NGINX Plus proprietary code were hosted on the NOC servers and not Rambler's company-wide servers, which contained the innocuous communications from Konovalov and Sysoev with Rambler employees at large.

329.    In the second-half of 2014, Sysoev appeared in local Russian industry journals that extolled his programming talent for writing Open Source NGINX.  Although the Russian industry journals did not mention NGINX Plus, Rambler at the direction of its majority shareholder A&NN Group (of which Lynwood was then a member) decided to perform another review of Sysoev and Konovalov's emails and a review of the company's equipment inventory records given the attention he was receiving in Russia over Open Source NGINX.

330.    In keeping with A&NN Group's instruction, Rambler's new CEO directed that such review once again be undertaken. However, the review of Sysoev's and Konovalov's Rambler company emails hosted on the Exchange Server revealed nothing unusual or suspicious.

331.    Neither Rambler nor Lynwood knew of the Yam Server and that it contained the Disloyal Employees' communications concerning their misappropriation of the NGINX Enterprise, that its data had been deleted without being backed up on any other Rambler server, and that it had been deactivated and placed in queue for dismantlement without any identifier information so that all of the information hosted on the Yam Server could never again be recovered.

332.    As explained further below, Popov sought to protect the Team once more in the summer of 2019 after Korotkov blew the whistle on the Defendants and provided Rambler and Lynwood with the particulars of the conspiracy.  However, Korotkov's disclosures sparked an internal investigation by Rambler and Lynwood that ultimately revealed that Popov was close to both Konovalov and Sysoev and that contrary to his prior denials to Rambler, was found on email communications with the Disloyal Employees plotting with them to cover up their development and theft of the NGINX Enterprise, including Pre-Exit NGINX Plus.

**Robertson Joins the Conspiracy and the NGINX Enterprise, including Pre-Exit NGINX Plus, Gets Positioned for a Sale to a Large American Technology Company**

333.    After the Disloyal Employees departed from Rambler and after the Team formed the various NGINX entities, the Team, Runa Capital and BV Capital (now E.Ventures) continued to quietly raise outside capital in pursuit of their common plan and ultimate object of their conspiracy – a sale of the NGINX Enterprise, including Rambler's Pre-Exit NGINX Plus, to a large American technology company for their own ill-gotten gains, without any remuneration to Rambler.

334.    Runa Capital and BV Capital, which became shareholders in NGINX BVI as of October 23, 2011, knowingly participated in multiple future rounds of financing to grow the NGINX entities and set the table for the Merger transaction with F5 in 2019.

335.    In addition to Runa Capital and BV Capital's participation in future rounds of financings in October 2013, December 2014 and April 2016, Runa Capital's Dmitry Chikhachev and

1    BV Capital's Thomas Gieselmann also held board seats on NGINX BVI's board of directors up to

2    the time of the company's merger with F5 during which time Chikhachev and Gieselmann

3    participated in material decisions undertaken by NGINX BVI including its public rollout of NGINX

4    Plus that was owned by Rambler.

5         336.    One of the first decisions made by Runa Capital and BV Capital was to convince the

6    Team to hire Defendant Angus ("Gus") Robertson in 2012 to act as the CEO of NGINX Software,

7    Inc., and later NGINX BVI.

8         337.    Runa Capital and BV Capital sought out Robertson because he had experience

9    working in a start-up that culminated in a sale to Microsoft.  Robertson also more recently had been

10   Vice President of Business Development for leading open source software vendor Red Hat.  That

11   made Robertson appealing to Runa Capital and BV Capital as well as the Team.

12        338.    Robertson readily joined the conspiracy, taking an equity stake in the scheme so he

13   would personally profit when the ultimate object of the conspiracy – a sale to a large technology

14   company – was achieved.

15        339.    Through his nearly seven-year tenure with the NGINX Defendants, Robertson gained

16   in-depth knowledge that Open Source NGINX, Pre-Exit NGINX Plus, the NGINX Enterprise and

17   all related business opportunities were conceived of and developed by Sysoev during his employment

18   with Rambler and belonged to, and were stolen from, Rambler.

19        340.    Despite this knowledge, Robertson proceeded to spearhead the unlawful commercial

20   exploitation and ultimate sale of the NGINX Enterprise, including Pre-Exit NGINX Plus, to the

21   exclusion of its rightful owner, Rambler.

22   **Sysoev Coyly Only Asserts Authorship, Not Ownership of Open Source NGINX**

23        341.    From the beginning, Sysoev has been purposefully vague about Rambler's role in the

24   development of Open Source NGINX and what rights, if any, he was claiming in the software or the

25   basis of that claim.  Neither Sysoev nor any of the other co-conspirators ever communicated to

26   Rambler or its representatives or successors to claim ownership rights in Open Source NGINX or

27   Pre-Exit NGINX Plus.  Moreover, Sysoev in multiple interviews with major media outlets

28

throughout the world, repeatedly claimed that he wrote Open Source NGNIX while working at Rambler, but was always silent on the subject of ownership.

342.    Sysoev's downplaying of ownership rights, if any, he may claim in Open Source NGINX began in late September 2004 as he prepared to release it on October 4, 2004 pursuant to the terms of a FreeBSD version of the so-called 2 paragraph Berkeley Software Distribution (BSD) open source license.    After two years of working on Open Source NGINX as part of his Rambler responsibilities, Sysoev, for the first time, inserted a copyright notice in a read-me file in the Open Source NGINX that contained his name and creation dates to show his authorship of the code. Russian law distinguishes between authorship and ownership rights to a work.  Sysoev's choice of words were clearly designed to avoid a confrontation with Rambler over NGINX software ownership rights.

343.    Sysoev chose to use a FreeBSD version of the BSD-style license terms for Open Source NGINX that contains no reference to the term "copyright holder", a term that is included in more popular BSD-style license terms, such as those published by the Open Source Initiative.  The open source license language selected by Sysoev states that Open Source NGINX "… IS PROVIDED BY THE *AUTHOR AND CONTRIBUTORS* 'AS IS'…" and that "IN NO EVENT SHALL THE *AUTHOR OR CONTRIBUTORS* BE LIABLE FOR" consequential damages, etc. (emphasis added). In contrast, the Open Source Initiative 2-paragraph BSD open source license states that the software in question "IS PROVIDED BY THE *COPYRIGHT HOLDERS AND CONTRIBUTORS* 'AS IS', and that "IN NO EVENT SHALL THE *COPYRIGHT HOLDERS OR CONTRIBUTORS* BE LIABLE FOR" consequential damages, etc. (emphasis added).    In this manner, Sysoev could take authorship credit for Open Source NGINX, in accordance with Russian law, while avoiding an express assertion that he was the holder of copyright rights in Open Source NGINX.

344.    Sysoev and his co-conspirators were silent with respect to ownership rights in Pre-Exit NGINX Plus.  Instead of alleging to Rambler or claiming in their public statements that Sysoev or the other Disloyal Employees owned Pre-Exit NGINX Plus, Sysoev and his co-conspirators

1    intentionally kept Pre-Exit NGINX Plus secret from Rambler.  Sysoev and his co-conspirators were

2    always careful not to disclose Pre-Exit NGINX Plus to Rambler or assert ownership therein to

3    Rambler in order to avoid provoking Rambler into taking legal action against them to assert exclusive

4    ownership rights to such software.

5    **The Team Sells the NGINX Enterprise, including Pre-Exit NGINX Plus, to F5 Through a**

6    **Merger**

7    345.    On March 9, 2019, F5 entered into a Merger Agreement (the "Merger Agreement")

8    with NGINX BVI, Neva Merger Sub Limited, a British Virgin Islands company and a wholly owned

9    subsidiary of F5 ("Merger Sub"), and Fortis Advisors LLC, a Delaware limited liability company,

10    as security holder representative (the "Securityholder Representative"), pursuant to which, Merger

11    Sub merged with and into NGINX BVI (the "Merger"), with NGINX BVI surviving the Merger and

12    becoming a wholly-owned subsidiary of F5.

13    346.    Before the Merger, F5 conducted extensive due diligence concerning the NGINX

14    entities and its principals.

15    347.    Most importantly, F5 conducted extensive due diligence concerning Open Source

16    NGINX and its proprietary companion code, NGINX Plus, and their origins, which of course

17    revealed that Sysoev developed Open Source NGINX for Rambler and Pre-Exit NGINX Plus with

18    Rambler's resources while he was employed there.

19    348.    F5 reviewed and analyzed Open Source NGINX and NGINX Plus itself, and therefore

20    F5 knew that Sysoev wrote Open Source NGINX and Pre-Exit NGINX Plus during normal working

21    hours while employed by Rambler – a fact which confirmed that, Open Source NGINX and Pre Exit

22    NGINX Plus were works made for hire that Rambler owned.  Moreover, as to Open Source NGINX,

23    F5, based on its due diligence, knew that Sysoev and/or the NGINX entities had never taken the overt

24    position that they owned Open Source NGINX or Pre-Exit NGINX Plus or its derivatives.

25    349.    F5's review and analysis of Open Source NGINX also revealed that the software code

26    that was released publicly by Sysoev between 2004 and 2011 while employed by Rambler was still

27    in the Open Source NGINX as of 2019 and, indeed, remained the core code driving the functionality

28

of Open Source NGINX.  In fact, more than 75 percent of the source code contained in Open Source NGINX today consists of software code that Sysoev wrote as works for hire while he was employed by Rambler.

350.    Moreover, F5's review and analysis of NGINX Plus and the financials of the NGINX Enterprise necessarily revealed that Pre-Exit NGINX Plus was conceived of, designed and/or written by Sysoev while he was employed by Rambler.

351.    F5 reviewed and analyzed Open Source NGINX and Pre-Exit NGINX Plus, and therefore F5 knew that Sysoev and NGINX entities, including the NGINX Defendants never overtly asserted a proprietary interest in them, either to Rambler or Lynwood or otherwise.  Sysoev certainly never asserted a proprietary interest in Pre-Exit NGINX Plus to Rambler or Lynwood.  Rather, Sysoev kept Pre-Exit NGINX Plus secret from Rambler so that it would not discover and interfere with the conspirators' plan to misappropriate the NGINX Enterprise.

352.    Instead, F5's due diligence revealed that Sysoev and the NGINX entities only asserted authorship of Open Source NGINX under Russian law, a claim that is consistent with Open Source NGINX being a work made for hire that Rambler owned.

353.    F5 also had the opportunity to review Sysoev's admissions that he developed NGINX to solve Rambler problems with Apache which impeded Rambler's ability to handle large quantities of web data and related user traffic.

354.    F5's due diligence revealed that Sysoev and the other Disloyal Employees designed and developed Open Source NGINX and Pre-Exit NGINX Plus while in the employment of Rambler using Rambler resources and in furtherance of their employment responsibilities thereby making Open Source NGINX and Pre-Exit NGINX Plus works made for hire that Rambler owned.

355.    F5's due diligence thus revealed that the Team was seeking to sell a business, including NGINX-related software, that properly belonged to Rambler, not the Team.

356.    After conducting all its due diligence, F5, both legally and ethically, should have declined to close on the Merger transaction so as to not aid and abet the Team's conspiracy to steal

the NGINX Enterprise, including Pre-Exit NGINX Plus and related business opportunities from Rambler in order to sell it to a third-party for a profit.

357.    Instead, with knowledge of the Team's conspiracy, F5 proceeded to provide the Team with substantial assistance toward the end goal of the Team's conspiracy – selling Rambler's NGINX-related business opportunity.  F5 was motivated by its own financial gain in acquiring control of the highly valuable NGINX Enterprise, including NGINX Plus.

358.    The Merger closed on May 8, 2019, as announced by F5.

359.    The result of the Merger is that (i) NGINX BVI became the wholly owned subsidiary of F5, (ii) Merger Sub was merged out of existence and with and into NGINX BVI, (iii) NGINX, BVI was the "surviving corporation" in the Merger and, thus, the separate legal existence of NGINX BVI survived, and continues following, the Merger, and (iv) all of the assets (including property), rights, privileges, powers and franchises of NGINX BVI and Merger Sub and all claims, debts, liabilities and duties of NGINX BVI and Merger Sub becomes the debts, liabilities and duties of NGINX BVI.

360.    Subject to the terms and conditions of the Merger Agreement, F5 paid an aggregate amount of consideration worth approximately $670,000,000 in cash, subject to certain adjustments set forth in the Merger Agreement, for all of the outstanding shares of NGINX BVI (excluding shares (i) owned by NGINX BVI or any subsidiary of NGINX BVI and (ii) held by NGINX BVI shareholders who perfected their dissenters' rights with respect to the Merger) and all of the other outstanding equity securities of NGINX BVI (the "Merger Consideration").

361.    In its Form 10-K filing with the U.S. Securities and Exchange Commission for the fiscal year ended September 30, 2019, F5 allocated what it referred to as the total purchase price of $643,414,000 as follows: $44,494,000 to net tangible assets, $62,500,000 to developed technologies, $12,000,000 to customer relationships, $14,500,000 to trade name, and $509,414,000 to goodwill.

362.    The terms of the Merger Agreement make apparent that F5 was cognizant of the legal risks associated with the history of Open Source NGINX and Pre-Exit NGINX Plus having been

developed by Sysoev and the other Disloyal Employees, while they were employed by Rambler, during work hours and with the resources and facilities of Rambler.

363.    In its 8-K SEC filing in connection with the Merger, F5 described how, upon consummation of the Merger, "certain of Nginx's former security holders will undertake certain indemnity obligations."

364.    In addition, F5 stated, "at the closing of the Merger, F5 will deposit with an escrow agent (i) $2,000,000 of the Merger Consideration to fund potential payment obligations of certain former securityholders of NGINX BVI with respect to a post-closing purchase price adjustment, and (ii) 1% of the Merger Consideration to fund potential post-closing indemnification obligations of certain former securityholders of NGINX BVI, on the terms and conditions set forth in the Merger Agreement."  F5 added that it had obtained an insurance policy "[t]o supplement the potential post-closing indemnification obligations for breaches of Nginx's representations and warranties and certain other matters…."

365.    The Merger Agreement also recites that as a condition and inducement to F5's willingness to enter into the agreement, each of the "Founders", "Key Executives" and "Key Employees" was simultaneously entering into employment agreements with F5, "(including proprietary information and inventions assignment agreements)".  As a further condition of F5 entering into the Merger Agreement, each of the Founders and Key Executives also entered into a "Holdback Agreement" with F5.

366.    Defendant Konovalov, co-founder of NGINX BVI, is now Vice President of Engineering for F5.

367.    Defendant Sysoev, co-founder of NGINX BVI, became a Senior Architect at F5. According to public announcements, he left F5 on or about January 18, 2022.

