Alexander D. Pencu (*pro hac vice*)
adp@msf-law.com
Christopher J. Major (*pro hac vice*)
cjm@msf-law.com
Jeffrey P. Weingart (*pro hac vice*)
jpw@msf-law.com
**MEISTER SEELIG & FEIN PLLC**
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

Patricia L. Peden (CA Bar No. 206440)
patricia@warrenkashwarren.com
**WARREN KASH WARREN LLP**
2261 Market Street No. 606
San Francisco, CA 94114
Telephone: (415) 895-2940
Fax: (415) 895-2964

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| LYNWOOD INVESTMENTS CY LIMITED, | Case No. 3:20-CV-03778-MMC |
| Plaintiff, | **PLAINTIFF'S MOTION TO COMPEL NETFLIX, INC. TO COMPLY WITH PLAINTIFF'S SUBPOENA AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| vs. | |
| MAXIM KONOVALOV, IGOR SYSOEV, ANDREY ALEXEEV, MAXIM DOUNIN, GLEB SMIRNOFF, ANGUS ROBERTSON, NGINX, INC. (BVI), NGINX SOFTWARE, INC., NGINX, INC. (DE), BV NGINX, LLC, RUNA CAPITAL, Inc., EVENTURE CAPITAL PARTNERS II, LLC and F5 NETWORKS, INC., | **[FRCP 37 and 45 and CIV. L.R. 37]** |
| Defendants. | **Hearing Date:  October 10, 2025 9:00 a.m.** |

1

## <u>NOTICE OF MOTION AND MOTION</u>

2      PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure ("Federal Rules")

3   Rules 37 and 45 and Civil Local Rule 37, Plaintiff Hemma Investments CY Limited f/k/a Lynwood

4   Investments CY Limited ("Plaintiff" or "Lynwood") hereby moves for an order to compel Netflix,

5   Inc. ("Netflix") to comply with Plaintiff's June 10, 2025 subpoena (the "Subpoena"). The motion is

6   set for a hearing on Friday October 10, 2025, at 9:00 a.m. or at such other date as may be agreed or

7   ordered in the United States District Court for the Northern District of California, San Francisco

8   Courthouse, Courtroom 7, 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102.

9      Plaintiff seeks an order to compel Netflix to comply with the Subpoena by immediately

10  producing all documents responsive to the Subpoena.

11      The motion is based on: (1) this Notice of Motion and Motion; (2) the following

12  Memorandum of Points and Authorities; (3) the accompanying Declaration of Christopher J. Major

13  ("Major Decl."); (4) the accompanying Declaration of Nicholas Ellison ("Ellison Decl."); (5) any

14  additional evidence and argument that may be presented to the Court prior to or at the hearing; and

15  (6) the pleadings, briefings, orders, and other materials appearing on the docket in this matter.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2

INTRODUCTION ..................................................................................................................1

3

STATEMENT OF ISSUES TO BE DECIDED ...................................................................2

4

FACTUAL BACKGROUND ...............................................................................................3

5

I.      LEGAL ARGUMENT ............................................................................................13

6

A.  Legal Standard.............................................................................................13

7

B.  Discovery From Netflix is Within the Scope of Phase I Discovery.........13

8

1.  The Temporal Scope of Phase 1 Discovery Extends Through 2012.................14

9

2.  Category 1: NGINX Source Code and Modules Used By Netflix (Request Nos.

10

3-7, 11-15, 18, 22-29) ..............................................................15

11

3.  Category 2: The Team's Work for Netflix (Request Nos. 1, 16-17).................18

12

4.  Category 3: Discovery Concerning NGINX, NGINX-Based Modules or

13

Extensions Provided to Netflix (Request Nos. 19-21, 30-31) ...........................19

14

5.  Category 4: Public Statements by Defendants or Netflix Concerning the Team's

15

Work For Netflix or Open Connect (Request Nos. 2, 8-10) .............................20

16

C.  The Discovery Lynwood Seeks Is Relevant and Proportional.................21

17

1.  Lynwood is Not Required to Exhaust Party Discovery.....................................21

18

2.  Netflix Has Not Sustained Its Burden to Demonstrate Undue Burden .............23

19

CONCLUSION ...................................................................................................................24

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Federation of Government Employees, AFL-CIO v. Trump*,
  2025 WL 2098628 (N.D. Cal. July 25, 2025) ............................................................... 19

*Apple, Inc. v. Samsung Elecs. Co.*,
  2013 WL 1942163 (N.D. Cal. May 9, 2013) ................................................................ 24

*Crump Inx. Servs., Inc. v. McGrath*, No. C,
  2008 WL 11388598 (N.D. Cal. Aug. 19, 2008) ........................................................... 20

*E.E.O.C. v. Ferrellgas, L.P.*,
  97 F.4th 338 (6th Cir. 2024) ........................................................................................ 24

*Evans v. DSW Inc.*,
  2017 WL 9480800 (C.D. Cal. Aug. 24, 2017) ............................................................. 20

*Genus Lifesciences Inc. v. Lannett Co., Inc.*,
  Case No. 18-cv-07603-WHO, 2019 WL 7313047 (N.D. Cal. Dec. 30, 2019) ........................... 23

*Gonzales v. Google, Inc.*,
  234 F.R.D. 674 (N.D. Cal. 2006) ................................................................................. 23

*In re Uber Technologies, Inc. Passenger Sexual Assault Litig.*,
  2024 WL 3416644 (N.D. Cal. July 14, 2024) .............................................................. 21

*Lang Van Inc. v. VMG Corp*,
  2019 WL 8107874 (C.D. Cal. May 28, 2019) .............................................................. 20

*Legal Voice v. Stormans Inc.*,
  738 F.3d 1178 (9th Cir. 2013) ..................................................................................... 24

*Lofton v. Verizon Wireless (VAW) LLC*,
  308 F.R.D. 276 (N.D. Cal. 2015) ........................................................................... 13, 20

*Sihler v. Microsoft Corp.*,
  2024 WL 5186927 (W.D. Wash. Dec. 20, 2024) ......................................................... 23

*Sullivan v. Personalized Media Comm., LLC*,
  2016 WL 5109994 (N.D. Cal. Sept. 21, 2016) ........................................................ 13, 23

*Thomas v. Cate*,
  715 F.Supp.2d 1012 (E.D. Cal. 2010) .......................................................................... 24

*Viacom Int'l, Inc. v. YouTube, Inc*,
    2008 WL 3876142 (N.D. Cal. Aug. 18, 2008) ........................................................................ 21, 23

Rules

Fed. R. Civ. P. 26 ........................................................................................................ 13, 21, 23

Fed. R. Civ. P. 45 ................................................................................................................. 13

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**INTRODUCTION**

3      Defendants willfully infringed on Lynwood's valuable copyrights in a popular software

4   program known as NGINX Plus.  NGINX Plus was conceived and developed by employees of a

5   Russian technology company, Rambler Internet Holding. LLC ("Rambler"), which subsequently

6   assigned its ownership rights to Lynwood.  The Rambler employees, Defendants Igor Sysoev

7   ("Sysoev"), Maxim Konovalov ("Konovalov"), and Gleb Smirnoff ("Smirnoff" and together the

8   "Disloyal Employees"), developed NGINX Plus as a work made for hire and it is owned by Rambler

9   under Russian law.  NGINX Plus is the commercial form of NGINX, an open source web server

10  program also developed by the Disloyal Employees while they were employed by Rambler ("Open

11  Source NGINX").  The Disloyal Employees developed NGINX Plus while employed by Rambler,

12  stole the software to start their own company called NGINX, and, in 2019, sold NGINX to Defendant

13  F5 Networks, Inc. ("F5") for $670 million dollars.

14      After the Ninth Circuit held that Lynwood has a claim for copyright infringement against

15  Defendants, the District Court (Chesney, J.) at the March 7, 2025 Case Management Conference

16  ("CMC"), mandated that the parties conduct discovery in phases.  The first phase ("Phase 1") is

17  designed to determine whether the Disloyal Employees developed and wrote the NGINX Plus code

18  while employed by Rambler.   The District Court explicitly recognized that Phase 1 discovery would

19  necessarily include non-parties, including Netflix specifically.

