Alexander D. Pencu (pro hac vice)
adp@msf-law.com
Christopher J. Major (pro hac vice)
cjm@msf-law.com
Jeffrey P. Weingart (pro hac vice)
jpw@msf-law.com
MEISTER SEELIG & FEIN PLLC
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

Patricia L. Peden (State Bar No. 206440)
DeMarcus B. T. Williams (State Bar No. 329756)
WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
20-3778@cases.warrenllp.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| LYNWOOD INVESTMENTS CY LIMITED,<br><br>   Plaintiff,<br><br>v.<br><br>MAXIM KONOVALOV, IGOR SYSOEV, ANDREY ALEXEEV, MAXIM DOUNIN, GLEB SMIRNOFF, ANGUS ROBERTSON, NGINX, INC. (BVI), NGINX SOFTWARE, INC., NGINX, INC. (DE), BV NGINX, LLC, RUNA CAPITAL, INC., EVENTURE CAPITAL PARTNERS II LLC and F5 NETWORKS, INC.,<br><br>   Defendants. | Case No. 3:20-cv-03778-MMC<br><br>**JOINT DISCOVERY LETTER #2 RE: PRODUCTION OF OBJECT CODE** |

In accordance with paragraph 14 of Magistrate Judge Westmore's Standing Order, the parties respectfully submit the attached joint letter addressing whether object code should be produced directly to Plaintiff and designated under the Protective Order's "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" designation, or made available for inspection under the Protective Order's procedures for "HIGHLY CONFIDENTIAL – SOURCE CODE" designation.

The parties engaged in two video conference meet and confer sessions and have adhered to Section 9 of the Northern District's Guidelines for Professional Conduct regarding discovery before submitting this joint letter. Lead trial counsel for both parties held a video conference meet and confer session on January 29, 2026. During this conference, the parties agreed that they had reached an impasse and further agreed to submit the dispute to the Court for resolution.

Dated: February 5, 2026                Respectfully submitted,

                                         _/s/ Patricia L. Peden_
Alexander D. Pencu (pro hac vice)
adp@msf-law.com
Christopher J. Major (pro hac vice)
cjm@msf-law.com
Jeffrey P. Weingart (pro hac vice)
jpw@msf-law.com
MEISTER SEELIG & FEIN PLLC
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

Patricia L. Peden (State Bar No. 206440)
DeMarcus B. T. Williams (State Bar No. 329756)

WARREN LLP

20-3778@cases.warrenllp.com
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

*Attorneys for Plaintiff*

Dated: February 5, 2026                 _/s/ Eric C. Pai_
Eric C. Pai (CA SBN 247604)
MORRISON & FOERSTER LLP

– 2 –                Case No. 3:20-cv-03778-MMC
JOINT DISCOVERY LETTER

755 Page Mill Road, CA 94304-1018
Telephone: (650) 813-5600
Facsimile: (650) 494-0792
EPai@mofo.com

Benjamin J. Fox (CA SBN 193374)
Mark D. Marciszewski (CA SBN 344240)
Andrew Q. Nguyen (CA SBN 357744)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: (213) 892-5200
Facsimile: (213) 892-5454
BFox@mofo.com; MMarciszewski@mofo.com;
AndrewNguyen@mofo.com

*Attorneys for Defendants*
F5 Networks, Inc., NGINX, Inc. (BVI),
and NGINX Software, Inc.

Dated: February 5, 2026

 /s/ Shane Brun
Shane Brun (CA SBN 179079)
Samuel R. Diamant (CA SBN 288738)
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, California 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
sbrun@kslaw.com; sdiamant@kslaw.com

Bruce W. Baber (*Admitted pro hac vice*)
Ellen Y. Min (*Admitted pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30303-1763
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
bbaber@kslaw.com; emin@kslaw.com

*Attorneys for Defendants*
Maxim Konovalov, Igor Sysoev,
Andrey Alexeev, Gleb Smirnoff,
Maxim Dounin and Angus Robertson

### Plaintiff's Position: Object Code Must Be Produced

The question presented is whether F5 can rely on a Protective Order ("PO") provision that is explicitly limited to "source code" to refuse to produce "object code" that Lynwood needs to establish the fundamental case facts: Who wrote the NGINX Plus code, and when.