368.    Defendant Alexeev, co-founder of NGINX BVI, is listed as the Product Owner for NGINX Amplify.

369.    Defendant Robertson, NGINX BVI's CEO, became a Senior Vice President of F5 and General Manager of the NGINX business for F5.  Robertson left that position in or around November 2021.

370.    Defendant Dounin, a longtime employee of NGINX BVI, became a Principal Software Engineer for F5.  He left that position in 2022.

371.    The Merger Agreement contains a number of representations and warranties provided by NGINX BVI to F5 and the "Merger Sub" concerning intellectual property-related matters.  For example, NGINX BVI represents and warrants that each person who contributed to "Company IP" has executed an irrevocable assignment of intellectual property to NGINX BVI; that "no Employee or former employer of any Employee has any claim, right or interest in or to any Company IP; and that "no employee or independent contractor of the Company or any Subsidiary is in breach of any Contract with any former employer or other Person concerning Intellectual Property Rights or confidentiality."

372.    A number of the representations and warranties in the Merger Agreement involve or encompass what the agreement defines as "Company Product", a term that is defined as "...each and every product or service marketed, licensed, or sold by the Company or any Subsidiary at any time and any product or service currently under development by the Company or any subsidiary, including nginx (open source), NGINX, NGINX Plus, NGINX Amplify, NGINX Controller, NGINX Unit."

373.    Article IX of the Merger Agreement is entitled "Post-Closing Indemnification." Section 9.1 provides, among other things, that representations and warranties regarding intellectual property matters survive the closing of the transaction for four years.

374.    Upon information and belief, F5 negotiated the Post-Closing Indemnification obligation from NGINX BVI because F5 had actual knowledge from its own due diligence that Sysoev wrote Open Source NGINX and Pre-Exit NGINX Plus while he was a Rambler employee and that the NGINX Enterprise was owned by Rambler (not NGINX BVI).  Like Runa Capital and BV Capital, however, F5 was willing to proceed with the acquisition of the NGINX Enterprise and take a calculated risk that Rambler would not pursue its ownership rights in the future, but it protected

itself by negotiating an indemnity from NGINX BVI for any breaches in NGINX BVI's representations and warranties regarding the NGINX intellectual property.

**F5 Heavily Markets and Monetizes Open Source NGINX and NGINX Plus**

375.    In announcing its acquisition of NGINX, F5 announced it "will maintain the brand with current NGINX CEO, Gus Robertson, and founders, Igor Sysoev and Maxim Konovalov, joining F5 to continue to lead NGINX."

376.    F5 further stated: "Together, F5 and NGINX will enable multi-cloud application services across all environments, providing the ease-of-use and flexibility developers require while also delivering the scale, security, reliability and enterprise readiness network operations teams demand."

377.    F5 stated it was "committed to continue innovation & investment in the NGINX open source project."

378.    F5 noted that at the time of the merger, "375 million sites globally run on NGINX," including "60% of the busiest 100k sites run on NGINX."

379.    F5 further stated that NGINX BVI "founded in 2011," had collected approximately $26 million in revenue in calendar year 2018, which represented a sixty-five percent growth in revenue levels from the previous calendar year.

380.    F5 has publicly stated that "NGINX…extends our reach to cloud-native and microservices environments and extends our role into application servers, web servers, and API gateways."

381.    According to F5:

Under the NGINX brand we offer: * NGINX Plus, an all-in-one load balancer, web server, content cache, and API gateway for modern applications. * NGINX Controller, which provides centralized monitoring and management for NGINX Plus.  We believe the combined forces of F5 and NGINX will enable multi-cloud application services across a broader range of environments than either company could have addressed independently, providing the ease-of-use and flexibility developers require while also

delivering the scale, security, reliability, and enterprise readiness network operations teams demand.

382.    F5 is exploiting the newly acquired NGINX Enterprise in a number of ways.

383.    One way is through licenses to customers, on a subscription basis or per-instance basis, of NGINX Plus, *i.e.,* Pre-Exit NGINX Plus and its derivatives.

384.    According to F5, NGINX Plus is a software load balancer, web server, and content cache built on top of Open Source NGINX. NGINX Plus has exclusive enterprise-grade features beyond what's available in the open source offering, including session persistence, configuration via API, and active health checks.  As F5 advertises, "[u]se NGINX Plus instead of your hardware load balancer and get the freedom to innovate without being constrained by infrastructure."

385.    NGINX CONTROLLER is a cloud-native, secure, and high-performance application delivery platform.

386.    NGINX UNIT is an App server, HTTP server, and reverse proxy that is designed from scratch around the needs of distributed applications.

387.    NGINX WAF is an App firewall providing security software for Apps by stopping SQL injection, LFI, RFI, and almost any Layer 7 attack—based on the widely used ModSecurity open source software.

388.    NGINX CONTROLLER, NGINX UNIT and NGINX WAF are dependent on and operate in conjunction with NGINX Plus.

389.    The scope of F5's market share in the open-source web server space, particularly after its acquisition of NGINX, is massive.  As F5 states in its Corporate Flyer, "[w]hen you combine F5's and NGINX's expertise powering more than half of the world's applications across all types of environments, with Shape's insight from mitigating one billion application attacks per day, you have a company that knows how to deliver and secure more applications, and more value, than any company in the industry."

390.    F5 describes NGINX Plus as "a software load balancer, web server, and content cache built on top of open source NGINX" – the same features and functionality that was included in Pre-

Exit NGINX Plus and that the Team had touted to potential venture capital investors starting in 2009 and early 2010.

391.    NGINX Plus has "exclusive enterprise-grade features beyond what's available in the open source offering, including session persistence, configuration via API, and active health checks." Such features were developed as part of Pre-Exit NGINX Plus by the Disloyal Employees before they departed Rambler.

**A Whistleblower Comes Forward to Rambler Revealing the Conspiracy**

392.    In the wake of the F5 Merger, during the late spring of 2019, Rambler was approached by Korotkov.

393.    Korotkov, having been cut from the Team despite his early efforts on their behalf, blew the whistle on the conspiracy and scheme.

394.    Korotkov informed Rambler that the Disloyal Employees conspired to conceal from Rambler that Open Source NGINX and Pre-Exit NGINX Plus were developed by Sysoev and the Disloyal Employees while they were still employed at Rambler and at Rambler's expense.

395.    Korotkov informed Rambler that the Disloyal Employees conspired to conceal from Rambler the value of Open Source NGINX and Pre-Exit NGINX Plus, and more generally the NGINX Enterprise.

396.    Korotkov further informed Rambler that the Disloyal Employees actively concealed their work on Open Source NGINX, Pre-Exit NGINX Plus, and the NGINX Enterprise during their employment with Rambler.

397.    Korotkov also explained that Konovalov's position as CTO facilitated the Disloyal Employees' concealment of their work on Open Source NGINX and Pre-Exit NGINX Plus as well as the pervasive concealment of the true utility and value of the NGINX Enterprise to Rambler.

398.    Korotkov also disclosed to Rambler that during their employment with Rambler, the Disloyal Employees conspired to and consistently did conceal from Rambler the commercialization and monetization they recognized for Open Source NGINX and Pre-Exit NGINX Plus, which they had exploited and were planning to further exploit.

1     399.   Korotkov further disclosed to Rambler that the Disloyal Employees developed Open

2    Source NGINX and Pre-Exit NGINX Plus during their work hours utilizing Rambler's infrastructure.

3     400.   In addition, Korotkov disclosed to Rambler that, in furtherance of their conspiracy,

4    the Team directed Smirnoff who stayed behind at Rambler to help the Team cover their tracks, to

5    misappropriate and then destroy the servers in the hope that it would conceal their scheme to steal

6    the NGINX Enterprise, including Pre-Exit NGINX Plus, from Rambler.

7     401.   Korotkov also disclosed to Rambler and Lynwood where to investigate to find any

8    remaining evidence of the Disloyal Employees' wrongful conduct.  Specifically, Korotkov informed

9    Rambler and Lynwood of the importance of the NOC department and its ring-fenced servers for

10   hosting relevant information regarding the NGINX Enterprise.  Neither Rambler's nor Lynwood's

11   senior management knew of the NOC department's Yam Server.

12     402.   Prior to Korotkov's disclosures, Rambler did not have reason to, and did not,

13   understand the scope or value of the Disloyal Employees' work on Open Source NGINX and Pre-

14   Exit NGINX Plus code, which was developed at the expense and risk of Rambler, but under the

15   office of Konovalov.

16     403.   With the cover of reporting to Konovalov, the Disloyal Employees were able to

17   successfully conceal the utility, scope, and value of the NGINX Enterprise from Rambler.

18     404.   Immediately after Korotkov's disclosures, Rambler and Lynwood conducted

19   extensive investigations regarding the whistleblower's assertions.

20     405.   Rambler and Lynwood's extensive investigations confirmed the veracity of the

21   whistleblower's assertions, and this lawsuit followed.

22   **Lynwood Acquires Rambler's Rights to Open Source NGINX, Pre-Exit NGINX Plus, The**

23   **NGINX Enterprise, Related Intellectual Property Rights, and The Claims Asserted Herein**

24     406.   Lynwood's former name prior to January 2, 2015 was A&NN Holdings Limited

25   ("A&NN Holdings").  From 2013 until December 2014, A&NN Holdings indirectly owned 25% of

26   Rambler while another 25% of Rambler was owned by A&NN Holdings' sister companies.  A&NN

27   Holdings and its sister companies together formed a part of A&NN group of companies ("A&NN

28

1    Group"). From 2013, A&NN Group was not only a 50% shareholder of Rambler but also a managing

2    partner of Rambler.

3        407.    In January 2015, Lynwood ceased to be an indirect shareholder but A&NN Group

4    remained a 50% shareholder of Rambler and would go on to increase its ownership stake to 100% in

5    2017. Tekso Holdings Limited (one of the companies that comprised part of A&NN Group in 2017)

6    sold its approximate 50% stake in Rambler in July 2020.

7        408.    Lynwood is a seasoned holding company that invests in a variety of industries across

8    Europe.

9        409.    In the second-half of 2014, Sysoev appeared in industry specific media outlets to give

10   interviews concerning his authorship of Open Source NGINX, which was gaining popularity. In

11   those interviews, Sysoev did not mention the Team's "open core" strategy, the existence and

12   commercialization of NGINX Plus, or the fact that Pre-Exit NGINX Plus was developed and tested

13   by the Disloyal Employees prior to their departure from Rambler and was the basis of NGINX Plus.

14   Nevertheless, as Rambler's largest shareholder and its managing partner at the time, A&NN Group

15   asked Rambler to investigate its records concerning Sysoev and Konovalov and the development of

16   Open Source NGINX.

17       410.    In January 2015, Rambler reported back to Lynwood (post-separation from A&NN

18   Group) that its investigation revealed nothing out of the ordinary and that Sysoev's and Konovalov's

19   email communications concerning Open Source NGINX centered on Rambler's internal usage of

20   Open Source NGINX to solve its web traffic issues.

21       411.    Neither Rambler nor Lynwood knew of Pre-Exit NGNIX Plus, let alone that it and

22   the NGINX Enterprise, including software comprising Pre-Exit NGINX Plus, had been conceived,

23   developed and tested at Rambler before the Disloyal Employees left Rambler.

24       412.    Moreover, Rambler and Lynwood could not have known in 2015 that the reason their

25   investigation did not uncover the Disloyal Employees' conspiracy to steal the NGINX Enterprise,

26   including Pre-Exit NGINX Plus, was that the Team, together with the Rambler Employee

27   Conspirators, had deliberately walled themselves off in the NOC, separate from the rest of Rambler,

28

and that they had meticulously covered up their misdeeds by deleting revealing emails and other electronic files, removing, relocating and dismantling incriminating servers, and routing conspiracy-related email traffic through the Yam Server domain.

413.    Nevertheless, Lynwood understood that Konovalov and Sysoev held important positions at Rambler, which gave both of them (especially Konovalov) access to Rambler's confidential information.  Given the importance of their former positions at Rambler and the fact that Sysoev was now appearing and giving interviews on his authorship of Open Source NGINX, Rambler and Lynwood prophylactically entered into an Assignment Agreement, dated January 15, 2015 and amended on January 23, 2015 (the "2015 Assignment").  The 2015 Assignment assigned Rambler's employment and intellectual property rights to Lynwood for enforcement in the event Sysoev or Konovalov would ever claim an ownership right to NGINX or had previously engaged in any illicit or wrongful conduct vis-à-vis their employment obligations or Russian law as it concerned Rambler and its proprietary information and products.

414.    At that time, however, neither Rambler nor Lynwood were aware that the Disloyal Employees had conceived and developed the NGINX Enterprise, including Pre-Exit NGINX Plus while in the employment of Rambler.  Moreover, neither Sysoev nor any of the other Disloyal Employees had ever claimed to Rambler that Sysoev owned (as opposed to authored) Open Source NGINX or Pre-Exit NGINX Plus or its derivatives.

415.    At that time, Rambler and Lynwood were also unaware of the value of the NGINX Enterprise precisely because Konovalov had consistently given it a "1" or worthless value in his internal reports as the company CTO responsible for product development and because neither Konovalov nor Sysoev ever disclosed the scope and magnitude of the Open Source NGINX project or the Pre-Exit NGINX Plus project that the Disloyal Employees were working on at Rambler; and also because the Disloyal Employees removed the servers containing the NGINX-related work product in 2012 before Smirnoff left Rambler.  Moreover, Rambler had previously directed Popov and Chesnokov  to perform a review of Sysoev and Konovalov's emails and to ensure that they had returned their Rambler equipment, with no revealing evidence of wrongdoing to show for it.

Unbeknownst to Rambler and Lynwood, Popov, Chesnokov and the other Rambler Employee Conspirators were active participants in the Team's conspiracy and concealed from Rambler that the Team had misappropriated the NGINX Enterprise, including Pre-Exit NGINX Plus.

416.    Therefore, as of January 15, 2015, Rambler reasonably understood it had lost considerable technical talent with Sysoev's departure, but it reasonably did not suspect that talent was working on a massive heist from Rambler.

417.    It was only after the whistleblower Korotkov came forward in April 2019 and detailed to Rambler and Lynwood the scope of the Team's conspiracy, and informed them, for the first time, of where the incriminating evidence of the conspiracy could be found, including the Yam server, and after Rambler and Lynwood conducted yet another investigation in 2019 based on Korotkov's revelations, that evidence of the Team's conspiracy and massive coverup was finally discovered.