20      Netflix was the Disloyal Employees' first customer, in 2011, while they were still employed

21  by Rambler.  The Disloyal Employees marketed, serviced, explained, and delivered NGINX Plus

22  code to Netflix while the Disloyal Employees were still employed by Rambler.  Consequently,

23  Netflix is highly likely to possess critical documents (the "Netflix Documents") regarding the

24  Disloyal Employees' development and deployment of the NGINX Plus code while they were

25  employed by Rambler.  The requested Netflix Documents are likely to reveal that the Disloyal

26  Employees wrote the NGINX Plus software code while they were still employed by Rambler.

27

28

Despite the importance of the Netflix Documents, Netflix refuses to even search for responsive documents.

Lynwood requires the Netflix Documents as part of Phase 1 discovery to assist in proving that the Disloyal Employees developed NGINX Plus before the last Disloyal Employee, Smirnoff, left Rambler's employ in November 2012.  Lynwood served the Subpoena on Netflix, and is conducting party discovery in parallel, as explicitly sanctioned by the Court at the CMC.  Without the immediate production of the Netflix Documents, Plaintiff will be severely prejudiced in its efforts to take Phase 1 discovery, particularly in light of Defendants' ongoing stonewalling of party discovery, and given that Phase I is relatively short.  The Netflix Documents are key, and likely will lead to additional critical discovery.  Blocking production of the Netflix Documents until late in Phase 1 discovery will severely prejudice Lynwood.

Netflix seeks to conceal the Netflix Documents from Lynwood by parroting Defendants' unsupported position that Defendants' supposed production of their own NGINX Plus source code repository of "commits" is the only document Lynwood should receive.  However, the development or "commit" history reflected in the NGINX Plus source code stored in Defendants' current repository is not a reliable indicator of when the code was written or who wrote it.  When source code is "committed" (added to a code repository) does not in any way prove when that code was actually written.  Critically, the original development history was stored on the Rambler servers the Disloyal Employees used to develop NGINX Plus.  But the Disloyal Employees destroyed and removed those servers before the last Disloyal Employee (Smirnoff) left Rambler.  Defendants' spoliation of evidence means that Lynwood must obtain documents from third parties, most importantly Netflix.  To uncover the truth of what the Disloyal Employees developed while at Rambler, Lynwood must compare the NGINX Plus code stored in Defendants' code repository to the NGINX Plus code developed by the Disloyal Employees while employed by Rambler and used by Netflix beginning in 2011.  Accordingly, the Court should grant Lynwood's motion.

## STATEMENT OF ISSUES TO BE DECIDED

1. Are the Netflix Documents within the scope of Phase 1 discovery?

2. Can Lynwood obtain the Netflix Documents before completely exhausting party discovery?

2

1

**FACTUAL BACKGROUND**

2

**Overview of Lynwood's Action**

3          The Second Amended Complaint ("SAC") alleges that the Disloyal Employees (Sysoev,

4   Konovalov, and Smirnoff) used Rambler's resources and infrastructure to secretly incubate a

5   business based on the NGINX software they developed while employed at Rambler.  SAC, ¶¶123,

6   160-166.    Under Russian law, Rambler maintains the exclusive ownership rights to any software

7   developed by its employees, because it is deemed a work made for hire.  *Id.*, ¶¶183, 434.  Lynwood

8   was a corporate owner of Rambler during the relevant time, and is now the exclusive assignee from

9   Rambler of all right, title and interest in and to NGINX Plus, including the exclusive right to bring

10  this copyright infringement action.  *Id.*, ¶¶14, 35.

11         Sysoev was a software engineer at Rambler from November 14, 2000 until December 1,

12  2011.  *Id.*, ¶¶51, 93.  Sysoev's primary responsibility was solving technical problems.  *Id.*, ¶107.

13  Sysoev wrote the NGINX code in his role as a Rambler software engineer.  *Id.*, ¶¶107-108.

14         Sysoev worked in the Network Operations Center or "NOC" Department at Rambler, headed

15  by co-defendant and fellow Disloyal Employee Gleb Smirnoff.  *Id.*, ¶¶96, 149, 158.   Smirnoff was

16  employed at Rambler from September 21, 2006 until November 12, 2012.  *Id.*, ¶95.   Maxim

17  Konovalov was Rambler's Chief Technology Officer, and was employed at Rambler from March

18  18, 2008 until April 29, 2011.  *Id.*, ¶37.  Konovalov was Smirnoff's direct supervisor, and a member

19  of Rambler's senior management reporting directly to Rambler's CEO.  *Id.*, ¶¶38, 96, 157.

20         Sysoev (along with Smirnoff and Konovalov) wrote, developed, tested and improved NGINX

21  code while at Rambler using Rambler resources and infrastructure.  *Id.*, ¶¶123, 126.   During this

22  time, Sysoev released some of the NGINX code the Disloyal Employees wrote as open source

23  software, available for members of the public to use pursuant to the terms of a Berkeley Software

24  Distribution ("BSD") open source license beginning in 2004 ("Open Source NGINX").  *Id.*, ¶¶124-

25  126.  However, Sysoev held back other portions of the NGINX code, which he stockpiled on Rambler

26  laptops and servers and did not release as Open Source NGINX.  *Id.*, ¶¶127-128, 241- 247.

27         The Disloyal Employees intended the NGINX code that Sysoev stockpiled and withheld from

28  Open Source NGINX to become (and it ultimately became) the first commercial extensions of Open

3

Source NGINX, *i.e.*, NGINX Plus. *Id*., ¶¶150-153, 209-214. The Disloyal Employees' simultaneous development of NGINX code for Open Source NGINX and NGINX Plus was part of their "open core" business model, which centered on subscription-fee proprietary software product offerings with enhanced functionality on top of Open Source NGINX. *Id*., ¶¶11, 36, 150, 184-190, 209-210.

The Disloyal Employees conspired with Defendants Andrey Alexeev ("Alexeev") and Maxim Dounin ("Dounin"), who with the Disloyal Employees are collectively referred to as the "Team" in the SAC. *Id*., ¶¶36, 150. The Team planned and executed their common scheme to steal the NGINX code Sysoev stockpiled on Rambler's equipment and used this code to develop software to anchor the NGINX business they formed in 2011. *Id*. Between 2008 and the end of 2012, the Disloyal Employees and their conspirators built a loyal customer base for the free Open Source NGINX, with the NGINX brand and open-source software gaining a loyal following. *Id*., ¶¶150, 213. Once the stockpiled, non-open-source NGINX commercial code was sufficiently tested and vetted against numerous real-world settings – an environment that required Rambler's infrastructure and user base – the Team formed their companies (Defendants NGINX Inc. (BVI) and NGINX Software Inc.) and, in October 2011, the Team obtained their first venture capital seed investment. *Id*., ¶¶160, 169, 250, 260, 269-271, 474. Thereafter, the Disloyal Employees staggered their resignations from Rambler beginning with Konovalov on April 29, 2011, Sysoev on December 1, 2011, and Smirnoff on November 12, 2012. *Id*., ¶¶37, 93, 95.