Defendants' NGINX Plus takes two forms: source code and object code; they are fundamentally distinct, differing in form, readability, and function. *Beijing Meishe Network Tech. Co. v. TikTok Inc.*, 2025 WL 2522377, at *13 (N.D. Cal. Sept. 2, 2025); *Syntek Semi. Co. v. Micro. Tech. Inc.*, 307 F.3d 775, 779 (9th Cir. 2002). Source code is human-readable code; "a high level language that people can readily understand." *Id.* Object code is the machine language form of a program that the computer executes. Unlike source code, object code does not raise the same confidentiality concerns. Indeed, courts have ordered object code produced. *Roller Bearing Co. of Am. v. Am. Software, Inc.*, 2010 WL 11566393 at *2 (D. Conn. Feb. 4, 2010); *3DO Co. v. Poptop Soft. Inc.*, 1998 WL 962202, at *7 (N.D. Cal. Oct. 27, 1998); *Custom Hardware Eng'g & Consult., Inc. v. Dowell*, 2011 WL 6260440, at *1 (E.D. Mo. Dec. 15, 2011).

**F5 Widely Distributes its Object Code, Yet it Refuses to Produce it to Lynwood**

F5 distributes NGINX Plus in object code form to thousands of customers around the world under terms less restrictive than the PO. This practice is widespread in the software industry because of the fundamental differences between source code and object code. Source code can be understood and easily misappropriated by humans. In contrast, object code is binary code that is not easily read or understood by humans, requiring specialized engineering for modification, and is much harder to steal. Producing compiled NGINX object code to Lynwood's experts, subject to the protections of the PO, poses less risk to F5 than its customary business practice.

F5's end-user license agreement ("EULA") does not prohibit all disassembly and decompilation, as F5 claims below. The EULA permits limited reverse engineering upon notice. https://cdn.studio.f5.com/files/k6fem79d/production/3c537bcb617360b3bb6e1fe3e483a55b576ed5f4.pdf at 3(e)(3). The concession is mandated by copyright law. 17 U.S.C. § 1201(f). The Ninth Circuit has allowed reverse engineering of object code for restricted purposes. *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1518 (9th Cir. 1992), *as amended* (disassembly of object code is fair use if needed to access elements for which the copier has a legitimate reason for access); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) (reverse engineering to access unprotected functional elements permitted). Lynwood is not a competitor or a participant in the software marketplace. Therefore, there is no justification to impose stricter object code access requirements on Lynwood than are permitted by law and the EULA. The PO strictly limits Lynwood's attorneys and experts to using the object code solely for this litigation. These protections, along with the Court's sanctioning authority, offer a much stronger enforcement mechanism than is found in F5's business practices.

**The Protective Order Assumes Production of Object Code**

The source code provisions in the PO do not apply to object code. The PO's text specifically limits the "HIGHLY CONFIDENTIAL–**SOURCE CODE**" designation to "source code" and closely related materials, not to all software generally. Dkt. No. 260  2.9.  Section 2.9 lists items that constitute the classic source-code categories: "computer code and associated comments and revision histories, formulas, engineering specifications, or schematics . . ." *Id.*  Section 8(a) reiterates the scope, stating that "to the extent production of *source code* becomes necessary," a

producing party may designate "*source code*" as "HIGHLY CONFIDENTIAL–*SOURCE CODE*." Id.   8(a). There is no parallel on-site inspection clause for object code.