418.    Korotkov's disclosure was the spark that lead Rambler and Lynwood to investigate his assertions and the possibility that Rambler (now Lynwood) had potential claims against the Team and potentially other participants.  Rambler and Lynwood did not simply take Korotkov at his word.  They assumed Korotkov had an axe to grind toward the Team.  However, Korotkov provided Rambler and Lynwood with specific information about the extent to which the Team went to conceal the NGINX Enterprise, including Pre-Exit NGINX Plus, and their misconduct from Rambler.  Thus, Rambler and Lynwood investigated Korotkov's allegations.

419.    It was only after the completion of these time-consuming and expensive forensic investigations that Rambler and Lynwood independently verified and corroborated the information Korotkov provided them in April 2019.

420.    The company-wide investigation that Rambler and Lynwood conducted in 2019, unlike the second-half 2014 investigation, had the game-changing benefit of the detailed conspiracy description and evidence roadmap provided by Korotkov.  It also confirmed that without Korotkov's assistance in describing how the conspiracy was hatched and executed, including by using and then removing servers that were never accounted for in Rambler's inventory records and that no one

1    outside of the conspirators had access to, including an entirely ring-fenced NOC email server (Yam),

2    Rambler would have never discovered the Defendants' misconduct.

3        421.    In Phase 1 of the 2019 investigation, Rambler searched for: email servers that could

4    have contained email traffic for the years 2001 through 2012; backups in Unix infrastructure;

5    inventory    databases;    rm.rambler-co.ru    (new);    invkur.rambler.ru    (old),    and

6    mediawiki.park.rambler.ru (old).  In addition, Rambler storage facilities in Malino, Stupino urban

7    district in the Moscow Region and Ostapoviskiy DC in Moscow were searched to identify any servers

8    that contained storage media and/or unutilized hard disks.  No relevant information concerning the

9    Disloyal Employees' conspiracy was contained in these repositories of information.

10        422.    In Phase 2 of the 2019 investigation, Rambler and Lynwood searched for documents

11    concerning the assignment of tasks related to the development, debugging and testing of Open Source

12    NGINX from 2001 through 2012.  In particular, the Rambler application systems jira.rambler-co.ru

13    and otrs.park.rambler.ru, otrs.park.rambler.ru, and otrs2.park.rambler.ru were analyzed.  No relevant

14    information concerning the Disloyal Employees' conspiracy was contained in these repositories of

15    information either.

16        423.    In Phase 3 of the 2019 investigation, a search was conducted for servers on which

17    Open Source NGINX could have been developed.  During the course of such search, 120 hard drives

18    found in Rambler storage facilities were analyzed.  Once again, no relevant information concerning

19    the conspiracy to steal and then sell the NGINX Enterprise was found.

20        424.    The most significant find, by far, during the 2019 investigation was the Yam Server.

21    In the course of the 2019 investigation, based on specific information from Korotkov, Rambler

22    located the Yam Server, an aging, non-descript server located in an off-site Rambler server farm,

23    disconnected from any network and in queue to be dismantled.  It was discovered that the Yam Server

24    had been used by Disloyal Employees and the Rambler Employee Conspirators to conduct and store

25    internal NOC communications.  The reason that the Yam Server had not been located in late

26    2014/2015 was that it was not identified on Rambler's inventory of servers or anywhere else in

27    Rambler's records.  This omission was by design – the Disloyal Employees, in conjunction with the

28

other Rambler Employee Conspirators, had ensured that the Yam Server was "off the grid" and was not identified in Rambler corporate records.  The 2019 investigation revealed that the Yam Server had been shut down, was no longer in use, and was slated for disposal.

425.    Once the Yam Server was identified, it became a focal point of Phase 4 of the 2019 investigation (i.e., Fall of 2019).  Rambler and Lynwood first examined the Yam Server for any information related to NGINX.  As part of that analysis, it searched for traces of correspondence and/or email boxes of the Disloyal Employees, Popov, Korotkov, NOC personnel and other Rambler software programmers.  While traces of correspondence were found, most mailboxes were not located, *i.e.*, had been removed, or their contents had been mostly or entirely deleted.   Therefore, Lynwood hired outside forensics investigations firm Group iB, a leading cyber forensics firm to restore the Yam server so its contents could be reviewed.

426.    Phase 5 of the 2019 investigation involved extensive searches in Rambler's corporate-wide Exchange email server for mailboxes for those the same individuals and all other key Rambler employees and officers who could have had potential information concerning NGINX from 2001 until 2019, including from backed-up email systems.  The investigation found that the Disloyal Employees' and Rambler Employee Conspirators' Exchange emails contained only the innocuous communications. All of the illicit communications concerning the Disloyal Employees' and Rambler Employee Conspirators' misappropriation of the NGINX Enterprise were hosted and stored on the Yam server, which was walled-off from the Rambler company-wide server and never integrated. Nor was the information on the Yam server backed-up prior to the Rambler Employee Conspirators deleting its data, moving it into an off-site server rack, disconnecting it and slating it to be dismantled.

427.    In other words, Rambler and Lynwood undertook a full-blown internal investigation and uncovered no evidence of the Disloyal Employees' and Rambler Employee Conspirators' actions until they discovered the disabled Yam server in an off-site Rambler server farm, disconnected, with its data wiped, and in queue to be dismantled.  The Rambler internal investigations team only knew to search for the Yam server because of Korotkov's revelations.

428.    Moreover, the 2019 investigation re-confirmed that nothing existed on Rambler's integrated systems in 2012 or second-half of 2014/January 2015 when the company conducted its prior investigations.  The only way Rambler would have discovered the conspiracy is if one of the co-conspirators had blown the whistle, like Korotkov finally did in April 2019.  Instead, Rambler's previous searches in 2012 and second-half 2014/January 2015, unbeknownst to Rambler and Lynwood, had been obstructed by the Rambler Employee Conspirators at the explicit directions of Konovalov, Sysoev and Smirnoff.

429.    While Rambler and Lynwood's internal investigation was underway, Popov was questioned anew by Rambler and Lynwood on May 17, 2019 in light of Korotkov's disclosures concerning the destruction of Rambler servers containing information concerning the development of the NGINX Enterprise.  Popov denied knowledge of finding anything suspicious involving Sysoev and Konovalov and reaffirmed that he exhaustively searched Rambler's records including the company's inventory records and found nothing.  Popov also denied that he assisted the Team in concealing their misappropriation of the NGINX Enterprise and evidence destruction.

430.    After Group iB restored the deleted files stored on the Yam server, Rambler and Lynwood found electronic communications evidencing that Chesnokov and Popov had been actively assisting the Team to conceal their actions from late 2008 until 2019 (at the direction of the Disloyal Employees).  Korotkov's revelations and the post-whistleblower discovery of the contents from the Yam Server also revealed that the Team misappropriated the NGINX Enterprise, including Pre-Exit NGINX Plus, which was conceived and developed at Rambler by the Disloyal Employees.

431.    Based on their own forensic investigatory findings and an internal investigation within Rambler, a new assignment agreement was entered into by Rambler and Lynwood to replace and supersede the 2015 Assignment.

432.    On April 20, 2020, Rambler and Lynwood entered into an Assignment Agreement (the "Assignment"), pursuant to which Rambler on behalf of itself and its affiliates irrevocably assigned to Lynwood any and all rights to Open Source NGINX, Pre-Exit NGINX Plus, all derivative works thereof, and all related intellectual property and business opportunities, as well as any and all

claims for damages arising out of or relating to, Rambler's rights in or to Open Source NGINX, NGINX Plus and intellectual property and related business opportunities, and the exclusive right as the owner thereof, to enforce all rights Rambler holds with respect to all related intellectual property and/or the legal and contractual duties owed to Rambler by Rambler's former employees. The Assignment was authorized unanimously by the Rambler Board of Directors.

433. By virtue of the Assignment, Lynwood owns the cause of action asserted in this Complaint against the Defendants for direct copyright infringement of Lynwood's exclusive copyright rights in and to Pre-Exit NGINX Plus and all derivative works thereof.

**Under Russian Law, Rambler Owned Open Source NGINX, Pre-Exit NGINX Plus and Related Intellectual Property and Business Opportunities**

434. Under Russian law, Open Source NGINX and Pre-Exit NGINX Plus, and all derivative works thereof, were owned *ab initio* by Rambler, the employer of Sysoev, from the moment of its creation, as work made for hire. The applicable Russian law to the Defendants' conduct is law of the Russian Federation from July 9, 1993 "On Copyright and Neighboring Rights" (the "1993 Law") as well as the Law of the Russian Federation from September 23, 1992 No. 3523-1 "On Legal Protection of Computer's Programs and Databases" (the "1992 Law").

435. Both the 1992 Law and the 1993 Law were in effect at the time Sysoev first wrote Open Source NGINX for Rambler in 2001, and continued to govern the Disloyal Employees' misconduct as employees and Rambler's ownership rights (and thus Lynwood's ownership rights) throughout the relevant time period in this Complaint.

436. While Sysoev could rightfully claim under Russian law the right to be identified as the author of Open Source NGINX or Pre-Exit NGINX Plus, or derivatives thereof, neither he nor any other member of the Team could claim the proprietary copyright thereto, which always belonged to Sysoev's employer, Rambler, and is now owned by Lynwood.

437. Sysoev's unauthorized release of Open Source NGINX to the public, under the BSD open source license, and the Team's continued commercial exploitation thereof and of Pre-Exit NGINX Plus and derivatives thereof, eventually through NGINX Software, Inc. and NGINX BVI,

and now through F5, constituted a gross violation under Russian law of Sysoev's and the Disloyal Employees' obligations as employees of Rambler as well as violations of the Rambler Code of Conduct, the Rambler Regulations and Russian civil law provisions governing "works made for hire."

438.    Section 2 of the 1992 Law and Section 7 of the 1993 Law includes programs for computational devices ("computer programs") in literary works and recognizes them as objects of copyright.

439.    Rights related to computer programs arise from the mere fact of their creation (and from the moment of their creation) and do not require separate registration with a relevant government authority (in Russia, – RosPatent).

440.    Section 11 of the 1992 Law and Section 16 of the 1993 Law provides for the owner of copyright to exclusively use and/or dispose of such rights in any way that he or she deems appropriate, provided such use or disposal does not otherwise violate the law.

441.    Copyright under Russian law consists of two elements: (i) the authorship right and (ii) the "exclusive proprietary right" to exploit the work.

442.    Under Section 13 of the 1992 Law, the copyright for a computer program can be registered with RosPatent at any time, but failure to do so does not cancel or undermine the owner's rights.

443.    Under Russian law, protection of the proprietary rights/right of usage of the computer program applies to the program codes, as distinct from the authorship right, and may be assigned, passed on under contract, inherited, or otherwise transferred.

444.    Pursuant to Section 9 of the 1993 Law and Section 13 of the 1992 Law, if the author of the computer program is employed at the time of the computer program creation, then the employer holds the proprietary rights to the program, unless the employee and the employer agree otherwise.  The program then becomes a copyrighted object made while in employment and is then regulated by the applicable provisions of the Russian civil law.

445.    Sections 12 of the Russian Civil Code, Sections 18 & 20 of the 1992 Laws, and Sections 48-49.1 of the 1993 Law provide remedies for the legitimate copyright owner in the event of the breach of copyright, including the recognition of rights, the restitution of the rights as they existed prior to the breach, compensatory damages, and the recovery of damages based on a violation of moral rights.

446.    In addition, Section 20 of the 1992 Law and Section 50 of the 1993 Law provide protection of computer programs by authorizing the issuance of a preliminary protective court order or general civil law compensation provisions.

447.    The basis for filing of the corresponding claim is the actual damage caused to the claimant per Section 15 of the Russian Civil Code and may be recovered in full.

448.    Under Russian law, recoverable damages include costs that the person whose right is breached has incurred and will have to incur in order to remedy the breached right, loss or damage to the property of such person as well as unrealized profits gains that such person should have received if his or right was not violated.

449.    Russia, like the United States, is a signatory to the Berne Convention.

450.    Article 5 of the Berne Convention provides: "Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals," but the "extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed." Berne Convention Art. 5(*l*)–5(2).

451.    Accordingly, with valid copyright claims in hand under Russian law against Defendants, U.S. Copyright law applies to a copyright infringement claim against those parties brought in United States federal courts based on infringing activity that occurs within the United States.

452.    Lynwood meets the standing test of 17 U.S.C. § 501(b), "which accords standing only to the legal or beneficial owner of an 'exclusive right.'"

453.    Where a work was created in a foreign country, the plaintiff's ownership of the copyright in the work is governed by the law of the jurisdiction where the work was "'created' and 'first published.'"

454.    Open Source NGINX and Pre-Exit NGINX Plus were created and/or first published and/or deployed in the Russian Federation, and therefore Russian law is the applicable law to determine issues of ownership of rights.

455.    Under Russian law, Rambler was the owner of Open Source NGINX and Pre-Exit NGINX Plus copyrights when they were developed and when the Team formed NGINX Software, Inc. in 2011.

456.    Sysoev developed Open Source NGINX and Pre-Exit NGINX Plus while Sysoev was an employee of Rambler.

457.    The Sysoev Employment Agreement with Rambler, in pertinent part, states as follows:  "7. WORKS FOR HIRE.  As part of the Employee's performance of his official duties, he may be entrusted with the Business Entity's administration or his or her authorized person to create works that are objects of copyright, such as computer programs and databases. Such works is an official work.  The exclusive property rights of such works belong to the Business Entity."

458.    The Sysoev Employment Agreement with Rambler contains the standard set of rights and obligations under Russian law that replicate the provisions of the Russian Labor Code.  Under Russian law, the copyright in a work made for hire belongs to the employer.

459.    As a matter of Russian intellectual property law, the exclusive proprietary right to work made for hire (in Russian, this is phrased *sluzhebnoye proizvedeniye*) belongs to the employer from the moment the work is created by the employee.

460.    Under Section 14 of the 1993 Law and Section 12 of the 1992 Law, the legal tests for determining the existence of a work made for hire are: (i) whether the work was made in the course of performance by the employee of his or her employment duties or (ii) by a job direction (instruction) issued to the employee by the employer.

461.    Pursuant to Russian law, if the relevant work was created by the employee while in the employer's employment, the exclusive right to commercially exploit the work will therefore automatically pass to the employer regardless of the payment of compensation for such work.

462.    Over nearly 10 years of employment with Rambler, Sysoev had several job titles, all of which at various periods of time involved "programming" and "system administration."

463.    In Russia, employers often rely on general descriptions of the employee's duties and responsibilities provided in the supporting sources such as the Unified Qualifications Register ("EKS").

464.    EKS provides a very detailed account of Sysoev's job description, in particular, when addressing the functions of "Engineer – System Programmer" and "Administrator of the Computer Network."