In March 2019, F5 acquired NGINX Inc. (BVI) in a merger transaction valued at $670 million. *Id*., ¶8. Through their investigations, including forensically, Lynwood and Rambler discovered that the Disloyal Employees and their conspirators within Rambler and the NOC department tried to cover their tracks by destroying and removing all Rambler equipment that the Disloyal Employees used to develop NGINX Plus. *Id*., ¶¶152, 308-327.

**Discovery From Netflix is Relevant to Lynwood's Claims**

Netflix was the Team's first commercial customer for proprietary modules of NGINX that comprised NGINX Plus. SAC, ¶¶212-213. In September 2011, Netflix engaged the Team to develop the technology for Netflix's content delivery network (CDN), "Open Connect." *Id*., *see also* Major Decl. Ex. 5. Open Connect is Netflix's global network of servers that delivers Netflix's streaming

4

service to its subscribers.  Discovery related to the NGINX code provided to Netflix is relevant because the Disloyal Employees wrote this code, and/or controlled others who wrote this code, while employed by Rambler.

Lynwood's investigations have uncovered admissions by Defendants that by 2011, and while employed by Rambler, the Disloyal Employees developed and were already selling NGINX Plus modules to enterprise customers, most notably Netflix:

- In a November 27, 2019 interview, Konovalov admitted that "in 2011, we started to build commercial product, NGINX Plus, and started to sell it to enterprises and corporates."  SAC, Ex. B, pp.143-144 (7:24-8:9).

- In his October 2014, seminar, "Why Did Netflix Use NGINX and FreeBSD" (the "Netflix Presentation"), Smirnoff confirmed that the Team's work for Netflix in 2011 included the development of "custom modules…specific to video streaming," and that this "commercial software" was designed to work as "one piece of software" in combination with Open Source NGINX.  *See* Major Decl., Ex. 6 (10:13-19); SAC, ¶¶188, 221-227.

- In a December 1, 2011 interview, Alexeev stated that the Team was "currently producing" "paid products based on NGINX," *i.e.*, NGINX Plus, that "existing customers and partners…have been very clear…are worth paying for."  *See* Major Decl., Ex. 7.  This included the Team's "current[] produc[tion]" of "a set of valuable extensions for the CDN, hosting, cloud, [and] media and entertainment markets," a clear reference to Netflix.  *Id.*  Alexeev's interview is notable for the additional reason that December 1, 2011, was Sysoev's last day at Rambler, SAC, ¶91.  In other words, the "valuable" CDN extensions Alexeev admits were "currently" under production in 2011 and licensed to paying customers were developed while Sysoev was employed by Rambler.

- In his January 2012 email interview, Sysoev, through Alexeev, confirmed the Team's development of "the first proprietary extensions based on NGINX…[in] the area of CDN and media streaming acceleration," an obvious reference to Netflix.  *See* Major Decl., Ex. 8, p.4.

The Disloyal Employees' development of non-open-source, commercial NGINX software code and modules while they were employed by Rambler is further confirmed by the disclosures

1   made in the Team's 2010 and 2011 investor presentations.  For example, the Team's June 2010

2   investor presentation emphasized their "focus on Content Delivery Infrastructure," and disclosed the

3   Team's work on a "geo-aware and cache-driven Distributed NGINX CDN," designed around a

4   network of "custom-built servers." SAC, Ex. D, Slides 13 and 19 (pp.171 and 177).  Similarly, in

5   their March 2011 investor presentation, the Team highlighted "cdn interfaces," a "media/streaming

6   server," and related commercial extensions as key revenue drivers.  *Id.*, Ex. B (p.124).

7        A content delivery network (CDN) is a network of geographically distributed servers that

8   work together to accelerate the delivery of data-heavy content to end users, *e.g.*, streaming media.

9   The "NGINX CDN" the Team developed in 2010 and 2011 is precisely what the Team provided to

10  Netflix in 2011 and 2012 in exchange for fees, and is one of the first products Defendants formally

11  released under the name NGINX Plus in 2013.  A key feature of the NGINX CDN was a "pool of

12  NGINX custom-built servers," with each server pre-loaded with encoded chunks of high demand

13  content, known as "caches." SAC, Ex. D, Slide 13 (p. 171).  To optimize delivery, the Team designed

14  the NGINX CDN as an "edge CDN," meaning that the custom cache servers would be placed at the

15  "edges" of the network to place content as close to the end users as possible.  *Id.*, Slide 19 (p.177).

16       The NGINX CDN the Team developed in 2010 was the basis for Netflix's Open Connect

17  CDN.  Like the NGINX CDN, the Team designed Open Connect as a "specialized CDN" comprised

18  of a network of custom cache servers, known as Open Connect Appliances, that were "dedicated [to]

19  serving the video content to the Netflix customers." *See* Major Decl., Ex. 6 (6:24-7:3).  In the Netflix

20  Presentation, Smirnoff confirmed that the Open Connect Appliances developed, tested, and put into

21  initial production use in 2011 came loaded with "additional modules for NGINX," including the

22  Team's "custom modules…specific to video streaming."  *Id.*, (8:23-9:3; 10:12-19).  And like the

23  NGINX CDN, the Team designed Open Connect as an edge CDN "to spread [Netflix's] caches

24  throughout the internet, and put them close to clients."  *Id.*, (6:3-10).  By June 2012, when Netflix

25  first publicly announced Open Connect, the Open Connect Appliances "already serv[ed] about five

26  percent of the Netflix video traffic", i.e., 5 percent of what Netflix described as a billion hours per

27  month of video it was then streaming, or 50 million hours of video per month. *See* Major Decl., Ex.

28  5.  The commercial CDN and media streaming NGINX modules the Team developed in 2010-2011,

6

and deployed in 2011 to Netflix, were included as core NGINX Plus features when NGINX Plus was formally released in August 2013 as a "fully supported, commercial version of NGINX." *See* Major Decl. 9 (NGINX Plus release notes).   This includes the NGINX Plus modules for "[a]daptive media streaming" and CDN-related services. *Id.*

Indeed, Defendants still tout the advanced video streaming capabilities of NGINX Plus – the very functionality contained in the custom NGINX code delivered to Netflix in 2011. *See e.g.,* https://www.youtube.com/watch?v=xbFBjvUT-k0.  Defendant F5 currently promotes NGINX Plus on its website as follows: "You're building amazing applications.  We make sure they stay amazing. NGINX Plus is a complete application delivery platform that combines web serving, *load balancing, content caching, and media streaming* into one easy to deploy and manage package." (Emphasis added) https://www.f5.com/resources/videos/nginx-plus-product-video.

Netflix objects to producing any discovery and claims that all relevant discovery related to NGINX Plus, including the underlying source code and source code information, is with Defendants and stored on Defendants' source code repository. *See* Major Decl., Ex. 4, p.2.  This is false.  Netflix is in unique possession of the original NGINX Plus software developed by the Disloyal Employees while they were employed by Rambler.  In fact, Netflix may be the only source of the original code and development history, because the Disloyal Employees destroyed and removed all information, including development history information stored on Rambler equipment they used to develop NGINX Plus. SAC, ¶¶152, 308-327. Also, discovery from Netflix, including source code discovery, is necessitated due to Defendants' blanket refusal to search for responsive discovery stored on archived media or backup tapes, the most likely places where the NGINX Plus code that the Disloyal Employees developed through 2012 resides.  *See* Major Decl., Ex. 12 (Objection No.3), pp.2-3.

**Case Management Conference**

At the March 7, 2025 CMC, the Court addressed the discovery issues raised in the parties' Joint Case Management Statement.  Dkt. No. 210.  Defendants pressed for phased discovery, focusing Phase 1 on the creation of NGINX Plus code to determine if any was written by Sysoev or other former Rambler employees during their employment before the end of 2011. Dkt. No. 209,

p.12. Defendants also advocated for limiting Phase 1 to NGINX Plus source code in F5's repository and excluding communications with third parties. *See* Major Decl., Ex. 10 (10:13-20, 11:8-14).