Object Code is properly designated as "Highly Confidential–Attorneys' Eyes Only"; a designation that is sufficiently protective without requiring an inspection room. Access is strictly limited to outside counsel and experts subject to a notice and objection process. Use of the object code is strictly limited to this litigation, covering all copies and derivatives. Confidentiality survives the case, requiring return of materials upon final disposition. Judicial sanctions provide a strong deterrent against misuse. F5's recent production of 43,068 pages was entirely designated "HIGHLY CONFIDENTIAL SOURCE CODE." F5 *produced* these alleged source code materials, rather than offering them for inspection, confirming the PO's safeguards are sufficient and conceding that the designation alone is not a valid basis for refusing production.

F5's argument that source and object code are the "same computer code" is incorrect and irrelevant. Lynwood does not dispute that source code and object code are two representations of the same computer program for copyright purposes; indeed, *Syntek* says exactly that. Lynwood's argument is that because those two representations differ markedly in form, readability, and misuse risk–as *Syntek* explains–the PO's inspection protocol does not extend to object code.

F5 misrepresents Lynwood's August 26 letter, which addressed using object code to recreate source code if it was unavailable. F5 claims to have all source code, eliminating the need to use object code to recreate it. Lynwood is not attempting to circumvent the PO's safeguards for source code. The PO already allows Lynwood access to the source code–it has no need for circumvention. Moreover, as Lynwood's experts would explain to the Court, decompilation does not create a perfect copy of the source code; the resulting output is merely a functional map, not a true rendition of the underlying source code. To address F5's concerns, however, Lynwood agrees to limit access to disclosed experts who are permitted access to the source code. Any source code snippets revealed during evaluation are permissible, as the PO allows Lynwood's experts to receive copies of source code.

**Production of Object Code is Required; Inspection is Insufficient**

Lynwood needs object code to uncover development details not available from the source code. F5's over-designation of every document it has produced as HC-Source Code, and refusal to produce object code have hindered Lynwood's efforts to prepare for a meaningful source code inspection, explaining why no inspection has yet occurred. Production of the object code is essential here for at least three reasons:

**Forensic Artifacts and Dating:** Object code contains independent forensic artifacts—such as build signatures, compiler choices, linked libraries, and timestamps—that are critical to determining when the code was written and by whom. The Court previously acknowledged there are meritorious questions regarding the authenticity and probative value of the F5 Defendants' source code commit history. *See* Dkt. No. 228 at 8, 20-23; Dkt. No. 229 at 2-6; Dkt. No. 252 at 9-10. The object code must be made available for full lab analysis to answer this core question.

**Functional Behavior and Infringement Analysis:** A dynamic analysis of object code is required to understand the software's true function, which a static source code review cannot provide. For example, a symbol like "*" in source code is inert text; its functionality is only revealed when the object code executes and that code is moved and processed. Evaluating this dynamic, operating object code requires specialized, iterative, tool-based examination, including

disassembly, decompilation, pattern matching, and correlation with external artifacts. This technical testing is time-consuming, demanding repeated access, tool re-running (including upfront configuration), and result verification over time–all of which are not feasible on a restrictive, visit-only review with limited ability to retain intermediate outputs for further study.

**Critical Evidence is Missing**: On January 29th, Lynwood learned that F5 lacks custodial files for key former Rambler employees who wrote the central code, some of whom are defendants in this case and former F5 employees. These developers frequently emailed code, and their missing emails would have helped reconstruct development timelines. The missing emails make a thorough evaluation of the object code essential.

To determine the true development timeline for NGINX Plus, Lynwood's experts must undertake a complex and time-intensive analysis of the object code, which could involve over 1,000,000 lines of code and require 30-40 man-days of effort across 6 to 8 machines. The analysis necessitates an extensive manual effort from a team of analysts, involving the iterative review of large object code sets. Conducting this analysis in a law firm's conference room is impractical because the inspection requires specialized programs with extra modules or configuration files from a network that cannot be employed in an offline setting.  Such an analysis can only be conducted by Lynwood's experts in a secure, fully equipped laboratory environment. F5's assertions to the contrary are without merit and should be accorded no weight. Lynwood's experts can explain the steps necessary to answer the core Phase 1 software development questions, either in sworn declarations or through testimony at an under-oath hearing.