465.    This description for System Programmer as found in EKS includes "development and tuning of applied program software," "development of software components," "modernization of standard software configurations, devices, networks, protocols and programs," and "participation in the development and [...] design of the new technical media."

466.    For Computer Network Administrator, the EKS description includes "support and, where necessary further work on the program media; development of programs for support of computer networks and network applications."

467.    As even Sysoev has admitted, he developed NGINX to solve issues he observed with Rambler's use of Apache.

468.    Konovalov has previously proclaimed in statements made to the Russian open source community that Rambler is the "Alma Mater of the popular NGINX web-server."

469.    Sysoev, with the active assistance of the other Disloyal Employees, developed, tested, and used NGINX software code that he either subsequently released into Open Source NGINX or incorporated into Pre-Exit NGINX Plus during his normal working hours and within the scope of his employment duties to Rambler.

470. The nginx.org website was hosted on the server hardware belonging to Rambler and at IP addresses belonging to Rambler, including (a) during the period from September 8, 2005 until October 24, 2009, IP address: 81.19.69.70; and (b) during the period from October 24, 2009 until July 28, 2011, at IP address: 81.19.68.137; (both of the aforementioned IP addresses belonged to Rambler).

471. The websites "sysoev.ru" and "nginx.org" were actually hosted on a Rambler server with the inventory number 2779, which from 2002 to 2012, was located in Rambler's server hardware center (Data Center) at the address: 10 Vostochnaya Street, Moscow.

472. The first public version of Open Source NGINX was released by Sysoev in October 2004 without Rambler's authorization, while Sysoev was working full time for Rambler.

473. Open Source NGINX and Pre-Exit NGINX Plus were developed in response to the professional tasks and challenges Rambler faced at a time when approximately twenty percent of overall Russian Internet traffic was routed *via* Rambler servers.

474. By that time, Rambler had launched many on-line products (ranging from photo apps to news to specialized mailing services) that required high levels of website responsiveness and lack of denials of service. Open Source NGINX was an important tool that Rambler used to provide adequate throughput and scalability to address this issue. While Sysoev periodically deployed portions of Pre-Exit NGINX Plus within Rambler to meet Rambler's information technology needs and, more importantly from his perspective, to fully production test it, he withheld it from the public Open Source NGINX repository so that he and his co-conspirators could profit from it when it was fully tested and production-ready to license to third parties in exchange for subscription and service related fees.

475. The Pre-Exit NGINX Plus software was also designed and developed by Sysoev with assistance from the other Disloyal Employees all of whom were employed by Rambler and utilized Rambler's infrastructure and resources in the development thereof.

476. To the extent, if any, that the Pre-Exit NGINX Plus software may not have been fully developed by Sysoev or the Disloyal Employees while employed at Rambler, under Russian law, it

1    is still owned by Lynwood.  Under Russian law, the fact that the employees did not complete the

2    development of the software program does not invalidate an employer's proprietary right to the code

3    as a work made for hire.

4        477.    Under Russian law, Rambler was the owner of all proprietary copyright rights in and

5    to Pre-Exit NGINX Plus, and now Lynwood owns Pre-Exit NGINX Plus, and all derivative works

6    thereof, by virtue of the assignment from Rambler to Lynwood.

7                                    **FIRST CLAIM FOR RELIEF**

8    ***Berne Convention for the Protection of Literary and Artistic Works and the United States***

9    ***Copyright Act (17 U.S.C. § 101, et seq.) Based on Direct Copyright Infringement of Plaintiff's***

10   ***Exclusive Copyrights in Pre-Exit NGINX Plus Against Defendants Konovalov, Sysoev, Alexeev,***

11   ***Dounin, Smirnoff, NGINX BVI, NGINX Software, Inc., NGINX DE, Robertson and F5***

12       478.    Lynwood realleges and incorporates by reference the allegations contained in

13   paragraphs 1 through 477 above as if fully set forth and repeated herein.

14       479.    The Berne Convention for the Protection of Literary and Artistic Works (the "Berne

15   Convention") Article 5(1) provides that "[a]uthors shall enjoy, in respect of works for which they

16   are protected under this Convention, in countries of the Union other than the country of origin, the

17   rights which their respective laws do now or may hereafter grant to their nationals, as well as rights

18   specifically granted by this Convention."

19       480.    The Berne Convention provides further that "[t]he enjoyment and exercise of those

20   rights shall not be subject to any formality; such enjoyment and such exercise shall be independent

21   of the existence of protection in the country of origin of the work."  Berne Convention, Article 5(2).

22       481.    For infringing acts occurring in the U.S., ownership of a copyright right is determined

23   based on the jurisdiction of the creation (*i.e.,* Russia); whether infringement has occurred is evaluated

24   under U.S. copyright law.

25       482.    According to Section 2 of the 1992 Law and Section 7 of the 1993 Law, "programs

26   for computational devices" ("computer programs") are protected under the same copyright

27   regulations as literary works and are entitled to copyright protection.  Rights related to computer

28

programs arise from the mere fact of their creation (and from the moment of their creation) and do not require separate registration or any other formality (i.e., registration with RosPatent).

483.    Section 10 of the 1992 Law and Section 16 of the 1993 Law provides for the owner of a copyright to exclusively use, copy and/or dispose of such rights in any way that the copyright owner, similar to the exclusive rights of a copyright owner set out in the United States Copyright Act, 17 U.S.C. § 106, which rights include the exclusive rights to reproduce the copyrighted work, prepare derivative works based on the copyrighted work, distribute copies of the copyrighted work to the public, and/or display the copyrighted work publicly, provided such use or disposal does not otherwise violate the law.

484.    Under Sections 9-10 of the 1992 Law and Sections 15-16 of the 1993 Law, copyright under Russian law consists of two rights: (i) the authorship right and (ii) the "exclusive proprietary right" to exploit the work.  Unlike the authorship right, the exclusive proprietary right may be transferred, assigned or inherited.  The authorship right under Russian law, on the other hand, is personal to the author and may never be transferred, assigned or inherited.

485.    Pursuant to Section 12 of the 1992 Law, if the author of the computer program is employed at the time of the computer program creation, then the employer holds the proprietary rights to the program, absent an explicit agreement otherwise.  The program then becomes a copyrighted object made while in employment and is then regulated by the applicable provisions of the Russian civil law, 1992 Law, and 1993 Law.

486.    Sysoev, Konovalov and Smirnoff signed, and were legally bound under Russian law, to employment agreements with Rambler, and Rambler internal policies and procedures, which designated everything that they worked on or produced in connection with their job responsibilities to Rambler during their tenure with the company as confidential works made for hire owned entirely by Rambler.

487.    The Disloyal Employees developed Pre-Exit NGINX Plus pursuant to their job duties at Rambler in Russia, and Rambler owned Pre-Exit NGINX Plus based on their employment agreements and/or Russian law.

488.    By 2009, at the latest, the Disloyal Employees and the Team had already commenced their development and commercialization of Pre-Exit NGINX Plus and/or portions thereof.

489.    The Disloyal Employees held back (i.e., did not release as parts of Open Source NGINX) the Pre-Exit NGINX Plus modules that they had conceived and developed at Rambler as part of their employment duties at Rambler prior to their departure from Rambler so that the Team could quickly kick-start their commercial operation with the introduction of such proprietary products to the market promptly after their departure from Rambler.

490.    The Team used the promise of NGINX Plus to help sell their business plan to potential investors.  The venture capital investors such as Runa Capital and BV Capital bought into the plan and funded it, and simultaneously with closing their first round of funding in or around September 2011, the Team and the NGINX Defendants rolled out to Netflix CDN-related custom modules of Pre-Exit NGINX Plus that had been previously developed by the Disloyal Employees while employed by Rambler.

491.    Within twenty-one (21) months of Sysoev's departure from Rambler, with only a skeleton development crew, the Team formally introduced their first tranche of commercial NGINX Plus products, which was the purloined Pre-Exit NGINX Plus code initially conceived and developed by the Disloyal Employees while they were employed at Rambler.

492.    The first formal announcement of the general commercial availability of the initial release of NGINX Plus (a form of which Konovalov acknowledged in his November 2019 GoTech interview was being commercially exploited in 2011 by the Team and the NGNIX Defendants) was issued on August 22, 2013 – just two weeks after Robertson joined NGINX BVI as CEO.  The release notes to that initial "R1" release of NGINX Plus stated: "NGINX Plus is the fully supported, commercial version of NGINX. It includes most NGINX open source modules and adds further features".  Among the "further features" identified as being part of R1 of NGINX Plus were "Application health checks"; "Live activity monitoring (implemented in the Extended Status module)"; "Advanced load balancing"; "On-the-fly reconfiguration of load-balanced upstream

groups"; "Extended logging capabilities"; "High availability setup"; and "Adaptive media streaming".

493.    The NGINX Plus features touted by the Team and the NGINX Defendants in August 2013 were described in further detail more than three years earlier, in the first half of 2010, in the Sysoev-Korotkov Deck that the pair used to solicit venture funds; such feature were also identified in the March 2011 Deck that Sysoev, Konovalev, and Alexeev used to solicit venture funds in 2011, while they were still employed by Rambler and after they jilted Korotkov.  The evidence shows that the features and functionality of commercial NGINX described in those decks and, in turn, all related software code, was in existence, and/or was being developed, as part of Pre-Exit NGINX Plus, at the time those decks were being drafted and presented to venture capital firms.

494.    The R1 Release of NGINX Plus – like all successive NGINX Plus releases – was and are provided to customers of NGINX BVI and NGINX Software, Inc. and, since 2019, F5, in binary, executable form (*i.e.*, not the source code but rather in compiled, binary form that only computers can understand) on a paid subscription basis, along with revenue-generating support services and professional customization services.  Those NGINX Plus products comprise and/or are derivatives of Pre-Exit NGINX Plus.

495.    Defendants' decision to release NGINX Plus in proprietary, pre-built, binary packages only, rather than in source code form that can be understood and manipulated by humans (like Open Source NGINX) was part of what Konovalov described in his 2019 GoTech interview as their "open core" strategy for monetizing Open Source NGINX, which the Disloyal Employees hatched behind closed doors in the Rambler NOC when they were employed there.

496.    NGINX Plus is the linchpin of that "open core" strategy, as highlighted in Defendant Robertson's September 6, 2017 announcement of "NGINX Application Platform", in which he described NGINX Plus as "the commercial variant of our popular NGINX Open Source offering". *See*  https://www.nginx.com/blog/introducing-nginx-application-platform/.    According to the announcement, NGINX Application Platform is a "suite of four products", namely NGINX Plus, NGINX ModSecurity, NGINX Unit, and NGINX Controller, the latter of which was "built to manage

NGINX Plus instances". Thus, the entire NGINX Application Platform suite is centered around NGINX Plus – without NGINX Plus, NGINX Controller and the other commercial NGINX product offerings under the NGINX Application Platform umbrella would not exist. Any and all revenue they generate is due to NGINX Plus.

497. As verified by Konovalov's GoTech interview admissions, while NGINX Plus was not formally announced until August of 2013, Pre-Exit NGINX Plus, and all related software code, had been in development, and had been developed, during the course of the previous several years, and was being licensed by Sysoev for personal gain and/or withheld from Open Source NGINX so that it could be commercialized after the Disloyal Employees stole the NGINX Enterprise, including Pre-Exit NGINX Plus, from Rambler.

498. Based on the Disloyal Employees' employment and separation agreements with Rambler, Rambler internal policies and procedures, and applicable Russian law, Rambler, which has assigned its rights to Lynwood, was the owner, and Lynwood is now the owner by assignment, of all right, title and interest in and to Pre-Exit NGINX Plus and all derivatives thereof, including all copyright rights inherent therein or appurtenant thereto.

499. The Disloyal Employees developed all Pre-Exit NGINX Plus in Rambler's offices in Moscow as part of their job duties.

500. Portions of Pre-Exit NGINX Plus were first used internally at Rambler to run Rambler's operations, and/or licensed to commercial entities located outside the United States, e.g., in Australia, by Fastmail and/or Last.fm, as well as by other foreign-based, "private" customers, prior to being commercially licensed to commercial customers in the United States. None of the Pre-Exit NGINX Plus software was released into the Open Source NGINX repository.

501. Unbeknownst to Rambler, Pre-Exit NGINX Plus was stored on Rambler servers located in Russia.

502. Accordingly, pursuant to the terms of the Berne Convention, Pre-Exit NGINX Plus constitutes a foreign work that is exempt from registration in the United States copyright office as prerequisite for Lynwood to commence this action for copyright infringement.

503.    Rambler has assigned to Lynwood all of its rights, including all intellectual property rights and the right to sue for past and present infringement, and to seek and collect damages, with respect to Open Source NGINX, the NGINX Enterprise, and Pre-Exit NGINX Plus, and all derivatives thereof.

504.    17 U.S.C. § 106 provides a list of exclusive rights the owner of a copyright holds, including the right to copy the work, prepare derivative works, to distribute copies, and other acts.

505.    17 U.S.C. § 501 provides that the owner of a copyright may bring a cause of action against a party who violates the owner's exclusive rights under § 106.

506.    The Defendants have engaged in and are engaging in reckless, blatant, willful, and repeated infringement of Lynwood's copyright rights in and to Pre-Exit NGINX Plus and derivatives thereof, under both international and U.S. law.

507.    The Defendants have reproduced, distributed, offered for sale and/or license, sold, licensed, and/or provided to customers and business partners on a paid subscription basis, Pre-Exit NGINX Plus and derivative works thereof, and have developed and commercialized derivative works thereof, in an unauthorized manner for commercial use, in violation of Rambler's, and now Lynwood's, exclusive rights, in violation of 17 U.S.C. § 106.

508.    Such infringement has occurred both in the United States and internationally, including because individuals and entities in the United States have downloaded Pre-Exit NGINX Plus and derivatives thereof, as well as copied, distributed and created derivative works of same, without Lynwood's or Rambler's authorization.

509.    Further, the Defendants have downloaded Pre-Exit NGINX Plus and derivatives thereof, as well as copied, distributed and created derivative works of same, from their respective offices and servers located in the U.S. and have imported and/or exported such infringing works to and from others throughout the world without authorization via such U.S. offices.

510.    Further, from 2013 through the present, the Defendants, including F5 since the Merger, have introduced 20 or more commercial releases of NGINX Plus and related extensions that

are based on, and to a significant degree are derived from and/or dependent upon, and therefore infringe upon, Pre-Exit NGINX Plus.

511.    The Defendants' conduct has been without the permission, consent, or license of Lynwood or the previous owner of Pre-Exit NGINX Plus.