Lynwood opposed Defendants' request because "the source code form of NGINX Plus alone is not sufficient to show whether NGINX Plus, or any portion thereof, or any code from which NGINX Plus is derived, was developed while any of the Defendants were still employed by Rambler." Dkt. No. 209, p.3. Lynwood emphasized the importance of third-party discovery, and specifically Netflix, because the NGINX software code stored on Netflix's network appliances, and later included as part of NGINX Plus, bears directly on the issue of when the code was written and by whom. *See* Major Decl., Ex. 10 (20:3-11).

The Court recognized the relevance of third-party discovery, including communications between Defendants and third parties. Major Decl., Ex. 10, (10:16-20; 29:18-23) ("You may want to talk to third parties and find out what defendant told them or gave them…"). The Court specifically recognized the relevance of Netflix Documents to demonstrate that the Disloyal Employees developed proprietary NGINX Plus code while they were employed by Rambler. *Id.*, 36:7-10.

At the conclusion of the CMC, the Court ordered phased discovery, with Phase 1 tied to the Disloyal Employees' dates of employment at Rambler and "limited to the issue of whether NGINX Plus code was written by either Sysoev or other former Rambler employees during their employment by Rambler." *Id.*, 36:10-14; Dkt. No. 211. Lynwood recognizes that the Court's Pretrial Preparation Order (the "Scheduling Order") identifies the "end of 2011" as the date that the Disloyal Employees left Rambler, but the date is incorrect. As the SAC alleges, the last Disloyal Employee, Smirnoff, remained at Rambler through November 2012. SAC, ¶¶95,97. In addition, the SAC pleads detailed allegations about Smirnoff's contributions to the development of NGINX Plus prior to his separation from Rambler on November 12, 2012. *Id.*, ¶¶183-185, 230-223, 237, 299, 310-312, 318, 321-323. As such, any NGINX-related code that Smirnoff wrote or tested leading up to his departure date in November 2012, either on his own or with the involvement of Sysoev, was owned exclusively by Rambler as works made for hire under Russian law. SAC, ¶¶99, 434-435. In all events, the Court repeatedly recognized that it would revisit limitations on discovery to the extent necessary as discovery progresses. Major Decl., Ex. 10, (33:10-16; 37:1-2)

**The Netflix Subpoena**

Lynwood served the Netflix Subpoena on June 10, 2025, including 31 requests:

1. All Documents and Communications concerning agreements, contracts and /or statements of work between Netflix and any of the Defendants.

2. All Documents and Communications concerning the subject matter of the following statement by Defendant F5 on the Web site located at URL https://www.f5.com/company/blog/nginx/microservices-at-netflix-architectural-best-practices#videos. "Netflix is a longtime user of NGINX Open Source and became the first customer of NGINX, Inc. after it incorporated in 2011. Indeed, Netflix chose NGINX as the heart of its delivery infrastructure, Open Connect, one of the largest content delivery networks (CDNs) in the world. With the ability to serve thousands, and sometimes millions, of requests per second, NGINX and NGINX Plus are optimal solutions for high performance HTTP delivery and enable companies like Netflix to offer high-quality digital experiences to millions of customers every day."

3. All Documents and Communications concerning software, Documentation, products, and/or work product provided to Netflix by any of the Defendants.

4. All Documents and Communications concerning any services (including software engineering, design, development, testing, implementation, maintenance and/or support services) provided to Netflix by any of the Defendants.

5. All Documents and Communications concerning the design and development of software for Netflix by any of the Defendants.

6. All Documents and Communications concerning consulting and/or development services provided by any of the Defendants to Netflix.

7. All Documents and Communications concerning software installed on the Netflix OpenConnect Appliance in 2010, 2011 and/or 2012.

8. All Documents and Communications concerning the following statement and/or the subject matter thereof made by Defendant NGINX, Inc. in the press release dated June 18, 2012 entitled "*Nginx, Inc. Consulted for Netflix "Open Connect" Initiative*" on the Web site

9

located at URL https://www.globenewswire.com/news-release/2012/06/18/952322/0/en/Nginx-Inc-Consulted-for-Netflix-Open-Connect-Initiative.html: "The work with Netflix included design, implementation and tuning of the NGINX Web server software and the underlying operating system as well as product technical support."

9.  All Documents and Communications concerning the following statement and/or the subject matter thereof made by Ken Florance, vice president of content delivery at Netflix, in the press release dated June 18, 2012 entitled "*Nginx, Inc. Consulted for Netflix "Open Connect" Initiative*" on the Web site located at URL https://www.globenewswire.com/news-release/2012/06/18/952322/0/en/Nginx-Inc-Consulted-for-Netflix-Open-Connect-Initiative.html:"We chose the NGINX Web server software because of its proven scalability and performance," said Ken Florance, vice president of content delivery at Netflix. "By working directly with the core engineering team at Nginx, Inc., we received great development support for our project."

10.  All Documents and Communications concerning the "development support" from NGINX, Inc. referenced by Ken Florance in the quotation included in Request No. 9, including, without limitation, all Communications with the "engineering team at Nginx, Inc.".

11.  All Documents and Communications concerning the "NGINX web server" and "custom modules" referenced on slide 9/28 of the Smirnoff Presentation.

12.  All "custom modules", in both source code and object code/executable code form, as referenced on slide 9/28 of the Smirnoff Presentation.

13.  All Documentation and/or work product concerning the "custom modules" referenced on slide 9/28 of the Smirnoff Presentation.

14.  All Documents and/or Communications concerning the "custom modules" referenced by Defendant Smirnoff in the Smirnoff Presentation as follows: "For the web server, no surprise, the best one is NGINX. Again, same arguments, it is fast and stable out of the box, and we wanted to launch OpenConnect as fast as possible…. What is also very

important for Netflix video streaming is the flexible framework for the custom modules, because we've got a couple of modules that are specific to video streaming."

15. All Documents and/or Communications concerning the "developers" referenced by Defendant Smirnoff in the Smirnoff Presentation as follows: "The OpenConnect Initiative started in 2011, and there were just two developers in the team. In June 2012, the first OpenConnect caches – the Open Connect was announced and the first OpenConnect caches started to serve. By this date, there were three developers in the team."

16. All invoices issued by any of the Defendants to Netflix.

17. Documents sufficient to show payments made by Netflix to any of the Defendants, including, without limitation, all Documents sufficient to show the reason for such payment and the services and/or products delivered by Defendants in consideration for such payments.

18. Documents sufficient to show all computer software installed by Netflix or its contractors or agents in 2010, 2011 and/or 2012 on the Netflix Open Connect Appliances.

19. All Communications between Netflix and any of the Defendants.

20. All Communications between Netflix and any of the following individuals: Ruslan Ermilov; Valentin Bartenev; Sergey Budnevich; and/or Andrey Belov.

21. All Communications between Netflix and any of the following individuals: Oleg Mamontov; Alexey Loginov; Fedor Dikarev; Anton Ermolaev; Alexander Postnikov; Konstantin Kukushkin; Konstantin Romanenko; Alexander Nikiforenko; Sergey Chesnokov; Victor Popov; and/or Stanislav Marimorich.

22. All computer software in both source code and object code form used by Netflix in connection with Open Connect that was developed by, or on behalf of, or with the assistance of, any of the Defendants.

23. All Documentation and Communications in 2010, 2011 and/or 2012 concerning Open Connect.

24. All Documents and Communications concerning Netflix's use of Open Source NGINX in 2010, 2011 and/or 2012.

11

25. All Documents and Communications concerning Netflix's use of extensions, derivations and/or customizations to Open Source NGINX in 2010, 2011 and/or 2012.