**Defendants' Position:  Object Code Is Available for Inspection Under the Protective Order**

The Protective Order entered in this case recognizes that "computer code" is entitled to special protection and provides specific procedures for its inspection.  The Order does not distinguish between source code and object code, which are simply two forms of the same computer code.  These "computer code" provisions of the Protective Order—which are based on this District's Model Protective Order and to which Lynwood agreed—resolve this dispute in F5's favor.  Lynwood never sought to modify these provisions during the parties' lengthy negotiations and prior motion practice over the Protective Order.  It cannot now rewrite the Protective Order.

Lynwood's belated demand that object code be carved out and produced directly seeks to make an end-run around the Protective Order's protections for computer code.  Lynwood admits that it intends to "decompile and/or reverse engineer" the object code *to derive the source code*.  (Letter from Lynwood dated 8/26/2025.)  Thus, giving Lynwood direct, unsupervised possession of the object code would allow Lynwood to avoid the inspection procedures for source code as well as object code.  It would risk compromising F5's software product and prejudice F5 by allowing Lynwood to recreate, modify, and use F5's proprietary code without F5's knowledge.

Lynwood has no basis for its assertion that inspection of source code and object code would be insufficient—the code has been available to Lynwood since January 5, shortly after the Protective Order issued, yet Lynwood has not bothered to inspect it.  Lynwood has not even identified any software tools it wishes to use on the inspection computer.  It also has not disclosed an expert under the Order's requirements for expert access to Highly Confidential information.  The parties' dispute over the accessibility and use of computer code is not ripe.

**The Protections of Section 2.9 and Section 8 of the Protective Order Apply to Object Code**

Section 2.9 of the Protective Order defines "HIGHLY CONFIDENTIAL – SOURCE CODE"

("HC-SC") as "extremely sensitive 'Confidential Information or Items' representing *computer code* . . . disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means." (ECF No. 262 (emphasis added).) This definition does not exclude object code, limit the category to source code only, or create different treatment for object code. Rather, by its plain language, "*computer code*" subject to the HC-SC provisions includes both source code and object code.

The Protective Order's use of "HIGHLY CONFIDENTIAL – SOURCE CODE" as a shorthand for this category does not change what its definition includes. Section 2.9 includes materials that are not code or software at all, such as "engineering specifications" and "schematics that define or otherwise describe in detail the algorithms or structure of software or *hardware designs*." The Protective Order's plain language contradicts Lynwood's arbitrary exclusion of object code.

Lynwood's arguments also run afoul of the procedures in Section 8 of the Protective Order. Lynwood argues that it should be allowed to decompile object code into source code as it pleases in its own facilities because it is permitted to receive copies of source code for further review. But Section 8 only permits Lynwood to request "*paper copies* of *limited portions* of source code that are reasonably necessary for the preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial"—it expressly prohibits "convert[ing] any of the information contained in the paper copies into any electronic format." While Lynwood argues that it needs to use software tools to analyze the object code, it ignores the provisions in Section 8 that allow Lynwood to request reasonable "preinstallation and use on the inspection computer" of "specifically identified software tools" for review. Lynwood has not done so.

Lynwood cites no case interpreting this District's Model Protective Order or any similar three-tier protective order to exclude object code from the highest tier. None of Lynwood's cited cases hold that only source code may be inspected and object code produced directly. If anything, Lynwood's cited cases address source code and object code together, and support F5's position that the two forms of code be treated the same, consistent with the Order's plain language.

**Object Code and Source Code Constitute the Same Computer Code**

Lynwood does not dispute that object code and source code constitute the same computer program. "The U.S. Copyright Office views source code and object code as two representations of the same work." *Laatz v. Zazzle, Inc.*, No. 22-cv-4844, 2025 WL 1359130, at *23 (N.D. Cal. May 9, 2025); *see GCA Corp. v. Chance*, No. C-82-1063, 1982 WL 1281, at *2 (N.D. Cal. Aug. 31, 1982) (source code and object code "are to be treated as one work"); *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 779 (9th Cir. 2002) (recognizing that object code is compiled source code, but silent as to "misuse risk," as Lynwood wrongly suggests).