512.    The Defendants, by virtue of the above-described acts, directly infringed upon Lynwood's copyright rights in and to Pre-Exit NGINX Plus and any derivative works thereof, in violation of 17 U.S.C. § 101 *et seq*., including 17 U.S.C. § 501.

513.    The Defendants' acts of infringement have been willful, intentional, and purposeful, in disregard of, and with indifference to, the rights of Rambler and now Lynwood.

514.    The Defendants will continue their infringing activity throughout the course of this action, further demonstrating their reckless disregard of Lynwood's intellectual property rights.

515.    As a direct and proximate result of Defendants' infringement of Lynwood's copyrights in Pre-Exit NGINX Plus and derivatives thereof, Lynwood is entitled to the election of its actual damages or to statutory damages pursuant to 17 U.S.C. § 504(c).  Lynwood is further entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

516.    The Defendants' infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2), and any statutory damages against the Defendants should be enhanced in accordance with that section.

517.    As a result of Defendants' acts of infringement of Pre-Exit NGINX Plus, Lynwood has suffered injury to its business and property in an amount to be determined at trial as damages pursuant to 17 U.S.C. § 504, presently believed to be well in excess of $750 million, and will continue to suffer damages in the future.

518.    The Defendants' conduct is causing, and, unless enjoined and restrained by this Court, will continue to cause Lynwood great and irreparable injury that cannot be fully compensated or measured in money.  Lynwood has no adequate remedy at law.  Pursuant to 17 U.S.C. §§'s 502 and 503, Lynwood is entitled to injunctive relief prohibiting the Defendants from further infringement of Lynwood's copyright rights in Pre-Exit NGINX Plus and all derivatives thereof.

519.    Unless an injunction pursuant to 17 U.S.C. § 502 is issued enjoining the Defendants and their officers, agents, servants, employees, and attorneys, and all those persons in active concert or participation with them from directly or indirectly infringing Lynwood's exclusive copyright rights in and to Pre-Exit NGINX Plus and all derivatives thereof, Lynwood will suffer irreparable injury for which there is no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against the Defendants as follows:

A.    A declaration that Plaintiff is the sole and exclusive owner of all copyright rights in and to Pre-Exit NGINX Plus and all derivatives thereof;

B.    A declaration that Defendants have willfully infringed Plaintiff's exclusive copyright rights in and to Pre-Exit NGINX Plus and all derivatives thereof;

C.    A judgment against Defendants in the amount of Plaintiff's actual damages and the disgorgement of all profits of Defendants that are attributable to violations of Plaintiff's copyright rights in and to Pre-Exit NGINX Plus and its derivatives as alleged herein pursuant to 17 U.S.C. § 504(b), in an amount to be determined at trial, but in no event less than $750 million;

D.    In the alternative, a judgment against Defendants in the form of statutory damages pursuant to 17 U.S.C. § 504(c); and because Defendants' infringements have been willful, the award of statutory damages should be enhanced pursuant to 17 U.S.C. § 504(c)(2);

E.    Enhanced damages based on the willfulness of Defendants' wrongful acts;

F.    An award of Plaintiff's attorneys' fees and costs under 17 U.S.C. § 505;

G.    Pre- and post-judgment interest on all monetary relief from the earliest date permitted by law at the maximum rate permitted by law;

H.    Punitive damages in an amount to be determined at trial;

I.    A permanent injunction prohibiting Defendants from further infringement of Plaintiff's copyright rights in Pre-Exit NGINX Plus and its derivatives; and

J.    A grant to Plaintiff of such other and further relief as the Court may deem just and proper.

Dated: April 7, 2025

By: /s/ Brian M. Affrunti

Douglas W. Dal Cielo (CA Bar No. 157109)
ddalcielo@bwslaw.com
Brian M. Affrunti (CA Bar No. 227072)
baffrunti@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
60 South Market Street, Suite 1000
San Jose, CA  95113
Telephone: (408) 606-6300
Fax: (408) 606-6333

Patricia L. Peden (CA Bar No. 206440)
ppeden@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Telephone: (510) 273-8780
Fax: (510) 839-9104

Alexander D. Pencu (*pro hac vice*)
adp@msf-law.com
Christopher J. Major (*pro hac vice*)
cjm@msf-law.com
Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com
**MEISTER SEELIG & FEIN PLLC**
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  April 7, 2025

By: ͟ /s/ Douglas W. Dal Cielo
      /s/ Brian M. Affrunti͟͟͟͟͟͟͟͟͟͟͟͟͟͟͟͟͟͟͟

Douglas W. Dal Cielo (CA Bar No. 157109)
ddalcielo@bwslaw.com
Brian M. Affrunti (CA Bar No. 227072)
baffrunti@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
60 South Market Street, Suite 1000
San Jose, CA  95113
Telephone: (408) 606-6300
Fax: (408) 606-6333

Patricia L. Peden (CA Bar No. 206440)
ppeden@bwslaw.com
**BURKE, WILLIAMS & SORENSEN, LLP**
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Telephone: (510) 273-8780
Fax: (510) 839-9104

Alexander D. Pencu (*pro hac vice*)
adp@msf-law.com
Christopher J. Major (*pro hac vice*)
cjm@msf-law.com
Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com
**MEISTER SEELIG & FEIN PLLC**
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff*

101

# EXHIBIT A

Search articles…                    SEARCH

END USERS    HACKING    HUMOUR    INTERVIEWS    OPINONS    REVIEWS
ALL ARTICLES              ISSUES              BOOKS

# Interview with Igor Sysoev, author of Apache's competitor NGINX

BY TONY MOBILY IN INTERVIEWS    1/5/2012    PERMALINK

TAGS: WEB-SERVER APACHE NGINX

NGINX is the new start rising in the landscape of web servers. Well, it's hardly "new" -- it will soon turn 10. However, it's definitely rocking the web server world, with Netcraft showing a huge increase in usage in the last few months.

I was fortunate enough to catch up with NGINX's author, Igor Sysoev, who agreed on answering a few questions for us. So, here is a glimpse on their business model, their new 2.0 version, and more.

### TM: When did you start working on NGINX, and why?

I started the initial work in 2002, and in 2004 I opened NGINX to the public. Back then, I was trying to overcome certain barriers of scaling the web infrastructure of a large online media company I worked for. In particular, the difficulties of handling many concurrent connections, reducing latency and offloading static content, SSL and persistent connections were my main interest. There weren't any reliable production quality web server software to crack so-called C10K problem (handling of at least 10,000 of concurrent connections, outlined by Dan

Kegel). So in a sense I decided to solve both practical and "academic" problems. I was very curious and excited to try it out and I'm really happy it turned to be a sucessful attempt and that NGINX is now used by the over 50,000,000 web sites on the Internet.

**TM: Was it hard to get hep to start with?**

The hardest part for me was to get the initial stucture of the code ready for further development.

**TM: When did NGINX become viable as a web server?**

It happened somewhere around 2007, and it's been growing since then.



NGINX's logo

**TM: NGINX has enjoyed a lot of growth lately. What do you think of the latest stats?**

I think it's awesome. We've been watching the latest surveys (from Netcraft and W3Techs) with great interest, and we're glad that the trend towards a better (in terms of performance, scalability and efficiency) architected web installations continues.

**TM: NGINX doesn't have dynamic modules like Apache does. Is that in the pipeline?**

It is. I've been working lately on the next major release of NGINX which will have support for dynamically loadable modules.

**TM: When do you plan on releasing it?**

When it's ready enough to be released! Speaking more seriously, it's in a very early implementation stage and I need to finalize the new core architecture first. Hopefully it'll be available in the next three months or so.

**TM: Do you think you will ever offer a way to have a modularised version of PHP for NGINX? Why?**

We consider adding something like this. Version 2.0 of NGINX will have much better support for embedded interpreters, including PHP. Why we see it as important -- because it would simplify installation of NGINX in combination with PHP-based applications, and will provide an easier way to upgrade from Apache.

**TM: Configuring NGINX is a little more involved; however, allowing Perl within the server configuration gives immense power. Are you considering making NGINX easier to configure?**

Actually many system administrators consider NGINX configuration to be much more scalable, easy and logical than that of Apache. Admittely, depending on the complexity of the existing legacy setup things might not be that easy, especially with lots of rewrites.

In fact there are two aspects here. For one, we've been working on the documentation to provide a better set of instructions for the new users of NGINX. Also, we've been thinking of a better scripting mechanism to support both initial and run-time configuration. Version 2.0 of NGINX will add additional means to simplify and maintain server configuration, including a better compatibility with the existing legacy installations based on Apache.

**TM: In July 2011, you announced that NGINX became a "company". Did you leave your day job for it?**

Yes I actually did, I am the main shareholder of the company and I now have a role of the Principal Architect and CTO for Nginx, Inc.

**TM: Are you making money with NGINX? If so, how?**

It has just started as a commercial entity, but yes, we're making our first money. I can't disclose the names of our clients as of yet, but we've got contracts signed for technical support, consulting and for the first

proprietary extensions based on NGINX as well. The latter mostly fall into the area of CDN and media streaming acceleration.

**TM: What's your business model for years to come?**

From the very beginning we planned to be a product company. We're going to produce a set of paid extensions on top of the open source NGINX that would constitute a viable commercial software product to be used as an "edge web server" for the cloud, hosting and CDN service providers and for the media&entertainment enterprise. This is exactly how NGINX has been used by many successful commercial entities on the Internet and we base our product plans on the real-life conversations with the existing and potential users of NGINX.

**TM: They would be based on new code, right? That is, things that you haven't released yet...**

Commercial features would be a new code, combined with the existing (and future) open source one. We aren't going to maintain two different distributions, but rather commercial products would be pluggable and licensed separately.

**TM: What kind of extensions are you talking about?**

For instance, features specific to CDN environment like those facilitating hierarchical architectures and advanced cache control, also commercial-grade HTTP streaming. There will be also improvements over existing L7 acceleration stuff. For the hosting&cloud service providers we are rather focusing on delivering a whole product to serve as a virtual L7 load balancing and accelerating solution with some security-related features too.

**TM: Are you concerned about alienating some adopters, who might end up seeing Apache as the "really free" option and NGINX as the expensive one?**

NGINX will remain a fully functional free open source web server under the same 2-clause BSD license. We have a whole lot of new features to add to the publicly available NGINX like websockets, support for SPDY, extended HTTP streaming, improved caching, a better API and so on. There's really no shortage of features in our roadmap to add to the "free open source NGINX".

Case 3:20-cv-03778-MMC    Document 217    Filed 04/07/25    Page 107 of 177

However, with the commercial extensions we're targeting the companies who have been using NGINX for years and now demand more commercial-grade features which aren't normally available in any existing open source product. With time, we're also going to target enterprise market and this type of customers often require both technical support and license payments, while fully appreciating the open source nature of the foundation product.

For the people who are worried about whether NGINX is "really free" I can point to the list of changes that were introduced to the open source version in just the past few months since the company has started (there are literally dozens of improvements and bugfixes).

I believe this is the best illustration in regards to how much we're devoted to maintaining the BSD-licensed software. In fact, we're seeing a growing number of new users interested in NGINX and we're quite happy the news about the company and the funding didn't alienate them. We all believe that the fact the company has started is really beneficially for the project as it greatly secures and streamlines the development.

**TM: Thank you for answering my questions Igor!**

## License

Verbatim copying and distribution of this entire article are permitted worldwide, without royalty, in any medium, provided this notice is preserved.

# EXHIBIT B

# NGINX

## web server

Moscow/NYC, 2011

proprietary and confidential

# what is nginx?



- compact, efficient, high-performance web server
- accelerated front end for
  - large web sites
  - web and mail hosting
  - content distribution networks
- Linux, Solaris, Windows



web user

network

**nginx**

content

 who uses nginx <u>in production?</u>





















...and 23,000,000 other web sites,
including 15% of the top 1,000 sites on the web



# market share: <u>growing</u>

15.90% of top 1,000 sites

6.42% of top 1,000,000 sites (6.31% in feb 2011)

7.65% of 298,002,705 web sites

### top **servers** across the million busiest sites



### **nginx** across the million busiest sites





# why nginx?

☑ speed

☑ scalability

☑ reliability

☑ efficiency

☑ simplicity



# what users say

Apache is like Microsoft Word, it has a million options but you only need six. Nginx does those six things, and it does five of them 50 times faster than Apache.

*- Chris Lea, Media Temple*

We are currently using Nginx 0.6.29 with the upstream hash module which gives us the static hashing we need to proxy to Varnish. We are regularly serving about 8-9k requests/second and about 1.2Gbit/sec through a few Nginx instances and have plenty of room to grow!

*- Wordpress.com*

A while back, we changed our frontend IMAP/POP proxy from perdition to nginx... [and] we've now switched over to using nginx for our frontend web proxy as well... The net result of all this is that each frontend proxy server currently maintains over 10,000 simultaneous IMAP, POP, Web & SMTP connections (including many SSL ones) using only about 10% of the available CPU.

*- FastMail.fm blog*

We were using Pound for load balancing at Justin.tv until today. It was consistently using about 20% CPU, and during spikes would use up to 80% CPU. Under extremely high load, it would occasionally freak out and break.
We just switched to Nginx, and load immediately dropped to around 3% CPU. Our pages feel a little snappier, although that might be my imagination. Not only is the config format easier to understand and better documented, but it offers a full webserver's complement of functionality. We haven't hit any spikes yet, but given the current performance I suspect it will cream Pound.



*- Emmet Shear, Justin tv*

We recently switched over our static content webserver over to Nginx, easily the most impressive webserver I've seen in years. We're running it on a machine with 8Gb of memory (along with some other stuff), but the nginx process is only using a ridiculously small 1.4Mb. In other words, it barely registers in any measurable way.

*- Philip Jacob, Stylefeeder tech blog*

in one voice: "it's fast, it's efficient, it doesn't break"

*Sources: unsolicited feedback on wiki and blogs*

# history

- crafted to handle **500 million** page requests per day
- spring 2002: development started
- october 2004: version 0.1.0
- current public version: 0.9.5
- version 2.0: autumn 2011
- variety of 3rd party modules and extensions
- heavy usage across all web frameworks including: PHP, Ruby/Rails, Python/Django etc.