26. All Documents and Communications concerning Netflix's use of NGINX Plus in 2010, 2011 and/or 2012.

27. All Documentation concerning the design, development, testing and implementation of software provided by any of the Defendants for use with, or as part of, Netflix Open Connect.

28. All Documents and Communications with any of the Defendants concerning support provided by NGINX, Inc. or the other Defendants with respect to Open Connect, in 2010, 2011 and/or 2012.

29. All Documents and Communications concerning materials, resources, property, specifications and/or information provided by Netflix to any of the Defendants in connection with the development, testing and/or implementation of Open Connect in 2010, 2011 and/or 2012

30. All Communications with Defendants or their representatives at any time concerning the Action and/or the subject matter thereof.

31. All Communications with Defendants or their representatives at any time concerning the Second Amended Complaint and/or the subject matter thereof.

*See* Major Decl. Ex. 1. Netflix responded on June 24, 2025 and July 28, 2025 ("Response"), but did not provide individualized responses. *See* Major Decl., Exs. 2, 4.

Lynwood held two meet and confer conferences with Netflix's counsel, on July 16, 2025 and July 29, 2025, via Microsoft Teams. *See* Major Decl., ¶¶5-10. In total, the parties conferred for approximately two hours. *Id.*, ¶6. The parties discussed the scope of Lynwood's requests, Netflix's categories of objections, and whether the parties could resolve Netflix's objections without court action. *Id.*, ¶¶7-8. After discussing the parties' respective positions, the parties reached an impasse due to disagreement on threshold issues. *Id.*, ¶9. Specifically, Netflix asserts that Lynwood is not entitled to Phase I discovery from Netflix until Netflix is satisfied with Lynwood's efforts to obtain purportedly similar discovery from Defendants. *Id.*, ¶¶8-9. Lynwood disagreed with Netflix's position for four primary reasons: (1) the discovery Lynwood seeks falls squarely within Phase 1;

12

(2) the Federal Rules do not require that Lynwood exhaust party discovery before engaging in third-party discovery; (3) at the CMC, the Court expressly recognized that party and non-party discovery would proceed in parallel; and (4) the timeframe for Phase 1 discovery is short and Lynwood will be prejudiced by having to first wait on the Defendants to make a complete production (even assuming a complete production would or could even be made by the Defendants and verified by Lynwood). *Id.*, ¶8; Major Decl., Ex. 10 (11:16-22; 36:7-37:9). Despite acknowledging that the Federal Rules include no exhaustion requirement, Netflix confirmed its refusal to search for responsive discovery until Lynwood satisfied Netflix's "delta" precondition. *Id.*, ¶8.

## LEGAL ARGUMENT

### A. Legal Standard

The "scope of discovery through a Rule 45 subpoena is the same as the scope of discovery permitted under Rule 26(b)." *Sullivan v. Personalized Media Comm., LLC*, Case No. 16-mc-80183-MEJ, 2016 WL 5109994, at *2 (N.D. Cal. Sept. 21, 2016); *see also* Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970) ("the scope of discovery through a subpoena is the same as that applicable to Rule 34 and other discovery rules"). Federal Rule 26(b) allows a party to obtain discovery concerning any nonprivileged matter that is relevant and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). The party opposing disclosure bears the burden of showing that discovery should not be allowed, and of clarifying, explaining, and supporting its objections with competent evidence. *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 281 (N.D. Cal. 2015).

### B. Discovery From Netflix is Within the Scope of Phase I Discovery

The Netflix Documents concern the proprietary NGINX software modules the Disloyal Employees developed and delivered to Netflix while still employed by Rambler. The CDN-related modules and functionalities provided to Netflix were the Team's "first proprietary extensions based on NGINX," and were developed while the Disloyal Employees worked for Rambler, and today are part of NGINX Plus. *See* Major Decl., Ex. 8; SAC, ¶¶186-188.

The Subpoena seeks the following four categories of discovery: (1) the NGINX "custom" modules and related services provided by Defendants to Netflix (Request Nos. 3-7, 18, 22-29); (2) the scope of the Team's work for Netflix, including Netflix's contracts, statements of work, and

13

invoices with Defendants (Request Nos. 1, 16-17); (3) documents and communications concerning NGINX, including source code, software, or add-on extensions provided to Netflix, and this action (Request Nos. 19-21, 30-31); and (4) discovery related to the substance of public statements by Defendants or Netflix concerning the Team's work for Netflix, including Open Connect (Request Nos. 2, 8-15). *See* Major Decl., Ex. 1. Netflix blanketly objects to the above Requests as "unduly burdensome because they are premature" based on Netflix's theory that Lynwood must first make a "showing" of the "delta" between Defendants' documents and the discovery Lynwood seeks from Netflix. *Id.*, Ex. 3, p.1. Lynwood addresses Netflix's burden and exhaustion objection in Section C below. In this section, Lynwood addresses Netflix's relevance objections.

### 1. The Temporal Scope of Phase 1 Discovery Extends Through 2012

The temporal scope of Phase 1 discovery is tied to the Disloyal Employees' dates of employment with Rambler. Rambler's ownership rights (and by assignment those of Lynwood) in the NGINX Plus software depend on whether the code was written while the Disloyal Employees were employed by Rambler such that it was work made for hire. *See* Major Decl. Ex. 10 (33:5-17, 36:10-17). Smirnoff, the last Disloyal Employee to leave Rambler, worked at Rambler until November 12, 2012. SAC, ¶¶95, 97. While at Rambler, Smirnoff contributed to the development of NGINX Plus, and was a core member of the group that designed, developed, tested, and implemented the custom NGINX modules "specific to video streaming," which the Team provided to Netflix and incorporated into NGINX Plus. *Id.*, *e.g.*, ¶¶183-188, 220-223; *see also* Major Decl., Ex. 6 (10:15-19). Smirnoff later joined Netflix, where he "manages the customized and performance-optimized FreeBSD-based firmware for Open Connect." *See* Major Decl., Ex. 13, p.3; SAC, ¶222. Based on Smirnoff's dates of employment at Rambler, and his concurrent development of proprietary modules, and extensions offered as part of NGINX Plus, the scope of Phase 1 necessarily includes NGINX Plus code developed through November 2012.

Netflix asserts that the "cut-off date" for Phase 1 discovery is the end of 2011. *See* Major Decl., Ex. 4, p.7. However, the 2011 date is not the intended temporal scope for Phase 1. Rather, the intended temporal scope was to coincide with the departure date of the last Disloyal Employee to have contributed to the development of NGINX while at Rambler. *See* Major Decl. Ex. 10 (33:5-

14

17, 36:10-17).   The CMC transcript makes clear that the Court intended to include a date parameter defined by the Disloyal Employees' dates of employment with Rambler.  *See* Major Decl., Ex. 10 (25:20-26:4; 35:10-17).   The 2011 date discussed at the CMC referred only to the end date of Sysoev's development of NGINX Plus at Rambler, not all "other former Rambler employees," including Smirnoff.   *Id.*, 30:6-32:22.   Indeed, the "end of 2011" timeframe was suggested by Individual Defendants' counsel with explicit reference to only Sysoev.  *Id.*, 30:6-32:22.

The scope of Phase 1 discovery should include all dates for which the Disloyal Employees who contributed to NGINX Plus were employed by Rambler, *i.e.* through November 2012 when Smirnoff left Rambler.  Such a ruling would align with the Court's stated intent behind the Phase 1 scope of discovery.  *See* Major Decl. Ex. 10 (33:5-17, 36:10-17).