Because object code can be decompiled into the source code for the same computer program, Lynwood's demand for unrestricted possession—and its admission that it seeks possession specifically to decompile and alter it—violate the letter and purpose of the Protective Order's inspection procedures. Indeed, Lynwood told Defendants that it believes that the object code "reflects the existence of uncompiled source code forms of such software" and that it seeks to "decompile and/or reverse engineer available run-time forms" to derive the allegedly uncompiled source code. (Letter from Lynwood counsel dated 8/26/2025.) Lynwood's stated objective of manipulating and decompiling object code and thus "reverse engineering" F5's code outside the Protective Order's safeguards underscores that object code is subject to the same "substantial risk of serious harm" as source code, and that F5 is entitled to apply HC-SC protections.

**<u>Lynwood Cannot Show That Inspection of the Code Is Insufficient</u>**

Lynwood's claims that inspection of the code is unworkable or insufficient are pure speculation. First, to date Lynwood has declined to inspect any of the code. Lynwood previously represented in court that the commit dates in the source code would resolve the Phase 1 issue in this case. *See Lynwood Ins. CY Ltd. v. Konovalov*, Appellant's Brief at 59 (9th Cir. 2024) ("Simply look at the date of the 'code commits,' or finalized portions of code, and isolate those that occurred before Sysoev left Rambler."). Lynwood has not bothered to take this key investigative step. Its arguments about the volume of code and time needed to review it are without any factual basis.

Second, the Protective Order's inspection procedures allow Lynwood to request reasonable "preinstallation and use on the inspection computer" of "specifically identified software tools" for review. Again, Lynwood has not identified any tools or requested their installation.

Third, any dispute over email production is not ripe and Lynwood's speculation regarding what any developers "frequently" did does not warrant modifying inspection procedures for computer code. F5 has produced more than 43,000 pages from development repositories (known as Jira and Wiki) which, in addition to source code, are the best evidence of the development history of NGINX Plus. (Contrary to Lynwood's argument, these productions do not present the same risk of disassembly and recreation of source code.) The parties are discussing email production, which are supplemental, at best, to Defendants' core document productions. None of these discussions implicates a need for direct production of object code.

Fourth, F5 does not make its object code available for customers without restriction, as Lynwood argues. Under F5's End User License Agreement ("EULA"), customers shall not disassemble, decompile, reverse engineer, or otherwise derive or attempt to derive NGINX Plus source code. Lynwood's arguments concerning fair use copyright principles relevant to infringement of object code say nothing about the designation of computer code under the Protective Order. *See, e.g., Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) (addressing fair use where defendant's computer game did not contain any of plaintiff's copyrighted code). Yet Lynwood seeks to employ experts to take steps that are expressly prohibited by F5's EULA.[1]

Finally, Lynwood's technical arguments concerning potential uses of object code are unsupported and at best speculation. Any search for "forensic artifacts"—whether in source code or object code—can be performed by Lynwood's experts on the computer that F5 has made available for inspection. And any "infringement analysis" that Lynwood might perform (which would be limited during Phase 1 to whether any code was written by a Rambler employee before 2012) would also not require access to F5's code outside of the Order's HC-SC process.

Lynwood should follow the inspection procedures it agreed to, and the Court entered, in the Protective Order. These procedures were based on this District's Model Protective Order to ensure sufficient protection for computer code while allowing an inspecting party to obtain the information it needs. F5 is prepared to work with Lynwood to accommodate Lynwood's review on a computer (or computers) at F5's counsel's office. But Lynwood has no basis for demanding revisions to the Protective Order's procedures or obtaining the production of object code directly.

---

[1] F5's EULA prohibits reverse engineering "except for interoperability purposes"—a narrow exception that does not permit what Lynwood seeks to do here. The EULA's restrictions on object code fall squarely within F5's legitimate interests in safeguarding its proprietary code.