# existing alternatives

| | | | |
|---|---|---|---|
| | apache | Linux, Solaris, Windows | Most ubiquitous general purpose web server in the world. Good performance, average scalability. Mature. Belongs to ASF ** |
| | apache traffic server | Linux | Former Inktomi Traffic Server. A proxy server. Good performance, good scalability. Complicated configuration. Belongs to ASF |
| | varnish | Linux, Solaris | Developed by FreeBSD core fellow. A proxy server. Can be hard to implement, manage, configure. Issues with CDNs |
| | tornado | Linux | Web server/framework written in high-level programming language (Python) originally for FriendFeed |
| | haproxy | Linux | A poor man load balancer and a proxy from France. GPL/LGPL licensing |
| | lighttpd | Linux | Originally developed as a proof-of-concept to solve "C10k problem". Issues with stability and quality of the code. More resource consuming |

** Apache Software Foundation (non-profit Delaware corporation, oversees a variety of software projects)



# license: <u>simplified BSD</u>

- permissive free software license
- allows **proprietary** use (Apple, Juniper)

```
1. Redistributions of source code must retain
the above copyright notice, this list of
conditions and the following disclaimer.
2. Redistributions in binary form must reproduce
the above copyright notice, this list of
conditions and the following disclaimer in the
documentation and/or other materials provided
with the distribution.
```





# founders

- ## maxim konovalov – *CEO*
  - – 15 years of engineering, PM and management experience,
  - – CTO at Rambler,
  - – Tomsk University, EMBA University of Antwerp

- ## igor sysoev – *author, principal architect, CTO*
  - – 15 years of software and systems engineering experience,
  - – senior system administrator at Rambler,
  - – Bauman Moscow University

- ## andrey alexeev – *VP Business development*
  - – 15 years of engineering, PM and management experience,
  - – Director IP service network at MTS/COMSTAR (NYSE: MBT),
  - – St.Petersburg Electrotechnical University, EMBA University of Antwerp



# company

- plan to incorporate in the U.S.
- presence in:
    - San Francisco
        - marketing, sales
    - Moscow, Russia
        - management, engineers
- staff
    - software developers
    - quality assurance
    - technical support



# what's a team to do

- keep open source nginx development
- support/grow user community
- net result:
  - promotion by word of mouth
  - nginx brand development
  - early adoption
  - additional source of useful ideas



# commercial products

- strategic customers need featured, predictable product support and development
- paid services, features and products
- partnership:
  - 3rd party products featuring nginx
  - professional services



# plans 2011

**Q3 2011**
- form and register companies
- establish offices/operations
- hire
  - one senior developer
  - one system engineer
  - one quality assurance engineer
- revamp development process
- book technical writer, start working on documentation
- gather results of customer opinion survey
- finalize nginx feature roadmap for 2011-2013
- begin marketing activity in US (prepare for version 2.0)

**Q4 2011**
- version 2.0 – first public release
  - new core
  - new API
  - loadable modules
  - distributed cache
  - html content manipulation
- version 1.0 – bug fixing, no new features
- hire
  - second senior developer
- negotiate for technical support contracts with the first clients
- sales revenue $10,000/Q4

# plan to revenues





# plans 2012

## Q1 2012
- version 2.1
  - cdn interfaces ($$$)
  - extended statistics ($$$)
  - performance monitor ($$$)
- hire
  - three additional developers
  - one system engineer

## Q2 2012
- version 2.2
  - web frameworks integration
  - comet/push-to-a-browser ($$$)
  - http extensions
- sales revenue $100,000/Q1-Q2

## Q3 2012
- version 2.3
  - distributed storage support
  - cdn director ($$$)
  - advanced load balancing
  - control panel/dashboard ($$$)

## Q4 2012
- version 2.4
  - video content transformation
  - media/streaming server ($$$)
- sales revenue $150,000/Q3-Q4



# revenue model

- technical support services for key accounts
  - subscription model
  - 8/5 and 24/7 offerings
  - prompt reaction time
  - open/track cases, obtain workaround, get emergency fix/update
- new paid features (modules, custom features)
- new products in a partnership with software and hardware vendors
  - cdn functionality
  - embedded version (e.g. with cpe vendors)
  - load balancing



# revenue model

- price tags for technical support
  - $10,000/year for 8/5
  - $20,000/year for 24/7
- why clients would buy
  - no product support can lead to no business for a serious web entrepreneur
- price tags for custom development
  - from $100,000 per FTE
- why clients would buy
  - save resources when a specific custom feature or custom setup is required



# financials

# series A
# $2,500,000



# financials

- **operating budgets**
  - payroll
  - marketing
  - administrative
- **staff**
  - management, engineers
  - marketing/sales
- **offices**
  - Moscow, class B, 100 m$^2$



# financials

- **next 18 months**
  - 15% of top 1,000,000 sites use nginx
  - 15-20 key clients use technical support services
  - feature/release roadmap fulfilled
  - strategic partnership established with software and hardware vendors
  - contracted sales revenue $500,000/year



# potential exits

- networking vendor
  - cisco, juniper, f5, brocade, radware
- virtualization software vendor
  - citrix, parallels, emc/vmware
- infrastructure software vendor
  - ibm, oracle, hp, ericsson
- telco/isp/cdn
  - at&t, level 3, comcast, akamai
- maturity period = real $$$
  - 4-5 years



thank you!

# nginx components: <u>web</u>







# nginx components: <u>mail</u>



- pop/imap/smtp
- ssl
- external auth
- external mailbox-to-backend mapping database



# netcraft report: <u>march 2011</u>



| Developer | February 2011 | Percent | March 2011 | Percent | Change |
|-----------|---------------|---------|------------|---------|--------|
| Apache | 660,238 | 66.42% | 659,369 | 66.32% | -0.09 |
| Microsoft | 161,189 | 16.21% | 160,069 | 16.10% | -0.11 |
| nginx | 62,762 | 6.31% | 64,221 | 6.46% | 0.15 |
| Google | 19,422 | 1.95% | 21,099 | 2.12% | 0.17 |



# strategic partnership: <u>example</u>

1) We have been testing NGINX against Squid and Varnish and NGINX clearly **came out as the most flexible, scalable and robust** solution.

2) We predict that Content Delivery Networks will not only be used for internet delivery (which will always be best effort delivery) but also for premium content delivery, for instance for IPTV and OTT services, deeply deployed into telco and enterprise networks.

This means that CDN technologies have to be upgraded from basic caching and DNS technologies to advanced distribution and geo load balancing technologies. This is not just a trend, we are selling CDNs to large telcos for exactly that reason. Our CDN technology does offer premium functions over 'regular' CDNs.

We also predict that telcos do not want to deploy yet-another-box in their network but want to work with software solutions instead. Our CDN technology is 100% software and we have an open delivery vendor strategy: we don't sell caching appliances, we focus on the CDN intelligent layer instead.

I am convinced that bundling of a commercial tuned up and fully supported version of NGINX combined with our CDN management suite **can really make a punch in the CDN space.** especially if we can align strategies, use our partnerships and if we can align road maps for the topics as described below.

*– excerpts from a CDN vendor summary on NGINX, march 2011*

# EXHIBIT C

1

2

3

4

5

6

7

8              Transcription of Video File

9    GoTech2019 Fireside Chat with Maxim Konovalov,

10          Co-Founder of NGINX

11              Audio Runtime:  31:12

12

13              November 27, 2019

14     https://www.youtube.com/watch?v=X6SXe1SPu-8

15

16

17

18

19

20

21

22

23

24

25

1              (Beginning of video recording.)

2         ALEXEY OBROVETS:   I give you Maxim Konovalov.

3         MAXIM KONOVALOV:   Thank you.

4         ALEXEY OBROVETS:   So it's a beautiful story.

5    The company name is NGINX, and it's been a big deal

6    for our country and for the market over the last year

7    because 670 million U.S. Dollars was waving in the air

8    for the super technology that's been an open-source

9    technology --

10        MAXIM KONOVALOV:   You mean this room --

11        ALEXEY OBROVETS:   -- for years.   Not in this

12   room.   But we believe that you have the money

13   somewhere.   You, personally.   And so we will ask you

14   questions.   And so from a little bootstrap company,

15   NGINX went -- went global with 250 employees with a

16   great cost, bought by F5 Networks.   Could you say a

17   couple of words first?   What is NGINX?   So that --

18   because not all of us are engineers.

19        MAXIM KONOVALOV:   We call it NGINX.   NGINX is

20   -- a classic definition of is NGINX is a web server

21   and reverse proxy.   It's very boring, right?   So to

22   provide less technical definition, it is like entry

23   point for your browser on your laptop or for your

24   mobile clients, it's server site.   So it's like

25   internet access point for your client.   This is what

1  NGINX and this is like very simply, simply explain --

2  definition for like five years old, Pete, like my son.

3        ALEXEY OBROVETS: So your explanation is really

4  simple, but -- and then for some reason 670 million.

5  Just, you know, for the website to be shown on the

6  internet?

7        MAXIM KONOVALOV: Yeah, yeah.  That's -- that's

8  easy.  NGINX today serves like a half of internet

9  traffic.  So I'm talking about NGINX open-source

10 products that was built initially by a single person,

11 Igor Sysoev, who started this project in 2002 as a

12 hobby project and it was an open-source project from

13 the beginning.  And by 2011, without marketing,

14 without no costs for promotion, NGINX served from six

15 to eight percent of all internet.  So not just the

16 Russian internet but whole internet.  So that's how it

17 started.

18        ALEXEY OBROVETS: And now 50 percent of the

19 biggest websites on the worldwide web, is that

20 including China or excluding China?

21        MAXIM KONOVALOV: It's hard to tell precisely.

22 It does include at least part of China, like Alibaba

23 sites and so on.

24        ALEXEY OBROVETS: Yeah, that little internet

25 web stores, right?

1          MAXIM KONOVALOV: Yeah, just very shy one.

2          ALEXEY OBROVETS: Small -- the small market.

3          MAXIM KONOVALOV: Shy, yeah.

4          ALEXEY OBROVETS: Yes.  So what is the secret?

5    How did you get half of the internet hosting using

6    your technology?

7          MAXIM KONOVALOV: Yes, the reason, no extra

8    secret to share unfortunately.  NGINX is very simple,

9    yet flexible, high performance, secure and reliable

10   open-source software and that is why people started to

11   use it like 2004 and as you said, yeah, half of

12   internet uses it today just because of that.

13         ALEXEY OBROVETS: If we could talk about the

14   history a little more.  So I remember it -- I entered

15   the Rambler in 2003, and I remember Igor sitting with

16   most of the servers in the -- next to him behind his

17   back, so he would listen to the "shweeew", to the

18   coolers of the servers and writing -- writing his

19   software.  And he looked simple.  Just a Russian

20   engineer with no fame, no -- sometimes even no respect

21   from the colleagues because they say, nah, just asking

22   questions, you know, this doesn't work, that doesn't

23   work.  He would say okay, let me fix this.  So how did

24   that simple procedure went big?  What happened there?

25   How did it start?  I understand that you are one of

1  the people that worked with Igor and just made him

2  understand he needed to go global.

3          MAXIM KONOVALOV: Oh, yes, it's true.  I still

4  work with Igor today.  Nothing changed basically.

5  Igor is still a computer geek.  If you ask him about

6  him, he will told you -- tell you that he's not a

7  businessman.  He's like a -- he's still computer geek.

8  We don't keep servers in the office these days, so --

9  so more -- now we have more comfort environment for

10 him.  But he still work -- he still works on code.  He

11 comes to the office every day and works on new code.

12 So nothing changed.

13         What made NGINX so good, so great besides of

14 Igor talents as an engineer, I think that the main

15 answer to this question is repeatable exercise.  So

16 Igor -- Igor spent nine years working on this project,

17 and it requires enormous effort to concentrate on all

18 sorts of technical problems.  So think about myself,

19 well, it's almost impossible for me to consider

20 something for nine years without interruption is

21 really incredible.  It's very exciting for me at

22 least.

23         ALEXEY OBROVETS: And so you've -- you -- if

24 we're working on a formula, then first you need an

25 engineer that is a really good engineer.  So if you

1    want to be -- if you want to be famous and rich after

2    nine years, first you need a really nice engineer that

3    is only concentrating on his job?

4         MAXIM KONOVALOV: Yeah, maybe two.

5         ALEXEY OBROVETS: But okay.

6         MAXIM KONOVALOV:  Just to have a backup.

7         ALEXEY OBROVETS: Okay.  So everybody needs a

8    student and everybody needs a teacher.  That's right.

9         MAXIM KONOVALOV: And so let him work on his

10   ideas.  That's very important.

11        ALEXEY OBROVETS: But how does his ideas become

12   a product then?

13        MAXIM KONOVALOV: It's also a part of his

14   exercise actually.  He -- initially, he builds his

15   product to you.  So it's not just goal.  It's about

16   complete view of the product for -- so Igor started to

17   build from scratch and actually formed initial ideas -

18   - set of initial ideas of how the product should look

19   like.

20        ALEXEY OBROVETS: But this is the big question.

21   So first, of course, you need the idea, you need a

22   spot on the market that you work on, first for

23   yourself, and then for other companies.  But then how

24   does a Russian engineer become an entrepreneur?

25        MAXIM KONOVALOV: Well --

1        ALEXEY OBROVETS: Because it's a great

2    transformation.  Because 2002 you don't look at the

3    web as something global.  You just look at your

4    company, at your market and you only go home and back

5    and forth.  So you don't think of even traveling to

6    work.

7        MAXIM KONOVALOV: Yes, that's right.  As I said

8    previously, NGINX customer base -- it's not really

9    customers but user base because it was an open-source

10   and freeware project.  So we can talk about users, not

11   customers.  So but anyway, by 2011, like six or eight

12   percent all internet use NGINX, and it was -- it

13   became crystal clear that there were some business

14   opportunities.  And three of us came together, Igor,

15   myself and one -- we had a sort of co-founder -- and

16   started to talk about that.  And at some point we

17   decided, okay, let's try.  Let's try and explore these

18   opportunities.

19        And so that is how we decided to build a

20   company and there are many -- there was a bunch of

21   ideas of how to extract money from open-source and

22   freeware product.  But we decided to take like an easy

23   one probably.  We decided to explore the open core

24   model.  Open core model is when you take an open-

25   source software and build something paid like

1    commercial software on top.  And this is what we have

2    been doing since 2011.  No changes surprisingly in our

3    strategy.  So we continue to develop NGINX open-source

4    these days and continue to build a great open-source

5    freeware software.

6          In parallel, we -- in 2011, we started to build

7    commercial product, NGINX Plus, and started to sell it

8    to enterprises and corporates.  So this is what we are

9    doing today, yeah.

10          ALEXEY OBROVETS: But why did you get the

11    investments?  So according to Crunch Base, beginning

12    with 2011, you received 104 million dollars as an

13    investment?

14          MAXIM KONOVALOV: Yeah, that's true.  That's

15    true.