## 2.  Category 1: NGINX Source Code and Modules Used By Netflix (Request Nos. 3-7, 11-15, 18, 22-29)

The Category 1 Requests seek discovery related to the development, testing, and implementation of proprietary NGINX modules and extensions that Defendants provided to Netflix.  *See* Major Decl., Ex. 1.   Discovery concerning the Team's design, development, testing, or implementation of NGINX software for Netflix, including the "custom modules" of NGINX which Smirnoff confirmed the Team developed "specific to video streaming" in 2011 and 2012, are proper topics for Phase 1 discovery.  The requested documents will help Lynwood prove that the products and services provided to Netflix comprise NGINX Plus code developed while the Disloyal Employees were employed by Rambler.  *See* Major Decl., Ex. 6 (10:13-19).

Netflix objects to the Category 1 Requests, and repeats Defendants' contention that "[a]ll of the NGINX Plus code is in the NGINX Plus code repository" that F5 acquired in 2019.  *See* Major Decl., Ex. 4, p.2.  Netflix's reliance on Defendants' source code repository is misplaced.  Even if the code stored in Netflix's code repository mirrors the code found in Defendants' supposed repository, access to Defendants' source code repository is insufficient to identify when the code was written or by whom.  The Team's statements to Netflix about the code, and the code delivered to Netflix will be a reliable source of what code existed while the Disloyal Employees were still working for Rambler.  Moreover, if the custom NGINX code delivered to Netflix does mirror code in Defendants'

15

1   NGINX Plus code repository, it would conclusively establish that NGINX Plus code was developed

2   by the Team in 2011.

3         In software development, a "commit" contains the changes between versions of files, *e.g.*,

4   the addition or removal of lines of code, that exist in a source code repository, all of which are

5   managed by what is known as a "version control system." *See* Ellison Decl., ¶10(b). A commit may

6   also indicate that a file or directory has been added to the repository for the first time. *Id*. A commit

7   will also include a timestamp (the "commit date") and the "author" of the commit. *Id*.

8         Both Netflix and Defendants rely heavily on the commit dates of the NGINX Plus code stored

9   in Defendants' repository, but as illustrated below, commit dates are an unreliable method to

10  determine when the code in Defendants' repository was actually written or by whom. *See* Major

11  Decl., Ex.10 (4:8-9, 5:3-11).

12        By way of analogy, a brief filed on PACER is signed by counsel of record and is stamped

13  with the date of filing, but this information is insufficient to determine when the brief was written,

14  the number of prior drafts in existence, or the person(s) who wrote or contributed to the brief.

15  Similarly, the proprietary NGINX code, modules, and extensions the Team provided to Netflix

16  contain essential information, in original form, that will allow Lynwood to prove that the NGINX

17  products and services the Team provided to Netflix became incorporated into NGINX Plus.

18  Defendants argue that the only way Lynwood can prove its copyright infringement claim is by

19  comparing the NGINX Plus code stored on Defendants' repository against source code developed

20  by the Disloyal Employees while they were at Rambler. *See* Major Decl., 10 (17:18-22). However,

21  as explained above, because the Disloyal Employees destroyed, deleted, or removed every Rambler

22  server they used to develop NGINX Plus, Netflix may be the only source of the original NGINX

23  Plus code that Defendants contend is necessary for Lynwood to prove infringement.

24        Also, when developing software, a developer chooses which files or directories to include

25  when committing to a repository, and when to commit code to a repository. *See* Ellison Decl., ¶14(a).

26  Developers can work on source code without committing or "pushing" the code to the repository,

27  which is what happened here. *Id*. Lynwood alleges that beginning in 2009, the Disloyal Employees

28  used Rambler as an incubator for their "open core" business to develop proprietary, commercial

NGINX code, software, and modules later released as NGINX Plus.  SAC, ¶123.  While the Disloyal Employees were employed at Rambler, Sysoev selectively deployed portions of the code to release as open source NGINX.  *Id*.  Sysoev withheld material portions of the code for Defendants' later commercial use, including NGINX Plus.  *Id*.  Thus, the commit information in the source code are not reliable to analyze the Disloyal Employees' development of NGINX Plus.

In addition to withholding code, commit dates are unreliable because they are easily manipulated.  *See* Ellison Decl., ¶¶13-14.  When code is migrated between different version control systems or different repositories, there is a significant chance that the existing commit information will be affected unless steps are taken in advance to preserve the existing data. *Id*., ¶14(b).  Also, when files committed to a repository are later transferred to another computer the original timestamps do not transfer, meaning that the original timestamps may be lost through the migration process.  *Id*. Moreover, certain version control systems explicitly allow commit information modifications at the time of commit, and a user who wishes to manipulate a timestamp can achieve this simply by changing the clock settings on the device being used.  *Id*., ¶14(c)-(d).  Thus, the Disloyal Employees could easily manipulate commit date records to make it appear that NGINX Plus code was committed years after being written simply by changing the clock settings.  *Id*.

Netflix speculates that the Team did not write code for Netflix or Open Connect, but only provided "[s]ervices…to help Netflix write its own code."  *See* Major Decl., Ex. 4, p.6.  Netflix's objection is belied by Defendants' contemporaneous statements from 2011 and 2012, including Alexeev's December 1, 2011, admission that the Team was "currently producing a set of valuable extensions for the CDN, hosting, cloud, media and entertainment markets."  *Id*., Ex. 6, p.3. Alexeev's admission, made in the present tense, stands in stark contrast to Defendants' statement at the CMC that the extensions the Team provided to Netflix in 2011 and 2012 "wasn't even code." *Id*., Ex. 9 (16:2-3).  It also directly contradicts Konovalov's public admission that by 2011, the Team was already selling NGINX Plus modules to paying customers. SAC, ¶209, Ex. C (8:6-9) (p.144).

Netflix also objects to the Category 1 Requests on the basis that Lynwood's request for discovery related to the "design and development" of "software" exceeds the scope of Phase 1 discovery.  *See* Major Decl., Ex. 4, p.5.  Netflix's contention that Phase 1 discovery is limited to the

17

production and review of source code misapprehends the Court's orders including the Pretrial Preparation Order.  *Id.*  The Court expressly recognized the relevance of information in Netflix's possession that may show the Disloyal Employees' development of NGINX Plus code while they were employed at Rambler.  *See* Major Decl., Ex. 10 (36:7-10).  Nowhere in either the CMC transcript or the Scheduling Order did the Court indicate that Phase 1 discovery was limited to reviewing NGINX Plus source code in the possession of Defendants.  Indeed, Defendants concede that "discovery regarding the development" of the NGINX Plus code is within the scope of Phase 1 discovery.  *Id.*, 10:13-20 ("We're not saying all they can see is the source code and commit dates").  Netflix's restrictive view of Phase 1 discovery is wrong.

### 3.  Category 2: The Team's Work for Netflix (Request Nos. 1, 16-17)

The Category 2 Requests are relevant to Lynwood's allegations that the non-open source NGINX code modules developed while the Disloyal Employees were at Rambler, and later included as part of NGINX Plus, included the proprietary NGINX modules which the Team provided to Netflix in 2011 and 2012.  SAC, ¶¶186-188, 201, 211-228.  Lynwood's allegations are supported by Defendants' admissions related to the Team's development and sale of NGINX Plus modules in 2011.  This includes Smirnoff's admission that "Open Connect started in 2011," and his statement that when Netflix engaged the Team in September 2011, it did so to take advantage of the Team's "custom modules…that are specific to video streaming."  *See* Major Decl., Ex. 10 (10:13-19)), Ex. 10 (Slide 35).  Discovery related to Netflix's agreements, statements of work, and invoices with Defendants, and Netflix's payments to Defendants, and all related communications, are probative to identifying and comparing the NGINX proprietary software developed through 2012.