16          ALEXEY OBROVETS: How and why?

17          MAXIM KONOVALOV: Yeah.  First of all, why.  We

18    have -- from the beginning we wanted to build an

19    international, a global company with sales worldwide.

20    That was initial idea, and we never considered other

21    options.  So we -- and to build international company,

22    you need -- and fast and quickly, you basically need

23    resources for that.  You want to hire -- you want to

24    hire bright people with right attitude, right skills

25    for your marketing for sales.  And you want the best

1  engineers to work on your products.  And this is

2  expensive, especially in the U.S.  So this is why we

3  needed money.  We needed money for that and we wanted

4  to make it fast and quickly.

5        So -- and how we get them -- how we got them,

6  basically again, same boring story.  No surprises.  We

7  got that -- in 2011, we decided to actually explore

8  approach venture, ventures funds.  What is ventures

9  funds.  Tell a story about NGINX.  Tell our ideas

10  about possible business around NGINX and at that time

11  we got couple of term sheets and start fundraising for

12  Series A.

13        ALEXEY OBROVETS: I cannot imagine you were

14  eager to be on a stage like this as a start-up person,

15  you know, giving a speech that, you know, we have made

16  in other Uber for backend, for hosting websites.  But

17  how did you pitch?  How did you talk?  How did you --

18  where did you even start the conversation?

19        MAXIM KONOVALOV:  Well, we never actually tried

20  to be Uber for X or Facebook for Y or Amazon for Zed.

21  I think -- just my personal idea about that, that

22  investors actually fed with these stories.  So we --

23  during all history of why I was at company of NGINX,

24  we talked with investors into technology, technology

25  niche.  And had no issues actually to talk with them

1    about NGINX, mainly because most of the portfolio

2    companies already use NGINX.  So it was very easy to

3    get good references about product.

4         So that never was an issue for us.  We spent

5    very little time to explain what NGINX did.  So that

6    wasn't an issue for us to talk with investors at all.

7    So I don't have any magic recipes or magic formulas

8    how to do that.  Just can just tell you story, our

9    story.

10        ALEXEY OBROVETS: And the next question is

11   there's absolutely no material on your company in

12   media.  Because there are big companies that you read

13   about all the time.  All the time.  There's something

14   new, something new, something new.  And their

15   beautiful faces are all over Tech Crunch and other

16   places.  What's wrong with you.  Why don't we see a

17   lot about --

18        MAXIM KONOVALOV: They are not beautiful

19   enough.

20        ALEXEY OBROVETS:  So just simple Russian

21   engineers?

22        MAXIM KONOVALOV: Yes, Russian faces.  That's

23   boring and sometimes dangerous.  No, seriously, we are

24   in a need to be market, so we don't really need such

25   shiny stories and scandals.  And another point, I have

1   an -- NGINX open-source have a super strong brand,

2   super strong.  If you walk in San Francisco with this

3   jacket, this NGINX logo, someone will approach you and

4   tell you thank you for great software.  Just true

5   stories.  This happens every day.  So very strong

6   brand.  And this strong brand saved us and still saves

7   million of marketing dollars.

8        And also from other hand, you're quite right.

9   Press and media, they want something hot and something

10  sexy.  Something they want that they can sell to

11  audience, to their audience.  And NGINX is really deep

12  technology and boring company, so -- (inaudible) is a

13  boring company.

14       ALEXEY OBROVETS: But it's a big question then.

15  How can an open-source company with a lot of open-

16  source code hope to be famous and rich again?  Is

17  there a chance?  Because as I understand, most of the

18  open-source projects have a problem and their future

19  is always open-source until the end of the days.

20       MAXIM KONOVALOV: Yes, that's true.  That's

21  very true.  It is very hard to convert open-source

22  project or product into commercial entity.  So this is

23  -- there are just a few good examples of right

24  strategy, like Red Hat.  And unfortunately, I cannot

25  provide good recipe for that as well.

1          We -- we enjoy by the open core model, but it

2    doesn't mean it will work for everyone.  So we're a

3    unique combination of open-source product in our

4    commercial strategy.  So it works for us more or less

5    good, but it doesn't mean it will work for everyone.

6          ALEXEY OBROVETS: And so here's the situation.

7    For example, if I were an engineer and I wrote code

8    and I open-sourced it and so let's say 2000 companies

9    use my code and making money, what are my next three

10   steps in trying to make some money out of that open-

11   source code?

12         MAXIM KONOVALOV: There are several options

13   here.  You can provide technical support.  You can

14   provide, like, customization service.  You can start

15   to sell licenses, but it is a very tough topic,

16   especially if you have initially open-source product

17   with permissive license.  You can convert.  And this

18   is probably the most interesting option -- convert

19   your open-source product into service, something that

20   you sell as a service, something like that.

21         In NGINX, we tried actually this approach as

22   well and ran at some point -- where we ran SAS

23   platform services -- as a software as a service

24   platform for NGINX moratorium, performance moratorium

25   basically.  And work management, but it didn't fly for

1    us.  It didn't work for us.  So we have to stop it

2    eventually.  So again, no secrets and no magic recipe.

3           ALEXEY OBROVETS: Let's talk about living in

4    Russia or abroad.  So now you're a global company that

5    works everywhere.  Could you achieve everything you

6    have achieved by now if you stayed in Russian

7    Federation?

8           MAXIM KONOVALOV: Oh, we stayed in Russia.

9    Yeah, Igor in Russia and I am in Moscow and our R and

10   D office is -- well, one of our R and D office is in

11   Moscow.  Yeah, it's possible to build a global company

12   sitting in Moscow in Russia.  It is a tough exercise.

13   We were very lucky to hire a brilliant CEO for our San

14   Francisco headquarters in 2014, Gus Robertson.  He's

15   now head of NGINX business unit at F5.  But yeah, as I

16   said, we were very lucky with that with this guy.

17          And still it was very tough to work remotely

18   with the rest of our company, remote with our western

19   -- west foreign customers with different culture, with

20   different way of thinking and doing business.

21          Yeah, so thinking back to 2011, today, I would

22   say I would move to the U.S.  Yeah, to stay close with

23   all this stuff.  But back to your question, yes, it's

24   possible to build a global company sitting in Russia,

25   right, still.

1          ALEXEY OBROVETS: Why didn't you go?  Do you

2     remember your logic in --

3          MAXIM KONOVALOV: Well, yeah, yeah.

4          ALEXEY OBROVETS: -- 2011?

5          MAXIM KONOVALOV: The logic was very clear.  I

6     had normally an engineer in office in Moscow and I

7     left this office and still live in this office.  So I

8     wanted to be sure that we building right software and

9     with right people, we hired the right people and we

10    had right process and everything.  Technical support

11    and professional service.  We built this, all this

12    stuff, elements from scratch and, yeah, this is why I

13    stayed in Moscow.

14         ALEXEY OBROVETS:  And so what transformation

15    does an engineer need to become an entrepreneur?  I

16    want to get back to this question because you talk

17    about Igor.  You talk about yourself and you say all

18    you care about is the product, that the code works,

19    that we give the right support and we don't want to go

20    anywhere.  We just want to write code.  And what did

21    you have to understand to start going abroad?

22         MAXIM KONOVALOV: Well, my transformation into

23    interpreting a like person started a while before

24    NGINX and is still in process I think.  Igor, as I

25    said, is still a computer geek and he basically

1    doesn't want to be businessman at all.  And this is

2    good.  No problem with that.

3         So how to become, how an engineer can become an

4    entrepreneur.  I don't know.  Maybe read some book,

5    magic book like -- I don't know.  What I can recommend

6    to and what could be helpful with that is maybe learn

7    other cultures, Western culture, maybe Asia culture,

8    work abroad, travel and basically learn.  In our case

9    what would be helpful is learn Western culture, how

10   they think, how they doing business, because there are

11   many differences.  And this experience very helpful.

12   It was very helpful for us, and I think it's helpful

13   in general.

14        ALEXEY OBROVETS: So for many, many years, you

15   were writing code, you were working on this product.

16   And then finally, at the end you sell it for big

17   money, but anyway, you sell it.  It's like I'm getting

18   ready for one of my daughters to get married and I

19   will be really emotional.  So how did you feel about

20   your code now growing --

21        MAXIM KONOVALOV: Yeah, look --

22        ALEXEY OBROVETS: -- up?

23        MAXIM KONOVALOV: -- NGINX today is 17, one

24   seven, years old.

25        ALEXEY OBROVETS: Legal to get married, right?

1          MAXIM KONOVALOV: Well, in IT it means 70, like

2    seven zero.  It's okay to let it go, so -- so but

3    seriously, we -- talking about this transaction, these

4    commercial acquisition, we had no concerns for the

5    following reason.  We, uh, F5 Networks is a leader

6    actually, is a technology leader in load balancing and

7    application acceleration.  We know this company.  We

8    know their products and they are great, really great.

9    And this companies' merge is very natural.

10          I talked -- during the diligence process, the

11    due diligence process, I talked with dozens people

12    literally from our F5 Networks and found that they had

13    a huge respect to our work.  And I --

14          ALEXEY OBROVETS: Well, because you are a great

15    competitor?

16          MAXIM KONOVALOV: Yeah, yeah.

17          ALEXEY OBROVETS: And you were ready to kill

18    their project, so they had to buy you?

19          MAXIM KONOVALOV: Well, partially, yes.

20          ALEXEY OBROVETS: Okay.

21          MAXIM KONOVALOV:  Yeah, but their engineers

22    don't really think this way.  They enjoy the product

23    we build from technology point of view and they

24    appreciate what we have done so far.  So the right

25    people with right culture, with right attitude, again,

1    and right -- just right home and I had no concerns and

2    I became confident about NGINX products' future and

3    our people future within this company.  So we are

4    okay.

5          ALEXEY OBROVETS: Can you name two mistakes

6    that you as a company made in the whole process?

7          MAXIM KONOVALOV: Well, we had to start

8    learning.  We spent too much time talking.  So we had

9    to start 2007, maybe 2009.  So -- and you -- we have

10   go -- we had to go quicker.  So we spent a lot of time

11   on talking and discussing and yeah.  So we had to go

12   quicker.

13         ALEXEY OBROVETS:  So looking back, what advice

14   do you give to young engineers that come to you and

15   say okay, I have some code, I am sure it's good, I'm

16   sure it may become a product, what are my next steps?

17         MAXIM KONOVALOV: Yeah, I do have a lot of

18   advices.  Just my favorite two.  The first one is

19   don't pay much attention to advices, mainly because

20   they are cheap or even free.  Real actions, real

21   actions are not cheap.  So concentrate on real actions

22   and concentrate on your gut feeling.  You have

23   intuition.  You and your team know product, your

24   product or products, your service, and know your

25   strategy.  So trust your gut feeling.

1        And thus otherwise is to never think this is a

2    short run.  This quite -- quite contrary.  This is a

3    long run, long run.  So if you are thinking this way,

4    oh, we are so cute, we are so smart, we are -- our

5    product is so sexy, so someone big will come in next

6    two years and buy us, so forget about that.  No way.

7    This is long run and no one will come and buy you.  So

8    be prepared and plan accordingly.

9        We all know that like the journey of a thousand

10   miles starts from the first step and the first step is

11   very important, but don't forget about million other

12   steps you have to do and million steps in front of

13   you.  That's it.

14       ALEXEY OBROVETS: Thank you, Maxim.

15       MAXIM KONOVALOV:  Thank you.

16       ALEXEY OBROVETS: We have one minute, if you

17   have questions, please raise your hand and ask your

18   questions.  Okay.  That looks good.

19       AUDIENCE MEMBER: Thank you for the excellent

20   story.  I have a question, again, about the open-

21   source model for the software.  As you mentioned that

22   you used the open-source model for your product and

23   your success, but still what would you say -- what

24   would you think about the current situation maybe?  So

25   what is more preferable for the new entrepreneur's

1  model of software?  What would be more successful,

2  open-source model or commercial model for us?

3       MAXIM KONOVALOV: That is, yeah, great

4  question.  Unfortunately, it is not possible to answer

5  in a good way.  It depends on your software basically.

6  So either way can work and either way can fail.  So no

7  good answer unfortunately.  We have to sit -- not we -

8  - you have to sit and check what options you have and,

9  again, as I said, trust your gut feeling.

10      Open-source is quite really quite relevant

11 model right now and open-core works for some

12 companies.  At the same time, there are several

13 discussions right now how to fight with, for example,

14 Amazon.  Amazon takes, say, MongoDB and converts

15 MongoDB to a service for free, for -- take MongoDB for

16 example, for free and convert for paid service.  And

17 MongoDB company has no benefits of that.  Basically

18 they lost customers because customers moved to AWS and

19 used MongoDB as a service and don't bring any money to

20 MongoDB company.  This is a real issue.  And they're

21 trying to fight with AWS and Google Cloud and DuJour

22 to extract some money back to the company, and it's

23 still issue.  So it can work for you, can -- you can

24 fail with this approach.  No, I don't have any good

25 answers for you.  Sorry.

1           ALEXEY OBROVETS: Well, we need to finish with

2    -- in a positive manner.

3           MAXIM KONOVALOV: That's right.

4           ALEXEY OBROVETS: So my first observation is

5    the code that became great was first working at a

6    company that the guys were employees of.  So first,

7    what we need to do is become great engineers and

8    become great professionals at the place of our work.

9    And then the next step is maybe 670 million.

10          MAXIM KONOVALOV: Maybe more, yeah, and good

11   luck with that.

12          ALEXEY OBROVETS: Maxim, thank you very much.

13          MAXIM KONOVALOV: Thank you.

14          ALEXEY OBROVETS: All the questions left please

15   ask in the zone of coffee break.

16          (End of video recording.)

17

18

19

20

21

22

23

24

25

Page 21

1                            CERTIFICATE

2

3            I, Wendy Sawyer, do hereby certify that I was

4    authorized to and transcribed the foregoing recorded

5    proceedings and that the transcript is a true record, to

6    the best of my ability.

7

8

9            DATED this 21st day of April, 2021.

10

11   _____

12            WENDY SAWYER, CDLT

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

**1** NGiNX    Server Platform for Real-Time Web and Mobile Networks Content Delivery

## NGINX technology for accelerating new Real-Time, Rich Internet Applications and Content Delivery on Wireless Mobile Networks

- Developed with one main idea in mind – to serve as the most efficient gateway for various application back-ends and architected to be infinitely scalable, NGINX server is uniquely capable to solve the current real-time web latency issues. The next generation version NGINX will :

- Take Real-Time web applications to the next level with a robust and highly efficient implementation of Server-Push Technologies

- Significantly speed-up Content Delivery on Mobile Networks by using a fully-integrated, Distributed NGINX Network Caching Layer plus :

- Use advanced, Geo-Aware DNS Load-Balancing / Intelligent BGP Routing

- In short - NGINX - the world's fastest web server, can be extended with adjacent technologies to create a robust Real-Time Web Platform.  The time-proven performance of NGINX kernel provides a perfect foundation to grow into a comprehensive Network Infrastructure Layer for the enterprise needs.