Netflix contends that the Category 2 Requests fall outside of Phase 1 discovery because documents concerning "contracts or agreements" with Defendants and "invoices and payments made by Netflix to Defendants" are unrelated to "who wrote the code at issue."  *See* Major Decl., Ex. 4, pp.3-4.  Contrary to Netflix's contention, the timing and scope of software development services and related work product which the Team provided to Netflix, including the resulting NGINX custom modules, bears directly on "the issue of whether NGINX Plus code was written by either Sysoev or other former Rambler employees during their employment by Rambler."  *Id.*, Ex. 9 (36:12-17).

18

1    Moreover, the requested discovery is relevant to test Defendants' assertion at the CMC that "[o]ur

2    folks know that their very first customer was not until late 2011," a clear reference to Netflix, and

3    "that none of that code was anything that was ever used in NGINX Plus.  It wasn't even code,

4    actually, it was a totally different kind of project."  *See* Major Decl., Ex. 10 (15:25-16:3).

5    Defendants' statements at the CMC are inconsistent with the Team's prior admissions concerning

6    their development and sale of NGINX Plus modules in 2011, and highlights why Lynwood is

7    "entitled to discovery relevant to [its] claims rather than simply taking defendants' word for it."

8    *American Federation of Government Employees, AFL-CIO v. Trump*, Case No. 25-cv-03698-SI,

9    2025 WL 2098628, at *3 (N.D. Cal. July 25, 2025) (denying motion for a protective order or to

10   quash" plaintiff's document requests).

11          **4.  Category 3:  Discovery Concerning NGINX, NGINX-Based Modules or**

12               **Extensions Provided to Netflix (Request Nos. 19-21, 30-31)**

13         The Category 3 Requests seek documents and communications related to Defendants

14   admitted 2011 development, production, and sale of "paid products based on NGINX."  *See* Major

15   Decl., Ex. 7, p.3.  Documents and communications related to Defendants' work for Netflix, and

16   Netflix's communications with Defendants and non-party conspirators are probative to who

17   developed the proprietary NGINX code, modules, and extensions provided to Netflix, and what

18   NGINX-based software code Netflix received.  This is the type of third-party discovery the Court

19   knew would be encompassed in Phase 1.  *Id.*, 10:16-20; 29:18-23 ("You may want to talk to third

20   parties and find out what defendant told them or gave them…..").   The Category 3 Requests are

21   proper to contest Defendants' contention that the products and services provided to Netflix "wasn't

22   even code" or that "none of [the] code" provided to Netflix "was anything that was ever used in

23   NGINX Plus."  *See* Major Decl., Ex. 10 (15:25-16:3).  Discovery reflecting what the Team delivered

24   to Netflix provides the critical link between what the Disloyal Employees developed while employed

25   by Rambler and what was later released by Defendants as NGINX Plus.

26         Netflix contends that the "Requests would sweep up communications that have nothing to do

27   with NGINX" or "any product or service offered by Netflix to users," but Netflix's purported

28   concerns are speculative and easily addressed through search terms.  *See* Major Decl., Ex. 4, p.8.

19

The speculative nature of Netflix's objections is evidenced by Netflix's confirmation during the parties' meet and confer that Netflix has made no effort to search for or collect responsive documents. *See* Major Decl., ¶¶4-10.  Netflix's speculation is insufficient to sustain its burden to identify "competent evidence" to further delay discovery.  *Lofton*, 308 F.R.D. at 281.

### 5. Category 4: Public Statements by Defendants or Netflix Concerning the Team's Work For Netflix or Open Connect (Request Nos. 2, 8-10)

Category 4 Requests seek discovery related to the content of public statements by Defendants and Netflix concerning the commercial NGINX-based code, products, and services Defendants provided to Netflix in 2011 and 2012, including for Open Connect.   Netflix's contention that statements made by Netflix or Defendants "after the 'end of 2011'…have no bearing on who owns the code or who wrote it" misapprehends the scope of discovery permitted under the Federal Rules, and seeks to impose an artificial time limit. *See* Major Decl. 4, p. 7.  Under the Federal Rules, relevance is "construed liberally and with common sense," and "discovery should be allowed unless the information sought has no conceivable bearing on the case."  *Evans v. DSW Inc.*, CV-16-3791-JGB (SPx), 2017 WL 9480800, at *2 (C.D. Cal. Aug. 24, 2017) (internal quotations omitted).

Regardless of date of creation, Lynwood is entitled to discovery related to Defendants' and Netflix's public statements concerning NGINX code and modules developed while the Disloyal Employees were employed by Rambler.  Responsive discovery is not shielded from production simply because a document or communication may have been made or created after the Disloyal Employees left Rambler. *See Crump Inx. Servs., Inc. v. McGrath*, No. C 07-4636 MMC, 2008 WL 11388598, at *3 (N.D. Cal. Aug. 19, 2008) (documents and communications created after a former employee left the company may be responsive insofar as the discovery concerns or discusses the underlying claim for theft and misappropriation of trade secrets).  The relevant inquiry is not the date of creation, but whether the discovery "bear[s] upon the relevant timeframe," *i.e.*, while the Disloyal Employees were employed by Rambler.  *Lang Van Inc. v. VMG Corp*, Case No. 8:14-cv-00100-AG (JDEx), 2019 WL 8107874, at *6 (C.D. Cal. May 28, 2019); Dkt. No. 211.  The Category 4 Requests are narrowly targeted at public statements related to proprietary NGNIX software developed and delivered to Netflix while the Disloyal Employees were employed by Rambler.

20

1

2

### C.  The Discovery Lynwood Seeks Is Relevant and Proportional

#### 1.  Lynwood is Not Required to Exhaust Party Discovery

Netflix's global objection that the Subpoena is "unduly burdensome" and "premature" because Lynwood must first obtain party discovery, misapprehends the scope of discovery authorized under the Federal Rules and ignores the procedural posture of this action.  *See* Major Decl. Ex. 4, p.1.  Federal Rule 45 "does not require that a requesting party exhaust party discovery before seeking discovery from a nonparty," and there is "no general rule that plaintiffs cannot seek nonparty discovery of documents" even if the discovery is "likely to be in defendants' possession." *In re Uber Technologies, Inc. Passenger Sexual Assault Litig*., 2024 WL 3416644, *3 (N.D. Cal. July 14, 2024) (denying motions to quash or stay enforcement of plaintiff's third-party subpoena).

Netflix refuses to take the first step of searching for responsive documents until Lynwood identifies the precise "delta…between documents in the possession, custody, or control of Parties to the litigation and documents it is seeking from Netflix" *See* Major Decl. Ex. 4, p.1.  While Netflix claims it is not imposing an exhaustion requirement, Netflix's "delta" precondition necessarily requires Lynwood to complete party discovery.  Courts have rejected identical exhaustion arguments "even though the documents are likely to be in possession of defendants."  *Viacom Int'l, Inc. v. YouTube, Inc*, No. C 08-80129 SL, 2008 WL 3876142, at *3 (N.D. Cal. Aug. 18, 2008) (compelling production by non-party venture capital investors without requiring exhaustion of party discovery).

The proper inquiry is not the purported "delta" between the discovery in Defendants' and Netflix's possession, custody, or control, but is whether the scope of discovery Lynwood seeks is proportional to the needs of the action.  Fed. R. Civ. P. 26(b).  Proportionality takes into account "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).  Each of the above factors weighs in Lynwood's favor.