# 2 Background and performance benchmarks

- **NGINX was developed in 2001 by Igor Sysoev and has been used as web search/reverse proxy Gateway on millions of internet sites since: it powers high-load sites like TURNER Networks, AOL mail servers, HULU.com, software.Intel.com, SourceForge, WordPress, Github.**

- **Overall, NGINX has over 15 million+ installations worldwide. It has experienced a massive surge in active installations in 2007-2010 and popularity due to its stability, performance as well as very logical and straightforward configuration.**

- **Performance-wise, NGINX is undoubtedly  No. 1. As tested by TURNER Networks, it's able to serve 70,000 – 100,000 requests/sec - compared to a 3-5k typical high-load server throughput.**

- **As of May 2010, NGINX is the 4th-most-popular Web Server in overall installations – after Apache, IIS and GFE (see NetCraft survey).**

- **Effectively, it is the 2nd most-used high-performance Web Server available for Linux (after Apache - which appeared in early '90s, and has more features , but is considerably slower under high-loads).**

# 3

# NGINX recognized worldwide - Quintura BLOG – Feb '10:

@ 19:34 [23. 02. 10]

The web server software **Nginx** served 7.5% of top servers across all domains in January 2010, ahead of **Google** with 7%, according to Netcraft. **Apache** and **Microsoft** held 53.8% and 24.1% market share for top servers across all domains, respectively. **Nginx** has been steadily gaining market share ever since first release in 2004. The growth accelerated in 2009 when **nginx** added more than 12 million web-sites.

**Nginx** serves over 15 million web-sites. It is being used by leading Russian portal **Rambler.ru**, as frontend IMAP/POP proxy by **FastMail** and load balancer by **WordPress**, among others.

The http, reverse proxy and mail proxy server software **nginx** [**engine x**] is free and open source. **Nginx** was written by one person, the Russian software developer **Igor Sysoev**.
He is the only developer of **nginx**, according to his interview to Pingdom.

**Igor Sysoev** was born and grew up in Almaty, Kazakhstan. He graduated from the Bauman State Technical University in Moscow in 1994. **Igor Sysoev** works at **Rambler Media** (the owner of **Rambler.ru**) as senior system administrator.

# 4    NGiNX Team    Founders

- **Alex Korotkoff      -  Founder and CEO**

**Alex worked in Silicon Valley since 1996 for such well-known companies as Charles Schwab, Sybase, Keynote, AlliedSignal.**
**Before joining Rambler search engine as Director of Data Analytics, Alex was member of the core engineering team at SYBASE Inc. - one of the world's largest database companies -  where he was responsible for Network Connectivity &  Open Client/Server development. He was one the key contributors to SYBASE ASE 12.0 Avatar and 12.5 Voyager releases .**
**Alex is an MBA graduate of Duke University,  Fuqua School of Business.**

- **Igor Sysoev          -  Founder and CTO**

**The inventor of the fastest web serving platform on the internet - NGINX - with 15 million worldwide installations and 14% market share of the top 1000 most visited websites (by JUN 2010 Google survey).**
**He's the most talented Rambler network architect capable architecting high-volume, extremely scalable, low-latency  server platform.**
**Igor is a distinguished speaker at many international high-load web server technology forums.**

# 5 | NGiNX Team | Advisory Board



**Kurk McKusick, Ph.D., Computer Science  -   Chief Strategist**
As one of the founders of Berkeley UNIX – BSD UNIX – Kirk brings an immensely valuable perspective to NGINX development.  His achievements and expertise in the field are well known.
FreeBSD and NGINX have long been a blend of OS and server software which achieved exceptional performance.
Many large network companies like Juniper Networks, F5, etc. have been using BSD kernel for their high-end server infrastructure products.
Kirk, the guru of TCP/IP network stack and kernel development, will guide the team in its network optimizations work.



**Jaanus Krabi, Ph.D., Physics   -   Chief Scientist**
The founder and CEO of Pluff.de – a localized German search engine which was later acquired by Deutsche Telecom. He was Rambler's CTO during the 2007-8 years, responsible the daily operations of the search engine portal and infrastructure development with 300+ employees and $10 million annual budget. In Germany, he also worked on large consulting projects for Lufthansa, T-Online and Scout Group.

# 6 NGINX – Key Features at a Glance



1. NginX is the absolute **FASTEST** web gateway by many performance benchmarks. Its speed in Connection Handling and Request Forwarding is unparalleled.



2. Being a proxy by design, it excels in **ROUTING** and **LOAD BALANCING** abilities.

3. NginX has an extremely **SCALABLE** architecture limited only by Hardware resources. It easily parallels itself among multiple CPU cores, and multiple server machines.



4. NginX has time-proven reliability: 100% **FAULT-TOLERANT**, it is able to recover if any service layer behind it fails.



5. NginX speed also comes from **CACHING** capability. It works with Memcached, but has a much faster NGINX internal Cache Mechanism.

6. NginX is very popular with Web 2.0 frameworks: RUBY on RAILS/PASSENGER, DJANGO (Python), Scala/LIFT; as well as Tomcat/Jetty Java servers.

# 7 | **Significant recent growth in active usage**

- **Since the end of 2008 it has enjoyed a dramatic increase in active installations/usage dwarfing the next open-source competitor - Lighttpd :**



# 8 Recent growth across all domains





**9** **Recent growth ( outpacing the competition )**

**Recent Growth of installations/active usage as reflected by NETCRAFT market rating:**

http://news.netcraft.com/archives/2010/01/07/january_2010_web_server_survey.html

| Developer | December 2009 | Percent | January 2010 | Percent | Change |
|-----------|--------------|---------|--------------|---------|--------|
| Apache | 42,729,326 | 53.67% | 43,667,682 | 52.32% | -1.35 |
| Microsoft | 14,534,008 | 18.26% | 14,738,628 | 17.66% | -0.60 |
| Google | 10,768,497 | 13.53% | 10,761,265 | 12.89% | -0.63 |
| nginx | 6,967,512 | 8.75% | 9,632,642 | 11.54% | 2.79 |
| lighttpd | 245,993 | 0.31% | 288,368 | 0.35% | 0.04 |

# 10 NGINX on FreeBSD OS is top choice for network serving

**NGINX + FreeBSD – a powerful combination which results in the extremely stable and scalable web architecture:**

## Most Reliable Hosting Company Sites in April 2010

| Rank | Company site | OS | Outage hh:mm:ss | Failed Req% | DNS | Connect |
|---|---|---|---|---|---|---|
| 1 | DataPipe | FreeBSD | 0:00:00 | 0.015 | 0.031 | 0.027 |
| 2 | GoDaddy.com Inc | Windows Server 2003 | 0:00:00 | 0.023 | 0.161 | 0.092 |
| 3 | New York Internet | FreeBSD | 0:00:00 | 0.027 | 0.106 | 0.051 |
| 4 | iWeb Technologies | Linux | 0:00:00 | 0.031 | 1.187 | 0.063 |
| 5 | www.dinahosting.com | Linux | 0:00:00 | 0.031 | 0.178 | 0.128 |
| 6 | www.navisite.com | Linux | 0:00:00 | 0.035 | 0.353 | 0.102 |
| 7 | www.netcetera.co.uk | Windows Server 2003 | 0:00:00 | 0.039 | 0.084 | 0.050 |
| 8 | Virtual Internet | Linux | 0:00:00 | 0.039 | 0.173 | 0.054 |
| 9 | ServInt | Linux | 0:00:00 | 0.039 | 0.162 | 0.063 |
| 10 | www.acens.com | Linux | 0:00:00 | 0.046 | 0.298 | 0.129 |

# 11 : NGINX 1.0:  Accelerating Real-Time Web Applications

- **In its initial 1.0 Commercial Offering, NGINX will effectively address the needs of real-time web applications :**
  - **Real-time Stock Quotes**
  - **News Feeds**
  - **Geo-Social Applications, Geo-Location-Aware Tweets (e.g. hottest startup FourSquare.com)**
  - **Online Games on Mobile Devices**
  - **Web room chat / Video-chat / Live Sports Scoreboards**

- **The reality is - web browser/server real-time communications still don't have effective implementations, face big latency problems, and ultimately hinge on Web server ability to immediately PUSH data out to the clients (i.e. SERVER PUSH technologies)**

- **Many Social Networks, Gaming and Content-delivery companies urgently need robust server modules which provide effective "Reverse AJAX" / COMET capabilities. The NGINX team will concentrate on developing industrial, NGINX-kernel-based, real-time push modules which will provide this implementation.**



# 12

## NGINX 1.1:  Integrated in Custom Web Technology Stack



The Commercial NGINX versions will provide support for "Scaling an application with no system administration skills" - with feature-rich enterprise-level offerings such as:

- **Custom-built, pre-configured technology stack** (like LAMP stack but without "A": with Cache, Database, 2.0 framework layers built in; that can be created through a by-step configuration by visiting the NGINX website (similar to EngineYard.com configuration approach)

- **NGINX-based SSL Acceleration/Authentication solutions :** (with 1/10 of a price for F5/CISCO SSL solutions, see p. 2)

- **Advanced load-balancing  algorithms (back-end performance-based)**

- **"NGINX Master Control" to administer back-ends through a secure internal port with JSON-like protocol**

- **Ability to Health-monitor and "fast fail" HTTP requests to back-ends**

- **Comprehensive server stats & request-processing analysis/reports.  Easy deployment, upgrades, etc.**

# 13

# NGINX 2.0:  Content delivery for Mobile Networks



NGINX Geo-Aware DNS

NGINX Edge Gateways

NGINX Distributed CACHE

**Phase 2.0 will focus on a much larger commercial opportunity - using NGINX platform for Mobile Network Web Content delivery, i.e. CDN type application for Cellular Networks.**

**Latencies remain large for most of Web Content – images, videos, .CSS, Java-script libraries – and effectively caching all these content at cellular towers with geo-aware and cache-driven Distributed NGINX CDN is an elegant cost-effective solution.**

**We basically mean a Distributed Edge Network (CDN type) of a pool of NGINX custom-built servers (on special Linux kernel) with:**

- **Integrated geo-aware DNS servers (NGINX kernel based)**
- **NGINX gateways themselves (edge-distributed)**
- **Integrated Distributed Network Cache (made up of NGINX internal caches), benchmark proven to perform much faster than Varnish or Memcached caching solutions**

# 14

## NGINX 3.0: NGINX infrastructure stack for Private Clouds

**Phase 3.0: Despite the overall drive towards centralized, open cloud services and cloud storage solutions, many businesses and individuals would still prefer to keep their information PRIVATE. Similar to Corporate Intranets, geographically-distributed PRIVATE CLOUD / CDN solutions will be in strong demand as more data and applications are moved into the cloud.**

**NGINX software based, easily deployable Private Cloud Stack can be easily created on existing infrastructure – high-end or even commodity hardware.**

**Tests have shown that NGINX easily outperforms existing software stack configurations on Amazon EC2 ( 30% performance gain – 282ms vs. 412ms ):**




**( The next 4 slides dwell in more detail on NGINX cloud scalability.  )**

# 15 | NGINX – a uniquely Scalable Architecture for the Cloud



1. **NGINX has truly INSTANT ON-DEMAND SCALABILITY.**

**It is able to serve more requests per second with less resources because of its architecture. It consists of a master process, which delegates work to one or more worker processes. Each worker handles multiple requests in an event-driven or asynchronous manner using special functionality from the Linux kernel (epoll/select/poll). This allows NGINX to handle a extremely large number of concurrent  connections with very little overhead.**

**Horizontally, i.e. in the creation of parallel worker-processes, it can scale practically indefinitely – limited only by the OS and Hardware resources. In contrast to its closest high-load rival – Lighttpd - NGINX is able to parallel its processing workload on multi-core CPUs, as well as multiple Servers Machines (clusters).**

# 16 | NGINX is 100% FAULT-TOLERANT



**2. NGINX Master-to-Worker processes architecture provides for unique stability and unprecedented FAULT-TOLERANCE.**

**Uniquely architected to be a Front-Line Gateway, NGINX is able to recover and provide an adequate response if any service (server) behind it fails.**

**Moreover, any incoming request which has been accepted by NGINX is guaranteed to be processed to completion even if several worker processes are suddenly terminated due to hardware failures.**

**This high-availability has been tested and honed in real life high-load massive Web Search Infrastructure environments. As a recent example, HULU.COM – the fastest-growing commercial content video-serving US web site has been using NGINX as its front-end gateway for streaming video with unparalleled success.**

# 17 Solid Extra Layer of Security



**3. NGINX is capable of adding a Solid Layer of Defense to the existing Cloud Infrastructure by separating and masquerading the type of services that exist behind it.**

**By applying special configurations the servers further up the chain (SaaS entry points) become better protected – through Obfuscation and Indirect Authentication mechanisms.**

**In short, by deploying the infrastructure, a single point of access and control is created which allows to better track and contain any attacks against In-Cloud Service Layers.**

# 18  Infinitely horizontally scalable   < -------- >



**4.  NGINX is infinitely horizontally scalable:**

**The NGINX Master Process can scale up to practically any number of worker processes. In practice, several thousand worker processes were created with no software-related issues or significant CPU overload or network latency issues.**

**The Master process monitors all created worker processes, and can dynamically check their configuration, and restart them if needed or any sudden failures occur.**

**Comprehensive MONITORING and LOGGING could be devised, and some ideas around fast logging are already under development.**

# 19

## 3 stage Commercial Product Offers to drive revenue



**To sum up:**

1. **NGINX+ 1.0 will make commercial offerings to customers running high-load websites (hundreds of CPUs like HULU.com) based on :**
- **Stable and scalable Real-Time Web SERVER PUSH modules**
- **advanced back-end management and monitoring with dynamic (no-restart) configurations**
- **advanced load-balancing features, VPN and SSL features**
- **advanced comprehensive support for Web 2.0 frameworks Ruby, PHP5, PERL modules, Python and JAVA/Lua in the future**

2. **NGINX++ 2.0 will focus on Content Delivery Infrastructure for internet and wireless mobile networks by creating an BGP-driven, Geo-Aware DNS integrated, EDGE distributed network of efficient custom-kernel FreeBSD-NGINX servers.**

3. **NGINIA (Nginx 3.0) will provide a full-blown Web Technology Layer (with Cache, routing and security) for Private Clouds Infrastructure.**