This action concerns Defendants' infringement of Lynwood's exclusive copyright rights in NGINX Plus code written and developed by the Disloyal Employees while employed by Rambler, and their use of Rambler's resources and infrastructure to develop, test, and implement the stolen

21

NGINX Plus software code to start their own company, which they and their co-conspirators sold to F5 in 2019 for $670 million.  SAC, ¶¶2-8.  Netflix was the Team's first customer and the recipient of the Team's "first proprietary extensions based on NGINX…[in] the area[s] of CDN and media streaming acceleration."  *See* Major Decl., Ex. 8, p.4.  Netflix's possession of relevant discovery is supported by Defendants' admissions, including Konovalov's admission that "in 2011, we started to build commercial product, NGINX Plus," and Alexeev's December 1, 2011 admission that the Team was "currently producing" "paid products based on NGINX," specifically "a set of valuable extensions for CDN…[and the] media and entertainment markets."  SAC, Ex. B, (7:24-8:9) (pp.143-144); Major Decl., Ex. 7, p.3.  The proprietary NGINX software modules the Team provided to Netflix constitutes core Phase 1 discovery.  *See* Major Decl. Ex. 10 (36:10-14); Dkt. No. 211.

Lynwood will be severely prejudiced if Netflix is permitted to withhold or delay the production of responsive discovery.  At Defendants' request, the Court issued a compressed bifurcated discovery schedule, with Phase 1 discovery set to end on March 19, 2026.  Dkt. No. 211.  Netflix's manufactured "delta" precondition is an attempt to obstruct discovery to deprive Lynwood of critical discovery during Phase 1. *See Slovin v. CallFire, Inc.*, Case No. CV 17-mc-00091 DMG (JEMx) (rejecting non-party's argument that plaintiffs were "obliged to obtain the requested documents from Defendants in the underlying action…because Defendants have been uncooperative in and obstructive to Plaintiffs' discovery and the information necessary to Plaintiffs' case").  Netflix should not be allowed to run out the clock by conditioning its search for, and production of, responsive discovery on Lynwood's exhaustion of party discovery.

Moreover, immediate discovery from Netflix is appropriate because, as discussed above, the NGINX Plus code currently stored on F5's code repository is insufficient to answer the broader question of the historical development of the NGINX Plus software code, and because the Disloyal Employees and their conspirators within Rambler removed or destroyed evidence of the original NGINX Plus software code developed with Rambler's resources and infrastructure.  *See* SAC, ¶¶152, 308-327.  This includes Smirnoff's coordinated effort to remove, delete, or destroy all servers used to develop commercial NGINX code between September 2011, when Netflix engaged the Team to build Open Connect, and November 2012, when Smirnoff left Rambler.  *Id*., ¶318.  As a result of the

22

Disloyal Employees' spoliation of evidence, Netflix may be the exclusive custodian of the original NGINX Plus software code provided to Netflix.  Compelling Netflix's compliance with the Subpoena is consistent with the principle that non-party discovery is appropriate where "there is reason to believe that the files of the third party may contain different versions of documents, additional material, or perhaps, significant omissions." *Viacom*, 2008 WL 3876142, at *3.

### 2.  Netflix Has Not Sustained Its Burden to Demonstrate Undue Burden

As for burden, Netflix cannot evade discovery by simply claiming undue burden, it must "allege specific facts which indicate the nature and extent of the burden…by affidavit or other reliable evidence." *Sullivan*, 2016 WL 5109994, at *3.  This is because the "party claiming undue burden or expense ordinarily has far better information – perhaps the only information – with respect to that part of the determination." Fed. R. Civ. P. 26(b)(1), Adv. Comm.'s Note (2015).  The mere fact that party discovery remains ongoing, or that a portion of the discovery Lynwood seeks from Netflix may also be in Defendants' possession, does not automatically render the Subpoena unduly burdensome. *See Viacom*, 2008 WL 3876142, at *3.

Netflix cites the general proposition that non-parties are differently situated than parties. However, not all non-parties are the same. *See* Major Decl. Ex. 4, p.1.  Burden assessments are a comparative exercise that weighs "the relevance of the discovery sought" and "the requesting party's need" for the discovery against "the potential hardship to the party subject to the subpoena." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006).   Even among non-parties "what is unduly burdensome to a small business with a handful of employees may not be unduly burdensome to a Fortune 500 company." *See Sihler v. Microsoft Corp.*, Case No. 2:24-mc-00062-TL, 2024 WL 5186927, at *3 (W.D. Wash. Dec. 20, 2024).  Netflix cites *Genus Lifesciences Inc. v. Lannett Co., Inc.*, Case No. 18-cv-07603-WHO, 2019 WL 7313047 (N.D. Cal. Dec. 30, 2019) to support its burden and exhaustion arguments, but *Genus* concerned an individual's motion to quash a non-party subpoena.  Netflix equates its compliance burden to the burden imposed on an individual, but Netflix is a Fortune 500 company.[1]  At the CMC, the Court recognized the absurdity of Netflix citing undue

---

[1]  In 2025, Netflix ranked 116 on the Fortune 500 list with $38 billion in revenue and over $8 billion in profits. https://us500.com/fortune-500-companies#google_vignette

1    burden as a basis to avoid engaging in multiple rounds of discovery. *See* Major Decl., Ex. 10 (CMC

2    Tr.) 35:3-6 and 36:7-10; 34:15-19 (Court: "What about [Netflix]? They have lots of money….I'm

3    not going to feel sorry for Netflix"). Netflix is not in the same position as an individual non-party.

4    It can and should produce the requested discovery.

5        Netflix cannot simply claim burden; it must provide "some metric of *how significant* that

6    time and effort is," such as "why, relative to [its] size, the compliance cost and effort 'unduly

7    disrupt[ed] or seriously hinder[ed] normal operations.'" *E.E.O.C. v. Ferrellgas, L.P.*, 97 F.4th 338,

8    350 (6th Cir. 2024) (emphasis in original). Netflix confirmed that it has not searched for or collected

9    discovery responsive to the Subpoena and will not until Lynwood satisfies Netflix's "delta"

10   precondition. *See* Major Decl. ¶¶4-10. Netflix's refusal to make any effort to identify responsive

11   discovery renders its claim of undue burden purely speculative. As for software code, Netflix raises

12   purported logistical and expense concerns, but "[m]erely pointing out that compliance with the

13   subpoena will divert employee attention from ordinary tasks is insufficient – if that were enough then

14   nearly every…subpoena would fail." *Ferrellgas,* 97 F.4th at 350.

15       As for costs, even if some portion of the costs are determined to be an undue burden, Netflix's

16   remedy is to request cost-shifting, not to refuse to engage in discovery. *See Legal Voice v. Stormans*

17   *Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013). Netflix's status as a third party does not excuse it from

18   complying with an otherwise valid subpoena or "confer [it] a right to obfuscation or obstinacy." *See*

19   *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-0630-LHK (PSG), 2013 WL 1942163, at *3 (N.D.

20   Cal. May 9, 2013). Netflix's failure to identify an evidentiary basis to support its speculative claim

21   of undue burden fails. *See Thomas v. Cate*, 715 F.Supp.2d 1012, 1032 (E.D. Cal. 2010) ("an

22   objecting party must specifically establish the nature of any alleged burden, usually by affidavit or

23   other reliable evidence").

24                               **CONCLUSION**

25       For the reasons stated above, Lynwood respectfully requests that the Court compel Netflix

26   to immediately comply in full with the Subpoena.

27

28

1
DATED: August 29, 2025

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: /s/  Alexander D. Pencu
(Admitted *Pro Hac Vice*)
MEISTER SEELIG & FEIN PLLC
125 Park Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 655-3500

WARREN KASH WARREN, LLP
2261 Market Street, No. 606
San Francisco, California 94114
Telephone: (415) 895-2940
Facsimile: (415) 895-2964

*Attorneys for Plaintiff Hemma Investments CY*

*Limited f/k/a Lynwood Investments CY Limited*

PLAINTIFF'S MOTION TO COMPEL NETFLIX, INC.
TO COMPLY WITH PLAINTIFF'S SUBPOENA

Case No. 3:20-CV-03778